UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| ERIC GILBERT, Derivatively on Behalf of ALTRIA GROUP, INC. | ) ) ) | Case No.   3:20-cv-722 |
| Plaintiff, | ) ) | |
| vs. | ) ) | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF |
| WILLIAM F. GIFFORD, JR., HOWARD A. WILLARD III, KEVIN C. CROSTHWAITE, JR., JOHN T. CASTEEN III, DINYAR S. DEVITRE, THOMAS F. FARRELL II, DEBRA J. KELLY-ENNIS, W. LEO KIELY III, KATHRYN B. MCQUADE, GEORGE MUNOZ, MARK E. NEWMAN, NABIL Y. SAKKAB, VIRGINIA E. SHANKS, ADAM BOWEN, JAMES MONSEES, KEVIN BURNS, and JUUL LABS, INC. | ) ) ) ) ) ) ) ) ) ) ) ) ) | FIDUCIARY DUTY, UNJUST ENRICHMENT AND AIDING AND ABETTING BREACH OF FIDUCIARY DUTY |
| Defendants, | ) ) ) | **JURY TRIAL DEMANDED** |
| -and- | ) ) ) | |
| ALTRIA GROUP, INC., a Virginia Corporation, | ) ) ) ) | |
| Nominal Defendant. | ) ) | |

## I.     NATURE OF THE ACTION

1.     This is a shareholder derivative action on behalf of nominal defendant Altria Group, Inc. ("Altria" or the "Company") to protect and preserve its valuable claims for breaches of fiduciary duties, unjust enrichment, damages and other relief against certain current and former officers and directors of Altria, and certain current and former officers of JUUL Labs, Inc. (hereafter "JUUL" or "JLI").

2.     Plaintiff's allegations are based upon Plaintiff's counsel's investigation, except as to the allegations pertaining to Plaintiff, which are based upon personal knowledge. Plaintiff's counsel's investigation included, among other things, review and analysis of: (i) Altria's public filings with the SEC; (ii) transcripts of Altria's conference calls with analysts and investors; (iii) presentations, press releases, and reports concerning Altria and JLI; (iv) news and media reports concerning Altria, JLI and other facts related to the Action; (v) documents, testimony and other facts presented at the July 24 and 25, 2019 hearing before the House Committee on Oversight and Reform: "Examining JUUL's Role in the Youth  Nicotine Epidemic"; (vi) litigation involving JLI and Altria filed by, among others, various State Attorneys General; and (vii) scientific studies concerning e-cigarettes, vaping, JUUL, Altria, nicotine and vaping-related illnesses. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.     INTRODUCTION

3.     Altria is a traditional tobacco and cigarette company. JUUL is a tech-startup which pioneered and popularized e-cigarettes or vaping. JUUL's primary product is a vaporizer (or vape pen") and nicotine "pods" (which are a liquid filled cartridge used in the vape pen). JUUL's device is in substance a technological nicotine delivery system distinctly different from smoking a

cigarette. Both Altria and JUUL exist to provide addictive and dangerous products to consumers. Because so many tobacco users die of smoking-related illnesses, including cancers, both businesses future success depends on hooking new generations of young users.

4.      JUUL saw a meteoric rise between 2017-2019. JUUL's success was fueled by its popularity among underage users. JUUL claims that it has never targeted, and will never target, underage users. JUUL's actions, however, make this declaration little more than lip service. JUUL designed and promoted youth-oriented advertisements (some of which are displayed below) which are eerily similar to youth-oriented historic tobacco ads. JUUL placed these ads in media such as Cartoon Network and nickjr.com, mediums which cater to and are focused on youths. JUUL also heavily promoted fruity flavored vape cartridges. JUUL utilized social media that made JUUL's products so popular among teenagers that it turned JUUL into a verb (vaping a JUUL became known as "Juuling"). JUUL also de-emphasized nicotine in its marketing, despite the fact that JUUL actually placed more nicotine into its products than it disclosed, so that each JUUL pod contained far more nicotine delivered far more quickly than its claimed equivalent to a pack of cigarettes.

5.      Altria, owner of the country's dominant brand of cigarettes, Marlboro, was facing an existential crisis due to historically declining smoking rates, particularly among underage users. Altria knew that its traditional cigarettes were declining year by year, and that its ability to preserve its revenues by raising prices was beginning to wane. Given these realities and the success of companies like JUUL, Altria unsuccessfully attempted to enter the e-cigarette/vaping market and compete directly with JUUL, but failed. By 2018, despite spending hundreds of millions of dollars on products and advertising, Altria had only between a 4% to 11% share of the vaping market. Having failed to create its own popular e-cigarette electronic nicotine delivery system ("ENDS")

in-house, it desperately sought to acquire – or at least partner with – another company with more success in the field.

6.     The obvious candidate was JUUL, which, by 2018, had more than 70% of the e-cigarette market. However, JUUL refused to be acquired and its chief negotiators, Chief Executive Officer ("CEO") Kevin Burns ("Burns") and JUUL Board members Nicholas Pritzker ("Pritzker") and Riaz Valani ("Valani"), insisted on Altria's exit from the e-cigarette market and a commitment to not compete in that space as a non-negotiable condition to any kind of deal.

7.     Altria's chief negotiators and architects for a JUUL deal, then-CEO Howard Willard ("Willard"), then-Chief Financial Officer ("CFO") William F. Gifford ("Gifford"), and then-Chief Growth Officer Kevin C. Crosthwaite ("Crosthwaite") eventually agreed, and more importantly, also agreed to provide cross-marketing for JUUL, give JUUL the premium retail space Altria had previously reserved for itself, and a license to Altria's own e-cigarette intellectual property. On December 20, 2018, Altria announced that it invested $12.8 billion in JUUL, financing the transaction by doubling Altria's debt, for a 35% stake that valued JUUL at $38 billion. According to a March 23, 2019 *Wall Street Journal* article, Willard told employees that a bold change was necessary, that smokers were switching to vaping, and Altria's attempt to compete in the e-cigarette market was unlikely to ever catch up to JUUL.

8.     As part of Altria's investment, Altria issued JUUL a $2 billion payment that JUUL distributed as bonuses to its employees. Altria made this investment in JUUL despite the fact that throughout 2018, JUUL had become subject to increasing public scrutiny, regulatory actions, and civil lawsuits over its marketing toward youth and its misleading claims about safety and its nicotine content. With this investment, Altria was committing to marketing and distributing JUUL products, thus exposing Altria to the same reputational harm and legal liability.

9.     Defendants Willard, Gifford and Crosthwaite became enthusiastic emissaries for JUUL, with Crosthwaite sitting on JUUL's board as a non-voting observer from Altria. Via Crosthwaite, Altria gained full access to JUUL's proprietary business information, including JUUL's business and marketing strategies.

10.     Altria's investment in JUUL almost immediately faced significant problems. In the summer of 2019, an epidemic of vaping illnesses swept the country, leading to thousands of hospitalizations and at least 68 deaths. These vaping illnesses, although not exclusively connected to JUUL's products, drew increased scrutiny into and a dramatic growth in lawsuits against JUUL as the vaping market leader. As of February 18, 2020, a total of 2,807 hospitalized E-cigarette, or Vaping, Product Use Associated Lung Injury illnesses ("EVALI") cases or deaths have been reported to the Centers for Disease Control ("CDC") from all 50 states, the District of Columbia, and two U.S. territories (Puerto Rico and U.S. Virgin Islands).

11.     Given the magnitude of the health crisis, existing regulatory actions picked up momentum, including a Congressional investigation and lawsuits by several state attorneys general. Many of the key claims in the initial set of lawsuits have survived motions to dismiss. Likewise, the CDC continues to investigate the causes of vaping-related illnesses and current research faults vitamin-E acetate, a common additive in e-cigarette products, as a likely culprit.

12.     JUUL's reaction to the increased scrutiny, however, actually allowed for greater coordination and collusion between JUUL and Altria. Defendant Crosthwaite became JUUL's CEO at the end of September 2019, and Altria's JUUL Board observer became Gifford, who in April 2020 became Altria's CEO. Altria's chief regulatory officer, Joseph Murillo ("Murillo") joined JUUL as chief regulatory officer.

13.     Altria faces numerous lawsuits based on the events of the past few years, including

a securities fraud lawsuit in this District brought by Altria investors (the "Securities Action"), an antitrust action brought by the Federal Trade Commission ("FTC") which seeks to unwind Altria's JUUL investment (the "FTC Action"), and private antitrust suits brought against Altria and JUUL. The FTC Action alleges, among other things, that Altria and JUUL entered into a series of agreements which eliminated competition, in violation of federal law.

14.     Similarly, JUUL is also facing numerous lawsuits and regulatory scrutiny. On June 13, 2019, the U.S. House of Representatives launched an investigation into JUUL, looking into JUUL's business deal with Altria, social media and advertising practices, and communications. The investigation was spearheaded by Illinois Rep. Raja Krishnamoorthi, Chairman of the Oversight Subcommittee on Economic and Consumer Policy. The subcommittee found that "Juul appears to be violating FDA regulations against making unapproved express and implied claims that its product helps users stop smoking cigarettes and is safer than cigarettes." Given Altria's significant investment in JUUL, these lawsuits, investigations and events are relevant to this derivative action.

15.     Meanwhile, in addition to increased exposure to liability, Altria has also suffered from JUUL's declining businesses. In October 2019, Altria wrote down $4.5 billion of its JUUL investment. On January 30, 2020, Altria announced a second write-down of $4.1 billion. These accounting charges total $8.6 billion, reflecting a loss of 67% of Altria's investment in JUUL less than two years after it was made.

16.     All of these risks were well-known to Altria's officers when they negotiated and completed the JUUL transaction at the time of the deal, a fact that Altria admits in its defenses to other lawsuits. Yet Altria's officers went ahead with those transactions anyway, despite the risks. Importantly, Altria's Board of Directors (the "Board") failed to disclose these known risks to Altria

stockholders. There is also strong evidence that Altria's officers not only went ahead with a risky transaction but actively colluded with JUUL and its officers and directors to assist in JUUL's illegal marketing and misrepresentations as to its safety and nicotine content, as well as engaged in anticompetitive conduct in violation of federal law.

17.     For all these reasons, Plaintiff made a demand pursuant to Virginia law on Altria's Board (the "Demand") to investigate the events described herein (and in Plaintiff's Demand, attached hereto as Ex. A). Plaintiff's Demand has been ignored by Altria's Board. Thus, Plaintiff brings this Action against certain Altria directors and officers for breaching their fiduciary duties to Altria, as well as JUUL and certain of its directors and officers, for their role in aiding and abetting those breaches.

### III.   JURISDICTION AND VENUE

18.     This Court has jurisdiction over all claims pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     This Court has jurisdiction over each Defendant because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this jurisdiction so as to render the exercise of jurisdiction by this court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the acts and practices complained of herein occurred in this District, and the Company conducts

business in and maintains executive offices in this District.

21. In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## IV. PARTIES

**Plaintiff**

22. Plaintiff Eric Gilbert is a current owner of Altria common stock and has continuously owned Altria common stock since 2016. Plaintiff is a citizen of Florida.

**Nominal Defendant**

23. Altria is a Virginia corporation with its principal place of business in Richmond, Virginia.

**The Individual Defendants**

24. Defendant William F. Gifford ("Gifford") has been Altria's Chairman and CEO since 2018. Willard also serves on Altria's Board. Upon information and belief, Willard is a citizen of Virginia.

25. Defendant Howard Willard ("Willard") is the former Chairman and CEO of Altria. Willard announced his retirement on effective April 14, 2020.

26. Defendant Dinyar S. Devitre ("Devitre") serves on Altria's Board. Upon information and belief, Devitre is a citizen of New York.

27. Defendant Thomas F. Farrell II ("Farrell") serves on Altria's Board. Upon information and belief, Farrell is a citizen of Virginia.

28. Defendant Debra J. Kelly-Ennis ("Kelly-Ennis") serves on Altria's Board. Upon

information and belief, Kelly-Ennis is a citizen of Canada.

29. Defendant W. Leo Kiely III ("Kiely") serves on Altria's Board. Upon information and belief, Kiely is a citizen of Illinois.

30. Defendant Kathryn B. McQuade ("McQuade") serves on Altria's Board. Upon information and belief, McQuade is a citizen of Nevada.

31. Defendant George Munoz ("Munoz") serves on Altria's Board. Upon information and belief, Munoz is a citizen of Illinois.

32. Defendant John T. Casteen ("Casteen") serves on Altria's Board. Upon information and belief, Casteen is a citizen of Virginia.

33. Defendant Mark E. Newman ("Newman") serves on Altria's Board. Upon information and belief, Newman is a citizen of Delaware.

34. Defendant Nabil Y. Sakkab ("Sakkab") serves on Altria's Board. Upon information and belief, Sakka is a citizen of Nevada.

35. Defendant Virginia E. Shanks ("Shanks") serves on Altria's Board. Upon information and belief, Shanks is a citizen of Nevada.

36. Defendant Adam Bowen ("Bowen") is a co-founder of JUUL, serving as a member of the Board of Directors of JUUL and serving as the Chief Technology Officer of JUUL through October 2019 (thereafter transitioning to an advisory role assisting JUUL's CEO). Upon information and belief, defendant Bowen is a citizen of California.

37. Defendant James Monsees ("Monsees") is a co-founder of JUUL, serving as the Chief Product Officer of JUUL through October 2019 (thereafter transitioning to an advisory role assisting JUUL's CEO), and serving as member of the Board of Directors of JUUL until March 2020. Upon information and belief, Monsees is a citizen of California.

38.     Defendant Kevin Burns ("Burns") was the CEO of JUUL from December 2017 to September 2019. Upon information and belief, Burns is a citizen of California.

39.     Defendant Kevin C. Crosthwaite ("Crosthwaite") is the current CEO of JUUL. Crosthwaite served as an observer on JUUL's Board of Directors after Altria's investment in JUUL (and at that time was a senior executive of Altria). Upon information and belief, defendant Crosthwaite is a citizen of California.

40.     Defendants Casteen, Devitre, Farrell, Kelly-Ennis, Kiely, McQuade, Munoz, Newman, Sakkab, Shanks and Gifford are sometimes referred to herein as the "Board".

41.     Defendants Casteen, Devitre, Farrell, Kelly-Ennis, Kiely, McQuade, Munoz, Newman, Sakkab, Shanks, Willard, Gifford and Crosthwaite are sometimes referred to herein as the "Individual Defendants".

42.     Defendants Bowen, Monsees and Burns are sometimes referred to herein collectively as the "JUUL Individual Defendants," and with JLI, as the "JLI Defendants."

**JUUL**

43.     JUUL Labs, Inc. ("JLI") is a Delaware corporation with its principal place of business in Washington, D.C.

## V.     THE INDIVIDUAL DEFENDANTS' DUTIES

44.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as

to benefit all shareholders equally and not in furtherance of their personal interests or benefit. Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

45.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

46.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

47.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

    a)  manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

    b)  neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

    c)  establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d) neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business,

g) to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

h) ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

i) remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

48. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the

Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining Individual Defendants.

## VI.   SUBSTANTIVE ALLEGATIONS

### A.   History and Operations of Altria and JUUL

49.   Altria was founded in 1919 and is headquartered in Richmond, Virginia. The Company, through its subsidiaries, manufactures and sells cigarettes, smokeless products, and wine in the United States.

50.   Altria offers, among other products and services, combustible cigarettes, under the Marlboro, Virginia Slims and Parliament brands; cigars, principally under the Black & Mild brand; and moist smokeless tobacco products under the Copenhagen, Skoal, Red Seal, and Husky brands.

51.   JUUL is an American electronic cigarette company. JUUL sells the JUUL e-cigarette (or e-vaporizer), which packages nicotine salts from leaf tobacco into one-time use cartridges or "pods" that are heated and the resulting vapor is inhaled. The JUUL e-cigarette system is comprised of three parts: (1) the JUUL e-cigarette device, (2) the JUULpod (with e-liquid), and (3) the Universal Serial Bus [USB] charger (collectively referred to herein as "JUUL"). The JUUL e-cigarette device is a thin, sleek rectangular e-cigarette device consisting of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. JLI manufactures and distributes JUULpods that contain liquid that includes nicotine, flavoring

and other additives. Each JUULpod is a plastic enclosure containing 0.7 milliliters of JLI's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUULpod, the battery in the JUUL e-cigarette device activates the heating element, which in turn converts the nicotine solution in the JUULpod into a vapor consisting of nicotine, benzoic acid, glycerin, and propylene glycol along with myriad chemical flavorings and other chemicals, many of which are recognized as toxic.

### B.   Altria's History of Marketing to Young People and Misleading the Public as to the Dangers of Its Products

52.     For decades, Altria and the other behemoths of the U.S. tobacco industry, often referred to as "Big Tobacco," made billions of dollars through aggressive marketing campaigns in film, television, and print that failed to warn of the harmful effects of nicotine and cigarettes. This marketing campaign created the false impression that e-cigarettes were safe, yet left millions of Americans unwittingly addicted to nicotine, caused hundreds of thousands of deaths and illnesses due to lung cancer, lung disease and cardiovascular issues, and led to immeasurable human suffering.

53.     Since the true dangers of nicotine and smoking cigarettes came to light, Big Tobacco has faced decades of litigation over its advertising practices, including its ad campaigns targeting youth and its failure to adequately warn of the dangers associated with smoking cigarettes. Much of this litigation culminated in 1998, when 46 state attorneys general entered into the Tobacco Master Settlement Agreement ("MSA"). The MSA prohibits Altria and the other major cigarette companies from marketing and advertising their products to youth (ages 18 years old and younger) and setting forth specific acts prohibited (such as use of cartoon characters and billboards near school grounds).

54.     Beginning in the 1980s, Big Tobacco developed new, fruity flavors with matching

bright advertisements to attract young, impressionable consumers, who were unaware of the addictive, poisonous effects of cigarettes. In 2006, the United States Department of Justice reached a separate settlement with Altria and the other major cigarette companies that prohibited them from selling flavored cigarettes (excluding menthol); and required them to issue corrective statements explaining that cigarettes are not safe and were designed to create and sustain addiction.

55.     The MSA contains several provisions designed specifically to prevent tobacco marketing that targets youth. The first provision sets out a general prohibition on "any action, directly or indirectly, to target Youth . . . in the advertising, promotion or marketing of Tobacco Products." Subsequent provisions prohibit specific actions such as utilizing cartoons, sponsoring certain music or sporting events, advertising on billboards or on public transportation, using paid product placement in media, creating and distributing tobacco brand-name merchandise, distributing free samples, and providing gifts to youth in exchange for proofs of purchase, rewards points, or coupons.

56.     In August 2006, a federal judge found the major cigarette makers guilty of civil fraud and racketeering, saying the government had proven their participation in a decades-long conspiracy to deceive the public about the risks of smoking in order to sustain their profits. The court ruled that Altria and the tobacco industry engaged in a decades-long racketeering enterprise that conspired to hide the dangers of smoking.

57.     The judge wrote: "Over the course of more than 50 years, defendants lied, misrepresented, and deceived the American public, including smokers and the young people they avidly sought as 'replacement smokers,' about the devastating health effects of smoking and environmental tobacco smoke."

58.     "They suppressed research, they destroyed documents, they manipulated the use

of nicotine so as to increase and perpetuate addiction, they distorted the truth about low-tar and light cigarettes so as to discourage smokers from quitting, and they abused the legal system in order to achieve their goal -- to make money with little, if any, regard for individual suffering, soaring health costs, or the integrity of the legal system," the court concluded.

59.     Citing internal industry documents, the court found that the industry knew that nicotine was addictive, but publicly denied it "and continue(s) to do so." In addition, the court found that the companies "concealed and suppressed research data and other evidence that nicotine is addictive," adding that the companies "have falsely denied that they can and do control the level of nicotine delivered in order to create and sustain addiction" and worked on ensuring that "all cigarettes delivered doses of nicotine adequate to create and sustain addiction." They do so, the court concluded, by altering the chemical form of nicotine delivered in smoke and by changing cigarette filters' design and paper porosity and composition.

60.     The court specifically faulted the industry for marketing to youth, concluding that "independent studies have found that marketing is a substantial contributing factor to youth smoking initiation." Despite the tobacco industry asserting that it does not want children to smoke, the court found that the companies tracked youth behavior and preferences, thereby ensuring that "marketing and promotion reaches youth."

61.     In addition, the court stated, the companies continued to use marketing themes intended to resonate among youths, advertise in youth-oriented publications and continue price promotions that lure young people to their products. The court also found that the companies' purported youth smoking prevention programs were "not designed to effectively prevent youth smoking."

62.     The implementation of the MSA's marketing restrictions in the late 1990s,

combined with public health and public policy efforts inspired or funded by the MSA, disclosure of documents relating to Big Tobacco's wrongdoing, and subsequent litigation enforcing the MSA, contributed to dramatic declines in tobacco use, including among youth.

### C.        It is Illegal to Market or Sell E-Cigarettes to Anyone Under 18 Years of Age

63.     According to the U.S. Federal Government, nearly 9 out of 10 smokers start smoking by age 18, and more than 80% of underage smokers choose brands from among the top three most heavily advertised.[1] If the goal is to curb American smoking, it is thus critical to stop underage smoking. Several different federal laws provide regulators with tools they can use in their attempts to limit and reduce underage tobacco use.

64.     The 2010 implementation of the Family Smoking Prevention and Tobacco Control Act ("Tobacco Control Act") provides the United States Food and Drug Administration ("FDA") with authority over all products made or derived from tobacco.

65.     The Food, Drug, and Cosmetic Act ("FD&C Act") prohibits the introduction into interstate commerce of any modified risk tobacco product without permission from the FDA. A "modified risk tobacco product" means any tobacco product, including an e-cigarette, that is sold or distributed for use to reduce harm or the risk of tobacco-related disease associated with commercially marketed tobacco products. 21 U.S.C. § 387k(a), (b)(1).

66.     The FD&C Act covers a tobacco product sold with labeling or advertising that "represents explicitly or implicitly" that the product presents a lower risk of tobacco-related disease or is less harmful than other tobacco products, or about which its manufacturer has taken any action directed to consumers that would result in consumers believing the product is safer than

---

[1]      *Preventing Tobacco Use Among Youths*, Surgeon General Fact Sheet, Surgeon Gen., https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/preventing-youthtobacco-use- factsheet/index.html.

other tobacco products. 21 U.S.C. § 387k(b)(2). For a company to market a product as a modified risk tobacco product, it must receive authorization from the FDA. 21 U.S.C. § 387k(g).

67.    FDA regulations prohibit tobacco product manufacturers, including both Altria and JLI, from making claims regarding relative **_risk_** of particular tobacco products without the FDA first issuing a marketing order ("MRTP Order") approving the use of such claims after extensive scientific analysis is conducted and submitted to the FDA. JUUL has never received an MRTP Order from the FDA.

### D.    Nicotine is Harmful and Addictive

68.    Cigarettes are highly regulated because, _inter alia_, cigarettes contain harmful chemicals, including tar and nicotine. Nicotine is a highly addictive central nervous system stimulant derived primarily from the tobacco plant. Both combustible cigarettes and e-cigarettes deliver nicotine in highly efficient ways to the user's airway, bloodstream, and brain. Once ingested, nicotine travels quickly to the brain, where it triggers the release of chemicals and ultimately feelings of reward. As a result, users come to associate nicotine with pleasurable feelings. Nicotine addiction is the most common and most harmful effect of nicotine use. Regular use of nicotine leads to problematic symptoms upon withdrawal, which, in turn, perpetuate continued use regardless of adverse consequences.

69.    Nicotine use can result in the rapid onset of both physiological and psychological dependence and various physical and behavioral side effects, including but not limited to increased heart rate and blood pressure, peripheral vasoconstriction, headache, dizziness, nausea, irritability, and sleep disturbance. Use of nicotine while pregnant is associated with severe health risks to children after they are born, including but not limited to hypertension, infertility, respiratory dysfunction, and type 2 diabetes.

70.    Nicotine is particularly dangerous for young people because their brains are still

18

developing until about age 25. During adolescent brain development, the brain creates connections (synapses) that allow for the creation of new memories and development of new skills faster than the adult brain. This increased rate of synapse creation means that adolescents can more easily become addicted to nicotine than adults, which can prime their brains for addiction to other drugs. Nicotine creates stronger feelings of reward in adolescents than in adults and, as a result, adolescent smokers are more likely than adult smokers to become dependent on nicotine.

71.     Scientific evidence clearly shows that the use of e-cigarettes, such as those sold by JUUL, may contribute to lung disease, heart attacks, and may even cause seizures. E-cigarette aerosolized liquid may also contain carcinogens. Similar to traditional combustible cigarettes, e-cigarettes contain nicotine, which is more damaging for young users because their brain development is still in progress. Studies have also shown nicotine affects cell activity in the brain and negatively affects the capacities for attention, learning and memory.

72.     Moreover, human brain development, including in areas of the brain involved in higher cognitive function, such as the prefrontal cortex, continues throughout adolescence and well past the age of 20. According to the CDC, "[u]sing nicotine in adolescence can harm the parts of the brain that control attention, learning, mood, and impulse control."

73.     Youth who become addicted to nicotine through JUUL products often experience a range of negative social, emotional, behavioral, and physical effects. Teenagers describe wild mood swings, violent outbursts, shouting, and emotional confrontations with family and friends. They express feelings of self-hatred for being dependent on a JUUL device and intense anxiety at the thought of doing without it. Evidence also exists showing that some minors resort to stealing from their  parents or selling e-cigarette paraphernalia or clothing items to support their habits. They also find themselves feeling winded – coined "JUUL lung" – and unable to keep up with

their regular physical activity. Young JUUL users report increased anxiety and physical symptoms such as uncontrollable shaking when withdrawing from nicotine.

74.     Families of young people addicted to e-cigarettes struggle to identify treatment options, must respond to school disciplinary matters, and must monitor their children to ensure that they are not continuing to use e-cigarettes. Some families expend significant sums of money to place their children in private drug treatment programs.

75.     The full extent of negative health effects to underage consumers from widespread use of JUUL e-cigarettes is still unknown. Scientists warn that the long-term health effects of JUUL and other e-cigarettes may not be known for decades.

**E.     JLI Designed Its Product to Spike Nicotine Delivery Levels with Improved Taste to Make It More Appealing, Addictive and Dangerous, Especially to Young People**

76.     E-cigarette companies' first step in replicating the success of combustible cigarettes was to create a product that, like combustible cigarettes, was based on getting users addicted to the nicotine in the product. Route of administration and speed of delivery are key to understanding nicotine's addictive potential.

77.     Nicotine fosters addiction through the brain's "reward" pathway. Both a stimulant and a relaxant, nicotine affects the central nervous system; increases blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin; and causes muscle relaxation. Long-term exposure to nicotine causes upregulation—an increase in the number of these high-affinity nicotinic receptors in the brain. When nicotine binds to these receptors, it triggers a series of physiological effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. With regular nicotine use, however, these feelings diminish, and the user must consume increasing amounts of nicotine to achieve the same effects.

78.     As described by the U.S Surgeon General, "Tobacco use is a pediatric epidemic."

Nine out of ten smokers begin by age 18 and 80% who begin as teens will smoke into adulthood.[2]

79.     The above statements apply equally, if not more so, to e-cigarettes. Further, the U.S. Surgeon General has explained how the nicotine in e-cigarettes affects the developing brain and can addict kids more easily than adults: "Until about age 25, the brain is still growing. Each time a new memory is created, or a new skill is learned, stronger connections—or synapses—are built between brain cells. Young people's brains build synapses faster than adult brains. Because addiction is a form of learning, adolescents can get addicted more easily than adults."[3]

80.     It took five decades of public health initiatives, government intervention, impact litigation, consumer education and tobacco regulation to finally see a significant drop in cigarette smoking and nicotine addiction. According to the CDC, by 2014, the number of adults who reported using cigarettes had dropped to 18%, and the number of adult smokers who reported quitting smoking increased from 50.8% in 2005 to 59% by 2016. By 2014, teen smoking also hit a record low of 15.7%.

81.     The U.S. Surgeon General reported in 2014 that: "We are at a historic moment in our fight to end the epidemic of tobacco use that continues to kill more of our citizens than any other preventable cause. The good news is that we know which strategies work best. By applying these strategies more fully and more aggressively, we can move closer to our goal of making the next generation tobacco-free."[4]

---

[2]     *Preventing Tobacco Use Among Youth and Young Adults, A Report of the Surgeon General* at 1 (2012), https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/index.html.

[3]     *Know The Risks: E-Cigarettes & Young People*, https://e-cigarettes.surgeongeneral.gov/knowtherisks.html.

[4]     U.S. Dept. of Health and Human Services. *LET'S MAKE THE NEXT GENERATION TOBACCO-FREE: Your Guide to the 50th Anniversary Surgeon General's Report on Smoking and Health,* https://www.hhs.gov/sites/default/files/consequences-smoking-consumerguide.pdf.

82.     Where the public health community saw progress in curbing the use of cigarettes and nicotine addiction, JUUL, the JUUL Individual Defendants and the Individual Defendants saw (and seized) a business opportunity.

### 1.     Following the Big Tobacco Playbook, JUUL Sought to Market a Product That Would Create and Sustain Nicotine Addiction, but Without the Stigma Associated with Cigarettes

83.     Seeking to build and dominate a new market for nicotine products without the baggage of combustible cigarettes (*i.e.*, with a well-established link to death and disease), JLI engineered a modern, tech-forward and cool-looking e-cigarette device capable of delivering more nicotine and fueling higher levels of consumer addiction than ever before. JLI marketed that highly-addictive device as healthy, safe, cool and available in kid-friendly flavors.

84.     In doing so, JLI followed Big Tobacco's historical playbook. Defendant Monsees admitted that when creating JLI, he and defendant Bowen carefully studied the marketing strategies, advertisements, and product design revealed in cigarette industry documents that were uncovered through litigation and made public under the November 1998 MSA between the state attorneys general of forty-six states, five U.S. territories, the District of Columbia and the four largest cigarette manufacturers in the United States. "[Cigarette industry documents] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[5]

85.     In a thesis presentation defendants Bowen and Monsees gave in 2004, Monsees candidly admitted, "[t]he cigarette is actually a carefully engineered product for nicotine delivery

---

[5]     Gabriel Montoya, *Pax Labs: Origins with James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/

and addiction."[6] JLI researched how cigarette companies engineered their products and chemically manipulated nicotine to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry." With access to the trove of documents made public to curb youth smoking and aid research to support tobacco control efforts, JLI was able to review literature on manipulating nicotine pH to maximize its delivery in a youth-friendly vapor with minimal "throat hit."

86.     By studying historical Big Tobacco documents, JLI learned that the cigarette industry had tried for years to figure out ways to create and sustain addiction by delivering more nicotine in a way that would be easy to ingest—without the nausea, cough, or other adverse side effects that many new smokers experienced. JLI also engaged former cigarette industry researchers to consult on the design of its product.

87.     JLI attempted to distinguish JUUL products from the death and disease associated with cigarettes by deliberately providing a false assurance of safety. For example, on May 8, 2018, a document titled "Letter from the CEO" appeared on JUUL's website. The document stated: "[JUUL]'s simple and convenient system incorporates temperature regulation to heat nicotine liquid and deliver smokers the satisfaction that they want without the combustion and the harm associated with it."[7]

88.     JLI even took this message to ninth graders: in 2018, a representative from JLI spoke at a high school during a presentation for ninth graders, stating that JUUL "was much safer

---

[6]     Jordan Crook, *This is the Stanford Thesis Presentation That Launched Juul*, Tech Crunch (Feb. 27, 2019, 7:51 am PST), https://techcrunch.com/2019/02/27/this-is-the-stanford-thesispresentation-that-launched-juul/

[7]     U.S. Food and Drug Administration Warning Letter to JUUL Labs, (September 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminalinvestigations/warning-letters/juul-labs-inc- 590950-09092019.

than cigarettes," that JUUL was "totally safe," that JUUL was a "safer alternative than smoking cigarettes," and that the "FDA was about to come out and say [JUUL] was 99% safer than cigarettes . . . and that. . . would happen very soon."[8]

89.     JLI's mission was not to improve public health. Rather, JLI sought to introduce a new generation of consumers to nicotine in a way that Big Tobacco (and Altria) had failed to do. JLI's business model was never about reducing addiction. As one JLI engineer put it: "We don't think a lot about addiction here because we're not trying to design a cessation product at all . . . anything about health is not on our mind."[9]

90.     JLI, Bowen, and Monsees achieved their vision. Pioneering a nicotine delivery technology that eliminated the harshness of traditional free-base nicotine, JLI's e-cigarette system provided consumers with palatable access to high-concentrations of nicotine like never before. Since JUUL's launch in 2015, JLI has become the dominant e-cigarette manufacturer in the United States. Its revenues grew by 700% in 2017 alone. By 2019, JLI owned three quarters of the e-cigarette market.

91.     As combustible cigarette sales were on the decline, e-cigarettes were introduced to the U.S. market beginning in 2007. Over time, e-cigarettes developed a small group of regular users, who were primarily current or former smokers. By 2014, the e-cigarette market in the U.S. was in decline.

92.     E-cigarettes struggled to compete with combustible cigarettes, because of the technical challenge of delivering enough aerosolized nicotine to satisfy a smoker's addiction in a

---

[8]     *Id*.

[9]     Kevin Roose, *Juul's Convenient Smoke Screen*, N.Y. Times (Jan. 11, 2019), https://www.nytimes.com/2019/01/11/technology/juul-cigarettes-marketing.html

palatable form. Before JUUL, most e-cigarettes used an alkaline form of nicotine called free-base nicotine. When aerosolized and inhaled, free-base nicotine is relatively bitter, irritates the throat, and is perceived as harsh by the user. This experience is often referred to as a "throat hit." The higher the concentration of free-base nicotine, the more intense the "throat hit." While some "harshness" would not have much impact on seasoned cigarette smokers, it would deter newcomers.

93.     Before 2015, most e-liquids on the market were between 1% and 2% concentrations; 3% concentrations were marketed as appropriate for consumers who were accustomed to smoking approximately forty cigarettes a day. None of these e-liquids delivered as much nicotine as quickly as a combustible cigarette.

94.     Around 2013, JLI scientists developed new e-liquids and new devices to increase the amount of nicotine that e-cigarettes could deliver to users and to reduce the throat hit. Dramatically reducing the throat hit is not necessary for a product that is aimed at smokers, who are accustomed to the harshness of cigarette smoke, but it very effectively appeals to nonsmokers, especially youths. Reducing the harshness of nicotine also allows more frequent use of e-cigarettes for longer periods of time, and masks the amount of nicotine being delivered. By removing the physiological drawbacks of inhaling traditional free-base nicotine, JLI's technology removes the principal barrier to nicotine consumption and addiction.

95.     In 2014, JUUL's scientists calculated key pharmacokinetic parameters, including maximum concentration of nicotine in the blood ("Cmax") and total nicotine exposure ("Area Under the Curve" or "AUC"). JLI reported the results in U.S. Patent No. 9,215,895 (the '895 patent), for which JLI applied on October 10, 2014, and which was granted in December 2015. The named inventors on the '895 patent were Adam Bowen and Chenyue Xing.

25

96.     Among the formulations was a 4% benzoate formulation, which was made with 3.8% benzoic acid and 5% nicotine, as well as propylene glycol and vegetable glycerin. As a comparison, JLI also measured nicotine blood levels after smoking Pall Mall cigarettes. According to the patent, the Cmax for Pall Mall cigarettes was 11.65 ng/mL, and for 4% benzoate it was 15.06 ng/mL, which is nearly 30% higher. The total nicotine exposure (as measured by Area Under the Curve or AUC) was 367.5 ng * min/mL for Pall Mall cigarettes and 400.2 ng * min/mL for 4% benzoate, which is almost 9% higher. The 4% benzoate formulation had the highest Cmax and AUC of any of the formulations measured.

97.     Describing these results, JLI's '895 patent all but brags that it surpassed a commercially available combustible cigarette (Pall Mall) in maximum delivery and nearly rivaled it in how soon it could deliver peak nicotine. According to the '895 patent, "certain nicotine salt formulations [*i.e.*, JLI's] provide satisfaction in an individual superior to that of free base nicotine, and more comparable to the satisfaction in an individual smoking a traditional cigarette." The patent further explains that the "rate of nicotine uptake in the blood" is higher for some claimed nicotine salt formulations "than for other nicotine salt formulations aerosolized by an electronic cigarette . . . and likewise higher than nicotine free-base formulations, while the peak nicotine concentration in the blood and total amount of nicotine delivered appears comparable to a traditional cigarette."

98.     In other words, JLI distinguishes itself, and established the patentability of its e-liquids, by reference to their superlative ability to deliver nicotine, both in terms of peak blood concentration and total nicotine delivery. The rate of nicotine absorption is key to providing users with the nicotine "kick" that drives addiction and abuse. Because "nicotine yield is strongly correlated with tobacco consumption," a JUULpod with more nicotine will strongly correlate with

higher rates of consumption of JUULpods, generating more revenue for JUUL. In essence, JLI distinguished itself based on its e-liquids' extraordinary potential to addict.

99.     A study conducted by Samantha Reilly in 2019 tested JUUL's tobacco, crème brûlée, fruit medley, and mint flavors and found that a puff of JUUL delivered 164 ± 41 micrograms of nicotine per 75 mL puff.[10] By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152-193 μg/puff.[11] Correcting to account for the different puff sizes between these two studies, this suggests that, at 75 mL/puff, Marlboro would deliver about 114-145 μg/puff. In other words, the Reilly study suggests that JUUL delivers more nicotine per puff than a Marlboro cigarette.

100.     JLI scientists realized in 2014 that the amount of nicotine that JUUL e-cigarettes delivered could be problematic. Chenyue Xing stated that "[y]ou hope that they get what they want, and they stop," but JLI scientists were concerned that "a Juul—unlike a cigarette—never burns out," so the device gives no signal to the user to stop. According to Xing, JLI scientists "didn't want to introduce a new product with stronger addictive power."[12] For this reason, "the company's engineers explored features to stop users from ingesting too much of the drug, too quickly. JLI's founders applied for a patent in 2014 that described methods for alerting the user or disabling the device when the dose of a drug such as nicotine exceeds a certain threshold." *Id.* For example, "[o]ne idea was to shut down the device for a half-hour or more after a certain number

---

[10]     Samantha M. Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, 21 Nicotine Tobacco Research 1274 (Aug. 19, 2019), https://www.ncbi.nlm.nih.gov/pubmed/30346584.

[11]     Megan J. Schroeder & Allison C. Hoffman, *Electronic Cigarettes and Nicotine Clinical Pharmacology*, 23 Tobacco Control ii30 (May 23, 2014), www.ncbi.nlm.nih.gov/pmc/articles/PMC3995273/.

[12]     Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019, 11:00 AM), https://www.reuters.com/investigates/special-report/juul-ecigarette/.

of puffs[.]" *Id.* But upper management rejected the concerns that the scientists raised, and "[t]he company never produced an e-cigarette that limited nicotine intake." *Id.*

101.    JLI knew that, among its target audience, young people, cigarette smoking had become increasingly stigmatized. JLI wanted to create a product that would create "buzz" and excitement, totally different from the image of addicted cigarette smokers huddling outside their workplaces in the cold to get their nicotine fix. Not only did JUUL contain high levels of nicotine that delivered a strong "buzz" from the first puff, JLI designed its product to look appealing to youth and non-smokers.

102.    Unlike the distinct smell and odor emitted from combustible cigarettes, JUUL emits a reduced aerosol with a nearly undetectable scent. And unlike other e-cigarettes, the JUUL device does not produce large plumes of smoke. Instead, the vapor cloud is very small and dissipates very quickly, allowing for concealed use. As a result, young users can, and do, use JUUL—in class or at home—without detection.

103.    The JUUL device is small and discrete. Fully assembled, the device is just over 9.5 cm in length and 1.5 cm wide. The JUUL device resembles a memory stick and can be charged in a computer's USB drive. As can be seen from the following image, this design allows the device to be concealed in plain sight, camouflaged as a thumb-drive, for use in public spaces, like schools:



104.     JLI's high- tech design was designed to make it appealing to youth. JUUL's design also included an LED light, which allowed users to activate "party mode," whereby the LED light would flash a rainbow of colors. "Party mode" is activated by the user by waving the JUUL device back and forth until the white LED light starts flashing multiple colors, so that the rainbow colors are visible while the person inhales from the JUUL device. "Party mode" can also be permanently activated on the JUUL by the user quickly and firmly slapping the JUUL against the palm of the hand, until the LED light starts flashing multiple colors permanently. This feature was another characteristic that set JUUL apart from other e-cigarettes on the market, and made it even more appealing and "cool" to young users.

**2.     JUUL Enticed Youth and Newcomers to Nicotine with Kid-Friendly Flavors**

105.     Cigarette companies have known for decades that flavored products are key to getting young people to acclimate to nicotine. A 2004 study found that seventeen-year-old smokers were more than three times as likely as those over the age of twenty-five to smoke flavored

cigarettes, and they viewed flavored cigarettes as safer.[13]

106.    In June 2015, JUUL came to market in four flavors including tabaac (later renamed tobacco), fruut (later renamed fruit medley), bruulé (later renamed crème brulee), and miint (later renamed mint). JUUL later offered other kid-friendly flavors, including cool mint, cucumber, and mango.

107.    In 2009, the FDA banned flavored cigarettes (other than menthol) as its first major anti-tobacco action pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009. "Flavored cigarettes attract and allure kids into addiction," Health and Human Services Assistant Secretary Howard Koh, MD, MPH, said at a news conference held to announce the ban.[14] In January 2020, the FDA banned flavored e-cigarette pods, other than "Tobacco" and "Menthol" flavors, in response to "epidemic levels of youth use of e-cigarettes" because these products are "so appealing" to children."

108.    A former JUUL manager, who spoke to *The New York Times* on the condition that his name not be used, said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others to make the purchases for them. Some people bought more JUUL kits on JUUL's website than they could individually use—sometimes ten or more devices at a time. "First, they just knew it was being bought for resale," said the former senior manager, who was briefed on the company's business strategy. "Then, when they saw the

---

[13]    Gardiner Harris, *Flavors Banned From Cigarettes to Deter Youth*, N.Y. Times (Sept. 22, 2009), https://www.nytimes.com/2009/09/23/health/policy/23fda.html.

[14]    Daniel J. DeNoon, FDA Bans Flavored Cigarettes: Ban Includes Cigarettes with Clove, Candy, and Fruit Flavors, WebMD (Sept. 22, 2009), https://www.webmd.com/smokingcessation/news/20090922/fda-bans-flavored- cigarettes#2.

social media, in fall and winter of 2015, they suspected it was teens."[15]

109.    JLI's use of flavors unfairly targeted not only youth, but unsuspecting adults as well. By positioning JUULpods as a flavor-oriented product rather than a system for delivering a highly addictive drug, JLI deceptively led consumers to believe that JUULpods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

### 3.    JUUL and Altria Developed and Promoted the Mint Flavor and Sought to Preserve Its Market

110.    While the JLI Defendants were developing and marketing their flavored products to appeal to and recruit youth, the Individual Defendants, recognizing the value of those young "replacement smokers," committed Altria to furthering this cause. With the shared goal to grow the number of nicotine-addicted users, and as detailed further herein, the JLI Defendants and the Individual Defendants set out to do whatever was necessary to create and preserve the lucrative market for flavors (which were banned in combustible cigarettes, but not in JUULpods). This shared purpose would culminate with efforts to promote mint flavor. In order to maximize the value of its mint line of JUULpods, the JLI Defendants chemically and socially engineered the mint pods to become the most popular "flavor" among youth, including through extensive surveillance of youth behavior and preferences, all while seeking to conceal mint's appeal to youth.

111.    Although mint was one of the least popular e-cigarette flavor categories with youth in 2015, trailing the fruit and dessert categories, RJR, Altria and JLI had all introduced mint-flavored products within a year of each company's initial release. Unlike Reynolds and Altria,

---

[15]    Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teenmarketing.html.

which released mint products after first releasing a menthol variant, JLI skipped menthol and went straight to mint, adding Menthol in late 2017 around the same time it released its mango JUULpods.

112.    The JLI Defendants and the Individual Defendants recognized both the potential of using flavors to hook kids and the inevitability that the government would seek to regulate said flavors. Therefore, they sought to solidify the market presence of a "substitute" youth-friendly flavor—mint—which might escape regulation and preserve JLI's astronomical sales figures.

113.    According to Siddharth Breja, who was senior vice president for global finance at JLI, after JLI pulled most flavored pods, including mango, from the market in a claimed attempt to reduce youth usage of JUUL, defendant Burns said that "[y]ou need to have an IQ of 5 to know that when customers don't find mango they buy mint."[16] With that knowledge and with no genuine interest in youth prevention, and as detailed below, the JLI Defendants and the Individual Defendants committed to work to preserve mint as a flavor for as long as possible. By keeping mint on the market long after other flavors were pulled, these defendants continued to expand the number of addicted e-cigarette users.

F.    **The JLI Defendants and the Individual Defendants Developed and Implemented a Marketing Scheme to Mislead Consumers into Believing that JUUL Products Contained Less Nicotine Than They Actually Do**

114.    Having created a product designed to hook users to its nicotine, JLI then misled consumers into believing JUUL was something other than what it actually was. Specifically, JLI engaged in a years' long campaign to downplay JUUL's nicotine content, nicotine delivery, and the unprecedented risks of abuse and addiction JUUL poses. JUUL, on its website and on its

---

[16]    Sheila Kaplan and Jan Hoffman, *Juul Knowingly Sold Tainted Nicotine Pods, Former Executive Says*, N.Y. Times (Nov. 20, 2019), https://www.nytimes.com/2019/10/30/health/juulpods-contaminated.html

packages, misleadingly represented that its products were "5% nicotine by weight" and about as much nicotine as a pack of combustible cigarettes. A set of lawsuits pending in the U.S. District Court for the Northern District of California allege that JUUL's nicotine solution is actually at a 6.2% concentration, rather than the 5% concentration it discloses. In ruling on motions to dismiss those lawsuits, the federal court credited the allegations, and observed that "[t]his difference would constitute over 20% more nicotine than JUUL claims its products deliver." *Colgate v. JUUL Labs, Inc.*, 345 F. Supp. 3d 1178, 1189 (N.D. Cal. 2018).[17]

115.     The Defendants knew in 2017 that a JUULpod delivered more nicotine than one pack of cigarettes. In 2017, Altria launched its MarkTen Bold e-cigarette, a relatively high-strength 4% formulation compared to the 2.5% and 3.5% strength MarkTen products initially offered. Even though JUUL was already on store shelves and was rapidly gaining market share with its 5% nicotine formulation, the Individual Defendants chose to bring a less potent 4% formulation to market.

116.     Based on their own internal knowledge and Altria's decades of research and experience, the Individual Defendants knew that a 5% nicotine formulation would carry more nicotine than one pack of cigarettes. In addition to data they received from JLI, the Individual Defendants' due diligence undoubtedly included a careful examination of JLI's intellectual property, including the '895 patent, which provides a detailed overview of nicotine benzoate's pharmacokinetic profile.

        **1.     JUUL's "Make the Switch" Campaign Misled and Deceived the Public to Believe that JUUL Is a Cessation Device For Adult Smokers**

---

[17]     This same lawsuit questions the validity of measuring nicotine by weight as opposed to by volume. Measuring by volume is standard practice for liquids (such as the JUULpods) and measured by volume, JUUL's nicotine would be 6% concentration, not the 5% claimed.

117.    The JLI Defendants and the Individual Defendants repeatedly made false and misleading statements to the public that JUUL was created and designed as a smoking cessation device, and falsely and misleadingly spread the subterfuge.

118.    JUUL marketed its products as modified risk tobacco products without express permission from the FDA, in violation of 21 U.S.C. § 387k. According to congressional testimony on July 24, 2019, in 2017, a JUUL representative assured teens at a New York City high school that JUUL products were "much safer than cigarettes"; "totally safe"; and a "safer alternative than smoking cigarettes." The representative also claimed that the "FDA was about to come out and say [JUUL's e-cigarette product] was 99% safer than cigarettes."

119.    JUUL continued to market its products as a safer alternative to cigarettes, even as recently as 2018. In a letter that JUUL published on its website in the spring of 2018, defendant Burns declared that JUUL's "simple and convenient system incorporates temperature regulation to heat nicotine liquid and deliver smokers the satisfaction that they want without the combustion and the harm associated with it."

120.    In early 2016, JLI initiated a marketing campaign that focused more on switching from smoking to using JUUL, known as the "Switch Campaign" via advertising on social media (Facebook, Instagram, Twitter, Reddit, YouTube, and its own social media platform known as "JUUL Talk"), content created and shared by social media influencers, direct email marketing, retail advertisements, and billboards.

121.    JUUL also began making more brazen claims about the supposed health benefits of using JUUL and the appropriateness of using JUUL as a smoking cessation device. JLI's advertising encouraged smokers to "switch" to JUUL in order to improve their lives, implying that JUUL was safer to use than cigarettes. These claims were not backed by science. JLI also made

specific representations on JUUL's website and in other advertising media about JUUL's temperature control systems, claiming JUUL presents less risk of harm to users than smoking cigarettes by producing harmful compounds in smaller amounts.

122.    JUUL's 2018 "Make the Switch" advertising campaign also suggested to consumers that its products had a therapeutic function as smoking cessation devices, when, in fact, a single JUULpod contains at least as much nicotine as an entire pack of cigarettes and JUUL's products have not been approved for such use.

## G.    JUUL Targeted Youth

123.    JUUL was not bound by the terms of the MSA and it seized upon an opportunity to use Big Tobacco's strategy of marketing to youth while creating the false impression that its products were harmless, thereby addicting a new generation of consumers to nicotine.

124.    Defendants Monsees and Bowen capitalized on a central database of Big Tobacco advertising information maintained by a research group known as Stanford Research Into the Impact of Tobacco Advertising ("SRITA"), run by Dr. Robert Jackler,[18] using it as the building blocks for JUUL's advertising strategy.

125.    The emulation is obvious. As can be seen from the following image, a side-by-side comparison of JUUL advertisements with historical cigarette advertisements reveals the appropriated pattern of focusing on imagery related to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory pleasure, including taste.

---

[18]    Robert Jackler, et al., Stanford Univ. Sch. of Med., *JUUL Advertising Over Its First Three Years on the Market*, 27 (2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf (accessed on Sept. 17, 2020).



126.    JUUL deployed this same strategy, but adapted it to modern advertising tactics. JUUL's #Vaporized campaign provides a classic example. In 2015, JUUL launched its products with an expensive, multi-faceted marketing campaign. On social media platforms widely used by adolescents, such as Twitter, Instagram, and Facebook, JUUL branded itself with the catchy hashtag "#Vaporized," to introduce the sleekness and style of its JUULpods.

127.    JUUL developed its initial marketing strategy with the help of two creative agencies — Cult Collective and Grit Creative Group ("Grit"). Cult Collective promises to provide companies with a competitive edge by "focusing on proven platforms that . . . forge fanatical loyalty" while Grit declares itself an "authority on Millennial culture."

128.    JUUL rolled out magazine advertisements and social media marketing posts with flashy images of young people looking hip, cool, and sexy while holding their JUUL devices. These ads were full of bright colors, funky patterns, and attractive, young models. JUUL's ads featured little copy, typically including only the words, "JUUL" and "Vaporized," in black or white, offset against the splashy background. These ads portray JUUL as a hip and fun brand for

36

millennials and young people.

129.    Having developed advertisements for the Vaporized campaign featuring youthful, fashionable models, JUUL engaged the services of numerous companies to place advertisements, including static "banner" advertisements and video advertisements, on websites across the internet. These companies, known as programmatic media buyers, purchased "impressions" (*i.e.,* the appearance of an advertisement on a particular website when visited by a single user or device) from online advertising exchanges. Advertisements from the Vaporized campaign began appearing on websites as early as June 2015.

130.    JUUL marketed its products by purchasing banner advertisements and video advertisements on nick.com and nickjr.com. These two Nickelodeon websites feature shows and games from the Nickelodeon television network, which is a television network for children.

131.    JUUL purchased banner advertisements on the Cartoon Network's website at cartoonnetwork.com, allfreekidscrafts.com, hellokids.com, kidsgameheroes.com, dailydressupgames.com, didigames.com, forhergames.com, games2girls.com, girlgames.com, and girlsgogames.com. These websites offer children's television programs and games for children.

132.    JUUL purchased advertisements on a range of websites designed to help middle school and high school students develop their mathematics and social studies skills. JUUL purchased tens of thousands of impressions for video and banner advertisements on coolmath-games.com, basic-mathematics.com, coolmath.com, math-aids.com, mathplayground.com, mathway.com, onlinemathlearning.com, purplemath.com and socialstudiesforkids.com.

133.    JUUL purchased banner advertisements on websites expressly designed for teenagers, such as teen.com, seventeen.com, justjaredjr.com, and hireteen.com.

134.    JUUL purchased advertisements on websites for high school students hoping to

attend college such as collegeconfidential.com and collegeview.com.

135.    Critically, these allegations regarding JUUL's marketing to children were made in a lawsuit against JLI brought by the Massachusetts Attorney General and reporting in the *New York Times*.[19]

136.    JLI's direct advertising on the above websites was supplemented by significant engagement by JUUL with customers and influencers on social media, including Twitter and Instagram. JUUL typically solicited influencers by sending them free JUUL e-cigarettes or discount codes that would enable influencers to obtain free e-cigarettes from JUUL's website. JUUL intended that, after receiving these free or deeply discounted products, influencers would promote JUUL e-cigarettes by using them in public, post JUUL-related content on their social media accounts, or otherwise share positive impressions regarding JUUL with others. JUUL monitored influencer social media accounts for JUUL-related content and reposted JUUL-related social media content created by influencers.

137.    Most egregiously, JUUL gave presentations to high schoolers across the country, supposedly to address addiction issues; however, these presentations largely consisted of propaganda for JUUL. JLI representatives assured impressionable high school students that JUUL's products were "totally safe." After the assembly, one student approached the JUUL representative and asked what to do about a friend addicted to nicotine. The representative responded that JUUL's products are a "safer alternative than smoking cigarettes and it would be better for that kid to use JUUL."

138.    JUUL's and the JLI Defendants' efforts were incredibly successful. In fact, a 2018

---

[19]    Kaplan, Sheila. *JUUL Bought Ads Appearing on Cartoon Network and Other Youth Sites, Suit Claims.* The New York Times. Feb. 12, 2020. https://www.nytimes.com/2020/02/12/health/juul-vaping-lawsuit.html

study of JUUL users between the ages of fifteen and twenty-four revealed that 63% remained unaware that JUUL products contain nicotine.[20] Similarly, in 2018, a literature review of seventy-two articles published in the *International Journal of Environmental Research and Public Health* found that e-cigarettes were perceived by adults and youth as being healthier, safer, less addictive, safer for one's social environment, and safer to use during pregnancy than combustible cigarettes. *Id.*

### H.   Altria Invests in JUUL Despite the Individual Defendants' Knowledge of JLI's Misconduct Targeting Youth

139.    The Individual Defendants were desperate to enter the vaping market, but in doing so, through their investment in, and then collusion with, the JLI Defendants, breached their fiduciary duties to Altria in three ways.

140.    First, their pursuit of, and recommendation of, an investment in JUUL in the face of known risks was reckless (and also likely illegal given the agreement was conditioned on Altria exiting the e-cigarette industry and not competing with JUUL), and therefore, constituted a bad faith violation of fiduciary duties to Altria, because it exposed Altria to reputational harm and legal liability through its participation, knowing or unknowing, in JUUL's wrongdoing.

141.    Second, the evidence suggests that the Individual Defendants knew about JUUL's misrepresentations and illegal marketing, and caused Altria to actively participate in the wrongdoing by assisting JUUL in marketing, and therefore, made Altria liable for disseminating misleading misrepresentations of JUUL's nicotine content and safety, and exposed Altria to liability for promoting use among youth users.

142.    Third, the Individual Defendants have exposed Altria to liability by engaging in

---

[20]    Jeffrey G. Willett, et al. Recognition, Use and Perceptions of Juul Among Youth and Young Adults, 28 Tobacco Control 054273 (2019).

illegal and unfair trade practices and anticompetitive conduct with the JLI Defendants.

### 1.    The Individual Defendants Put Altria's Business at Risk by Recklessly Pursuing JUUL Despite the Known Risks

143.    Defendant Willard, as Altria's COO at the time, began to have "confidential discussions" with JUUL in spring 2017, which continued for 18 months. Even by 2017, JUUL's popularity among youth was apparent and so were its marketing tactics. The youth-oriented marketing would have been most apparent to defendant Willard and the other Individual Defendants because much of JUUL's early marketing was patterned off youth marketing by Altria's predecessor and subsidiary, Philip Morris.

144.    The Individual Defendants knew about the reputational risks because JUUL's marketing campaigns were a matter of public record, and JUUL's nicotine salt formulation was patented, so that was also a matter of public information. As Altria itself admitted in opposing the Securities Action, the facts about JUUL's youth use, nicotine, addictiveness, and marketing were well-known public risks that were well-publicized throughout 2017 and 2018 when Altria was simultaneously seeking to invest in JUUL.

145.    And as Altria stated in its motion to dismiss the Securities Action, defendant Willard made public statements about the risks, and when the investment was announced and shortly thereafter, defendant Willard acknowledged that youth usage of JUUL products was a "big problem" and "could put the whole category at risk." At the same time, despite the widespread public record demonstrating otherwise, defendant Willard falsely asserted that JUUL only had a few youth users.

146.    In the lead-up to Altria's JUUL investment, defendant Willard showed a clear understanding of the regulatory risks and scrutiny Altria was under, and would be under, when during a quarterly earnings conference call on October 9, 2018, he was asked about his thoughts on

the Massachusetts Attorney General's recent lawsuit against JUUL. While he did not comment specifically on JUUL, he replied, "I think what we're seeing is that for quite some time, the tobacco industry has been expected to operate under a very specific set of rules, and the [MSA] laid those out for the cigarette category And we are always aware that the FDA and the Attorneys General are watching everything we do to make sure we're operating responsibly. And frankly, we appreciate the AGs making sure that there's a minimum level of performance expected from everybody in the industry."

147.   JUUL's product composition (which would have revealed the high nicotine content) and marketing would also have been a key part of the due diligence Altria engaged in prior to investing billions of dollars in JUUL. Defendants Willard, Gifford, and Crosthwaite, who were the primary Altria representatives engaged in JUUL negotiations, were veterans of the tobacco industry and longtime employees at Altria or its predecessors. Willard had spent his entire career at Altria or its predecessors, stretching back 25 years, so that he would have been around when Altria was settling the tobacco lawsuits with the state AGs. Crosthwaite, who became JUUL's CEO in late 2019 when its business was tanking in the wake of the vaping illness epidemic, has also worked in the tobacco industry since 1997. He was Altria's chief growth officer before he became JUUL's CEO, and he was President and CEO of Philip Morris from April 2017 to June 2018. Gifford is now Altria's CEO and before then its Vice Chairman and CFO; he has worked in Altria since joining Philip Morris in 1994 (where, like Crosthwaite, he also served a stint as the President and CEO).

148.   Despite the reputational risks, the Individual Defendants doubled down and pressed further for a transaction after defendant Willard became CEO in February 2018. The FTC's lawsuit likewise disclosed several meetings between defendants Willard and Gifford, on the one

hand, negotiating directly with defendant Burns and other senior JLI executives on the other hand. Thus, the public record demonstrates the extensive involvement of the Individual Defendants in leading the transaction.

149.    Altria has defended its transaction as one where it sought to utilize its expertise to curb underage vaping. But Altria's defense in the FTC Action illustrates the incoherence of that argument. Atria cites a September 12, 2018, letter from then-FDA Commissioner Scott Gottlieb ("Gottlieb") to JUUL and three other vaping manufacturers that expressed concern that vaping products were contributing to the "epidemic rate of increase in youth use" and called for manufacturers to consider stopping sale of flavored products. In its defense to the FTC Action, Altria wrote that it "recognized the letter as creating new regulatory exposure for e-vapor products. In response, on October 25, 2018, Altria determined to discontinue its Elite product and the flavored MarkTen products (other than the traditional tobacco, menthol, and mint varieties)." Yet in the very next sentence, Altria also admits it "continued its efforts to reach a deal with [JUUL]." The Individual Defendants could not have failed to understand that JUUL was primarily known for its flavored products – the very kind the FDA expressed concern about – and that JUUL was among the most notorious vaping companies to be popular among teenagers. JUUL's popularity with a new generation of nicotine users was the benefit of the JLI investment in the first place!

150.    At another point in its FTC Action defense, Altria claimed that it pulled its products because "[b]oth MarkTen and Elite lacked a key element for obtaining [Premarket Tobacco Product Application ("PMTA")] approval – the ability to convert existing smokers and thereby significantly reduce the overall harm to the health of American tobacco consumers." Yet the JLI Defendants knew that JUUL's ability to convert existing smokers was also unproven.

151.    In addition, Altria now appears to claim that JUUL's product could not win

approval without Altria's regulatory guidance ("And, for its part, JUUL would lose the support from Altria that it needs to obtain PMTA approval and to pursue its mission to convert [adult] smokers."). But this contradicts Altria's stated rationale for investing in the first place, which was based on Altria needing to invest in a product that could win regulatory approval, or Altria is conceding that it invested in an illegal product – or a product with a high likelihood of becoming illegal – which itself would be a violation of fiduciary duty for the JLI Defendants to cause the Company to do so.

## I.      The Individual Defendants' Decision to Invest in JUUL Has Damaged Altria

### 1.      JUUL is Sued by Consumers

152.     JUUL consumers have purportedly experienced significant health problems from using JUUL's products, including its JUULpods.  Numerous scientific studies have shown that the use of e-cigarettes, including JUUL, cause significant lung injuries and have been implicated in multiple severe pathological lung injuries.[21] Recent studies have also demonstrated that exposure to JUUL aerosol induces oxidative stress, inflammation, epithelial barrier dysfunction, and DNA damage in lung cells.[22] Numerous other scientific studies have established links between e-cigarette use and respiratory problems.

153.     Over the summer of 2019, healthcare providers started to note an influx of acute respiratory failure and a myriad of lung injuries in patients who were using e-cigarettes. This prompted a CDC investigation of an outbreak of vaping associated lung injuries. The reported injuries mirrored the injuries that had been reported in medical literature since 2012. In October

---

[21]     *See, e.g., Lauren F. Chun et al., Pulmonary Toxicity of E-cigarettes, 313 Am. J. Physio. Lung Cell Mol. Physiol L193 (May 18, 2017). https://www.ncbi.nlm.nih.gov/pubmed/28522559.*

[22]     Thivanka Muthumalage, et al., E-cigarette Flavored Pods Induce Inflammation, Epithelial Barrier Dysfunction, and DNA Damage in Lung Epithelial Cells and Monocytes, 9 Scientific Reports 19035 (2019), https://www.nature.com/articles/s41598-019-51643-6.

2019, the CDC issued treatment guidelines to assist doctors in clinical practice. The CDC defined a new recognized medical condition referred to as EVALI.

154.    Researchers noted that the recent proliferation of vaping-related cases known as EVALI demonstrated a heterogeneous collection of pneumonitis patterns that included acute eosinophilic pneumonia, organizing pneumonia, lipoid pneumonia, diffuse alveolar damage and acute respiratory distress syndrome ("ARDS"), diffuse alveolar hemorrhage, hypersensitivity pneumonitis, and the rare giant-cell interstitial pneumonitis. Active infection (which would include live bacterial contamination of e-cigarette fluids) did not appear to explain the clinical presentation, but acute toxic lung injury did seem to fit.[23]

155.    A recent publication in 2020 noted that there were almost 2,000 cases of EVALI at the time it was written. The authors further noted that Vitamin E acetate was one possible cause of the recent outbreak but there may be more than one cause and therefore everyone should refrain from using e-cigarette or vaping products.[24]

156.    The multiple pathological lung injuries and toxicity associated with e-cigarette use, including JUUL, can lead to acute respiratory failure, intubation with mechanic ventilation and death. It has been established that the use of e-cigarettes, including JUUL, can lead to acute and chronic lung injuries such as EVALI, lipoid pneumonia, organizing pneumonia, chemical pneumonitis, alveolar hemorrhage, bronchiolitis obliterans (popcorn lung), pneumothorax, acute respiratory failure, ARDS, asthma, emphysema and COPD. Defendants never warned the public

---

[23]    *See* David C. Christiani, *Vaping-Induced Injury*, 68 New England J. Med. 787 (2019).

[24]    Sascha Ellington, et al., *Update: Product, Substance-Use, and Demographic Characteristics of Hospitalized Patients in a Nationwide Outbreak of E-cigarette, or Vaping, Product Use-Associated Lung Injury—United States*, *August 2019–January 2020*, 69 Morbidity and Mortality Weekly Rep. 44 (2020).

of the risk of serious acute and chronic lung injuries that were associated with the use of e-cigarettes, including JUUL.

157.    The failure to properly and adequately test the safety of JUUL prior to marketing it to the public, including teenagers and young adults, and continuing in the face of the onslaught of publications in the medical literature demonstrating an association with e-cigarette use and significant lung injuries, amounts to a reckless disregard for public safety. These outcomes, have unsurprisingly, led to a substantial amount of litigation against JLI.

158.    State attorneys general in Arizona, California, Illinois, Massachusetts, Minnesota, Mississippi, New York, and North Carolina have alleged that JLI has marketed an unsafe product to children. News reports also document dozens (or hundreds) of personal injury and/or wrongful death suits against JUUL in state courts across the country.

## 2.    Altria is Sued By Investors

159.    On November 4, 2019, Altria investors filed the Securities Action against Altria and defendants Willard, Gifford, JLI, Bowen, Monsees, Burns and Crosthwaite in the U.S. District Court for the Eastern District of New York for violation of federal securities laws. Subsequent class action lawsuits would be filed in this District, where the cases were eventually consolidated, and a lead plaintiff and lead counsel appointed. The lead plaintiff filed the operative pleading (the "Securities Action Complaint" or "SAC") in the Securities Action on July 2, 2020. *See Klein et al., v. Altria Group, Inc. et al..,* Case No. 3:20-cv-00075-DJN (Dkt. No. 108).

160.    The Securities Action generally alleges that throughout the Class Period (defined as all purchasers of Altria stock between December 20, 2018 and February 21, 2020, inclusive), the defendants made a series of materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, the SAC alleges that the defendants made false and/or misleading statements and/or failed to disclose that: (i) Altria had

45

conducted insufficient due diligence into JUUL prior to the Company's $12.8 billion investment, or 35% stake, in JUUL; (ii) Altria consequently failed to inform investors, or account for, material risks associated with JUUL's products and marketing practices, and the true value of JUUL and its products; (iii) all of the foregoing, as well as mounting public scrutiny, negative publicity, and governmental pressure on e-vapor products and JUUL made it reasonably likely that Altria's investment in JUUL would have a material negative impact on the Company's reputation and operations; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

161.    The SAC further alleges that the JUUL and defendants Willard, Gifford, Bowen, Monsees, Burns, and Crosthwaite directed and coordinated fraudulent acts to grow the market of addicted e-cigarette users. The SAC alleges that throughout the 2017-2018 negotiation period, JUUL provided Altria with information regarding JUUL's design and nicotine content, and its advertising, retail distribution, online sales, age verification procedure, underage users' flavor preferences, and regulatory strategies. Altria also provided JUUL with advice in these areas.

### i.    Confidential Witnesses from the Securities Class Action Corroborate the JLI Defendants and the Individual Defendants' Misconduct

162.    The SAC cites several confidential witnesses who allegedly had firsthand information regarding the events described herein. Plaintiff and Plaintiff's counsel have not independently spoken with these confidential witnesses, yet cite the allegations based on confidential witness accounts in the SAC in this complaint for two reasons. First, these allegations were submitted in a federal legal pleading under the penalty of perjury. Second, the information confirms much of the misconduct committed by the Individual Defendants.

163.    Securities Action Confidential Witness #1 ("CW1") is described as having worked for Altria in a variety of senior leadership roles from October 2003 until February 2019, most

recently as Senior Vice President, Marketing and Commerce Strategy. CW1's other roles at Altria included President and CEO, NuMark; President and CEO, U.S. Smokeless Tobacco Company; and Director of Marketing, Phillip Morris USA. CW1 worked out of Altria's headquarters in Richmond, Virginia.

164.     The SAC states that CW1 described how defendant Willard had been targeting JUUL since his tenure as the company's Chief Operating Officer, stating that it was clear as early as 2017 that Altria was moving toward an investment in JUUL. CW1 is quoted as stating: "I believe that Howard wanted [JUUL] so bad, that he just wanted it," CW1 said. "When he was COO … he was very vocal about, 'JUUL's the answer.' And when he became CEO, he in essence sat me down and sat [Chief Growth Officer] K.C. [Crosthwaite] down and said, 'K.C., your job is to get JUUL done. And [CW1], your job is to figure out what to do if JUUL doesn't happen.'" CW1 said that Crosthwaite was responsible for Altria's investment in JUUL.

165.     While CW1 was not personally involved in conducting the due diligence, the SAC provides that CW1 stated, in general, that Altria's due diligence for investments was comprised of a large team of "dozens" of people with experts across all key functions, including law, sales, distribution, supply chain, purchasing and manufacturing. The company's due diligence was typically a "rigorous process" that lasted "months," and Altria did not use outside consultants for due diligence work.  Furthermore, "on previous [due diligence], it was taking people with relevant, category- specific knowledge from within the company to look at what was there for the entity we were buying," CW1 said. "It was usually pretty broad teams with senior leaders across all different functions."

166.     The SAC's discussion with CW1 regarding underage JUUL consumers is particularly damning. The SAC alleges that CW1 said that JUUL's issues with underage users

were well-known within Altria. Asked how he knew that JUUL was marketing to underage users, CW1 said, "It was like asking, 'How do you know that the sky is blue?'" "Everybody knew at this point that there was a youth issue," CW1 said. "So there was no doubt [that JUUL was marketing to underage users]."

167.    The SAC also questioned CW1 regarding Altria's marketing policies. CW1 stated that Altria had specific policies and guidelines against targeting underage users, including a ban on using social media channels for marketing. "We weren't doing it," CW1 said. "It would have been against our policy." CW1, according to the SAC, stated that JUUL, meanwhile, had a very different approach, noting that JUUL had an active social media operation that used influencers and a variety of platforms, including Instagram.

168.    Securities Action Confidential Witness #2 ("CW2") purportedly worked for Altria from July or August 2018 until the end of 2018 as a Product Manager, Regulatory Quality Compliance Management. CW2 worked out of Altria's headquarters in Richmond, Virginia, reporting to Evelyn Pollard, who at the time was a Senior Manager, Quality Business Systems.

169.    The SAC states that CW2 also confirmed that JUUL's marketing to underage users was "well-known" prior to Altria's investment in the company.

### 3.    Altria is Sued by the FTC for Anticompetitive Practices

170.    The FTC, in an administrative complaint filed on April 1, 2020, alleged that Altria actively colluded with JUUL to stifle competition in the vaping market. *See In the Matter of Altria Group, Inc. and JUUL Labs, Inc.*, Dkt. No. 9393 (F.T.C.) (the "FTC Action"). The FTC alleges that Altria's acquisition of JUUL shares and the associated agreements together constitute an unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 5 of the FTC Act, and substantially lessened competition in violation of Section 7 of the Clayton Act. The FTC voted 5-0 to proceed with the complaint against Altria.

171.    The FTC Action detailed numerous discussions and meetings between defendants Willard and Gifford, on behalf of Altria, and defendant Burns with Valani and Pritzker, on behalf of JUUL, where the clear import of the discussions – even when the actual text was redacted – was to convey that JUUL would only do a deal if Altria agreed to withdraw from the e-cigarette market and refrain from competing in it going forward. Such behavior is anticompetitive and violates federal law. The FTC Action, as discussed herein in this section, describes the allegedly illegal behavior between and among the Individual Defendants and the JLI Defendants.

172.    Although the actual discussion was redacted in the public version of the FTC Action complaint, the redacted complaint made it clear that Burns, Pritzker, and Valani all made it clear that they would only agree to a transaction with Altria if Altria exited the e-cigarette market. Among other actions, defendant Pritzker sent an opening term sheet to defendant Willard, on July 30, 2018, and the FTC revealed, "Continued competition from Altria's e- cigarette products was the only option clearly off the table."

173.    This point was reinforced at a Washington, D.C., meeting between defendant Burns and Valani, Pritzker and Riaz, from JUUL, and defendants Willard and Gifford, from Altria, to discuss these terms.  Willard appeared to then reinforce his understanding on a call with JUUL on or about August 5, 2018. When defendant Gifford attempted to send over a revised draft term sheet that weakened the non-compete, defendant Burns reacted negatively.

174.    The FTC Action also alleges that Valani impressed this no-compete point on defendant Devitre at a meeting in New York City on August 15, 2018, shortly before an August 31, 2018, negotiation session between Altria and JUUL in San Francisco. On October 5, 2018, defendant Willard sent defendant Burns a letter that appeared to give in on the non-compete issue. Defendant Burns then appeared to tell JUUL's chief legal officer that those terms were acceptable.

49

Shortly thereafter, on October 25, 2018, Altria announced that it would temporarily halt sales of its MarkTen Elite, citing concerns with youth vaping. Just a few days later, Altria announced its deal with JUUL, which included not competing with JUUL in e-cigarettes. By December 7, 2018, Altria further announced that it would wind down its remaining e-cigarette business.

175.    The FTC further alleges that on December 9, 2018, Altria's chief legal officer e-mailed his counterpart at JUUL to discuss the deal. Less than two weeks later, JUUL and Altria executed their transaction agreements. Not only did Altria concede its own e-cigarette market, but it also agreed to refrain from other acquisitions or partnerships through which Altria could participate in the e-cigarette market.

176.    When Altria initiated its investment in JUUL, it did not require Hart-Scott-Rodino Act ("HSR") clearance, because its stake was non-voting. However, in February 2019, it filed for HSR clearance when it sought to convert its interest into voting securities and sought to have the right to appoint three out of the nine members of JUUL's board. At that time, the FTC allegedly became aware of Altria's non-compete agreement with JUUL, which the FTC states included the following:

> [Altria] shall not . . . directly or indirectly: (1) own, manage, operate, control, engage in or assist others in engaging in, the e-Vapor business; (2) take actions with the purpose of preparing to engage in the e-Vapor Business, including through engaging in or sponsoring research and development activities; or (3) Beneficially Own any equity interest in any Person, other than an aggregate of not more than four and nine-tenths percent (4.9%) of the equity interests of any Person which is publicly listed on a national stock exchange, that engages directly or indirectly in the e-Vapor Business (other than (x) as a result of [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship of, research and development activities not directed toward the e-Vapor Business and not undertaken with the purpose of developing or commercializing technology or products in the e-Vapor Business)  Notwithstanding the foregoing, (x) the [Altria] and its Subsidiaries and controlled Affiliates may engage in the business relating to (I) its Green Smoke,

> MarkTen (or Solaris, which is the non-U.S. equivalent brand of MarkTen) and MarkTen Elite brands, in each case, as such business is presently conducted, subject to Section 4.1 of the Purchase Agreement, and (II) for a period of sixty (60) days commencing on the date of this Agreement, certain research and development activities pursuant to existing agreements with third parties that are in the process of being discontinued. . . .

177.    The FTC Action alleges that Altria fulfilled this promise and pulled its e-cigarette products from the market. As discussed above, the FDA Commissioner, upon seeing the news of Altria's pending investment, expressed consternation because he thought Altria had earlier represented it would quit the e-cigarette market because of the risk of youth use, but now was investing in a company whereby in late 2018 it was well known had a problem with youth use.

178.    Furthermore, Altria's agreement with JUUL required Altria to provide services to JUUL by leasing convenience store shelf space to JUUL, providing regulatory consulting, and distribution support. This included direct marketing and cross-promotions, such as putting ads for JUUL pods in Marlboro packages. Altria also gave JUUL a license over Altria's e-cigarette portfolio. Thus, at the same time that Altria cleared the way by removing its own products, it was taking affirmative steps to further bolster JUUL's market leadership.

179.    The opportunity for illegal collusion was great, as FTC commissioners Rohit Chopra and Rebecca Kelly Slaughter pointed out in a separate statement, because Altria had an executive observer who sat in on JUUL's board meetings. As the FTC Commissioners pointed out, giving Altria a board observer seat meant that Altria would have access to JUUL's non-public business strategy and trade secrets, as well as information relevant to how Altria and JUUL could compete in other areas. But with this information access, Altria could further steer itself to go out of JUUL's way, which it already had demonstrated previously through the non-compete agreement. For example, the Commissioners noted that tobacco products are often sold behind the counter, and tobacco companies and e-cigarette companies may compete by offering promotions and other

incentives to retailers in return for that space.  But with Altria investing in JUUL, it has an incentive to compete less hard for that retail space, knowing it can share in the upside if JUUL is its competitor for that space. This could also affect Altria's sourcing decisions and recruitment decisions, to the extent Altria now knows JUUL's sourcing or recruiting plans. The Commissioners noted, "In light of these realities, allowing a situation where Altria has potential access to JUUL's operational and development plans puts too much risk on consumers and flies in the face of one of the underlying premises of the FTC Act: '. . . [T]o stop in their incipiency acts and practices which, when full blown, would violate [the Sherman Act and the Clayton Act] '".[25]

180.    Moreover, between when the transaction closed in December 2018, to his ascension as JUUL's CEO in late September 2019, defendant Crosthwaite remained Altria's CGO and was also their designated observer on JUUL's board. Thus, he had direct access to JUUL's confidential information and could directly coordinate Altria and JUUL's activities. As JUUL's CEO, he continued to have direct contact with Altria because defendant Gifford then replaced him as the Altria Board observer.  Similarly, from late September 2019 to the present, when defendant Gifford took over as the Altria Board observer at JUUL, he had direct access to JUUL's information and could coordinate activities between JUUL and Altria. Those opportunities have only become greater since the end of April 2020, when defendant Gifford become Altria's CEO.

181.    In January 2020, under increasing pressure from regulators, Altria and JUUL revised their agreements. The Voting Agreement provided for one fewer Board seat for Altria (two

---

[25]    *See* Statement of Commissioner Rohit Chopra Joined By Commissioner Rebecca Kelly Slaughter. *In the Matter of Altria Group, Inc. and JUUL Labs, Inc.,* Commission File No. 1910075. April 2, 2020.

https://www.ftc.gov/system/files/documents/public_statements/1570265/statement_of_comm_chopra_in_the_matter_of_altria-juul.pdf

out of nine instead of three out of nine), once the transaction has been approved by the FTC, but this formal decrease in Board seats was more than made up by the fact that the executive ranks of JUUL were closely related to the executive ranks of Altria because JUUL's CEO was Altria's former Chief Growth Officer, defendant Crosthwaite, who was Altria's designee board observer on JUUL's board. Moreover, JUUL brought Altria's chief regulatory officer and the head of Altria's e-cigarette business. Furthermore, defendant Gifford, who had a direct role in negotiating the Altria investment, was now the Altria observer on JUUL's board, and in June 2020, defendant Gifford become Altria's CEO.

182.    Other aspects of the Voting Agreement provided for Altria to have a ***greater*** role in controlling JUUL.  Under the revised Voting Agreement, Altria will appoint one of the four members of JUUL's Nominating Committee, which would be able to veto the nomination of independent JUUL directors, and appoint two out of the five – and the Chair – of a new Litigation Oversight Committee – as well as one out of three members of a Litigation Subcommittee that would have the right, through a unanimous vote, to change JUUL's senior outside counsel on litigation matters involving both Altria and JUUL.

183.    Altria and JUUL also weakened the non-compete by allowing Altria to re-enter the e-cigarette market if Altria's valuation of JUUL fell under 10% of its original valuation or a year after JUUL is prohibited from selling its products by the Federal government. But this revision actually laid bare Altria's original motivation: to bolster JUUL's chances in return for getting out of JUUL's way. Now that JUUL's chances were decreasing, the FTC alleges that Altria wanted the option to get back in the market in case JUUL failed.

184.    Under increasing regulatory scrutiny of JUUL's marketing and use by teenagers, Altria also stopped providing marketing services. But Altria continues to provide regulatory advice

to JUUL.

### 4.   Altria Has Been Damaged

185.   Altria has already expended significant resources defending itself in both the Securities Action and the FTC Action. These expenses will only go up as the litigation proceeds. Altria further faces potential damages in the hundreds of millions of dollars for the Securities Action (should it lose or settle that lawsuit) and the possibility of having its investment in JUUL "unwound" in the FTC Action, which could cost the Company billions of dollars. The Company's situation is further complicated by Altria already having taken charges writing down its investment in JUUL by more than $8 billion. This charge is also a direct result of the Individual Defendants' misconduct and a concrete damage to Altria.

## VII.   FALSE AND MISLEADING STATEMENTS

186.   On December 20, 2018, Altria and JUUL both issued press releases announcing that Altria had signed and closed a $12.8 billion investment in JUUL. According to Altria's December 20, 2018 Press Release (the "December 2018 Press Release"), "[t]he service agreements w[ould] accelerate JUUL's mission to switch adult smokers to e-vapor products[,]" thereby presumably increasing JUUL's sales and the value of Altria's investment. Additionally, the December 2018 Press Release highlighted that "Altria's investment represents a 35% economic interest in JUUL, valuing the company at $38 billion."

187.   Altria's December 2018 Press Release also quoted defendant Willard, who touted Altria's investment in JUUL as the "biggest" in the Company's history, and a move that the Company made in an effort to promote products that reduced harm, stating, in relevant part:

> We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing

> $12.8 billion in JUUL, a world leader in switching adult smokers . . . . We have long said that providing adult smokers with superior, satisfying products **with the potential to reduce harm** is the best way to achieve tobacco harm reduction. Through JUUL, we are making the biggest investment in our history **toward that goal. We strongly believe that working with JUUL to accelerate its mission will have long-term benefits for adult smokers and our shareholders.**

(Emphases added.)

188.    Altria's December 2018 Press Release also quoted JUUL's CEO, defendant Burns, who stated, in relevant part:

> **Altria's investment sends a very clear message that JUUL's technology has given us a truly historic opportunity to improve the lives of the world's one billion adult cigarette smokers** . . . . This investment and the service agreements will accelerate our mission to increase the number of adult smokers who switch from combustible cigarettes to JUUL devices.

(Emphasis added.)

189.    Finally, Altria's December 2018 Press Release attempted to assure investors that Altria's investment in JUUL was made with an ongoing commitment to prevent underage tobacco consumption, promising that Altria and JUUL would work together to prevent underage use of JUUL's products.

190.    Also on December 20, 2018, sixteen minutes after Altria's December 2018 Press Release was distributed, JUUL issued its own press release, in a coordinated fashion, mirroring that of Altria's, titled "JUUL Statement About Altria Minority Investment and Service Agreements." Discussing the rise in youth vaping and Altria's investment, JUUL likewise stated that its "**intent was never to have youth use JUUL products**" and the company identified Altria's investment as furthering JUUL's purported mission to prevent underage vaping: "Today, we have been joined by an unlikely – and seemingly counterintuitive – investor in our journey. Altria today announced a minority investment of $12.8 billion into JUUL for a 35% ownership in the company along with services to accelerate our mission." JUUL stated that as part of the agreement, JUUL

would gain access to Altria's retail, marketing and distribution apparatus including "access to its premier innovative tobacco products retail shelf space," access to users with "direct communications through cigarette pack inserts and mailing to adult smokers via Altria's companies' databases," and Altria will apply its logistics and distribution experience to help JUUL expand its reach and efficiency, and JUUL will have the option to be supported by Altria's sales organization, which covers more than 230,000 retail locations. JUUL also stated that a condition of the agreement was that Altria must "allow JUUL to remain in control. As part of this investment JUUL remains fully independent and retains full operating control."

191.    During a December 20, 2018 call with analysts and investors discussing the investment, defendant Willard again assured everyone that "Importantly, Altria and JUUL are committed to preventing kids from using any tobacco products. As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve."

192.    During the call, Steve Powers of Deutsche Bank asked defendant Willard point blank: "*how much of JUUL's business over the last 12 months have you concluded comes from underage consumers*, and how confident are you that progress can be made to eradicate that consumption? And I guess, lastly, what are the risks that you assign to the idea that JUUL's products ultimately may not receive FDA approval through the PMTA process, given their known association with underage consumption?" Willard responded: "I think it's hard to nail down exactly how much of the volume could be contributed to -- could be attributed to underage use. *We believe it's quite a small percentage*…."

193.    Beginning in December 2018 and continuing through the present, JUUL and Altria, through television advertisements and inserts in Altria's cigarette packs, conducted the "Make the Switch" advertising campaign.

194.     On February 26, 2019, the Individual Defendants caused Altria to file its Annual

Report on Form 10-K with the SEC, reporting the Company's financial and operating results for

the quarter and year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by

defendants Willard, Gifford, Casteen, Devitre, Farrell, Kelly-Ennis, Kiely, McQuade, Munoz,

Newman, Sakkab, and Shanks. It falsely downplayed the FDA's concern with Altria's investment

into JUUL while simultaneously touting Altria's continued commitment to preventing underage

vaping. Specifically, the 2018 10-K stated, in relevant part:

> The FDA announced in September 2018 that it is using its regulatory
> authority to address underage access and use of e-vapor products. As
> part of this effort, the FDA issued letters to manufacturers of certain
> e-vapor products, including Nu Mark and JUUL, requiring them to
> (1) discuss with the FDA the steps each manufacturer intends to take
> to address youth access and use of its e-vapor products and (2) within
> 60 days provide a detailed written plan to address underage access
> and use.

> In October 2018, Altria responded to the FDA's request for a written
> plan *setting forth the actions it was taking to address underage
> access and met with the FDA* . . . . Later in December, Altria
> purchased, through a wholly owned subsidiary, a 35% economic
> interest in JUUL. Following the announcement of this investment,
> Altria requested a meeting with the FDA to discuss the transaction
> and its ongoing support for underage tobacco prevention. In
> February 2018 [*sic*], the FDA sent Altria a letter expressing concern
> about this investment given the rise in underage use of e-vapor
> products and issued a statement indicating that, if the increased trend
> in underage use of e-vapor products does not reverse, the FDA may
> unilaterally take action to address the trend. *Altria responded by
> reaffirming its ongoing and long-standing investment in underage
> tobacco prevention efforts*. For example, Altria is advocating raising
> the minimum legal age to purchase all tobacco products to 21 at the
> federal and state levels to further address underage tobacco use.
> Altria will meet with the FDA to continue discussing underage e-
> vapor use.

> * * *

> [T]he expected benefits of the JUUL transaction, such as any equity
> earnings and receipt of cash dividends, may not materialize in the
> expected manner or timeframe or at all, including due to the risks
> encountered by JUUL in its business, such as operational risks and
> *regulatory risks* at the international, federal and state levels,
> *including actions by the FDA*; unanticipated impacts on JUUL's
> relationships with employees, customers, suppliers and other third

parties; potential disruptions to JUUL's management or current or future plans and operations due to the JUUL transaction; or domestic or international litigation developments, investigations, or otherwise . . . . Failure to realize the expected benefits of our JUUL investment could adversely affect the value of the investment. [. . .] [I]f a qualitative assessment of impairment of our JUUL investment were to indicate that its fair value is less than its carrying value, the investment would be written down to its fair value, which could have a material adverse effect on Altria's consolidated financial position or earnings.

195.    The statements referenced in Altria's 2019 Annual Report were materially false and misleading because the Individual Defendants knew or recklessly disregarded but failed to disclose the true risks of its investment in JUUL, including: (i) that JLI's overarching marketing scheme was directed at youth; (ii) that JUUL's products were harmful and not a tobacco cessation product; (iii) that JLI's youth marketing scheme subjected JLI, Altria, and Altria's investment in JUUL to material risks and expenses, including reputational, litigation and regulatory actions and fines; (iv) that these risks associated with JLI's products and marketing practices, and the true value of JLI and its products were known to the Individual Defendants but were not communicated to Altria investors; (v) that all of the foregoing, as well as mounting public scrutiny, negative publicity, and governmental pressure on e-vapor products and JLI made it reasonably likely that Altria's investment in JLI would impact Altria's reputation and operations; and (vi) that the materialization of these risks would require Altria to write-down a material portion of its investment in JLI. The risks of these events would materialize shortly after the filing of this 10-K.

## VIII.   The Truth Is Revealed

196.    Altria's JUUL investment came at a historically inopportune time, which they knew based on the risks described herein above. Temporally coinciding with Altria's JUUL investment, e-vapor products and JUUL increasingly became the subject of scrutiny by government authorities throughout the country. Mounting skepticism, fear, and negative publicity

in the media regarding e-cigarettes' safety led to increased scrutiny by government authorities into vaping products, and municipalities throughout the country began tightening sales practices related to those products.

197.    For example, on April 3, 2019, the FDA announced its investigation into nearly three dozen recent cases of people suffering from seizures after vaping. Between 2010 and 2019, the FDA said it received thirty-five reports of people, especially children and young adults, experiencing seizures after using e-cigarettes. On this news, Altria's stock price fell $2.71 per share, or 4.78%, to close at $53.98 per share on April 3, 2019.

198.    Nevertheless, the Individual Defendants continued to cause Altria to tout the benefits of the Company's investment in JUUL. On April 25, 2019, the Individual Defendants caused Altria to issue a press release announcing its financial and operating results for the first quarter of 2019 (the "1Q19 Press Release"). The 1Q19 Press Release quoted defendant Willard, who touted Altria's recent investments, which included JUUL, as factors that would accelerate Altria's growth and long-term success, stating, in relevant part:

> After taking steps to position Altria for long-term success at the end of 2018, we entered 2019 with an evolved business platform that includes our strong core tobacco businesses and ***new strategic investments*** with tremendous potential for growth . . . . We believe we've made significant progress in the first quarter on key initiatives to realize the potential of our evolved business platform.

199.    The 1Q19 Press Release also asserted that Altria's investment into JUUL had included, among other factors, an evaluation of the following:

> [T]he possibility that the expected benefits of the transaction may not materialize in the expected manner or timeframe, if at all; the potential inaccuracy of the financial projections (including projections relating to JUUL's domestic growth and international expansion); prevailing economic, market, ***regulatory or business conditions***, or changes in such conditions, negatively affecting the parties . . . [and] the fact that Altria's reported earnings, financial position and expected use of equity accounting and any future dividends paid by JUUL on shares owned by Altria may be adversely affected by tax and other factors, including the risks encountered

(*including regulatory and litigation risks*) and decisions made by JUUL in its business[.]

200.    That same day, the Individual Defendants caused Altria to file its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by defendant Gifford and briefly discussed ongoing litigation related to the dangers of e-vapor products, without going into detail, and while assuaging investors that Altria was already preparing responses to such lawsuits, stating in relevant part:

> *E-vapor Litigation*
>
> In April 2019, Altria, PM USA and JUUL were named as defendants in a tobacco and health class action lawsuit filed in the United States District Court for the Middle District of Florida. The lawsuit involves JUUL e-vapor products and proposes various classes of plaintiffs. The theories of recovery include: violation of RICO; fraud; failure to warn; design defect; negligence; unjust enrichment and deceptive and unfair trade practices. Plaintiffs seek various forms of relief including compensatory and punitive damages. Altria and PM USA are preparing their responses to the lawsuit.

201.    On May 16, 2019, Altria held its annual shareholder meeting. As reported by CNBC, defendant Willard was grilled by investors: "Analysts and investors worried Altria paid too much for its 35% stake in JUUL and very little say over its operations, especially with the e-cigarette giant facing regulatory scrutiny." Defendant Willard defended the terms of the deal, saying the e-cigarette market wasn't growing much before JUUL entered. Altria's own MarkTen products had hardly gained traction, prompting Altria to stop selling them in the fall before signing the deal with JUUL. As reported by CNBC, "Willard in response to a shareholder question on how Altria would make itself less vulnerable to JUUL's legal risks said *Altria was aware of early litigation when he made the investment in JUUL*. He said Altria is committed to reducing youth e- cigarette use…."

202.    On July 30, 2019, the Individual Defendants caused Altria to issue a press release

announcing the Company's financial and operating results for the second quarter of 2019 (the "2Q19 Press Release"). The 2Q19 Press Release quoted defendant Willard, who continued to describe the JUUL transaction as a factor that would contribute to Altria's future growth and success, stating, in relevant part:

> Altria delivered excellent second quarter adjusted diluted earnings per share growth of nearly 9%, driven by our core tobacco businesses. We've maintained our focus on the adult tobacco consumer and believe that with our leading premium tobacco brands, U.S. commercialization rights to IQOS, *investment in JUUL* and pending transactions, we are best positioned among tobacco peers to lead through a dynamic time in the U.S.

203.    The 2Q19 Press Release contained generic, boilerplate representations concerning risk factors related to Altria's investment in JUUL, including, in relevant part:

> [T]he risks generally related to our investments in JUUL and Cronos, including our inability to realize the expected benefits of our investments in the expected time frames, or at all, due to the risks encountered by our investees in their businesses, such as operational, compliance and regulatory risks at the international, federal and state levels, including actions by the FDA; [and] . . .

> domestic or international litigation developments, government investigations, tax disputes or otherwise; and potential impairment of our investments[.]

204.    On July 13, 2019, in an interview with CNBC, that was later posted on the internet, defendant Burns stated: "First of all, I'd tell them that I'm sorry that their child's using the product. *It's not intended for them. I hope there was nothing that we did that made it appealing to them.* As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through."

205.    On July 25, 2019, defendant Monsees stated to Congress through written testimony: "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products. . . .That is a serious problem. Our company has no higher priority than combatting underage use."

206.     On August 29, 2019, The *Wall Street Journal* reported that the FTC was investigating whether JUUL used influencers and other marketing practices to appeal e-cigarettes to minors. On this news, Altria's stock price fell $1.60 per share, or 3.49%, to close at $44.25 per share on August 29, 2019.

207.     On August 30, 2019, both the FDA and the CDC announced that they were collaborating to investigate e-cigarette related cases of illnesses and "working tirelessly to investigate the distressing incidents of severe respiratory disease associated with use of e-cigarette products." On this news, Altria's stock price fell an additional $0.51 per share, or 1.15%, to close at $43.74 per share on August 30, 2019—a total loss of $2.11 per share, or 4.6%, since closing at $45.85 per share two trading days earlier on August 28, 2019.

208.     On September 9, 2019, the FDA issued a warning letter to JUUL asserting that its statements regarding the risk of harm presented by JUUL constitute unauthorized modified risk claims under federal law and regulation, directing JLI to cease making or publishing such statements and to take immediate corrective action. These statements included those made to students during JUUL's youth outreach and education program indicating that JUUL was about to be approved by the FDA and that it was at least 99% safer than cigarettes, as well as JLI's former CEO, defendant Burns, making statements regarding the supposedly reduced levels of harmful compounds produced by JUUL's temperature control system.

209.     On September 11, 2019, news sources reported that the Trump administration was preparing a ban on flavored e-cigarettes as federal agencies probe an outbreak of a lung problem that killed at least six people and reportedly led to the sickness of hundreds of others. President Trump and U.S. Health Secretary Azar reportedly both confirmed that a ban was possible after the vaping issues were investigated.

210.     On September 12, 2019, during after-market hours, *Reuters* reported that, "[w]ithin weeks, New Jersey could become the latest state to restrict e-cigarette use, with the governor on Thursday launching a task force to find ways to curb vaping, linked by U.S. health officials to hundreds of respiratory illnesses and a half-dozen deaths." Additionally, that same day, the CDC reported that as of September 11, 2019, 380 confirmed cases, and probably cases of lung disease associated with vaping, had been reported by thirty-six states and the U.S. Virgin Islands, with six total deaths confirmed in six states. On this news, Altria's stock price fell $2.45 per share, or 5.51%, to close at $42.01 per share on September 13, 2019.

211.     On September 23, 2019, during after-market hours, news sources began reporting that federal prosecutors in California were conducting a criminal probe into JUUL.

212.     On September 24, 2019, JLI stated to the *Los Angeles Times* (which was later posted on the internet) that "We have never marketed to youth and we never will."

213.     On September 25, 2019, the Individual Defendants caused Altria to issue a press release announcing that Philip Morris had called off discussions of a $200 billion merger with Altria due to scrutiny of the vaping industry and the Company's 35% stake in market leader JUUL. JUUL also announced that it was replacing its CEO, defendant Burns, with longtime Altria executive, defendant Crosthwaite, and also announced that JUUL would stop all advertising in the U.S. According to an SEC filing, Altria made a "special recognition" payment of $2.5 million upon Crosthwaite's departure from Altria to JUUL. Defendant Crosthwaite had served as an observer on JUUL's board of directors after Altria's investment in JUUL. On this news, Altria's stock price fell an additional $0.17 per share, or 0.42%, to close at $40.56 per share on September 25, 2019—a total loss of $0.32 per share, or 0.78%, since closing at $40.88 per share two trading days earlier on September 23, 2019.

214.     On October 14, 2019, defendant Willard stated to Congress through a letter to Senator Durbin the following:

> "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and had quickly become a very compelling product among adult vapers. We decided to pursue an economic interest in JUUL, believing that an investment would significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products."

215.     On October 31, 2019, Altria announced that it was taking a $4.5 billion write-down on its investment in JUUL. Altria also announced that the FTC was scrutinizing Altria's role in the departure of JUUL's CEO, stating that on October 1, 2019, Altria received a civil investigative demand "seeking information regarding, among other things, Altria's role in the resignation of JUUL's former chief executive officer and the hiring by JUUL of any current or former Altria director, executive or employee." On this news, Altria's stock price fell an additional $1.15 per share, or 2.5%, to close at $44.06 per share on October 31, 2019.

216.     On January 30, 2020, Altria announced that it was taking an additional $4.1 billion charge related to its JUUL investment. It cited "the increased number of legal cases pending against JUUL and the expectation that the number of legal cases against JUUL will continue to increase." On this news, Altria's stock price fell an additional $2.11 per share, or 4.2%, to close at $48.00 per share on January 30, 2020.

217.     On February 21, 2020, at 3:37 pm (just before the close of trading), the *Wall Street Journal* reported that the SEC had launched an investigation into whether Altria fully disclosed to its shareholders the risks associated with its investment in JUUL. On this news, Altria's stock price fell $0.29 from $46.18 at 3:30 pm to $45.89 at the close of trading on February 21, 2020. Altria's stock price fell an additional $2.09 per share, or 4.8%, to close at $43.80 per share on the next

trading day February 24, 2020, and continued to decline to $40.30 on February 27, 2020, for a total decline of $5.88, or 12.7%.

218.     On April 17, 2020, Altria announced that defendant Willard would be resigning as CEO of Altria. Analysts and the press attributed Willard's resignation to Altria's investment in JUUL.

## IX.     DERIVATIVE AND DEMAND IGNORED ALLEGATIONS

219.     On April 7, 2020, Plaintiff issued the formal written pre-suit Demand under Virginia law on the Board. *See* Ex. A. Therein, Plaintiff demanded that Altria, acting by and through its Board, take critical steps to investigate, preserve and protect the Company's valuable claims against certain of the Individual Defendants named herein. Specifically, Plaintiff demanded: "(i) undertake an independent, good faith investigation into which directors and/or officers negotiated, arranged or consented to the arrangement with JUUL described herein and as alleged by the FTC; and (ii) take action against each officer and/or director to recover the damages described herein for the benefit of the Company; (iii) institute appropriate remedies, including changes to corporate governance and operational policies to ensure compliance with all applicable federal and state laws and regulations, including but not limited to marketing regulations, FTC regulations, and the federal antitrust laws."

220.     The Board's initial response, dated June 26, 2020, demanded documentation confirming Plaintiff's ownership of Altria common stock prior to making a further response to Plaintiff's demand. *See* Ex. B. Plaintiff responded by letter dated July 3, 2020, by noting that Virginia law does not require proof of stock ownership in connection with a shareholder demand, but nevertheless Plaintiff provided the evidence of ownership the Board demanded. *See* Ex. C. Four days later, on July 7, 2020, counsel for the Board responded to Plaintiff. The Board's response

confirmed that it would not take the actions demanded by Plaintiff, but that it would defer acting until "after there have been further developments" in related litigation, including the FTC action and "other ongoing litigation and government inquiries concerning JUUL and e-vapor products generally". *See* Ex. D. In other words, the Board decided that for an indefinite period of time, it would do absolutely nothing.

221.    The Board has taken no action in connection with the Demand since.

222.    The Board's conduct is antithetical to their affirmative duty to protect the interests of Altria and to refrain from conduct that would injure the corporation. By failing to investigate and act upon the Demand, the Board has failed in its fundamental duty and obligation to protect the corporate enterprise. Therefore, by virtue of its own actions, the Board has refused the Demand. Accordingly, Plaintiff may proceed with this derivative action designed to protect the interests of Altria by, among other things, perfecting the Company's claims for breach of fiduciary duty, aiding and abetting breaches of fiduciary duties, contribution, indemnification and related damages against the Individual Defendants.

**COUNT I**

**For Breach of Fiduciary Duties**
**Against All Individual Defendants**

223.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

224.    As Altria's directors and top officers, the Individaul Defendants owed Altria and its shareholders fiduciary duties of loyalty, candor and good faith – the highest duties known to the law. Rather than speak the entire truth when they said, or caused anything to be said, about the Company, the Individual Defendants breached their fiduciary duties by disseminating false and misleading statements about the Company's investment in JLI and the risks associated with that

66

investment, including JUUL's marketing of its products to underage consumers.

225.    As a result of defendants' fiduciary failures, Altria has been damaged.

226.    Plaintiff, on behalf of Altria, has no adequate remedy at law.

### COUNT II

**For Unjust Enrichment**
**Against All Individual Defendants**

227.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

228.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Altria.

229.    All the payments and benefits provided to the Individual Defendants were at the expense of Altria. The Company received no benefit from these payments.

230.    Plaintiff, on behalf of Altria, seeks restitution from the Individual Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

231.    Plaintiff, on behalf of Altria, has no adequate remedy at law.

### COUNT III

**For Aiding and Abetting Breaches of Fiduciary Duties**
**Against the JLI Defendants**

232.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

233.    By knowingly inducing the Individual Defendants to take the aforementioned wrongful actions, the JLI Defendants knowingly participated in the Individual Defendants' breaches of fiduciary duty.

234.     The Company suffered, and is suffering, damages as a proximate result of the Individual Defendants' breaches of fiduciary duty.

235.     As a result, the JLI Defendants aided and abetted the Individual Defendants in their breach of their fiduciary duties.

236.     The JLI Defendants are therefore liable to Altria for the damages Altria has sustained.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duty, corporate waste and unjust enrichment;

B.     Directing Altria to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Altria and its shareholders from a repetition of the damaging events described herein;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and the state statutory provisions sued hereunder, including attaching, impounding and imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of Altria have an effective remedy;

D.     Awarding to Altria restitution from the Individual Defendants, and each of them, including ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

E.     Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 1, 2020                                Respectfully submitted,


By _____/s/Matthew B. Kaplan_____
Matthew B. Kaplan
VSB No. 51027
The Kaplan Law Firm
1100 N Glebe Rd
Suite 1010
Arlington, VA 22201
Telephone: (703) 665-9529
Email:  mbkaplan@thekaplanlawfirm.com
*Counsel for Plaintiff*


**OF COUNSEL:**

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn (Pro hac vice motion to be filed)
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003

**SHUMAN, GLENN & STECKER**
Brett D. Stecker (Pro hac vice motion to be filed)
326 W. Lancaster Ave.
Ardmore, PA 19003
(303) 861-3003

**KASKELA LAW LLC**
Seamus Kaskela (Pro hac vice motion to be filed)
18 Campus Blvd. Ste. 100
Newtown Square, PA 19073
(888) 715-1740