**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| IN RE ALTRIA GROUP, INC. DERIVATIVE LITIGATION | Lead Case No. 3:20-cv-00772 (DJN) |

**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiffs bring this shareholder derivative action on behalf of nominal defendant Altria Group, Inc. ("Altria" or the "Company") in order to pursue claims for breach of fiduciary duty, unjust enrichment, and waste of corporate assets against certain current and former officers and directors of Altria, and claims for aiding and abetting breaches of fiduciary duty against JUUL Labs, Inc. ("JUUL"), and current and former officers of JUUL.

Plaintiffs' allegations are based upon Plaintiffs' counsel's investigation, except as to the allegations pertaining to Plaintiffs, which are based upon personal knowledge. Plaintiffs' counsel's investigation included, among other things, review and analysis of: (i) Altria's public filings with the U.S. Securities and Exchange Commission (the "SEC"); (ii) transcripts of Altria's conference calls with analysts and stockholders; (iii) presentations, press releases, and securities analyst reports concerning Altria and JUUL; (iv) news and business media reports; (v) authoritative book-length reports published by investigative journalists; (vi) documents, testimony and other facts presented during hearings held in July 2019 before the U.S. House of Representatives Committee on Oversight and Reform, "Examining JUUL's Role in the Youth Nicotine Epidemic;" (vii) myriad filings in related litigation against JUUL and Altria by the U.S. Federal Trade Commission (the "FTC"), consumers, and state entities, among others; and (viii)

scientific studies concerning e-cigarettes, vaping, nicotine addiction, and vaping-related illnesses, and JUUL and Altria's role in marketing e-cigarettes to minors. Based upon their investigation of the extensive public record to date, Plaintiffs believe substantial additional evidence supporting their allegations would be adduced in discovery.

## I.    NATURE OF THE ACTION

1.    Altria is the leading U.S. tobacco and cigarette company. JUUL is a privately held company that pioneered and popularized e-cigarettes used in "vaping." JUUL's primary products are re-usable vaporizers shaped like flash drives and re-chargeable in a computer's USB port, and disposable nicotine "pods" filled with flavored nicotine salt liquids called "JuulSalts." This action arises out of the Altria Defendants'[1] disastrous decision to invest $12.8 billion of Company (*i.e.*, Altria shareholders') money in JUUL, in conscious disregard of known public health risks, the complete absence of scientific data to support JUUL's health and safety claims for its products, and the thicket of consent orders and regulations specifically designed to prevent the marketing of highly addictive nicotine products to minors.

2.    JUUL experienced a meteoric rise between 2017 and 2019, fueled primarily by its success in attracting and addicting underage users.[2] JUUL's claims that it never targeted underage users in its advertising and marketing are belied by its open, notorious and sustained design and promotion of youth-oriented advertisements and marketing, which consciously mimicked Big Tobacco's historic youth-oriented tobacco advertising and marketing. In a conscious effort to "'own the early adopter'/'cool kid' equity as we build out volume[,]" JUUL's ads featured young, attractive models, young celebrities, and young internet "influencers" in stylish settings. JUUL

---

[1]    Defined herein below at ¶56.

[2]    "Underage" for purposes of this complaint means those under 18 years of age who are not of legal age to purchase or consume tobacco products.

ran the ads in traditional youth-oriented media outlets, such as Cartoon Network and nickjr.com, and in the rapidly growing internet-based social media outlets known to be popular among pre-teens and teen-agers. JUUL developed and promoted fruit-flavored vape cartridges calculated to appeal to young, first-time users. JUUL's youth-oriented multi-media blitz made JUUL's products so popular that vaping became known among youth and young-adult consumers as "Juuling." Even as JUUL consciously de-emphasized nicotine in its marketing, it intentionally designed the market's most potent nicotine delivery systems in order to match and exceed the potency of traditional cigarettes – a strategy that could not have been better calculated to quickly convert first-time and casual users into committed addicts.

3.      JUUL's rapid rise presented a competitive threat to Altria's own efforts to develop and market smokeless tobacco alternatives to offset rapidly declining smoking rates, especially among younger consumers. The Altria Defendants were focused on strategies to combat the steady drop-off in demand for Altria's traditional cigarette brands, like Marlboro, and consciously decided to bet big on JUUL to fill the gap, heedless of the obvious risks JUUL's product and marketing strategy posed to Altria. As Altria's then-Chief Executive Officer ("CEO"), defendant Howard Willard ("Willard"), explained to *The Wall Street Journal*, "[a]t a time when e-vapor is going to grow rapidly and likely cannibalize the consumers we have in our core business, if you don't invest in the new areas you potentially put your ability to deliver that financial result at risk."[3]

4.      Altria had attempted to offset falling cigarette sales with its own e-cigarette product, MarkTen. But by 2018, despite spending hundreds of millions of dollars on products and advertising, Altria had only between a 4% to 11% share of the vaping market, due in large part to

---

[3]      Jennifer Maloney and Dana Mattioli, *Why Marlboro Maker Bet on JUUL, the Vaping Upstart Aiming to Kill Cigarettes*, The Wall Street Journal (Mar. 23, 2019), https://www.wsj.com/articles/why-marlboro-maker-bet-on-juul-the-vaping-upstart-aiming-to-kill-cigarettes-11553313678

JUUL's success in marketing to new youth and young adult users.  As reported in the March 23, 2019 *Wall Street Journal* article, defendant Willard told Altria employees that a bold change was necessary, that smokers were switching to vaping, and that Altria's attempt to compete in the e-cigarette market was unlikely ever to catch up to JUUL.[4]  The obvious candidate to remedy Altria's inability to capture e-cigarette market share was JUUL, the market leader, which by 2018 had captured more than 70% of the e-cigarette market.

5.      JUUL's chief negotiators, defendant Kevin Burns ("Burns"), JUUL's then-CEO, and defendants Nicholas Pritzker ("Pritzker") and Riaz Valani ("Valani"), JUUL directors, insisted as a condition of any deal with Altria that Altria exit the e-cigarette market and commit not to compete in the e-cigarette market.  Despite the obvious risks that such a deal would violate state and federal antitrust laws, Altria's chief negotiators and architects of the JUUL deal, defendants Willard, Altria's then-Chief Financial Officer ("CFO") William F. Gifford ("Gifford"), and then-Chief Growth Officer ("CGO") Kevin C. Crosthwaite ("Crosthwaite"), agreed to these terms.  Altria's negotiators also recklessly agreed to: (i) provide cross-marketing for JUUL; (ii) give JUUL the premium retail space Altria had previously reserved for its own products; and (iii) grant JUUL a license to Altria's own e-cigarette intellectual property.

6.      With these concessions in place, on December 20, 2018, Altria announced that it had invested $12.8 billion in JUUL (making it the largest equity investment in U.S. history), financing the transaction by doubling Altria's debt, for a 35% stake that valued JUUL at $38 billion.  The Altria Defendants shut down Altria's MarkTen e-cigarette less than two weeks before announcing the JUUL transaction.

7.      After the deal closed, defendants Willard, Gifford and Crosthwaite became

---

[4]      *Id.*

4

enthusiastic emissaries for JUUL, and actively participated in its business affairs.  Defendant Crosthwaite took a seat on JUUL's board as a non-voting "observer" for Altria.  Notwithstanding his purported "observer" status, Crosthwaite was heavily involved in decisions regarding marketing and business strategy.  Through defendant Crosthwaite, Altria gained full access to JUUL's proprietary business information, including JUUL's business and marketing strategies.  Indeed, Crosthwaite became so integral to JUUL's operations that he eventually took over as its CEO.

8.      As part of Altria's massive investment in JUUL, Altria made a $2 billion payment to JUUL, which JUUL distributed as bonuses to its employees.

9.      The Altria Defendants proceeded to make this massive investment in JUUL despite  increasing public scrutiny, regulatory actions, and civil lawsuits over JUUL's youth-targeted marketing and misleading claims about the safety of its products.  When Altria closed on the deal at the end of 2018, the Altria Defendants were fully aware that JUUL had built its success on marketing to and addicting underage consumers using methods that mirrored and updated the strategies perfected and exploited by Altria and other Big Tobacco companies before a wave of public and private litigation culminated in the 1998 Tobacco Master Settlement Agreement with attorneys general from forty-six U.S. states, five territories and the District of Columbia.  Heedless of the obvious legal, regulatory, financial, and reputational risks to Altria, the Altria Defendants committed Altria to assisting and actively participating with JUUL in the financing, marketing, and distribution of JUUL's products.

10.     Defendant Willard, for example, had led Altria's youth prevention program in the early 2000s.  He recognized the youth-oriented elements that dominated JUUL's marketing and advertising strategy and understood that JUUL and other e-cigarette manufacturers had

successfully targeted youth and young-adult consumers – much as Altria and Philip Morris had done in years past.  In fact, just two months before closing on its investment, Altria had pulled its own flavored pod-based products from the market, announcing its decision to the public and to the U.S. Food and Drug Administration ("FDA") as an effort to reduce MarkTen's appeal to youth consumers.  Willard said Altria did not believe its flavored pod-based products contributed to youth vaping, claimed Altria pulled its flavored products out of an abundance of caution, and alluded to other companies' flavored pod-based products as being greater contributors to youth vaping.  At the time, JUUL's products were far and away the most popular vaping product among underage users – a fact that had made the headlines in dozens of news and media reports throughout 2018.  Yet, on the same day that Altria announced it was withdrawing its flavored pod-based products, Willard personally reassured the JUUL Defendants that Altria was still interested in doing a deal.

11.      The Altria Defendants' decision to disregard the complete absence of clinical research demonstrating the health and safety of JUUL's products soon placed Altria directly in the crosshairs of state attorneys general, federal regulators, and angry parents of youth and young adult consumers.  In the summer of 2019, an epidemic of vaping illnesses swept the country, leading to thousands of hospitalizations and at least 68 deaths.  As of February 18, 2020, a total of 2,807 E-cigarette, or Vaping, Product Use Associated Lung Injury ("EVALI") hospitalization cases and almost 70 deaths had been reported to the U.S. Centers for Disease Control ("CDC").

12.      Given the magnitude of the health crisis, regulatory actions accelerated, Congress commenced investigations, and several state attorneys general commenced a series of overlapping lawsuits.[5]  The CDC continues to investigate the causes of vaping-related illnesses, with current

---

[5]      JUUL recently announced the settlement of one lawsuit brought by the North Carolina

research pointing to vitamin-E acetate, a common additive in e-cigarette products, as a likely contributor.  These vaping illnesses inevitably led to legislative and regulatory scrutiny and a wave of public and private litigation against JUUL, the market leader.

13.     The Altria and JUUL Defendants responded to the crisis by coordinating their actions even more closely.  Defendant Crosthwaite became JUUL's CEO at the end of September 2019, and defendant Gifford (at the time, Altria's CFO) stepped in as Altria's observer on the JUUL Board.  In April 2020, defendant Willard "retired," and Gifford became Altria's CEO. Altria's chief regulatory officer, Joseph Murillo ("Murillo"), joined JUUL as its Chief Regulatory Officer.

14.     As alleged herein, Altria's investment in JUUL has been an unmitigated disaster for the Company, exposing it to catastrophic legal, financial, and reputational damage.  Altria and certain of the Altria Defendants face thousands of lawsuits arising out of Altria's ill-fated investment in JUUL.  Among other matters, Altria has become embroiled as a defendant in multidistrict litigation filed against JUUL in connection with its unlawful marketing practices and sale of dangerous vaping products.[6]  Altria also is a defendant in an antitrust action brought by the FTC, which seeks to unwind Altria's JUUL investment;[7] private antitrust suits brought against Altria and JUUL by consumers and distributors;[8] and the sustained securities fraud class action pending in this District brought by purchasers of Altria stock who allege to have been deceived by

---

Attorney General for $40 million and additional changes and limits on JUUL's marketing and sales tactics.  Many other suits remain pending.

[6]     *In re: JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:19-md-02913-WHO (N.D. Cal) (the "MDL").

[7]     *In the Matter of Altria Group, Inc. and JUUL Labs, Inc.*, Dkt. No. 9393 (F.T.C.) (the "FTC Action").

[8]     *In re: JUUL Labs, Inc. Antitrust Litigation*, Case No. 3:20-cv-02345-WHO (N.D. Cal.).

Altria's false and misleading statements about the risks associated with the JUUL investment.[9]

15.    As the FTC alleges, the terms of Altria's investment in JUUL were illegal: "***The results of this deal are repugnant to the purpose of the antitrust laws***: Altria took a cut of [JUUL's] lucrative e-cigarette profits instead of competing against the market leader now or in the future, while [JUUL] enjoyed a multibillion-dollar payday and the comfort of having eliminated a dangerous rival from the marketplace." *Id.* (Emphasis added). Importantly, the FTC has provided dramatic and compelling evidence, direct from certain of the Altria Defendants' communications with JUUL agents and even the JUUL Defendants, confirming that Altria's JUUL investment was predicated on Altria's exit from the lucrative e-cigarette market. For example, an October 5, 2018, letter from defendant Willard to defendant Burns confirmed that "***Altria would agree that it and its current and future subsidiaries, will not compete, in a manner consistent with our previous discussions, in the U.S. e-vapor market for any period, exclusive of the aforementioned transition period, during which it provides support services***." *Id.* at 2. (Emphasis added).

16.    JUUL continues to face Congressional and regulatory scrutiny for playing a leading role in a nationwide public health crisis of youth nicotine addiction and vaping-induced illness.  On June 13, 2019, the U.S. House of Representatives launched an investigation into JUUL, looking into JUUL's business deal with Altria and its social media and advertising practices.  The investigation was spearheaded by Illinois Rep. Raja Krishnamoorthi, Chairman of the House Oversight Subcommittee on Economic and Consumer Policy. The subcommittee found that "Juul appears to be violating FDA regulations against making unapproved express and implied claims that its product helps users stop smoking cigarettes and is safer than cigarettes."

17.    In addition to its own exposure to liability, the immediate financial consequences

---

[9]    *Klein et al., v. Altria Group, Inc. et al..,* Case No. 3:20-cv-00075-DJN (E.D. Va.) (the "Securities Action").

of the Altria Defendants' conscious disregard of the obvious, immediate and existential risks posed by the JUUL investment have been nothing short of catastrophic.  As the serious dangers of JUUL's products and the complete lack of clinical data supporting its safety became clear, JUUL's business collapsed.  In October 2019, Altria wrote down $4.5 billion of its JUUL investment. On January 30, 2020, Altria announced a second write-down of $4.1 billion. On October 30, 2020, Altria announced a further $2.6 billion write-down to fully account for the decimation of JUUL's value and estimates of the legal consequences of its misconduct.  These accounting charges total ***$11.2 billion***, reflecting a loss of ***88%*** of Altria's massive investment less than two years after it was made. Altria's carrying value of the JUUL investment is now just $1.2 billion.

18.     All of these risks were well known to the Altria Defendants and recklessly disregarded when they negotiated and completed the JUUL transaction.  Altria's Board of Directors (the "Board") and senior officers failed to disclose these known risks to Altria stockholders.  As reflected in the District Court's order denying Altria's motion to dismiss the Securities Action, the public record is replete with evidence supporting a strong inference that Altria and the Altria Defendants acted with scienter in proceeding with the deal and misrepresenting its obvious, existential risks.  There is also strong evidence that Altria's officers and directors actively colluded with JUUL and its officers and directors to assist in financing and exploiting JUUL's illegal marketing to youth, misleading representations as to safety and nicotine content, and illegal anticompetitive conduct.

19.     The circumstances surrounding the departures of key officers and directors directly involved in the JUUL investment support the inference of knowing wrongdoing. Following internal recriminations, Defendant James Monsees ("Monsees"), one of the co-founders of JUUL, announced his departure from JUUL in March 2020.  In April 2020, two weeks after the

FTC filed its antitrust action to unwind the Altria-JUUL transaction, defendant Willard announced his retirement as Altria's CEO.  The Board denied him an annual bonus because of "the significant impact that Altria's 2018 minority investment in Juul Labs, Inc. has had on shareholder value."[10] Defendant Willard has the dubious distinction of having the shortest tenure of any Altria CEO.

20.     In late 2019 and early 2020, Plaintiffs issued formal written pre-suit demands pursuant to Va. Code. § 13.1-672.1 *et seq*. on Altria's Board (the "Demands"). Plaintiffs demanded that the Board initiate an independent and reasonable investigation in good faith into the facts surrounding Altria's investment in JUUL and the conduct of the officers and directors primarily responsible for structuring, negotiating, and approving the deal, and that the Board take appropriate legal and remedial action based on its findings to secure redress for the Company and its shareholders.

21.     Plaintiffs issued their respective Demands between November 27, 2019 and July 30, 2020.  Despite the Board's fiduciary duty to promptly conduct an independent and good faith investigation and impartially evaluate Plaintiffs' allegations and proposed legal claims, the Board has repeatedly declined even to begin a formal investigation in response to the Demands. Approximately 20 months since the first of the Demands were made, no serious, sustained inquiry has been conducted by the Board for purposes of responding to the Demands.  Instead, counsel for the Board has asserted that "the Board is familiar with the history and current status of Altria's investment in JUUL[,]" and declined to undertake any investigation in response to the Demands until unspecified "further developments" transpire in the Securities Action.  The Securities Action has survived the defendants' motion to dismiss, the defendants have answered the operative complaint, and discovery is underway.  Yet the Board continues to refuse to take any action in

---

10      *Id*. at 382.

10

response to the Demands.  The Board has not even taken the precaution requested by Plaintiffs of securing tolling agreements with any of the targets to the Demand to ensure that the Company's claims are preserved.  *See, e.g.,* Exhibit A-1.

22.     The Board's extended, continuing, and indefinite refusal to investigate and make an informed decision with respect to the Demands violates Altria's Code of Business Conduct and Ethics for Directors, which obligates Altria's directors to take action to protect the Company's assets, and amounts to a tacit refusal of the Demands in violation of the Board's fiduciary duty to exercise its business judgment and make a decision with respect to the Demands on an informed basis and with due care.  This derivative action is necessary because Altria's Board members have refused to discharge their fiduciary duty to respond in good faith and on an informed basis to bona fide shareholder litigation demands, and to act to protect and preserve Altria's right to legal redress for the injuries inflicted on the Company and its shareholders by faithless fiduciaries.  In light of the Board's wrongful refusal of Plaintiffs' Demands, this Action must proceed.

## II.     JURISDICTION AND VENUE

23.     This Court has jurisdiction over all claims pursuant to 28 U.S.C. § 1332(a) because Plaintiffs and Defendants are citizens of different states, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     This Court has jurisdiction over each Defendant because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this jurisdiction to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

25.     As to the Altria officers and directors, the Court has jurisdiction over them because they are directors and officers of a Virginia corporation.

26.     The Altria officers also regularly worked in Virginia, where they engaged in many of the acts upon which Plaintiffs' claims are based, such as drafting and making statements to public investors through SEC filings, conducting due diligence into JUUL, initiating electronic, telephone, and other written correspondence in furtherance of their scheme with JUUL, and presenting to other Altria employees and the Board.

27.     On information and belief, each of the Altria officers were also residents of Virginia during the relevant period: Willard, Gifford, and Crosthwaite were each executives at Altria who each spent more than two decades at the Company.

28.     In addition to their role as directors of a Virginia corporation, the Altria Defendants conducted business in Virginia during Board meetings.  During the relevant period, there were Board meetings pertaining to the underlying misconduct, where the Board listened to presentations regarding Altria's own e-vapor development and JUUL's rise in the market, and where the Board approved pursuing the JUUL transaction, as well as granting final approval for the deal.

29.     As to the Juul Defendants, this Court has jurisdiction over them because they purposely availed themselves of this forum through conducting some of the activities at issue in this case in Virginia.  Specifically, JUUL Defendants Burns, Pritzker, and Valani met with the Altria Defendants Willard and Gifford at Altria's Richmond headquarters on several occasions in 2017 and 2018 to discuss a potential transaction.  And JUUL Defendants Monsees and Bowen were also keen on an investment by Altria; several years earlier, they had flown to Richmond to meet with Altria's chief technology officer, John R. Nelson, to discuss a potential investment in JUUL's predecessor.  Moreover, the JUUL Defendants engaged written and telephone correspondence with the Altria Officer Defendants while the latter were in Virginia in furtherance

of the underlying misconduct.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the acts and practices complained of herein occurred in this District, and the Company conducts business in and maintains executive offices in this District.

31.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

III.     **PARTIES**

**<u>Plaintiffs</u>**

32.     Plaintiff Eric Gilbert ("Gilbert") is a current owner of Altria common stock and has continuously owned Altria common stock since 2016. Plaintiff Gilbert is a citizen of Florida.

33.     Plaintiff Thomas Sandys ("Sandys") is a current owner of Altria common stock and has continuously owned Altria common stock since 1991. Plaintiff Sandys is a citizen of Ohio.

34.     Plaintiff David Hamilton ("Hamilton") is a current owner of Altria common stock and has continuously owned Altria common stock since 2008. Plaintiff Hamilton is a citizen of Pennsylvania.

35.     Plaintiff Maria Cecilia Lorca ("Lorca") is a current owner of Altria common stock and has continuously owned Altria common stock since 2014. Plaintiff Lorca is a citizen of Florida.

36.     Collectively, Plaintiffs Gilbert, Sandys, Hamilton and Lorca are referred to herein as "Plaintiffs." Plaintiffs Gilbert and Sandys were appointed Co-Lead Plaintiffs by this Court via order dated May 13, 2021. *See* Dkt. No. 94.

**Nominal Defendant**

37.     Altria is a Virginia corporation with its principal place of business in Richmond, Virginia.

**The Individual Defendants**

38.     Defendant Gifford has been Altria's Chairman and CEO since April 2020.  From May 2018 until April 2020, Gifford served as Altria's Vice Chairman and CFO, and from March 2015 until May 2018, Gifford served as Altria's Executive Vice President and CFO.  Gifford also serves on Altria's Board. Upon information and belief, Gifford is a citizen of Virginia.

39.     Defendant Willard is the former Chairman and CEO of Altria. Willard announced his retirement effective April 14, 2020, after spending 28 years with the Company in various roles. Upon information and belief, Willard is a citizen of Virginia.

40.     Defendant Dinyar S. Devitre ("Devitre") has served on Altria's Board since 2008. Devitre was also Altria's Chief Financial Officer from April 2002 to March 2008.   Devitre is a member of Altria's Innovation Committee and has been since at least April 2018 and also a member of the Altria's Nominating, Corporate Governance and Social Responsibility Committee and has been since at least April 2018.  Upon information and belief, Devitre is a citizen of New York.

41.     Defendant Debra J. Kelly-Ennis ("Kelly-Ennis") has served on Altria's Board since 2013.  Kelly-Ennis is a member of Altria's Audit and Innovation Committees and has been since at least April 2018 and also a member of Altria's Nominating, Corporate Governance and Social Responsibility Committee and has been since at least April 2018.  Upon information and belief, Kelly-Ennis is a citizen of Canada.

42.     Defendant W. Leo Kiely III ("Kiely") has served on Altria's Board since 2011.

Kiely is a member of Altria's Innovation Committee and has been since at least April 2018.  Upon information and belief, Kiely is a citizen of Illinois.

43.     Defendant Kathryn B. McQuade ("McQuade") has served on Altria's Board since 2012.  McQuade is a member of Altria's Audit Committee and has been since at least April 2018 and also a Chair of Altria's Nominating, Corporate Governance and Social Responsibility Committee and has been since at least April 2019.  Upon information and belief, McQuade is a citizen of Nevada.

44.     Defendant George Muñoz ("Muñoz") has served on Altria's Board since 2004.  Muñoz is Chairman and a member of Altria's Audit Committee and has been since at least April 2018 and also a member of Altria's Nominating, Corporate Governance and Social Responsibility Committee and has been since at least April 2018.  Upon information and belief, Munoz is a citizen of Illinois.

45.     Defendant John T. Casteen III ("Casteen") has served on Altria's Board since 2010.  Casteen is a member of Altria's Audit and Innovation Committees and has been since at least April 2018.  Upon information and belief, Casteen is a citizen of Virginia.

46.     Defendant Mark E. Newman ("Newman") has served on Altria's Board since 2018.  Newman is a member of Altria's Audit Committee and has been since at least April 2019, and a member of Altria's Innovation Committee and has been since at least April 2020.  Upon information and belief, Newman is a citizen of Delaware.

47.     Defendant Nabil Y. Sakkab ("Sakkab") has served on Altria's Board since 2008.  Sakkab is Chairman and a member of Altria's Innovation Committee and has been since at least April 2018 and also a member of the Altria's Nominating, Corporate Governance and Social Responsibility Committee and has been since at least April 2018.  Upon information and belief,

Sakkab is a citizen of Nevada.

48.     Defendant Virginia E. Shanks ("Shanks") has served on Altria's Board since 2017.  Shanks is a member of Altria's Audit and Innovation Committees and has been since at least April 2018.  Upon information and belief, Shanks is a citizen of Nevada.

49.     Defendant Adam Bowen ("Bowen") is a co-founder of JUUL, serving as a member of the Board of Directors of JUUL and serving as the Chief Technology Officer of JUUL through October 2019 (thereafter transitioning to an advisory role assisting JUUL's CEO). Upon information and belief, Bowen is a citizen of California.

50.     Defendant Monsees is a co-founder of JUUL, serving as the Chief Product Officer of JUUL through October 2019 (thereafter transitioning to an advisory role assisting JUUL's CEO), and serving as member of the Board of Directors of JUUL until March 2020. Upon information and belief, Monsees is a citizen of California.

51.     Defendant Burns was the CEO of JUUL from December 2017 to September 2019. Upon information and belief, Burns is a citizen of California.

52.     Defendant Crosthwaite is the current Chairman and CEO of JUUL. Crosthwaite served as an observer on JUUL's Board of Directors after Altria's investment in JUUL (and at that time, defendant Crosthwaite was a senior executive of Altria).  Upon information and belief, Crosthwaite is a citizen of California or Virginia.

53.     Defendant Valani is and has been a director of JUUL since May 2011. Although he is not an employee of JUUL, Valani was actively involved in JUUL's business. As described below, he had direct involvement in negotiating transactions with Altria from which the claims asserted in this complaint arise. Valani, through his investment vehicle, has been the single largest individual investor in JUUL almost since its inception.  Upon information and belief, Valani is a

citizen of California.

54.     Defendant Pritzker is and has been a director of JUUL since 2015. Although he is not an employee of JUUL, he was actively involved in JUUL's business. As described below, he had direct involvement in negotiating transactions with Altria from which the claims asserted in this complaint arise. Pritzker, through his investment vehicle, is the second largest individual investor in JUUL.  Upon information and belief, Pritzker is a citizen of California.

55.     Defendants Casteen, Devitre, Kelly-Ennis, Kiely, McQuade, Muñoz, Newman, Sakkab, Shanks and Gifford are sometimes referred to herein as the "Board."[11]

56.     Defendants Casteen, Devitre, Kelly-Ennis, Kiely, McQuade, Muñoz, Newman, Sakkab, Shanks, Willard, Gifford, Crosthwaite, Bowen, Monsees, Burns, Pritzker and Valani are sometimes referred to herein as the "Individual Defendants".

57.     Defendants JUUL, Bowen, Monsees, Burns, Pritzker and Valani are sometimes referred to herein collectively as "JUUL Defendants."

**JUUL**

58.     Defendant JUUL is a Delaware corporation with its principal places of business in San Francisco, California and Washington, D.C.

### IV.     THE ALTRIA DEFENDANTS' DUTIES

59.     Because of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Altria Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Altria Defendants were, and are,

---

[11]     Thomas Farrell II ("Farrell"), the former Chair of the Altria Board, passed away on April 2, 2021.  Neither Farrell nor his estate is named as a defendant in this amended complaint.

required to act in furtherance of the best interests of the Company and its shareholders to benefit all shareholders equally and not in furtherance of their personal interests or benefit. Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

60.    The Altria Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

61.    At all times relevant hereto, each of the Altria Defendants was the agent of the other Altria Defendants and of the Company and was at all times acting within the course and scope of such agency.

62.    To discharge their duties, the Altria Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the Altria Defendants were required to, among other things:

    a)  manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

    b)  neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

    c)  establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause

independent investigation to be made of, said reports and records;

d)  neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e)  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f)  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business,

g)  to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

h)  ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

i)  remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

63.     Each Altria Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as

well as in the use and preservation of its property and assets. The conduct of the Altria Defendants

alleged herein involves a violation of their obligations as directors and/or officers of the Company,

the absence of good faith on their part, and a reckless disregard for their duties to the Company

and its shareholders that the Altria Defendants were aware, or should have been aware, posed a

risk of serious injury to the Company. The conduct of the Altria Defendants, who were also officers

and/or directors of the Company, has been ratified by the remaining Altria Defendants.

### V.      SUBSTANTIVE ALLEGATIONS

#### A.      History and Operations of Altria

64.      Altria was founded in 1919 and is headquartered in Richmond, Virginia. The

Company, through its subsidiaries, manufactures and sells cigarettes, smokeless products, and

wine in the United States.  Altria offers, among other products and services, combustible cigarettes,

under the Marlboro, Virginia Slims and Parliament brands; cigars, principally under the Black &

Mild brand; and moist smokeless tobacco products under the Copenhagen, Skoal, Red Seal, and

Husky brands.

#### B.      History and Operations of JUUL

65.      JUUL is an American electronic cigarette company founded in 2007 by defendants

Bowen and Monsees. JUUL sells the JUUL e-cigarette (or e-vaporizer), which packages nicotine

salts from leaf tobacco into one-time use cartridges or "pods" that are heated, and the resulting

vapor is inhaled. The JUUL e-cigarette system consists of three parts: (1) the JUUL e-cigarette

device, (2) the JUULpod (with e-liquid), and (3) the USB charger (collectively referred to herein

as "JUUL"). The JUUL e-cigarette device is a thin, sleek rectangular e-cigarette device consisting

of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light,

and a pressure sensor. JUUL manufactures and distributes JUULpods, which contain liquid that

includes nicotine, flavoring and other additives. Each JUULpod is a plastic enclosure containing

0.7 milliliters of JUUL's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUULpod, the battery in the JUUL e-cigarette device activates the heating element. The heating element, in turn, converts the nicotine solution in the JUULpod into a vapor consisting of nicotine, benzoic acid, glycerin, and propylene glycol, along with myriad chemical flavorings and other chemicals. Many of these chemicals are recognized as toxic.

66.     In 2007, as combustible cigarette sales were on the decline, e-cigarettes were introduced to the U.S. market.  Over time, e-cigarettes developed a small group of regular users, primarily current or former smokers.  By 2014, however, the e-cigarette market in the U.S. was also in decline.

67.     E-cigarettes struggled to compete with combustible cigarettes because of the technical challenge of delivering enough aerosolized nicotine to satisfy a smoker's addiction in a palatable form. Before JUUL, most e-cigarettes used an alkaline form of nicotine called free-base nicotine. When aerosolized and inhaled, free-base nicotine is relatively bitter, irritates the throat, and is perceived as harsh by the user. This experience is often referred to as a "throat hit." The higher the concentration of free-base nicotine, the more intense the "throat hit." While some "harshness" would not have much impact on seasoned cigarette smokers, it would deter newcomers.

68.     Before 2015, most e-liquids on the market were between 1% and 2% concentrations; 3% concentrations were marketed as appropriate for consumers accustomed to smoking approximately forty cigarettes a day. None of these e-liquids delivered as much nicotine as quickly as a combustible cigarette.

69.     Around 2013, JUUL scientists developed new e-liquids and new devices to

simultaneously increase the amount of nicotine that e-cigarettes could deliver to users and reduce the throat hit. Dramatically reducing the throat hit is unnecessary for a product aimed at smokers, who are accustomed to the harshness of cigarette smoke. Still, it very effectively appeals to nonsmokers, especially youths. Reducing the harshness of nicotine also allows more frequent use of e-cigarettes for longer periods of time and masks the amount of nicotine being delivered. JUUL's technology removes the principal barrier to nicotine consumption and addiction by removing the physiological drawbacks of inhaling traditional free-base nicotine.

70.    In 2014, JUUL's scientists calculated key pharmacokinetic parameters, including maximum concentration of nicotine in the blood ("Cmax") and total nicotine exposure ("Area Under the Curve" or "AUC").  JUUL reported the results in U.S. Patent No. 9,215,895 (the '895 patent), for which JUUL applied on October 10, 2014, and which was granted in December 2015. The named inventors on the '895 patent were defendant Bowen and Chenyue Xing.

71.    Among the formulations was a 4% benzoate formulation, which was made with 3.8% benzoic acid and 5% nicotine, as well as propylene glycol and vegetable glycerin.  This 5% nicotine concentration meant that JUUL was 2 to 5 times the strength of the average e-cigarette, which, as mentioned above, only had an average concentration of 1-2% nicotine.  As a further comparison, JUUL also measured nicotine blood levels after smoking Pall Mall cigarettes. According to the patent, the Cmax for Pall Mall cigarettes was 11.65 ng/mL, and for 4% benzoate it was 15.06 ng/mL, which is nearly 30% higher. The total nicotine exposure (as measured by Area Under the Curve or AUC) was 367.5 ng * min/mL for Pall Mall cigarettes and 400.2 ng * min/mL for 4% benzoate, which is almost 9% higher. The 4% benzoate formulation had the highest Cmax and AUC of any of the formulations measured.

72.    Describing these results, JUUL's '895 patent all but brags that it surpassed a

commercially available combustible cigarette (Pall Mall) in maximum delivery and nearly rivaled it in how soon it could deliver peak nicotine. According to the '895 patent, "certain nicotine salt formulations [*i.e.*, JUUL's] provide satisfaction in an individual superior to that of free base nicotine, and more comparable to the satisfaction in an individual smoking a traditional cigarette." The patent further explains that the "rate of nicotine uptake in the blood" is higher for some claimed nicotine salt formulations "than for other nicotine salt formulations aerosolized by an electronic cigarette . . . and likewise higher than nicotine free-base formulations, while the peak nicotine concentration in the blood and total amount of nicotine delivered appears comparable to a traditional cigarette."

73.     In other words, JUUL distinguished itself, and established the patentability of its e-liquids, by reference to its superior ability to deliver nicotine, both in terms of peak blood concentration and total nicotine delivery. The nicotine absorption rate is key to providing users with the nicotine "kick" that drives addiction and abuse. Because "nicotine yield is strongly correlated with tobacco consumption," a JUULpod with more nicotine will strongly correlate with higher consumption rates of JUULpods, generating more revenue for JUUL. In essence, JUUL distinguished itself based on its e-liquids' extraordinary potential to addict.

74.     A study conducted by Samantha Reilly in 2019 tested JUUL's tobacco, crème brûlée, fruit medley, and mint flavors and found that a puff of JUUL delivered $164 \pm 41$ micrograms of nicotine per 75 mL puff.[12] By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152-193 µg/puff.[13] Correcting to account for the different

---

[12]     Samantha M. Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, 21 Nicotine Tobacco Research 1274 (Aug. 19, 2019), https://www.ncbi.nlm.nih.gov/pubmed/30346584.

[13]     Megan J. Schroeder & Allison C. Hoffman, *Electronic Cigarettes and Nicotine Clinical*

puff sizes between these two studies, this suggests that, at 75 mL/puff, Marlboro would deliver about 114-145 µg/puff. In other words, the Reilly study suggests that JUUL delivers more nicotine per puff than a Marlboro cigarette.

75. JUUL scientists realized in 2014 that the amount of nicotine JUUL e-cigarettes delivered could be problematic. Chenyue Xing stated that "[y]ou hope that they get what they want, and they stop," but JUUL scientists were concerned that "a Juul—unlike a cigarette—never burns out," so the device gives no signal to the user to stop. According to Xing, JUUL scientists "didn't want to introduce a new product with stronger addictive power."[14] For this reason, "the company's engineers explored features to stop users from ingesting too much of the drug, too quickly. JUUL's founders applied for a patent in 2014 that described methods for alerting the user or disabling the device when the dose of a drug such as nicotine exceeds a certain threshold." *Id.* For example, "[o]ne idea was to shut down the device for a half-hour or more after a certain number of puffs[.]" *Id.* But upper management rejected the concerns that the scientists raised, and "[t]he company never produced an e-cigarette that limited nicotine intake." *Id.*

76. JUUL knew that among its target audience—young people—cigarette smoking had become increasingly stigmatized. JUUL wanted to create a product that would create "buzz" and excitement, totally different from the image of addicted cigarette smokers huddling outside their workplaces in the cold to get their nicotine fix. Not only did JUUL contain high levels of nicotine that delivered a strong "buzz" from the first puff, JUUL designed its product to look appealing to youth and non-smokers.

---

*Pharmacology*, 23 Tobacco Control ii30 (May 23, 2014), www.ncbi.nlm.nih.gov/pmc/articles/PMC3995273/.

[14] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019, 11:00 AM), https://www.reuters.com/investigates/special-report/juul-ecigarette/.

77.     Unlike the distinct smell and odor emitted from combustible cigarettes, JUUL emits a reduced aerosol with a nearly undetectable scent. And unlike other e-cigarettes, the JUUL device does not produce large plumes of smoke. Instead, the vapor cloud is very small and dissipates very quickly, allowing for concealed use. As a result, young users can, and do, use JUUL—in class or at home—without detection.

78.     The JUUL device is small and discrete. Fully assembled, the device is just over 9.5 cm in length and 1.5 cm wide. The JUUL device resembles a memory stick and can be charged in a computer's USB drive. As can be seen from the following image, this design allows the device to be concealed in plain sight, camouflaged as a thumb-drive, for use in public spaces, like schools:



79.     JUUL's high-tech design was intended to make it appealing to youth. JUUL's design also included an LED light, which allowed users to activate "party mode," whereby the LED light would flash a rainbow of colors. "Party mode" is activated by the user by waving the JUUL device back and forth until the white LED light starts flashing multiple colors so that the rainbow colors are visible when the person inhales from the JUUL device. "Party mode" can also be permanently activated on the JUUL by the user quickly and firmly slapping the JUUL against

the palm of the hand, until the LED light starts flashing multiple colors permanently. This feature was another characteristic that set JUUL apart from other e-cigarettes on the market and made it even more appealing and "cool" to young users.

### C. Federal Law Prohibits the Marketing or Sale of E-Cigarettes to Anyone Under 18 Years of Age

80.     Government statistics show that nearly 9 out of 10 smokers start smoking by age 18, and more than 80% of underage smokers choose brands from among the top three most heavily advertised.[15] If the goal is to curb American smoking, it is, therefore, critical to stop underage smoking. Several different federal laws provide regulators with tools they can use in their attempts to limit and reduce underage tobacco use.

81.     The 2010 implementation of the Family Smoking Prevention and Tobacco Control Act ("Tobacco Control Act") provides the FDA with authority over all products made or derived from tobacco.

82.     The Food, Drug, and Cosmetic Act ("FD&C Act") prohibits introducing into interstate commerce of any modified risk tobacco product without permission from the FDA. A "modified risk tobacco product" means any tobacco product, including an e-cigarette, that is sold or distributed for use to reduce harm, or the risk of tobacco-related disease associated with commercially marketed tobacco products. 21 U.S.C. § 387k(a), (b)(1).

83.     The FD&C Act regulates a tobacco product sold with labeling or advertising that "represents explicitly or implicitly" that the product presents a lower risk of tobacco-related disease or is less harmful than other tobacco products. This regulation applies equally if a manufacturer takes any action directed to consumers that would cause consumers to believe the

---

[15]     *Preventing Tobacco Use Among Youths*, Surgeon General Fact Sheet, Surgeon Gen., https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/preventing-youthtobacco-use- factsheet/index.html.

product is safer than other tobacco products. 21 U.S.C. § 387k(b)(2). To market a product as a modified risk tobacco product, a company must receive authorization from the FDA. 21 U.S.C. § 387k(g).

84.     FDA regulations prohibit tobacco product manufacturers, including both Altria and JUUL, from making claims regarding the relative *risk* of particular tobacco products unless the FDA issues a marketing order ("MRTP Order") approving the use of such claims. Such approval can only come after a company conducts and submits extensive scientific to the FDA. JUUL has never received an MRTP Order from the FDA.

85.     Cigarettes are highly regulated because, *inter alia*, they contain harmful chemicals, including tar and nicotine. Nicotine is a highly addictive central nervous system stimulant derived primarily from the tobacco plant. Both combustible cigarettes and e-cigarettes deliver nicotine in highly efficient ways to the user's airway, bloodstream, and brain. Once ingested, nicotine travels quickly to the brain, triggering the release of chemicals and ultimately feelings of reward. As a result, users come to associate nicotine with pleasurable feelings. Nicotine addiction is the most common and most harmful effect of nicotine use. Regular use of nicotine leads to problematic symptoms upon withdrawal, which, in turn, perpetuate continued use regardless of adverse consequences.

86.     Nicotine use can cause the rapid onset of physiological and psychological dependence and various physical and behavioral side effects. These side effects include increased heart rate and blood pressure, peripheral vasoconstriction, headache, dizziness, nausea, irritability, and sleep disturbance. The use of nicotine while pregnant is associated with severe health risks to children after they are born, including but not limited to hypertension, infertility, respiratory dysfunction, and type 2 diabetes.

87.     Nicotine is particularly dangerous for young people because their brains are still developing until about age 25. During adolescent brain development, the brain creates connections (synapses) that allow for the creation of new memories and development of new skills faster than the adult brain. This increased rate of synapse creation means that adolescents can more easily become addicted to nicotine than adults, which can prime their brains for addiction to other drugs. Nicotine creates stronger feelings of reward in adolescents than in adults and, as a result, adolescent smokers are more likely than adult smokers to become dependent on nicotine.

88.     Scientific evidence clearly shows that the use of e-cigarettes, such as those sold by JUUL, may contribute to lung disease, heart attacks, and may even cause seizures. E-cigarette aerosolized liquid may also contain carcinogens. Similar to traditional combustible cigarettes, e-cigarettes contain nicotine, which is more damaging for young users because their brain development is still in progress. Studies have also shown that nicotine affects cell activity in the brain and negatively affects attention, learning, and memory capacities.

89.     Moreover, human brain development, including in areas of the brain involved in higher cognitive function, such as the prefrontal cortex, continues throughout adolescence and well past the age of 20. According to the CDC, "[u]sing nicotine in adolescence can harm the parts of the brain that control attention, learning, mood, and impulse control."

90.     Youth who become addicted to nicotine through JUUL products often experience a range of negative social, emotional, behavioral, and physical effects. Teenagers describe wild mood swings, violent outbursts, shouting, and emotional confrontations with family and friends. They express feelings of self-hatred for being dependent on a JUUL device and intense anxiety at the thought of doing without it. Evidence also shows that some minors resort to stealing from their parents or selling e-cigarette paraphernalia or clothing items to support their habits. They also find

themselves feeling winded—coined "JUUL lung"—and unable to keep up with their regular physical activity. Young JUUL users report increased anxiety and physical symptoms such as uncontrollable shaking when withdrawing from nicotine.

91.     Families of young people addicted to e-cigarettes struggle to identify treatment options. Such families must also respond to school disciplinary matters and monitor the children to ensure that they are not continuing to use e-cigarettes. Some families expend significant sums of money to place children in private drug treatment programs.

92.     The full extent of negative health effects to underage consumers from the widespread use of JUUL e-cigarettes is still unknown. Scientists warn that the long-term health effects of JUUL and other e-cigarettes may not be known for decades.

**D.     Altria's History of Marketing to Young People and Misleading the Public as to the Dangers of Its Products**

93.     For decades, Altria, its subsidiary Philip Morris, and the other behemoths of the U.S. tobacco industry, often referred to as "Big Tobacco," made billions of dollars through aggressive marketing campaigns in film, television, and print that failed to warn of the harmful effects of nicotine and cigarettes. This marketing campaign created the false impression that combustible cigarettes were safe, yet left millions of Americans unwittingly addicted to nicotine, caused millions of deaths and illnesses due to lung cancer, lung disease and cardiovascular issues, leading to immeasurable human suffering. Internal Philip Morris documents that have become public as a result of litigation reveal that Philip Morris's explosive growth in the middle part of the last century was driven by its intentional strategy of cultivating new teenage smokers. A host of such documents provide a glimpse into Philip Morris's strategies of targeting youth.

94.     Philip Morris conducted extensive research into youth smoking behavior to inform its marketing strategy. In the 1960s, Philip Morris commissioned studies examining teenagers'

smoking habits as young as 12 or 13 years old. A 1963 study examined the brands smoked by teenagers aged 13–18, how much they smoked, what prompted them to begin smoking, and how often they purchased cigarettes from vending machines. A 1973 internal memorandum discussed the results of a survey aimed at youths between 12–17 years old seeking to identify how and why such youths purchased cigarettes.

95.     Philip Morris itself recognized, internally, that its growth as a company was fueled by its efforts to market to teens. A May 1975 internal Philip Morris memorandum explained: "Marlboro's phenomenal growth rate in the past has been attributable in large part to our high market penetration among young smokers…15 to 19 years old… [M]y own data, which includes younger teenagers, shows even higher Marlboro market penetration among 15-17 year-olds."

96.     Another 1981 memo explained that Philip Morris's success stemmed from its ability to hook teenagers at an early age while cultivating brand loyalty which, when combined with addictive nicotine, would ensure long-term customers. The memo explained: "the success of Marlboro Red during its most rapid growth period was because it became *the* brand of choice among teenagers who then stuck with it as they grew older."

97.     This "phenomenal growth" was no accident. It was instead the product of a concerted business strategy. In an internal 1992 memorandum, Philip Morris acknowledged: "[T]he ability to attract new smokers and develop them into a young adult franchise is key to brand development."

98.     Another internal document underscored that the key to Philip Morris's continued success was to recruit new, young smokers to its brand: "[To support Marlboro's growth, Marlboro must] continue growth among new, young smokers…. While Marlboro continues to attract increasing shares of young smokers, expected declines in the number of young people restrict

future volume gains from this source."

99.     Decades before JUUL adopted the strategy of marketing its products directly to high-school students (as described below), Philip Morris invented that strategy. Philip Morris touted internally its efforts to sell its Marlboro cigarettes through retail locations close to high schools, exclaiming in an internal March 1998 document: "Sales—Outstanding! Outstanding! Outstanding! … This account is located 2 blocks from Bellingham High School. Our pre-sell has sold through. The account had reordered and received more product."

100.     Philip Morris was aware of how reductions in teenage smoking would cause a particularly negative impact on Philip Morris compared to other tobacco companies because Philip Morris had a high portion of youth customers. In a 1981 internal memo, Philip Morris acknowledged: "Because of our high share of the market among the youngest smokers, Philip Morris will suffer more than the other companies from the decline in the number of teenage smokers."

101.     Through its subsidiary, Philip Morris, Altria preserved and expanded its dominant market position in cigarettes by deceiving consumers about the health risks of cigarettes and, later, by touting so-called "light" cigarettes as a safer alternative to regular cigarettes. Altria's marketing provided a blueprint for JUUL's marketing strategy—to deceive consumers into believing that its product was safe or even beneficial.

102.     By the 1950s, the link between cigarettes and lung cancer had become firmly established among medical researchers. But there was uncertainty among the consuming public as to the link, particularly among addicted smokers who sought to rationalize their self-harming behavior by downplaying the harm. While smokers were hearing from public health experts about the cancer risk from smoking, they also heard from sources in the tobacco industry that smoking

was safe. Popular sports figures, movie stars, and other high-profile personalities appeared in thousands of cheery tobacco ads which made no reference to any hazard.

103.     Philip Morris and other tobacco companies countered the growing public health concern about smoking in several ways. For example, Philip Morris and other tobacco companies employed doctors to advertise that cigarettes were helpful to "soothe the throat" or "aid digestion" or "keep you alert."

104.     The tobacco industry stopped making explicit health claims in the 1950s, following a decade of governmental investigations in which the industry was charged with false advertising. But even without making explicit health claims, the tobacco industry, Philip Morris included, continued to fight back against the cancer scare with an aggressive, coordinated campaign of deceit.

105.     In 1953, the nation's largest tobacco companies met in New York and coordinated to issue the infamous "Frank Statement to Cigarette Smokers," published in newspapers throughout the country. The "Frank Statement" claimed that consumers' health was "paramount to every other consideration in our business" and that claims that cigarettes lead to death had been abandoned "one by one" for lack of evidence. This was an outright lie; claims relating to the health risks of cigarettes had not been abandoned but had instead accumulated steadily.

106.     Together with other tobacco companies, Philip Morris formed the Tobacco Industry Research Committee ("TIRC") to undermine the evidence accumulating in the public health community about the dangers of cigarettes. A 1962 TIRC press release claimed that "the causes of lung cancer are not known to science," and a 1978 booklet reasserted that "years of scientific research" had "failed to provide conclusive evidence that smoking causes disease."

107.     Altria and its affiliates were direct participants in concealing and downplaying the

32

harmful effects of cigarettes. In 1971, for example, in response to the British Research Council's findings that babies born to smoking mothers had higher mortality rates and were significantly underweight, Philip Morris' President and CEO, Joseph F. Cullman, III, responded on "Face the Nation," a popular national television program, that "we do not believe that cigarettes are hazardous" and that in any event, perhaps "some women would prefer having smaller babies."

108.    One important lesson from Philip Morris' history of deceiving the consuming public is that nicotine companies' public statements about the risks or benefits of their products often bear little relationship to their actual understanding of those risks and benefits. At the same time Philip Morris publicly questioned and denied the harmful nature of cigarettes, a 1996 internal Philip Morris document, marked as "Not to be taken from this room," acknowledged that "gross lung pathology can be induced by smoking cigarettes."

109.    Along the same lines, at the same time Philip Morris denied publicly that cigarettes caused cancer, an internal 1961 Philip Morris report listed 40 separate carcinogens in cigarette smoke and a dozen additional "tumor promoting agents."

110.    As the tobacco industry began to lose the battle of public opinion regarding the safety of cigarettes, Philip Morris tried a new strategy: making and promoting a type of cigarette as a safer alternative to "regular" cigarettes. Philip Morris's strategy directly foreshadowed JUUL's business model decades later: attempting to convince smokers that one addictive nicotine product was a safer alternative than other nicotine products.

111.    As Philip Morris began to develop a cigarette it could market as safer, however, it recognized one fact: the nicotine content of the cigarettes must be kept high because if nicotine levels fell below a threshold, people might begin to quit. Philip Morris's internal documents recognized that nicotine levels "should be 0.7 mg minimum" to keep smokers hooked.

112.     Philip Morris dishonestly achieved this goal by designing cigarettes with a lower tar and nicotine yield when measured by robotic smoking machines but that delivered the same tar and nicotine yield when smoked by a human. This disconnect between machine testing and human consumption was caused by a phenomenon known as "compensation," which refers to adjustments smokers unconsciously make to achieve the same degree of nicotine fix (for example, puffing the cigarette more forcefully). This strategy also provided a blueprint for JUUL, which, as discussed more fully below, would intentionally design its pod-based cigarette to maximize nicotine delivery to cause the user to become addicted.

113.     Philip Morris was fully aware of this phenomenon. As one internal Philip Morris document put it: "People do not smoke like the machine…people smoke in such a way that they get much more than predicted by the machine." Another internal document, prepared shortly before Philip Morris began selling "light" cigarettes, explained: "[I]t is the pharmacological effect of the inhaled some which mediates the smoking habit… We have then as our first premise that the primary motivation for smoking is to obtain the pharmacological effect of nicotine."

114.     Recognizing smokers were increasingly concerned about their health, Philip Morris developed and later sold so-called "light" cigarettes. Philip Morris's "light" cigarettes previewed the same marketing strategy JUUL would use decades later: seeking to keep consumers addicted to its product through promises of a healthier nicotine delivery system. Philip Morris started selling "Marlboro Lights" in 1972.

115.     Philip Morris, much like JUUL later, did not make explicit health claims but instead relied on product labels such as "lowered tar and nicotine" and "light" to communicate, indirectly, that health message. A 1980 internal Philip Morris document, for example, explained "implicit in the tobacco industry's promotion of the low delivery cigarettes is the assumption that

less tar and less nicotine represent a safer cigarette."

116.     Consumers broadly understood the message. Consumers who identified as "light smokers" were generally more concerned about their health, working under the assumption that light cigarettes were safer than regular cigarettes. A report commissioned by Philip Morris confirmed this consumer understanding, concluding: "The low tar brands have cornered opinion that to the extent any brands are better for your health, they are." Researchers in 1994 concluded that "the main reason for switching [to 'light' cigarettes] was perceived health."

117.     As explained above, however, this understanding was wrong, and Philip Morris knew it. In short, Philip Morris promoted a supposedly safer cigarette while knowing all along that "light" cigarettes were no safer than regular cigarettes.

118.     Since the true dangers of nicotine and smoking cigarettes came to light, Big Tobacco has faced decades of litigation over its advertising practices, including its marketing campaigns targeting youth and its failure to adequately warn of the dangers associated with smoking cigarettes. Much of this litigation culminated in 1998, when 46 state attorneys general entered into the aforementioned Tobacco Master Settlement Agreement, or MSA. The MSA prohibits Altria and the other major cigarette companies from marketing and advertising their products to youth (ages 18 years old and younger) and setting forth specific acts prohibited (such as use of cartoon characters and billboards near school grounds).

119.     The MSA contains several provisions designed specifically to prevent tobacco marketing that targets youth. The first provision sets out a general prohibition on "any action, directly or indirectly, to target Youth . . . in the advertising, promotion or marketing of Tobacco Products." Subsequent provisions prohibit specific actions such as utilizing cartoons, sponsoring certain music or sporting events, advertising on billboards or on public transportation, using paid

product placement in media, creating and distributing tobacco brand-name merchandise, distributing free samples, and providing gifts to youth in exchange for proofs of purchase, rewards points, or coupons.

120.    Beginning in the 1980s, Big Tobacco developed new, fruity flavors with matching bright advertisements to attract young, impressionable consumers who were unaware of the addictive, poisonous effects of cigarettes. In 2006, the U.S. Department of Justice reached a separate settlement with Altria and the other major cigarette companies which prohibited them from selling flavored cigarettes (excluding menthol); and required them to issue corrective statements explaining that cigarettes are unsafe and were designed to create and sustain addiction.

121.    In August 2006, a federal judge found the major cigarette makers guilty of civil fraud and racketeering, concluding that the government had proven their participation in a decades-long conspiracy to deceive the public about the risks of smoking in order to sustain their profits. The court found that Altria and the tobacco industry engaged in a decades-long racketeering enterprise that conspired to hide the dangers of smoking.

122.    The judge wrote: "Over the course of more than 50 years, defendants lied, misrepresented, and deceived the American public, including smokers and the young people they avidly sought as 'replacement smokers,' about the devastating health effects of smoking and environmental tobacco smoke."

123.    "They suppressed research, they destroyed documents, they manipulated the use of nicotine so as to increase and perpetuate addiction, they distorted the truth about low-tar and light cigarettes so as to discourage smokers from quitting, and they abused the legal system in order to achieve their goal -- to make money with little, if any, regard for individual suffering, soaring health costs, or the integrity of the legal system," the court concluded.

124.    Citing internal industry documents, the court found that the industry knew that nicotine was addictive, but publicly denied it "and continue(s) to do so." In addition, the court found that the companies "concealed and suppressed research data and other evidence that nicotine is addictive," adding that the companies "have falsely denied that they can and do control the level of nicotine delivered in order to create and sustain addiction" and worked on ensuring that "all cigarettes delivered doses of nicotine adequate to create and sustain addiction." They do so, the court concluded, by altering the chemical form of nicotine delivered in smoke and by changing cigarette filters' design and paper porosity and composition.

125.    The court specifically faulted the industry for marketing to youth, concluding that "independent studies have found that marketing is a substantial contributing factor to youth smoking initiation." Despite the tobacco industry asserting that it does not want children to smoke, the court found that the companies tracked youth behavior and preferences, thereby ensuring that "marketing and promotion reaches youth."

126.    In addition, the court stated that the companies continued to use marketing themes intended to resonate among youths, advertise in youth-oriented publications and continue price promotions that lure young people to their products. The court also found that the companies' purported youth smoking prevention programs were "not designed to effectively prevent youth smoking."

127.    The implementation of the MSA's marketing restrictions in the late 1990s, combined with public health and public policy efforts inspired or funded by the MSA, disclosure of documents relating to Big Tobacco's wrongdoing, and subsequent litigation enforcing the MSA, contributed to dramatic declines in tobacco use, including among youth.

128.    The Altria Defendants were well aware of the history of Philip Morris's illegal

and deceptive marketing.  In particular, defendants DeVitre, Willard, Gifford, and Crosthwaite were familiar with these efforts because they were long-time Altria and Philip Morris executives. DeVitre was a senior executive at Philip Morris and Altria for decades, culminating in his appointment as CFO of the entire Company in 2002, before retiring as an active executive in 2006. But since then, he has maintained his active involvement in the Company as a Board member. Defendant Willard spent 28 years at Philip Morris and Altria, and during the early 2000s even headed Philip Morris's youth prevention program, which often consisted of attacking criticism of Philip Morris's marketing programs.  Gifford, similarly, spent more than two decades at Philip Morris or Altria.  Crosthwaite spent his entire career at Philip Morris or Altria (for over 22 years) before moving to JUUL.  Willard, Gifford, and Crosthwaite all started at Philip Morris in the 1990s, when Philip Morris was in the middle of its regulatory battles with state and federal authorities, where Philip Morris ultimately expended billions of dollars in fines and settlements, suffered severe reputational damages, was forced to disclose its decades of deception, and suffered severe and ongoing reputational harm.

> **E.**     **JUUL Surges in Popularity by Copying Big Tobacco's Historical Playbook by Targeting New, Underage Smokers**

129.     JUUL closely followed the blueprint laid by Altria and other tobacco companies, which engaged in the same practices to maximize sales of combustible cigarettes decades earlier.

130.     E-cigarette companies' first step in replicating the success of combustible cigarettes was to create a product that, like combustible cigarettes, was based on getting users addicted to the nicotine in the product. Route of administration and speed of delivery are key to understanding nicotine's addictive potential.

131.     Nicotine fosters addiction through the brain's "reward" pathway. Both a stimulant and a relaxant, nicotine affects the central nervous system; increases blood pressure, pulse, and

metabolic rate; constricts blood vessels of the heart and skin; and causes muscle relaxation. Long-term exposure to nicotine causes physical changes to the brain, including an increase in the number of these high-affinity nicotinic receptors in the brain. When nicotine binds to these receptors, it triggers a series of physiological effects in the user that smokers perceive as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. With regular nicotine use, however, these feelings diminish, and the user must consume increasing amounts of nicotine to achieve the same effects.

132.    As described by the U.S. Surgeon General, "Tobacco use is a pediatric epidemic." Nine out of ten smokers begin by age 18, and 80% who begin as teens will smoke into adulthood.[16]

133.    The above statements apply equally, if not more so, to e-cigarettes. Further, the U.S. Surgeon General has explained how the nicotine in e-cigarettes affects the developing brain and can addict kids more easily than adults: "Until about age 25, the brain is still growing. Each time a new memory is created or a new skill is learned, stronger connections—or synapses—are built between brain cells. Young people's brains build synapses faster than adult brains. Because addiction is a form of learning, adolescents can get addicted more easily than adults."[17]

134.    It took five decades of public health initiatives, government intervention, impact litigation, consumer education, and tobacco regulation to finally see a significant drop in cigarette smoking and nicotine addiction. The CDC indicates self-reported adult smoking dropped to 18% by 2014 and self-reported quitting increased from 50.8% in 2005 to 59% in 2016. By 2014, teen smoking also hit a record low of 15.7%.

---

[16]    *Preventing Tobacco Use Among Youth and Young Adults, A Report of the Surgeon General* at 1 (2012), https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/index.html.

[17]    *Know The Risks: E-Cigarettes & Young People*, https://e-cigarettes.surgeongeneral.gov/knowtherisks.html.

39

135.    The U.S. Surgeon General reported in 2014 that: "We are at a historic moment in our fight to end the epidemic of tobacco use that continues to kill more of our citizens than any other preventable cause. The good news is that we know which strategies work best. By applying these strategies more fully and more aggressively, we can move closer to our goal of making the next generation tobacco-free."[18]

136.    Where the public health community saw progress in curbing the use of cigarettes and nicotine addiction, JUUL, the JUUL Defendants and the Altria Defendants saw (and seized) a business opportunity.

137.    JUUL sought to build and dominate a new market for nicotine products without the baggage of combustible cigarettes (*i.e.*, with a well-established link to death and disease). To accomplish this goal, JUUL engineered a modern, tech-forward, and cool-looking e-cigarette device capable of delivering more nicotine and fueling higher levels of consumer addiction than ever before. JUUL marketed that highly addictive device as healthy, safe, cool, and available in kid-friendly flavors.

138.    In achieving these goals, JUUL followed Big Tobacco's playbook, pioneered decades prior. Defendant Monsees admitted that he and defendant Bowen carefully studied the marketing strategies, advertisements, and product design revealed in cigarette industry documents when creating JUUL. Those documents were made public through litigation and the MSA, which required documents produced in litigation to be made publicly accessible through an online, searchable database. Monsees acknowledged that cigarette industry documents "became a very intriguing space for [them] to investigate because we had so much information that you wouldn't

---

[18]    U.S. Dept. of Health and Human Services. *LET'S MAKE THE NEXT GENERATION TOBACCO-FREE: Your Guide to the 50th Anniversary Surgeon General's Report on Smoking and Health,* https://www.hhs.gov/sites/default/files/consequences-smoking-consumerguide.pdf.

normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[19]

139.    In a thesis presentation defendants Bowen and Monsees gave in 2004, Monsees candidly admitted, "[t]he cigarette is actually a carefully engineered product for nicotine delivery and addiction."[20] JUUL researched how cigarette companies engineered their products and chemically manipulated nicotine to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry." Through the trove of documents made public to curb youth smoking and aid research to support tobacco control efforts, JUUL was able to review literature on manipulating nicotine pH to maximize its delivery in a youth-friendly vapor with minimal "throat hit."

140.    By studying historical Big Tobacco documents, JUUL learned that the cigarette industry had tried for years to figure out ways to create and sustain addiction by delivering more nicotine in a way that would be easy to ingest. The key was to deliver nicotine in a way that avoids nausea, cough, or other adverse side effects that many new smokers experienced. JUUL also engaged former cigarette industry researchers to consult on the design of its product.

141.    JUUL attempted to distinguish JUUL products from the death and disease associated with cigarettes by deliberately providing false assurances of safety. For example, on May 8, 2018, a document titled "Letter from the CEO" appeared on JUUL's website. The document stated: "[JUUL]'s simple and convenient system incorporates temperature regulation to heat nicotine liquid and deliver smokers the satisfaction that they want without the combustion

---

[19]    Gabriel Montoya, *Pax Labs: Origins with James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/

[20]    Jordan Crook, *This is the Stanford Thesis Presentation That Launched Juul*, Tech Crunch (Feb. 27, 2019), https://techcrunch.com/2019/02/27/this-is-the-stanford-thesispresentation-that-launched-juul/

and the harm associated with it."[21]

142.    The terms of the MSA did not bind JUUL. This provided JUUL a crucial advantage over established Big Tobacco companies, the marketing practices of which the MSA substantially curtailed. JUUL seized upon this opportunity to use Big Tobacco's old strategies of marketing to youth and creating the false impression that its products were harmless, thus addicting a new generation of consumers to nicotine. A study published on January 31, 2019, by researchers at the Stanford University School of Medicine (the "Stanford Study") performed a comprehensive analysis of JUUL's marketing during its first six months of operation, concluding that JUUL's marketing during that period was "patently youth oriented." For the two-and-a-half years following that period, although JUUL's targeting of youth was more subtle, the Stanford researchers found the youth focus was still very much present. This strategy included the distribution of advertising on social media channels frequented by youth, amplified by faux-viral campaigns for which young and underage users were the known and intended targets.

143.    Defendants Monsees and Bowen capitalized on a central database of Big Tobacco advertising information maintained by a research group known as Stanford Research Into the Impact of Tobacco Advertising ("SRITA"), run by Dr. Robert Jackler, as the building blocks for JUUL's advertising strategy.

144.    The emulation is obvious. The side-by-side comparison below between JUUL advertisements and historical cigarette advertisements reveals JUUL copied the historical advertisements. Specifically, JUUL focused on imagery related to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory pleasure, including taste.

---

[21]    U.S. Food and Drug Administration Warning Letter to JUUL Labs (September 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminalinvestigations/warning-letters/juul-labs-inc- 590950-09092019.



145.    JUUL deployed the very same strategy but adapted it to modern advertising tactics. JUUL's #Vaporized campaign provides a classic example. In 2015, JUUL launched its products with an expensive, multi-faceted marketing campaign. On social media platforms widely used by adolescents, such as Twitter, Instagram, and Facebook, JUUL branded itself with the catchy hashtag "#Vaporized," to introduce the sleekness and style of its JUULpods.

146.    JUUL developed its initial marketing strategy with the help of two creative agencies — Cult Collective and Grit Creative Group ("Grit"). Cult Collective promises to provide companies with a competitive edge by "focusing on proven platforms that . . . forge fanatical loyalty," while Grit declares itself an "authority on Millennial culture."

147.    JUUL rolled out magazine advertisements and social media marketing posts with flashy images of young people looking hip, cool, and sexy while holding their JUUL devices. These ads were full of bright colors, funky patterns, and attractive, young models. JUUL's ads featured little copy, typically including only the words "JUUL" and "Vaporized," in black or white, offset against the splashy background. These ads portray JUUL as a hip and fun brand for

43

millennials and young people. The vivid color scheme was designed to appeal to youth. Examples of advertising from the "Vaporized" campaign are below:



148.    After developing advertisements for the Vaporized campaign that featured youthful, fashionable models, JUUL engaged numerous companies to place advertisements, including static "banner" advertisements and video advertisements, on websites across the internet. These companies, known as programmatic media buyers, purchased "impressions" (*i.e.,* the

appearance of an advertisement on a particular website when visited by a single user or device) from online advertising exchanges. Advertisements from the Vaporized campaign began appearing on websites as early as June 2015.

149.    JUUL marketed its products by purchasing banner advertisements and video advertisements on nick.com and nickjr.com. These two Nickelodeon websites feature shows and games from the Nickelodeon television network, which is a television network for children.

150.    JUUL purchased banner advertisements on the Cartoon Network's website at cartoonnetwork.com, allfreekidscrafts.com, hellokids.com, kidsgameheroes.com, dailydressupgames.com, didigames.com, forhergames.com, games2girls.com, girlgames.com, and girlsgogames.com. *These websites each offer children's television programming and games for children.*

151.    JUUL purchased advertisements on a range of websites designed to help middle school and high school students develop their mathematics and social studies skills. JUUL purchased tens of thousands of impressions for video and banner advertisements on coolmath-games.com, basic-mathematics.com, coolmath.com, math-aids.com, mathplayground.com, mathway.com, onlinemathlearning.com, purplemath.com, and socialstudiesforkids.com.

152.    JUUL purchased banner advertisements on websites expressly designed for teenagers, such as teen.com, seventeen.com, justjaredjr.com, and hireteen.com.

153.    JUUL purchased advertisements on websites for high school students hoping to attend college, such as collegeconfidential.com and collegeview.com.

154.    These allegations regarding JUUL's marketing to youth were made in the Massachusetts Attorney General's thoroughly researched complaint against JUUL and reported in

*The New York Times.*[22]

155.     JUUL's website advertising was supplemented by substantial investments in direct engagement with customers and influencers through social media platforms, including Twitter and Instagram. JUUL solicited influencers by sending them free JUUL e-cigarettes or discount codes to enable influencers to obtain free e-cigarettes from JUUL's website. JUUL intended that, after receiving these free or deeply discounted products, influencers would promote JUUL e-cigarettes by using them in public, post JUUL-related content on their social media accounts, or otherwise share positive impressions regarding JUUL with others. JUUL monitored influencer social media accounts for JUUL-related content and reposted JUUL-related social media content created by influencers.

156.     Most egregiously, as Phillip Morris had done in the 1980s, under the guise of anti-smoking education programs, JUUL gave presentations to high schoolers across the country that effectively pitched JUUL's products as safer, smoke-free alternatives to combustion cigarettes. Despite the dearth of clinical studies demonstrating the safety of its products, JUUL representatives assured impressionable high school students that JUUL's products were "totally safe." For example, after one assembly, a student approached the JUUL representative and asked what to do about a friend addicted to nicotine. The representative responded that JUUL's products are a "safer alternative than smoking cigarettes, and it would be better for that kid to use JUUL."[23]

157.     JUUL's and the JUUL Defendants' efforts were incredibly successful.  A 2018 study of JUUL users between the ages of fifteen and twenty-four revealed that 63% remained

---

[22]     Kaplan, Sheila. *JUUL Bought Ads Appearing on Cartoon Network and Other Youth Sites, Suit Claims.* The New York Times (Feb. 12, 2020), https://www.nytimes.com/2020/02/12/health/juul-vaping-lawsuit.html

[23]     Jeffrey G. Willett, et al. *Recognition, Use and Perceptions of Juul Among Youth and Young Adults*, 28 Tobacco Control 054273 (2019).

unaware that JUUL products contain nicotine.[24] Similarly, in 2018, a literature review of seventy-two articles published in the *International Journal of Environmental Research and Public Health* found that adults and youth alike perceived e-cigarettes as being healthier, safer, less addictive, safer for one's social environment, and safer to use during pregnancy than combustible cigarettes. *Id.*

158.    JUUL's mission, of course, was not to improve public health. Rather, JUUL sought to introduce a new generation of consumers to nicotine in a way that Big Tobacco (and Altria) had failed to do and could no longer practically accomplish given the restrictions the MSA imposed. JUUL's business model was never about reducing addiction. As one JUUL engineer put it: "We don't think a lot about addiction here because we're not trying to design a cessation product at all . . . anything about health is not on our mind."[25]

159.    JUUL and defendants Bowen and Monsees achieved their vision. Pioneering a nicotine delivery technology that eliminated the harshness of traditional free-base nicotine, JUUL's e-cigarette system provided consumers with palatable access to high concentrations of nicotine like never before. Since JUUL's launch in 2015, JUUL has become the dominant e-cigarette manufacturer in the U.S. Its revenues grew by 700% in 2017 alone. By 2019, JUUL owned three-quarters of the e-cigarette market.

### F.    JUUL Enticed Youth and Newcomers to Nicotine with Kid-Friendly Flavors

160.    For decades, cigarette companies have known that flavored products are key to getting young people to acclimate to nicotine. A 2004 study found that seventeen-year-old smokers

---

[24]     *Id.*

[25]     Kevin Roose, *Juul's Convenient Smoke Screen*, The New York Times (Jan. 11, 2019), https://www.nytimes.com/2019/01/11/technology/juul-cigarettes-marketing.html

were more than three times as likely as those over the age of twenty-five to smoke flavored cigarettes, and that they viewed flavored cigarettes as safer than regular cigarettes.[26]

161.     In 2009, the FDA banned flavored cigarettes (other than menthol) as its first major anti-tobacco action pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009. "Flavored cigarettes attract and allure kids into addiction," Health and Human Services Assistant Secretary Howard Koh, MD, MPH, said at a news conference held to announce the ban.[27] In January 2020, the FDA banned flavored e-cigarette pods, other than "Tobacco" and "Menthol" flavors, in response to "epidemic levels of youth use of e- cigarettes" because these products are "so appealing" to children."

162.     Despite the long-standing industry knowledge that flavors enticed children, in June 2015, JUUL came to market in four flavors including tabaac (later renamed tobacco), fruut (later renamed fruit medley), bruulé (later renamed crème brulee), and miint (later renamed mint). JUUL later offered other kid-friendly flavors, including cool mint, cucumber,  and mango.

163.     A former JUUL manager, who spoke to *The New York Times* on the condition that his or her name would not be used, said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others to make the purchases for them. Some people bought more JUUL kits on JUUL's website than they could individually use—sometimes ten or more devices at a time. "First, they just knew it was being bought for resale," said the former senior manager, who was briefed on JUUL's business strategy. "Then,

---

[26]     Gardiner Harris, *Flavors Banned From Cigarettes to Deter Youth*, The New York Times (Sept. 22, 2009), https://www.nytimes.com/2009/09/23/health/policy/23fda.html.

[27]     Daniel J. DeNoon, FDA Bans Flavored Cigarettes: Ban Includes Cigarettes with Clove, Candy, and Fruit Flavors, WebMD (Sept. 22, 2009), https://www.webmd.com/smokingcessation/news/20090922/fda-bans-flavored- cigarettes#2.

when they saw the social media, in fall and winter of 2015, they suspected it was teens."[28]

164.     JUUL's use of flavors unfairly targeted not only youth, but unsuspecting adults as well. By positioning JUULpods as a flavor-oriented product rather than a system for delivering a highly addictive drug, JUUL deceived consumers into believing that JUULpods were healthy or at least essentially harmless. That is, JUUL led consumers to believe that they could consume JUULpods without guilt or adverse effect.

165.     While the JUUL Defendants were developing and marketing their flavored products to appeal to and recruit youth, the Altria Defendants, recognizing the value of those young "replacement smokers," also committed Altria to this cause. With the shared goal to grow the number of nicotine-addicted users, and as detailed further herein, the JUUL Defendants and the Altria Defendants set out to do whatever was necessary to create and preserve the lucrative market for flavors (which were banned in combustible cigarettes, but not in JUULpods). This shared purpose would culminate with efforts to promote mint flavor. To maximize the value of its mint line of JUULpods, the JUUL Defendants engineered the mint pods to become the most popular "flavor" among youth, including through extensive surveillance of youth behavior and preferences, all while seeking to conceal mint's appeal to youth.

166.     Although mint was one of the least popular e-cigarette flavor categories with youths in 2015, trailing the fruit and dessert categories, RJR, Altria and JUUL had all introduced mint-flavored products within a year of each company's initial e-cigarette release. Unlike RJR and Altria, which released mint products after first releasing a menthol variant, JUUL went straight to mint, adding menthol in late 2017 around the same time it released its mango JUULpods.

---

[28]     Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teenmarketing.html.

167.     The JUUL Defendants and the Altria Defendants recognized both the potential of using flavors to hook kids and the inevitability of the government seeking to regulate said flavors. Therefore, they sought to solidify the market presence of a "substitute" youth-friendly flavor—mint—which might escape regulation and preserve JUUL's astronomical sales figures.

168.     According to Siddharth Breja, JUUL's Senior Vice President for Global Finance, after JUUL pulled most flavored pods from the market, defendant Burns said that "[y]ou need to have an IQ of 5 to know that when customers don't find mango they buy mint."[29] With that knowledge, the Altria Defendants committed to preserve mint as a flavor for as long as possible. By keeping mint on the market long after JUUL pulled other flavors, these defendants continued to expand the number of addicted e-cigarette users, including underage users.

G.     **JUUL Developed and Implemented a Marketing Scheme to Mislead Consumers to Believe JUUL Products Contained Less Nicotine Than They Actually Do**

169.     Having created a product specifically designed to hook users to its nicotine, JUUL and the JUUL Defendants then misled consumers into believing JUUL was something other than what it actually was. Specifically, JUUL engaged in a years' long campaign to downplay JUUL's nicotine content, nicotine delivery, and the unprecedented risks of abuse and addiction JUUL poses. On its website and on its packages, JUUL misleadingly represented that its products were "5% nicotine by weight" and about as much nicotine as a pack of combustible cigarettes. A set of lawsuits pending in the U.S. District Court for the Northern District of California allege that JUUL's nicotine solution is actually at a 6.2% concentration, rather than the 5% concentration it discloses. In denying motions to dismiss those lawsuits, the federal court credited the allegations,

---

[29]     Sheila Kaplan and Jan Hoffman, *Juul Knowingly Sold Tainted Nicotine Pods, Former Executive Says*, The New York Times (Nov. 20, 2019), https://www.nytimes.com/2019/10/30/health/juulpods-contaminated.html

and observed that "[t]his difference would constitute over 20% more nicotine than JUUL claims its products deliver." *Colgate v. JUUL Labs, Inc.*, 345 F. Supp. 3d 1178, 1189 (N.D. Cal. 2018).[30] Because of their extensive research capabilities, the JUUL Defendants knew in 2017 that a JUULpod delivered more nicotine than one pack of cigarettes.

170.    Based on their internal knowledge and Altria's decades of research and experience, the Altria Defendants also knew that a 5% nicotine formulation would carry more nicotine than one pack of cigarettes. In addition to data they received from JUUL, the Altria Defendants' due diligence undoubtedly included a careful examination of JUUL's intellectual property, including the '895 patent, which provides a detailed overview of nicotine benzoate's pharmacokinetic profile.

171.    As further evidence of Altria Defendants' knowledge of JUULpods' high nicotine content compared to combustible cigarettes, the Altria Defendants launched their own higher-nicotine e-cigarette product in 2017, the MarkTen Bold e-cigarette, which Altria calibrated at 4% nicotine compared to the 2.5% and 3.5% strength MarkTen products initially offered. Altria's decision to bring a less potent formulation than JUUL, despite JUUL's rapid market share gains with its 5% formulation, reflected Altria's own assessment that the risks associated with higher nicotine (including attracting and addicting new users) were not worth the potential additional revenue.  But as negotiations with JUUL heated up in 2018, the Altria Defendants appeared to lose their inhibitions relating to JUULpods' potency, even going so far as to see it as a selling point.

### H.    JUUL's "Make the Switch" Campaign Misled and Deceived the Public to Believe that JUUL Is a Cessation Device for Adult Smokers

172.    As part of its campaign to hook new users, the JUUL Defendants repeatedly made

---

[30]    This same lawsuit questions the validity of measuring nicotine by weight as opposed to by volume. Measuring by volume is standard practice for liquids (such as the JUULpods) and measured by volume, JUUL's nicotine would be 6% concentration, not the 5% claimed.

false and misleading statements to the public that JUUL was instead created and designed as a smoking cessation device, and falsely and misleadingly spread the subterfuge.

173.     In early 2016, JUUL initiated a marketing campaign that focused more on switching from smoking to using JUUL, known as the "Switch Campaign." It implemented this campaign through social media (Facebook, Instagram, Twitter, Reddit, YouTube, and its own social media platform known as "JUUL Talk"), content created and shared by social media influencers, direct email marketing, retail advertisements, and billboards.

174.     JUUL also began making more brazen claims about the supposed health benefits of using JUUL and the appropriateness of using JUUL as a smoking cessation device. JUUL's advertising encouraged smokers to "switch" to JUUL to improve their lives, implying that JUUL was safer to use than cigarettes. These claims were not backed by science. JUUL also made specific representations on JUUL's website and other advertising media about JUUL's temperature control systems, claiming JUUL presents less risk of harming users than smoking cigarettes by producing harmful compounds in smaller amounts.

175.     JUUL's 2016 "Make the Switch" advertising campaign also suggested to consumers that its products had a therapeutic function as smoking cessation devices. In fact, a single JUULpod contained at least as much nicotine as an entire pack of cigarettes, and the FDA had not approved JUUL's products as cessation devices.

176.     JUUL also made similar claims on its website.  For example, in the spring of 2018, JUUL's website featured a letter from defendant Burns declaring that JUUL's "simple and convenient system incorporates temperature regulation to heat nicotine liquid and deliver smokers the satisfaction that they want without the combustion and the harm associated with it."

177.     And JUUL representatives pushed their products to teenagers.  In 2017 a JUUL

representative assured teens at a New York City high school that JUUL products were "much safer than cigarettes"; "totally safe"; and a "safer alternative than smoking cigarettes." The representative also claimed that the "FDA was about to come out and say [JUUL's e-cigarette product] was 99% safer than cigarettes." But this kind of direct-to-children marketing was done with subterfuge. This knowledge only became public when teenage JUULpod users testified about this meeting at a July 24, 2019 Congressional hearing.

178.   Thus, for years, JUUL was marketing its products as modified risk tobacco products without authorization from the FDA, in violation of 21 U.S.C. § 387k. Belatedly, after the furor created by the July 2019 Congressional testimony, the FDA began to take action. On September 9, 2019, the FDA publicly issued a warning letter[31] to JUUL to refrain from messaging that would imply that JUUL made reduced-risk tobacco products, because approval for such had not been granted.[32] The FDA also demanded further information from JUUL regarding JUUL's outreach to students, Native Americans, health insurers, and employers, based on troubling information revealed during then-recent Congressional testimony. This included statements that a JUUL representative had made to middle school students that JUUL was "totally safe," and was "much safer than cigarettes" and that the "FDA would approve it any day" and the "FDA was about to come out say [JUUL] was 99% safer than cigarettes[,]" as well as the JUUL representative encouraging students to use JUUL as a "safer alternative than smoking cigarettes[.]"

---

[31]   An FDA warning letter is an official message from the FDA to a manufacturer or other organization that has violated some rule in a federally regulated activity. FDA warning letters represent serious regulatory violations and require prompt corrective action from recipients.

[32]   *See* Press Release, *FDA warns JUUL Labs for marketing unauthorized modified risk tobacco products, including in outreach to youth*, Food and Drug Admin. (Sep. 9, 2019), https://www.fda.gov/news-events/press-announcements/fda-warns-juul-labs-marketing-unauthorized-modified-risk-tobacco-products-including-outreach-youth.

## I.      Altria Enters the E-Cigarette Market and Competes Against JUUL

179.     JUUL's ascendancy presented two problems for Altria. First, JUUL stood in the way of Altria's effort to lead the market for e-cigarettes. Second, JUUL's popularity threatened to accelerate Altria's losses in the market for combustible cigarettes, thus undermining what remained of Altria's core business.

180.     Altria responded to the threat posed by JUUL in two ways. Publicly, Altria competed aggressively with JUUL, including through price promotions and product innovation. But privately, especially among defendants Willard, Gifford, and Crosthwaite, their preferred approach was to eliminate the threat altogether by acquiring JUUL.  The latter effort picked up pace as the former proved to be less successful, with Altria eventually conceding outright control and agreeing to exit the e-cigarette market completely to affect an investment in JUUL.

181.     Altria entered the e-cigarette market through its subsidiary, NuMark, in 2013. Over the next several years, it invested heavily in e-cigarette products, spending hundreds of millions of dollars developing and promoting its products and acquiring other e-cigarette companies' products.  By mid-2017, Altria's MarkTen e-cigarette had achieved the second-highest market share among e-cigarettes.  And Altria sought to maintain and expand its market share by investing over $100 million in e-cigarette "shelf space" or "fixtures" to be installed at retail locations and enticed retailers to carry the MarkTen by offering payments.[33]

182.     Altria officers emphasized the importance of e-cigarettes to Altria's business during investor presentations. For example, as defendant Willard explained in February 2018, "NuMarks' goal is to lead the U.S. e-vapor category with a portfolio of superior, potentially reduced- risk products that…generate cigarette-like margins at scale."

---

[33]      *See* FTC Action Pre-Trial Brief, OSCAR No. 601467 at 17.

183.    In February 2018, Altria introduced the MarkTen Elite, a pod-based e-cigarette closely resembling JUUL's e-cigarette in appearance and design. Although JUUL continued to dominate the market, Altria told stockholders that its products were gaining against JUUL.

184.    Altria's e-cigarette products—its MarkTen line in particular—were strategically important to Altria because they operated as a hedge to reductions in combustible cigarette consumption due to health concerns about smoking. If Altria could become a leader in the e-cigarette market, then any reduction in combustible cigarette consumption would be a wash for Altria – or it could even be a benefit if Altria could command a greater share of the e-cigarette market than it possessed in the combustible cigarette market.

185.    Altria publicly described e-cigarettes as critical strategically to its future. Altria's former CEO, Martin Barrington ("Barrington"), told stockholders: "So we'll be clear: We aspire to be the U.S. leader in authorized, non-combustible, reduced-risk products." Defendant Willard, along the same lines, stated in an interview with *The Wall Street Journal*: "At a time when e-vapor is going to grow rapidly and likely cannibalize the consumers we have in our core business, if you don't invest in the new areas you potentially put your ability to deliver that financial result at risk."

### J.    When Altria's Attempt to Compete with JUUL Fails, Altria Seeks to Acquire JUUL Instead

186.    As described in detail herein, JUUL was the dominant player in the e-cigarette market. When Altria's competing product, the MarkTen, did not provide Altria the sales it desired in this lucrative market, the Altria Defendants shifted strategies.

187.    In May 2021, in an approximately 500-page book reflecting the findings of a lengthy investigation, *Bloomberg* reporter Lauren Etter chronicled the history of JUUL and Altria in the e-vapor market, including Altria's desperate gambit to invest in JUUL to head off Altria's own declining sales in combustible cigarettes, despite its leadership's knowledge that JUUL was

marketing to children and faced severe regulatory problems.[34]

188.    Defendant Willard, Altria's CEO at the time of the investment, had extensive familiarity with youth marketing issues because of his long tenure at Philip Morris and Altria and his specific role in ostensibly having Altria prevent youth use.  Defendant Willard had worked with Philip Morris ever since serving as their investment banker in 1991.  And in 1992, he joined Philip Morris as an executive.  Defendant Willard helped launch Philip Morris's website, where it, for the first time, acknowledged that cigarettes caused lung cancer and were addictive.

189.    In 2002, defendant Willard became the head of Philip Morris's youth smoking preventing program, in the middle of a contentious public relations battle with the American Legacy Foundation ("ALF"), a tobacco use prevention organization funded through the MSA.  The ALF accused Philip Morris of promoting cigarette use through the latter's "Think, Don't Smoke" campaign. Defendant Willard contested ALF's claims, insisting that "the data [ALF] collected on [Philip Morris's] youth smoking advertising is seriously flawed."[35]  Even though a few months later, Philip Morris pulled its ad campaign after ALF published its findings, defendant Willard continued to write editorials and letters to publicly contest claims that Philip Morris promoted youth use of its products.

190.    Defendant Willard was also familiar with Philip Morris's (and later, Altria's) early unsuccessful efforts at developing its own alternatives to combustible cigarettes.  He attended meetings of an internal Corporate Innovation Board, and he also headed "Corporate Responsibility" at the Company, which in part engaged in developing these alternative products.[36]

---

[34]    Lauren Etter, *The Devil's Playbook: Big Tobacco, JUUL, and the Addiction of a New Generation*, Penguin Random House LLC, New York (2021).

[35]    Etter, at 16.

[36]    *Id*. at 52.

He also helped secure funding for the Center for Nicotine and Smoke Cessation Research at Duke University, including research into the chemistry of nicotine absorption and addiction and the efficacy of alternative means of nicotine delivery.

191.     Thus, in these early roles, defendant Willard became familiar with both issues relating to the marketing of nicotine products, including underage marketing, as well as the market for cigarette alternatives, and the science behind nicotine delivery.  All of that knowledge was relevant to his decision to invest in JUUL decades later, knowing that JUUL relied on a highly addictive product marketed extensively to youth.

192.     On his path to the pinnacle at Altria, defendant Willard also spearheaded acquisitions into alternative nicotine products.  One of his greatest successes in that front was Altria's 2008 acquisition of U.S. Tobacco, which gave Altria its entrance into the smokeless tobacco market.  Although many investors were initially skeptical of the $10.4 billion price tag, the investment has ultimately paid off for Altria, and reinforced in Willard that the way to gain market share outside of combustible cigarettes was for Altria to buy its way in, and not to worry about sticker shock.

193.     Despite increased regulatory attention and evidence that e-cigarette companies, including JUUL, targeted children, Altria's leadership was as determined as ever to acquire a market-leading e-vapor company to compete in that space.  This mission became more urgent when Altria reported declining sales from its leading Marlboro brand of combustible cigarettes.  Around this time, defendant Crosthwaite was tasked with scoping out strategic acquisitions.

194.     Etter reported that while JUUL was on the rise during this period, Altria executives thought JUUL's youth-centered marketing was reckless. Furthermore, Altria executives saw the parallels between JUUL's youth-centered marketing and Philip Morris's past

marketing. In fact, Altria sent JUUL's predecessor, Pax Labs, cease-and-desist letters and then filed (and settled) a lawsuit against Pax Labs for infringing on Marlboro trade dress.   As JUUL continued to rise in the e-vapor scene, defendant Willard "seeth[ed]" at its success, and his "pursuit of the company and its fancy device would become an obsession."[37]  He was aided by defendant Crosthwaite, who was so closely associated with Willard that the two became known internally as "Batman and Robin."[38] Defendants Willard and Crosthwaite began to examine JUUL's marketplace more seriously.  Thus, they would have been personally familiar with JUUL's marketing, which at the time (around 2015) was especially youth-centered, with defendant Pritzker, a JUUL board member and its second largest investor (after defendant Valani), expressing concern that the "Vaporized" campaign "feels too young."[39]

195.   JUUL's sales continued to rise through 2016, even as more regulators reported the troubling trend of underage use.  In December 2016, the Surgeon General published a report on "E-cigarette Use Among Youth and Young Adults" that found that e-cigarette use among high school students grew by 900% between 2011 to 2015.[40]  Moreover, JUUL was also receiving over 3,000 complaints about adverse health effects suffered by JUUL users, including pain, burning sensations in the lungs, fever, chills, vomiting, lightheadedness, and bleeding.[41]

196.   As Altria's e-cigarette market share shrank and JUUL's market share grew, defendant Willard became more urgent about pushing for an acquisition of JUUL.  Around this

---

[37]   *Id*. at 147.

[38]   *Id*. at 145.

[39]   *Id*. at 149.

[40]   *Id*. at 171.

[41]   *Id*. at 179.

time, in 2017, defendant Willard attempted to establish a communication backchannel through JUUL's investment bankers.  In 2017, he sought a personal meeting with defendant Pritzker in San Francisco, but instead met with Pritzker's son.  But defendant Willard continued to have other communications with defendant Pritzker during this time period. Around this time, Altria floated a $10 billion valuation for JUUL, which the latter deemed to be too low.  Defendants Bowen and Monsees also insisted that JUUL only consider selling a minority stake.

197.     Throughout the rest of 2017 and into 2018, Altria repeatedly initiated contact with JUUL, but negotiations progressed slowly. Barrington, Altria's then-CEO, remained reluctant to do a deal with JUUL. Nevertheless, defendant Willard directed defendant Crosthwaite to "get JUUL done"—referring to the acquisition or partnership that Altria desired. Defendant Crosthwaite after that played a key role in negotiating the terms of a potential agreement with JUUL.

198.     In the course of due diligence, Altria employees discovered that JUUL had fixed a technical problem in its devices that arguably violated FDA regulations against modifying existing e-vapor products without seeking approval from the FDA.  If Altria had reported these findings to the FDA, it could have shut down JUUL.  Yet it did not do so.  Altria's consumer research department also discovered that one of JUUL's major customer bases was young new users of nicotine (about age 21-29). This was uncomfortably close to the minimum age of Altria customers, given Altria's official position was that it only sought to have adults aged at least 21 buy its products.  And as Altria did further research, it became impossible to ignore JUUL's popularity among underage users.

199.     Altria executives expressed nervousness about JUUL's underage usage and marketing and feared that JUUL would face a day of reckoning.  At the same time, Altria was

launching its MarkTen Elite on many retail shelves.  Barrington's unease at JUUL's youth usage and his hopes that Altria could gain traction led him to order that Altria employees stop working on a potential JUUL transaction.

200.     At the same time, however, Altria pressed forward with its own product in direct competition to JUUL, launching in February 2018 its MarkTen Elite, a pod-based e-cigarette very similar to JUUL's product. Altria's then-COO defendant Willard expressed a goal at that time "to lead the U.S. e-vapor category." He also said in an interview with the *Wall Street Journal*: "At a time when e-vapor is growing rapidly and [will] likely cannibalize the consumers we have in our core business, if you don't invest in the new area you potentially put your ability to deliver that financial result at risk."

201.     Barrington ceased as the main impediment to the JUUL transaction at Altria when he retired as CEO, and defendant Willard succeeded him in March 2018.  Now finally able to press fully ahead with his ambitions to gain e-cigarette market share through JUUL, Willard initiated a plan to press forward with pursuing a transaction with JUUL, while developing a competitive e-vapor product internally became a backup plan.  He put defendant Crosthwaite, as the new "chief growth officer," in charge of the JUUL transaction, calling it "Plan A."[42]  Altria's development of its own product, to be headed by Brian Quigley ("Quigley"), formerly the head of Altria's U.S. Smokeless Tobacco Company, as the new CEO of NuMark, was relegated to "Plan B."[43] Furthermore, Quigley was overseen by defendant Crosthwaite.  Joseph Begley, then head of NuMark, was instead put in charge of Altria's tobacco business.  This signaled that NuMark was a low priority for Altria under Willard's leadership and only a fallback option to defendant

---

[42]     *Id*. at 243.

[43]     *Id*.

60

Willard's primary focus in consummating a JUUL transaction.

202.    Meanwhile, the internal urgency to do a deal was heightened by Marlboro's continued sales declines by more than 10% (as opposed to the usual 3-4%) in the first quarter of 2018.  Analysts publicly speculated that Marlboro's sales declines were caused by JUUL's growth.

203.    The Altria executives knew that JUUL's sales were coming from initiating new users to nicotine, undoubtedly including underage users.  Quigley, the new head of NuMark, did not earn any favors at Altria because he came very close to speaking the uncomfortable truth about JUUL's success that others in Altria were not willing to acknowledge.  In summer 2018, one Altria executive asked at a meeting, "Why, if Juul is growing so fast, weren't industrywide cigarette volumes declining equally fast?"[44]  Quigley responded that it was because JUUL was "bringing new users into the category."[45]  Defendant Willard gave Quigley a hard look to warn him from speaking further because talking about "new users" came close to acknowledging that JUUL was attracting new underage users and that its real success lied in gaining new nicotine addicts rather than in helping adult smokers quit.[46]

204.    JUUL's youth usage problem and regulatory troubles were so well-known within Altria that Quigley and other executives considered it for leverage.  Quigley thought that JUUL's continued popularity among underage users and JUUL's pursuit of that market would eventually lead it to self-destruct, and that Altria's e-vapor products would succeed by default by waiting JUUL out.[47]  But defendant Willard, single-mindedly focused on investing in JUUL, instead

---

[44]    *Id*. at 250.

[45]    *Id*.

[46]    *Id*. at 251.

[47]    *Id.*

sought to sell JUUL on Altria's own regulatory and youth prevention expertise.

205.     Defendants Willard, Gifford, and Crosthwaite were the primary Altria representatives engaged in negotiations with JUUL.  They had such a close working relationship that they were internally called the "Three Musketeers."[48] Defendant DeVitre also played an active role in the negotiations because of his personal relationship with JUUL Defendant Valani, including hosting meetings at his home, shepherding correspondence between the parties, and strategizing deal points with Willard and Gifford.

206.     During the summer of 2018, negotiations between JUUL and Altria intensified, with the parties discussing an investment by Altria rather than an outright acquisition because of the JUUL Defendants' rejection of the latter.  The future of Altria's e-cigarette business emerged as a key point of contention. JUUL took the position that Altria's exit from the e-cigarette market was a requirement for any deal JUUL would enter into. That is, before JUUL would permit Altria to invest in JUUL, Altria—the second-highest selling e-cigarette maker—would have to agree not to compete with the market leader, JUUL.

207.     At that time, both sides contemplated that Altria would have a 40% stake in JUUL, but there was a significant gap in valuation: Altria contemplated a valuation of $16.6 billion while JUUL contemplated a valuation of $22.5 billion.  As the summer went on, the valuation for JUUL went up, as JUUL's sales continued to grow – doubling every quarter. Defendant Willard acknowledged at an internal meeting in Altria, "If we want Juul, we're going to need to pay."[49]

208.     Altria executives would track JUUL and MarkTen sales data every week, including data by consumer research companies such as Nielsen and IRI, and have people visit

---

[48]     *Id*. at 242.

[49]     *Id*. at 247.

stores where JUUL and MarkTen were both sold.  Although Altria's consumer research was not able to reach online sales, the trend was clear: JUUL's market share of the e-vapor market had gone up from 12% a year ago to more than 50%; by contrast, MarkTen's market share was down to about 12% when it was 23% a year ago.

209.    In the midst of their companies' relative markt success (or for Altria, the lack thereof), on July 30, 2018, defendant Pritzker emailed defendant Willard an opening term sheet. The contents of the term sheet indicated that continued competition from Altria's e-cigarette products was not a permissible path forward in JUUL's view.

210.    On August 1, 2018, negotiations between Altria and JUUL took place at the Park Hyatt Hotel in Washington, DC. The attendees of this meeting included defendants Pritzker and Valani (members of JUUL's board) and defendant Burns (JUUL's CEO), as well as defendant Willard (Altria's CEO) and defendant Gifford. JUUL reiterated at the meeting its demand that as part of any transaction, Altria agree not to compete with JUUL in the e-cigarette market.

211.    On August 5, 2018, defendant Valani met with defendant and Altria director Devitre, again impressing the importance of the non-compete provision.

212.    On August 15, 2018, defendant Valani met with defendant Devitre, an Altria director, at Devitre's offices and home in New York. JUUL delivered a simple message: there would be no deal unless Altria agreed to cease competing with JUUL in the e-cigarette market.

213.    Defendant Willard was so focused on the JUUL investment that, in response to JUUL's demand that Altria shut down its e-cigarette business, Willard responded by putting out internal feelers for just that.  By August 2018, with JUUL's brick-and-mortar sales amounting to nearly $200 million while MarkTen's sales were under $20 million, Willard internally mused:

"Maybe we should just exit the entire business."[50]   Quigley protested, "No, you can't do that . . . . What are you going to tell investors?"[51]   Quigley reminded the other Altria executives about how, a few months before, at Altria's Investor Day, Altria's top executives had bragged about Nu Mark's innovation pipeline.

214.    At the same time, there were public red flags about JUUL that should have given the Altria Defendants pause in pursuing a transaction.  By September 2018, FDA Commissioner Scott Gottlieb ("Gottlieb") was calling youth vaping an "epidemic" and publicly blamed JUUL.[52] And in the same month, FDA investigators went to JUUL's offices to investigate its products and marketing.

215.    The Altria Defendants' stance with regulators and stockholders was the opposite of their true goal of collaborating more closely with JUUL.  In October 2018, defendant Willard met with FDA Commissioner Gottlieb where he personally told him that youth vaping was a problem.  Willard also made it understood that he knew JUUL was part of the problem.   But at the same time, defendant Willard had stepped up negotiations with JUUL for a transaction.

216.    Even as Altria Defendants publicly acknowledged the youth vaping problem caused by JUUL, privately, they accelerated their negotiations with JUUL by agreeing to its key condition.  In October 2018, Altria indicated its agreement to JUUL's demand that Altria exit from the e-cigarette market and agree not to compete in the future. Specifically, on October 5, 2018, defendant Willard sent defendants Pritzker, Valani, and Burns a letter reassuring them that Altria would exit the market.

---

[50]      *Id*. at 272.

[51]      *Id*.

[52]      *Id*. at 276.

217.     After Altria made this concession and Altria's investment in JUUL was imminent, Altria took several steps to prepare for meeting its anticipated non-compete obligation. First, on October 25, 2018, Altria announced it was withdrawing from the market its MarkTen Elite product—the product that most closely resembled JUUL's pod-based product. This market withdrawal occurred only eight months after Altria had introduced the MarkTen Elite, a product which it had described as driving growth and gaining transaction among consumers.  Indeed, when Altria announced its withdrawal of the MarkTen, it told the FDA and the public that its reason for doing so was its belief that pod-based products (of which the market leader was JUUL) were a contributor to the youth vaping epidemic, even as Altria stated that it believed its own products were not a significator contributor to the problem.  But on the same day that Altria made this announcement, Willard personally called the JUUL Defendants to reassure them that he was still serious about pursuing a transaction.

218.     Only a few days after this announcement, Altria and JUUL agreed to the basic terms of the deal that would ultimately become the Altria-JUUL Agreements, including the non-compete provision upon which JUUL insisted. That is, it appears Altria's announcement of the withdrawal of the primary competitive threat to JUUL's product was the key event that enabled JUUL to commit itself to the terms of a deal.

219.     Meanwhile, the FDA continued to raise the alarm on youth vaping.  In November 2018, Gottlieb announced results from the 2018 National Youth Tobacco Use Survey that showed a "revers[al of] years of favorable trends in our nation's fight to prevent youth addiction to tobacco products.  These data shock my conscience . . . . I will not allow a generation of children to become addicted to nicotine through e-cigarettes."[53]

---

[53]     *Id*. at 287.

220.     Then, on December 7, 2018, Altria ended the remainder of its e-cigarette business. This withdrawal came just two weeks before JUUL and Altria would announce the JUUL-Altria Agreements. Two days later, Altria's General Counsel emailed JUUL's Chief Legal Officer to discuss the deal further, moving it closer to finalization.

221.     At the time of these major withdrawals of apparently growth-driving products, Altria offered the false public explanation that it was concerned with the rise in underage use of e-cigarette products. This explanation, however, was a smokescreen, given that Altria was on the verge of making a major investment in a company built upon underage use of e-cigarette products. The true purpose of Altria's withdrawal was to signal to JUUL that Altria intended to close the transaction on the anticompetitive terms that JUUL had demanded.

222.     Before the Altria-JUUL transaction, Altria had shown every intention to remain in the e-cigarette market for the long term, as reflected in the substantial investment leading to the introduction of its MarkTen Elite pod-based e-cigarette in February 2018.

223.     But just a couple of weeks after withdrawing from the e-cigarette market, ostensibly to help combat youth vaping, Altria would finalize its investment in JUUL.

224.     Upon seeing the news of Altria's pending investment, FDA Commissioner Gottlieb expressed consternation because Altria earlier said it would quit the e-cigarette market due to youth use but now invested in a company with a major underage usage problem.

### K.     The Terms of the Altria-JUUL Agreement

225.     On December 20, 2018, Altria and JUUL entered into a series of related agreements. First, through a "Purchase Agreement," Altria acquired a 35% non-voting equity interest in JUUL in exchange for $12.8 billion in cash—the largest equity investment in U.S. history. The non-voting interest was convertible to a voting interest upon approval by the FTC.

226.     Although Altria would initially not have any right to appoint individuals to serve

66

on JUUL's board, Altria would have the right to appoint three directors upon converting its shares to voting securities (a conversion that required regulatory approval). Moreover, before the conversion, Altria gained a right to have an observer attend JUUL board meetings, permitting it to participate in board meetings even though it had no decision-making power, and thus collude with JUUL on dividing the e-cigarette market. Altria appointed defendant Crosthwaite to observe on JUUL's board until September 2019, when he became JUUL's CEO. At that point, defendant Gifford became the Altria board observer, giving him direct access to JUUL's information and enabling JUUL and Altria to further coordinate activities.

227.    The $12.8 billion investment for a 35% stake valued JUUL at $38 billion. This valuation, notably, was more than 2.5 times JUUL's valuation from another investment just five months prior. That is, Altria's investment implied a dramatic increase in JUUL's value over just a few months, even though during those months, the risks to JUUL's core business strategy had become clear, with public backlash building and potentially crippling regulation imminent.

228.    Through another agreement, the "Relationship Agreement," Altria committed to providing JUUL access to Altria's retail, marketing, and distribution apparatus. Altria agreed to lease its highly favorable convenience store shelf space to JUUL, and Altria agreed to support JUUL in both marketing and sales. These commitments meant that Altria would not simply be a passive investor; it would become closely involved with the operation of JUUL's business. This participation in JUUL's business increased Altria's exposure to liability to third parties as a direct participant in JUUL's unlawful and deceptive conduct.

229.    Finally, as part of the Relationship Agreement, Altria followed through on its agreement to JUUL's most important demand—that Altria agree not to compete with JUUL in the e-cigarette marketplace. As noted, Altria had already withdrawn its competing products at the time

of the agreement; those withdrawals, despite Altria's publicly claimed altruistic intentions, were effected to convince JUUL to finalize the transactions with Altria.

230.    The non-compete provision was comprehensive. It provided:

> [Altria] shall not . . . directly or indirectly (1) own, manage, operate, control, engage in or assist others in engaging in, the e-Vapor business; (2) take actions with the purpose of preparing to engage in the e-Vapor Business, including through engaging in or sponsoring research and development activities; or (3) Beneficially Own any equity interest in any Person, other than an aggregate of not more than four and nine-tenths percent (4.9%) of the equity interests of any Person which is publicly listed on a national stock exchange, that engages directly or indirectly in the e-Vapor Business (other than (x) as a result of [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship of, research and development activities not directed toward the e-Vapor Business and not undertaken with the purpose of developing or commercializing technology or products in the e-Vapor Business)….

231.    That is, a core term of the agreements between Altria and JUUL was that the two companies who, just prior to the agreements, were the two largest participants in the U.S. e-cigarette market, agreed not to compete against each other. Because Altria did not obtain voting rights on JUUL's board immediately, the agreements did not at the time require regulatory approval, but the flagrant illegality of this agreement not to compete would soon come to the attention of competition regulators.

232.    Meanwhile, Altria's investors were concerned that Altria paid too much for a 35% stake, and were puzzled by how, as one investor put it, "there is no pathway to control given the size of the check[.]"[54]  Investors also expressed concern over the FDA's increasing scrutiny, which would appear to make JUUL a less valuable (and even harmful to Altria) investment.   But defendant Willard reassured them that while there would be some "disruption" as JUUL worked with the FDA to stem youth vaping, he "expect[ed] there to be upside over time."[55]

---

[54]    *Id*. at 297.

[55]    *Id*.

L.   **Altria Invests in JUUL Despite the Altria Defendants' Knowledge of JUUL's Misconduct Targeting Youth**

233.   The Altria Defendants were desperate to enter the vaping market, but in doing so, through their investment in, and then collusion with, the JUUL Defendants, they breached their fiduciary duties to Altria.

234.   First, as discussed above, the Altria Defendants' pursuit of, and recommendation of, an investment in JUUL in the face of known risks was reckless (and also likely illegal given the agreement was conditioned on Altria exiting the e-cigarette industry and not competing with JUUL). Therefore, these actions constituted a bad faith violation of fiduciary duties to Altria and its stockholders because they exposed Altria to reputational harm and legal liability through its participation, either knowingly or recklessly, in JUUL's wrongdoing.

235.   Second, the evidence suggests that the Altria Defendants knew about JUUL's misrepresentations and illegal marketing. The Altria Defendants caused Altria to actively participate in the wrongdoing by assisting JUUL in its marketing. These actions exposed Altria to liability for disseminating misleading misrepresentations of JUUL's nicotine content and safety, and exposed Altria to liability for promoting use among youth users.

236.   As Altria's COO at the time, defendant Willard began having "confidential discussions" with JUUL in the spring of 2017, which continued for 18 months. Even by 2017, JUUL's popularity among youth was apparent and so were its marketing tactics. The youth-oriented marketing would have been most apparent to defendant Willard and the other Altria Defendants because much of JUUL's early marketing was patterned off youth marketing by Altria's predecessor and subsidiary, Philip Morris, and because Willard personally led Altria's own youth prevention efforts earlier in his career at Philip Morris, in the wake of the MSA.

237.   The Altria Defendants knew about the reputational risks because JUUL's

marketing campaigns were a matter of public record, and JUUL's nicotine salt formulation was patented, so that was also a matter of public information.  Willard maintained a backchannel to JUUL even when his then-boss, then-CEO Barrington, ordered a stop to negotiations with JUUL because of his discomfort at the regulatory and reputational risks to Altria.  After Barrington retired, and Willard took his place, he pressed fully ahead with negotiations with JUUL even as the reputational and regulatory risks increased; Willard put one of his chief lieutenants, Crosthwaite, in charge of "getting JUUL done" and made the transaction "Plan A" for Altria.  By contrast, Altria's own e-cigarette development was relegated to "Plan B."

238.    In the lead-up to Altria's JUUL investment, defendant Willard clearly understood the regulatory risks and scrutiny Altria was under and would be under. During a quarterly earnings conference call on October 9, 2018, he was asked about his thoughts on the Massachusetts Attorney General's recent lawsuit against JUUL.  While he did not comment specifically on JUUL, he replied, "I think what we're seeing is that for quite some time, the tobacco industry has been expected to operate under a very specific set of rules, and the [MSA] laid those out for the cigarette category. And we are always aware that the FDA and the Attorneys General are watching everything we do to make sure we're operating responsibly. And frankly, we appreciate the AGs making sure that there's a minimum level of performance expected from everybody in the industry."  Furthermore, while not mentioning JUUL by name, Willard alluded to its role in causing and exacerbating the youth vaping pandemic when Altria publicly announced its withdrawal of Mark Ten Elite from the market later in October 2018.  But at the same time, Willard personally reassured the JUUL Defendants that he wanted to continue to negotiate an Altria investment in JUUL.

239.    JUUL's product composition (which would have revealed the high nicotine content) and marketing was a key part of the due diligence Altria engaged in prior to investing

billions of dollars in JUUL.  Defendants Willard, Gifford, and Crosthwaite, who were the primary Altria representatives engaged in JUUL negotiations, personally understood the implications that JUUL was attracting underage users with youth-oriented marketing, flavors, and high nicotine content, because they were veterans of the tobacco industry and longtime employees at Altria or its predecessors.

240.    Defendant Willard had spent most of his career at Altria or its predecessors, stretching back 28 years, including roles as head of the Company's youth prevention program (which often consisted of countering criticism against the Company's marketing), spearheading the Company's major acquisitions into areas adjacent to combustible cigarettes (including the Company's acquisition of the country's leading smokeless tobacco company), and running the entire Company's operations as COO. He was at Altria was settling the tobacco lawsuits with the state AGs, which targeted many of the marketing practices that JUUL later copied.

241.    Defendant Crosthwaite, who became JUUL's CEO in late 2019 when its business was flagging in the wake of the vaping illness epidemic, has spent almost his entire career in the tobacco industry, joining Philip Morris in 1997. He was Altria's CGO before he became JUUL's CEO, and he was President and CEO of Philip Morris from April 2017 to June 2018.

242.    Defendant Gifford is now Altria's CEO and before then its Vice Chairman and CFO. He has worked in Altria since joining Philip Morris in 1994 (where, like defendant Crosthwaite, he also served a stint as the President and CEO).

243.    Despite the known and foreseeable reputational risks warned of by Barrington, the Altria Defendants doubled down and pressed further for a transaction after defendant Willard became CEO. The Altria Defendants' decision to proceed with the JUUL investment has led to devastating results.

**M.**     **Altria's Massive Exposure to Liability**

**1. MDL Litigation**

244.     Over the summer of 2019, healthcare providers started to note an influx of acute respiratory failure and a myriad of lung injuries in patients who were using e-cigarettes. This prompted a CDC investigation of an outbreak of vaping associated lung injuries. The reported injuries mirrored the injuries that had been reported in medical literature since 2012. In October 2019, the CDC issued treatment guidelines to assist doctors in clinical practice. The CDC defined a new recognized medical condition referred to as EVALI.

245.     JUUL consumers allege that they have experienced significant health problems from using JUUL's products, including its JUULpods. Numerous scientific studies have shown that the use of e-cigarettes, including JUUL, cause significant lung injuries and have been implicated in multiple severe pathological lung injuries.[56] Recent studies have also demonstrated that exposure to JUUL aerosol induces oxidative stress, inflammation, epithelial barrier dysfunction, and DNA damage in lung cells.[57] Numerous other scientific studies have established links between e-cigarette use and respiratory problems.

246.     Researchers noted that the recent proliferation of vaping-related cases known as EVALI demonstrated a heterogeneous collection of pneumonitis patterns that included acute eosinophilic pneumonia, organizing pneumonia, lipoid pneumonia, diffuse alveolar damage and acute respiratory distress syndrome ("ARDS"), diffuse alveolar hemorrhage, hypersensitivity pneumonitis, and the rare giant-cell interstitial pneumonitis. Active infection (which would include

---

[56]     *See, e.g.,* Lauren F. Chun et al., *Pulmonary Toxicity of E-cigarettes,* 313 Am. J. Physio. Lung Cell Mol. Physiol L193 (May 18, 2017), *https://www.ncbi.nlm.nih.gov/pubmed/28522559.*

[57]     Thivanka Muthumalage, et al., *E-cigarette Flavored Pods Induce Inflammation, Epithelial Barrier Dysfunction, and DNA Damage in Lung Epithelial Cells and Monocytes*, 9 Scientific Reports 19035 (2019), https://www.nature.com/articles/s41598-019-51643-6.

live bacterial contamination of e-cigarette fluids) did not appear to explain the clinical presentation, but acute toxic lung injury did seem to fit.[58]

247.    A recent publication in 2020 noted that there were almost 2,000 cases of EVALI at the time it was written. The authors further noted that Vitamin E acetate was one possible cause of the recent outbreak but there may be more than one cause and therefore everyone should refrain from using e-cigarette or vaping products.[59]

248.    The multiple pathological lung injuries and toxicity associated with e-cigarette use, including JUUL, can lead to acute respiratory failure, intubation with mechanic ventilation, and death. The use of e-cigarettes, including JUUL, can lead to acute and chronic lung injuries such as EVALI, lipoid pneumonia, organizing pneumonia, chemical pneumonitis, alveolar hemorrhage, bronchiolitis obliterans (popcorn lung), pneumothorax, acute respiratory failure, ARDS, asthma, emphysema and COPD. Defendants never warned the public of the risk of serious acute and chronic lung injuries that were associated with the use of e-cigarettes, including JUUL.

249.    The failure to properly and adequately test the safety of JUUL prior to marketing it to the public, including teenagers and young adults, and continuing in the face of the onslaught of publications in the medical literature demonstrating an association with e-cigarette use and significant lung injuries, amounts to a reckless disregard for public safety.

250.    These outcomes have unsurprisingly led to a substantial amount of litigation against JUUL. According to the website drugwatch.com, as of mid-2020, there were more than 758 lawsuits filed against JUUL, which had been transferred into one multi-district litigation

---

[58]    *See* David C. Christiani, *Vaping-Induced Injury*, 68 New England J. Med. 787 (2019).

[59]    Sascha Ellington, et al., *Update: Product, Substance-Use, and Demographic Characteristics of Hospitalized Patients in a Nationwide Outbreak of E-cigarette, or Vaping, Product Use-Associated Lung Injury—United States, August 2019–January 2020*, 69 Morbidity and Mortality Weekly Rep. 44 (2020).

action, MDL-2913. The MDL litigation includes both class action lawsuits claiming JUUL's marketing targeted minors and individual personal injury lawsuits from the use of JUUL products. Altria is a defendant in many of the constituent lawsuits in the MDL and has become embroiled in massive litigation.

251.    As of June 2021, approximately 2,187 cases are pending in the MDL, naming 107 defendants.  Plaintiffs in the MDL have taken at least 12 depositions of current and former Altria employees and additional depositions are being scheduled.   Plaintiffs have also noticed or requested more than 85 JUUL-related witnesses, have completed 20 depositions of current and former JUUL employees, and are in the process of scheduling 42 depositions of current and former JUUL employees.  Motions to dismiss filed by the named defendants, which include JUUL, Altria and several of the Individual Defendants named herein, were denied on most of the substantive claims.  In a 152-page opinion on October 23, 2020, the Court systematically dismantled most of the defendants' defenses, and allowed plaintiffs to amend their RICO racketeering claims.[60]  On April 13, 2021, the court sustained the RICO racketeering claims against Altria, JUUL, defendants Monsees, Bowen, Pritzker, Valani, and JUUL director Hyoung Huh in connection with illegally marketing JUUL's nicotine products, concealing JUUL's harmful properties, and deceiving regulators and the public by asserting that JUUL was a smoking cessation device.[61] No trials have yet been scheduled, but discovery is underway.  A state court MDL has also been centralized in Los Angeles Superior Court.[62]   As of June 2021, 467 complaints are pending in JCCP 5052,

---

[60]    *In re Juul Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation*, 19-md-02913, WHO (N.D. Cal. Oct. 23, 2020).

[61]    *In re Juul Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation*, 19-md-02913, WHO (N.D. Cal. April 13, 2021).

[62]    *JUUL Labs Product Cases*, JCCP No. 5052.

including 83 government entity cases, including 78 school districts, and 385 personal injury cases brought on behalf of over 2,656 individual personal injury plaintiffs.

### 2. Securities Class Action Lawsuit

252.    On November 4, 2019, Altria investors filed the Securities Action against Altria and defendants Willard, Gifford, JUUL, Bowen, Monsees, Burns, and Crosthwaite in the U.S. District Court for the Eastern District of New York for violation of the federal securities laws. Subsequent securities class action lawsuits were filed in this District, where the cases were eventually consolidated, and a lead plaintiff and lead counsel appointed. The lead plaintiff filed the operative pleading (the "Securities Action Complaint" or "SAC") on July 2, 2020. *See Klein et al., v. Altria Group, Inc. et al..,* Case No. 3:20-cv-00075-DJN (Dkt. No. 108).

253.    The Securities Action alleges that throughout the Class Period (defined December 20, 2018 through February 21, 2020), the defendants made a series of materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, the SAC alleges that the defendants made false and/or misleading statements and/or failed to disclose that: (i) Altria had conducted insufficient due diligence into JUUL prior to the Company's $12.8 billion investment, or 35% stake, in JUUL; (ii) Altria consequently failed to inform investors, or account for, material risks associated with JUUL's products and marketing practices, and the true value of JUUL and its products; (iii) all of the foregoing, as well as mounting public scrutiny, negative publicity, and governmental pressure on e-vapor products and JUUL made it reasonably likely that Altria's investment in JUUL would have a material negative impact on the Company's reputation and operations; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times, causing stock losses when the truth was revealed.

254.    The SAC further alleges that JUUL and defendants Willard, Gifford, Bowen,

Monsees, Burns, and Crosthwaite directed and coordinated fraudulent acts to grow the market of addicted e-cigarette users. The SAC alleges that throughout the 2017-2018 negotiation period, JUUL provided Altria with information regarding JUUL's design and nicotine content, and its advertising, retail distribution, online sales, age verification procedure, underage users' flavor preferences, and regulatory strategies. Altria also provided JUUL with advice in these areas.

255.    The SAC cites accounts of multiple confidential witnesses who allegedly had firsthand information regarding the events described herein. Neither Plaintiffs nor Plaintiffs' counsel have independently spoken with these confidential witnesses, yet the allegations are cited herein based on confidential witness accounts in the SAC in this complaint for two reasons. First, these allegations were submitted in a federal legal pleading. Second, the information confirms much of the public reporting and those allegations raised in regulatory actions filed against JUUL and/or Altria.

256.    Securities Action Confidential Witness #1 ("CW1") is described as having worked for Altria in various leadership roles from October 2003 until February 2019, most recently as Senior Vice President, Marketing and Commerce Strategy. CW1's other roles included President and CEO, NuMark; President and CEO, U.S. Smokeless Tobacco Company; and Director of Marketing, Philip Morris USA. CW1 worked at Altria's headquarters in Richmond, Virginia.[63]

257.    The SAC states that CW1 described how defendant Willard had been targeting JUUL since his tenure as the Company's COO, stating that it was clear as early as 2017 that Altria was moving toward an investment in JUUL. CW1 is quoted as stating: "I believe that Howard wanted [JUUL] so bad, that he just wanted it," CW1 said. "When he was COO … he was very

---

[63]    Based on public reporting by Etter and through FTC trial testimony, CW1 is probably Brian Quigley, who Willard tasked with "Plan B," internal development of e-cigarette products, if "Plan A," a deal with JUUL, did not work out.

vocal about, 'JUUL's the answer.' And when he became CEO, he in essence sat me down and sat [Chief Growth Officer] K.C. [Crosthwaite] down and said, 'K.C., your job is to get JUUL done. And [CW1], your job is to figure out what to do if JUUL doesn't happen.'" CW1 said that defendant Crosthwaite was responsible for Altria's investment in JUUL.

258.    While CW1 was not personally involved in conducting the due diligence, the SAC provides that CW1 stated, in general, that Altria's due diligence for investments was comprised of a large team of "dozens" of people with experts across all key functions, including law, sales, distribution, supply chain, purchasing and manufacturing. Due diligence was typically a "rigorous process" that lasted "months," and Altria did not use outside consultants for due diligence work. Furthermore, "on previous [due diligence], it was taking people with relevant, category- specific knowledge from within the company to look at what was there for the entity we were buying," CW1 said. "It was usually pretty broad teams with senior leaders across all different functions."

259.    The SAC's discussion of CW1 regarding underage use of JUUL products is particularly damning. The SAC alleges that CW1 said that JUUL's popularity among underage users was well-known within Altria. Asked how he knew that JUUL was marketing to underage users, CW1 said, "It was like asking, 'How do you know that the sky is blue?'" "Everybody knew at this point that there was a youth issue," CW1 said. "So there was no doubt [that JUUL was marketing to underage users]."

260.    The SAC also describes CW1's knowledge regarding Altria's marketing policies. CW1 stated that Altria had specific policies and guidelines against targeting underage users, including a ban on using social media channels for marketing. "We weren't doing it," CW1 said. "It would have been against our policy." CW1, according to the SAC, stated that JUUL, meanwhile, had a very different approach, noting that JUUL had an active social media operation

that used influencers and a variety of platforms, including Instagram.

261.    Securities Action Confidential Witness #2 ("CW2") is alleged to have worked for Altria from July or August 2018 until the end of 2018 as a Product Manager, Regulatory Quality Compliance Management. CW2 worked out of Altria's headquarters in Richmond, Virginia, reporting to Evelyn Pollard, who at the time was a Senior Manager, Quality Business Systems.

262.    The SAC states that CW2 also confirmed that JUUL's marketing to underage users was "well-known" prior to Altria's investment in the company.

263.    On March 12, 2021, the U.S. District Judge David J. Novak of the United States District Court for the Eastern District of Virginia denied the Company's and defendants Willard, Gifford, Bowen, Burns, Monsees's motions to dismiss in their entirety in the Securities Action. *See* Dkt. No. 140. Defendant Crosthwaite's motion to dismiss was granted in part and denied in part. *Id.* Claims against each are now proceeding toward trial.

264.    Judge Novak found that, despite the heightened pleading standard found in the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), the lead plaintiffs had plausibly alleged material misrepresentations by the defendants. The Court held that "once Defendants chose to speak regarding youth issues and their marketing efforts, they had an obligation to tell the whole truth." *Id.* at 28. The Court noted that the SAC alleged that "JUUL embarked on a years-long effort to increase youth addiction and Altria knew about this effort." *Id.* at 31. "Rather than apprising investors of the risks associated with the effort, Defendants continued to publicly deny JUUL's intention of targeting youths in an effort to avoid further litigation or regulation that could curb their values." *Id.* at 31-32.

265.    The Court also found that the lead plaintiffs had sufficiently alleged that the defendants had acted with *scienter* and that the plaintiffs had adequately alleged "scheme liability"

78

against the named individual defendants. In its conclusion, this Court held that "Plaintiffs have pled sufficient facts that JUUL targeted youth for its products and that all Defendants knew that JUUL targeted youth." *Id.* at 42. "Moreover, Plaintiffs have pled sufficient facts that Defendants recognized the risks that this marking scheme posed to the value of JUUL and Altria, yet they chose not to disclose it to investors for fear of deflating the values of the company." *Id.* This is precisely what Plaintiffs allege in this action.

### 3.  The FTC Action

266.    On October 1, 2019, Altria received a civil investigative demand ("CID") from the FTC, which asked for information and documents in response to the FTC's concerns that Altria and JUUL violated the antitrust laws, as evidenced by Altria pulling its e-cigarette products from the market before finalizing the transaction with JUUL and defendant Crosthwaite's resignation from Altria to join JUUL before the transaction was approved by the FTC .

267.    In an administrative complaint filed on April 1, 2020 (the "FTC Action"), the FTC alleged that Altria actively colluded with JUUL to stifle competition in the vaping market. The FTC alleges that Altria's acquisition of JUUL shares and the associated agreements together constitute an unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 5 of the FTC Act, and substantially lessened competition in violation of Section 7 of the Clayton Act. The FTC voted 5-0 to proceed with the complaint against Altria.

268.    The FTC Action detailed the numerous discussions and meetings between defendants Willard and Gifford, on behalf of Altria, and defendant Burns with Valani and Pritzker, on behalf of JUUL, where the clear import of the discussions – even when the actual text was redacted – was to convey that JUUL would only do a deal if Altria agreed to withdraw from the e-cigarette market and refrain from competing in it going forward.

269.    Furthermore, Altria's agreement with JUUL required Altria to provide services to

JUUL by leasing convenience store shelf space to JUUL, providing regulatory consulting, and distribution support. This included direct marketing and cross-promotions, such as putting ads for JUUL pods in Marlboro packages. Altria also gave JUUL a license over Altria's e-cigarette portfolio. Thus, at the same time that Altria cleared the way by removing its own products, it was taking affirmative steps to further bolster JUUL's market leadership.

270.   Although the actual discussion was redacted in the public version of the FTC Action complaint, it made clear that Burns, Pritzker, and Valani would only agree to a transaction with Altria if Altria exited the e-cigarette market. Among other actions, defendant Pritzker sent an opening term sheet to defendant Willard, on July 30, 2018, and the FTC revealed, "Continued competition from Altria's e-cigarette products was the only option clearly off the table."

271.   This point was reinforced at a Washington, D.C., meeting between defendant Burns and Valani, Pritzker and Riaz, from JUUL, and defendants Willard and Gifford, from Altria, to discuss these terms.   Defendant Willard appeared to then reinforce his understanding on a call with JUUL on or about August 5, 2018. When defendant Gifford attempted to send over a revised draft term sheet that weakened the non-compete, defendant Burns reacted negatively.

272.   The FTC complaint also alleges that Valani impressed this no-compete point on defendant Devitre at a meeting in New York City on August 15, 2018, shortly before an August 31, 2018, negotiation session between Altria and JUUL in San Francisco. On October 5, 2018, defendant Willard sent defendant Burns a letter that appeared to give in on the non-compete issue. Defendant Burns then appeared to tell JUUL's chief legal officer that those terms were acceptable. Shortly thereafter, on October 25, 2018, Altria announced that it would temporarily halt sales of its MarkTen Elite, citing concerns with youth vaping. Just a few days later, Altria announced its deal with JUUL, which included not competing with JUUL in e-cigarettes. By December 7, 2018,

Altria further announced that it would wind down its remaining e-cigarette business.

273.     The FTC further alleges that on December 9, 2018, Altria's chief legal officer e-mailed his counterpart at JUUL to discuss the deal. Less than two weeks later, JUUL and Altria executed their transaction agreements. Not only did Altria concede its own e-cigarette market, but it also agreed to refrain from other acquisitions or partnerships through which Altria could participate in the e-cigarette market.

274.     As FTC commissioners Rohit Chopra and Rebecca Kelly Slaughter pointed out in a separate statement, the opportunity for illegal collusion was great because Altria had an executive observer who sat in on JUUL's board meetings. As the FTC Commissioners pointed out, giving Altria a board observer seat meant that Altria would have access to JUUL's non-public business strategy and trade secrets, as well as information relevant to how Altria and JUUL could compete in other areas.  But with this information access, Altria could further steer itself to go out of JUUL's way, which it already had demonstrated previously through the non-compete agreement.

275.     For example, the Commissioners noted that tobacco products are often sold behind the counter, and tobacco companies and e-cigarette companies may compete by offering promotions and other incentives to retailers in return for that space.  But with Altria investing in JUUL, it has an incentive to compete less hard for that retail space, knowing it can share in the upside if JUUL is its competitor for that space. This could also affect Altria's sourcing decisions and recruitment decisions, to the extent Altria now knows JUUL's sourcing or recruiting plans.

276.     The Commissioners noted, "In light of these realities, allowing a situation where Altria has potential access to JUUL's operational and development plans puts too much risk on consumers and flies in the face of one of the underlying premises of the FTC Act: '. . . [T]o stop in their incipiency acts and practices which, when full blown, would violate [the Sherman Act and

the Clayton Act].'"[64]

277.     The FTC Action trial began on June 2, 2021. The evidence submitted by the FTC paints a vivid picture of just how JUUL became so successful. While JUUL and Altria argued that JUUL gained most of its growth from converting adult smokers, they also acknowledged that JUUL's growth also came from attracting underage non-smokers.

278.     The FTC submitted evidence that Altria (and the Altria Defendants) knew that JUUL had an underage usage problem but proceeded with the deal anyway.  Altria's "defense" to this argument was that Altria could help JUUL solve the youth usage problem. This argument, however, is inconsistent and incompatible with how the Altria-JUUL investment was structured which prevented Altria from exercising control over JUUL.

279.     The FTC Action trial confirmed that the Altria Board was informed of negotiations with respect to the JUUL investment and of Altria's product sales, including the Company's efforts to compete in the lucrative e-cigarette market and the prospects for the MarkTen line of products. One Altria Board member in particularly, defendant DeVitre, was actively involved in the Altria-JUUL negotiations on behalf of the Board. It is a reasonable inference that defendant DeVitre's participation in these negotiations was communicated to his fellow Board members, which would provide them with the same detailed knowledge of the JUUL investment, including Altria's extensive due diligence, as defendant DeVitre received.

280.     The FTC Action trial record provides two competing narratives, either of which reflect violations of fiduciary duties by the Altria Defendants, and the aiding and abetting of such

---

[64]     *See* Statement of Commissioner Rohit Chopra Joined by Commissioner Rebecca Kelly Slaughter. *In the Matter of Altria Group, Inc. and JUUL Labs, Inc.,* Commission File No. 1910075 (April 2, 2020),
https://www.ftc.gov/system/files/documents/public_statements/1570265/statement_of_comm_chopra_in_the_matter_of_altria-juul.pdf

breaches by the JUUL Defendants. The FTC alleges that Altria and the Altria Defendants colluded with JUUL to divide the lucrative e-cigarette market in violation of federal law. Altria and JUUL argued that Altria failed at developing its own e-cigarette product and therefore had to make the investment in JUUL to gain market share in this lucrative market.

281.    If the FTC upholds the government's case and theory, the Altria Defendants broke federal law in pursuit of profit. Virginia law does not protect officers and directors who are law breakers, and the Altria Defendants should be held responsible for their actions and the resulting damages to the Company. Alternatively, if Altria's and JUUL's defense is successful, then the Altria Defendants acted in bad faith by causing Altria to invest in a company with a ***known youth usage problem***, ignoring the serious risk of regulatory and reputational harm. Such conduct, too, is a violation of the Altria Defendants' fiduciary duties to protect the corporate assets of Altria.

282.    The JUUL Defendants – consisting of sophisticated industry experts – also knowingly aided and abetted fiduciary duty breaches by the Altria Defendants by inducing Altria to invest in a business predicated on widespread illegality.

283.    Notably, defendants Willard and Gifford both testified at the trial that:

a.  Defendant Willard was aware of JUUL's problem with "youth use" and that "internal data supported" his understanding that flavored products (like JUUL sold during the course of the negotiations) were attractive to youth users, and that potential youth usage was a factor in the FDA approval process;

b.  Defendant Willard briefed the Board in February 2018 on JUUL's rapid growth, including its growth through "new users;"

c.  Defendant Willard was aware that while JUUL "attracted adult smokers, more youth were also attracted" to it;

    d.   Defendant Gifford was also aware of the FDA's concern about youth vaping and JUUL's appeal to youth; and

    e.   Defendant Gifford presented to the Board the "plummeting" market share of Altria's primary product and confirmed that NuMark lost money every year, while at the same time, pod-based products such as JUUL were growing rapidly.

284.    Similarly, defendants Valani and Pritzker testified at the FTC trial that:

    a.   The negotiations started in Altria's Richmond offices with a meeting involving defendants Gifford and Willard in 2017, when Willard was still the COO of Altria;

    b.   Defendants Pritzker, Valani and Burns again met with Willard and Gifford in spring of 2018 at Altria's Richmond headquarters to discuss a potential deal;

    c.   Defendants Pritzker and Valani confirmed that they strongly believed Altria could not invest in JUUL without a non-compete, because Altria would have access to JUUL's internal customer data;

    d.   Defendant Pritzker had active communications with JUUL"s investment banker where he again flagged his concerns with Altria competing with JUUL;

    e.   Defendants Pritzker and Valani were informed – both by email and by phone call with Willard – on the same day that Altria announced that it would pull its own flavored pod-based e-vapor products from the market, that Altria was still interested in an investment in JUUL;

    f.   Defendant Pritzker testified to his initial "surprise" at Altria's continued interest given its announcement, but also testified that Willard also met with him in New York to reiterate Altria's interest in a deal; and

    g.   Defendant Valani, in particular, was insistent on Altria not competing with JUUL

in the e-vapor market.

285.     The FTC trial also established the Board's culpability.  The Board was very actively involved in the negotiations, receiving numerous presentations and having one of its directors, defendant DeVitre, involved in the negotiations.  The Board also approved budgets and growth plans for all of Altria's subsidiaries, including NuMark, so it was regularly kept apprised of Altria's own business performance in the e-vapor category, and thus was also aware of the strong financial incentives for Altria to invest in JUUL, because Altria's own efforts were consistently losing money.  But at other times, the Board was willfully blind to the problem of youth usage, by relying on management presentations by defendants Willard, Gifford, and Crosthwaite, which focused on JUUL's growth and Altria's lack of growth in the space.

286.     The evidence showed that defendants Willard, Gifford, and Crosthwaite were so intent on completing the JUUL transaction, despite the known reputational risks, that they even took over direct messaging to the Board of the Company's own e-vapor efforts.  Whereas, previously, NuMark's senior leadership had presented to the Board directly, defendants Willard, Gifford, and Crosthwaite took over the presentation in August 2018, just as negotiations with JUUL were beginning to pick up steam.

287.     At the meeting, held at the Marlboro Ranch, defendants Willard, Gifford, and Crosthwaite spoon-fed the Board information that painted a more negative picture of Altria's e-vapor efforts, so that it could induce the Board to continue to approve seeking a transaction with JUUL, despite how by that time, JUUL's regulatory struggles and youth marketing were the subjects of widespread public reports.

288.     Moreover, Gifford testified that Crosthwaite was to "bird dog" NuMark.   And defendant Willard had made clear to Crosthwaite that a deal with JUUL was always "Plan A,"

while Altria's own e-vapor product was "Plan B." This further showed how defendants Willard, Gifford, and Crosthwaite placed a premium on the deal with JUUL, because the very person in charge of "getting JUUL done" was also the person who supervised (and thus could suppress) Altria's internal ostensibly competing efforts in the e-cigarette market.

289.     The FTC trial also established that the key executives at Altria, including defendants Willard and Gifford, as well as their lieutenants, understood that the key appeal of JUUL was its ability to attain "satisfaction" for users because of its high nicotine content and effective delivery through nicotine salts. These were features that Altria's products lacked. Altria's products had lower nicotine levels. And its most direct competitor with JUUL, MarkTen Elite, did not have nicotine salts. While the MarkTen Bold did have nicotine salts, it was shaped like a cigarette, and Altria understood that the appearance dissuaded customers, who did not want the stigma associated with smoking cigarettes. Because of FDA regulations, however, Altria was unable to alter its existing products – *i.e.*, combine the MarkTen Bold's salt formulation with the MarkTen Elite's pod shape.

290.     Thus, Altria executives were causing the Company to invest in a company for the specific purpose of increasing nicotine addiction, because they knew that nicotine addiction was the key to JUUL's success. They also constantly received information about regulatory problems that Altria faced, and therefore, they would have been aware of general regulatory problems that JUUL faced, as well. Yet despite knowing about these risks, the Altria Defendants continued to press ahead with the transaction, even at the cost of denigrating Altria's own e-vapor products.

291.     The FTC trial also revealed that the Altria Defendants were well-aware of the regulatory risks of investing in JUUL because they were informed of JUUL's youth usage problem and lack of experience in dealing with regulators. Altria also constantly tracked JUUL's market

share, and had extensive product and market research on JUUL, including through internal "product teardowns."

292.     Yet, Altria's officers continued to press ahead with this transaction, driven by their concerns that Altria could not catch up with JUUL's products. The FTC trial revealed how Altria's officers were so obsessed with closing the deal with JUUL that they were willing to damage their own relationships with Philip Morris International ("PMI"), where Altria had a license to market PMI's iQos heated tobacco product in the U.S.  Altria went so far as to pull PMI's e-vapor product, Apex, from the U.S. market, in October 2018, as part of its effort to assure JUUL that Altria would not compete with it in this space.

293.     Finally, The FTC trial showed that the Altria officers were well aware of antitrust concerns, especially because of the active involvement in negotiations by Altria's regulatory head and general counsel, Murray Garnick.  Yet Altria's officers consistently took actions that assuaged JUUL's concerns that Altria would compete with it – for example, by  Altria exiting the e-cigarette business before the transaction was closed – and telling this to JUUL Defendants such as Pritzker, Valani, and Burns.

294.     In short, Altria and the Altria Defendants have backed themselves into a corner with their defense in the FTC Action. There is no reasonable set of circumstances under which the Altria Defendants agreed to the JUUL investment that comports with their fiduciary duties.

### 4.  State Litigation Against JUUL

295.     Scrutiny by federal regulators would not be the only regulatory issues both Altria and JUUL would face. In May 2019, the North Carolina AG became the first state AG to sue JUUL for its youth marketing practices.  Also in May 2019, San Francisco became the first city in the country to ban e-cigarettes, which was targeted toward JUUL. This worsening regulatory news, and Altria's choice to tie itself to JUUL's fortunes, drove down Altria's stock price.

296.    By mid-2020, thirty-nine states had announced public investigations into JUUL. As of the date of this filing, multiple state attorneys general have filed lawsuits against JUUL, including California, Illinois, Hawaii, Minnesota, New York, Michigan, Arizona, Pennsylvania, New Mexico, Colorado, Alabama, Washington, Massachusetts, North Carolina, and Washington D.C.[65]

297.    Similar to the allegations in both the Securities Action and in this action, these lawsuits generally allege that JUUL utilized social media influencers popular among young people and designed flavors and products that were attractive to teens. Similarly, they allege that JUUL routinely downplayed the strength of its nicotine and that JUUL's products entered the market with nicotine concentrations well above what was typical at the time.

298.    North Carolina's lawsuit was the first filed against JUUL on May 15, 2019. The press release announcing the lawsuit quotes North Carolina Attorney General Josh Stein as follows: "JUUL targeted young people as customers. As a result, vaping has become an epidemic among minors…JUUL's business practices are not only reckless, they're illegal. And I intend to put a stop to them. We cannot allow another generation of young people to become addicted to nicotine." Mr. Stein gave an interview to CNN contemporaneous to the filing of the lawsuit against JUUL and stated, unequivocally: "JUUL claims its products are for adults, but its business strategy clearly targeted young people and minors."[66]

---

[65]    Additional public entities, including for example the Erie, Pennsylvania school district have authorized litigation against JUUL for marketing to underage children. *See, e.g.,* Ed Palattella. *Erie School District to join others in suing JUUL, claiming vaping company targeting minors*, Erie Times-News (Feb. 12, 2021), https://www.goerie.com/story/news/education/2021/02/12/erie-school-district-sue-e-cigarette-maker-juul-over-youth-vaping/6718289002/

[66]    Nadia Kounang and Michael Nedelman. *North Carolina Sues JUUL, claiming deceptinve marketing and targeting youth*, CNN (May 15, 2019), https://www.cnn.com/2019/05/15/health/north-carolina-juul-lawsuit-bn/index.html

299.    On June 28, 2021, JUUL announced that it had agreed to pay $40 million to the to settle North Carolina's lawsuit against JUUL. That lawsuit concerned JUUL's design, marketing, and selling its e-cigarettes to attract young people and for misrepresenting the potency and danger of nicotine in its products in violation of North Carolina's Unfair and Deceptive Trade Practices Act.  Additionally, JUUL agreed to adhere to a list of restrictions to block any promotion and sales of its products to youths. These restrictions prohibit JUUL from using advertisements that may appeal to youth; require it to avoid most social media advertising and the use of influencers; prohibit it from sponsoring sports and entertainment events, like concerts; and prohibit its use of anyone under the age of 35 in marketing. JUUL also agreed to help enforce age restrictions by running a "secret shopper" program whereby it will send undercover representatives, ages 21 to 27, into at least 50 stores throughout North Carolina per month to check whether retailers verify buyers' ages.

300.    North Carolina's settlement is likely to be the first of many wherein JUUL will pay for its deceptive behavior and marketing to youth.

**5.  Private Antitrust Actions Against JUUL and Altria**

301.    Beginning in early 2020, multiple private consumers sued both Altria and JUUL for violating antitrust laws by conspiring to reduce the variety of products on the market. Those cases were eventually consolidated in the U.S. District Court for the Northern District of California.  On May 7, 2020, the Court consolidated all cases under *Reece v. Altria Group, Inc., et al.,* 3:20-cv-02345-WHO.  On November 13, 2020, a group of "Direct Purchaser Plaintiffs" filed a consolidated class action complaint in *In re: Juul Labs, Inc. Antitrust Litigation*, which relates to all Direct Purchaser actions/suits. These suits allege that Altria also agreed not to compete with JUUL and to provide JUUL valuable retail shelf space in the e-cigarette market. Through this agreement, JUUL maintained its dominance in the e-cigarette market and earned monopoly profits.

Altria then shared these profits through its ownership stake in JUUL. These private antitrust lawsuits are currently in the discovery stage and remain pending.

### 6.   The SEC Investigates Altria and JUUL

302.     On February 21, 2020, the SEC announced an investigation into Altria's investment in JUUL, including whether Altria adequately disclosed to shareholders the risks of the investment into JUUL. The SEC subpoenaed JUUL, and JUUL turned over to the SEC financial projections JUUL shared with Altria, but those internal projections have not become public, nor has there been a public resolution of the SEC's inquiry. Upon information and belief, the SEC's inquiry remains ongoing.

### N.     The Altria Defendants' False and Misleading Statements to Shareholders

303.     The Altria Defendants also caused Altria to issue a series of materially false and misleading statements to stockholders concerning the Company's JUUL investment. Specifically, the Altria Defendants misled stockholders regarding the risks of the JUUL investment, JUUL's marketing efforts aimed toward minors and the amount of nicotine in JUUL products, including JUULpods. As this Court held in the Securities Action, when a company decides to communicate with stockholders on a topic (for example, underage smoking mitigation), it must do so accurately and completely. The Altria Defendants utterly failed to do so in the following examples.

304.     On December 20, 2018, Altria and JUUL both issued press releases announcing that Altria had signed and closed a $12.8 billion investment in JUUL. According to Altria's December 20, 2018 Press Release (the "December 2018 Press Release"), "[t]he service agreements w[ould] accelerate JUUL's mission to switch adult smokers to e-vapor products[,]" thereby presumably increasing JUUL's sales and the value of Altria's investment. Additionally, the December 2018 Press Release highlighted that "Altria's investment represents a 35% economic

interest in JUUL, valuing the company at $38 billion."

305.     Altria's December 2018 Press Release also quoted defendant Willard, who touted

Altria's investment in JUUL as the "biggest" in the Company's history, and a move that the

Company made in an effort to promote products that reduced harm, stating, in relevant part:

> We are taking significant action to prepare for a future where adult
> smokers overwhelmingly choose non-combustible products over
> cigarettes by investing $12.8 billion in JUUL, a world leader in
> switching adult smokers . . . . We have long said that providing adult
> smokers with superior, satisfying products **with the potential to
> reduce harm** is the best way to achieve tobacco harm reduction.
> Through JUUL, we are making the biggest investment in our history
> **toward that goal**. **We strongly believe that working with JUUL to
> accelerate its mission will have long-term benefits for adult
> smokers and our shareholders.**

(Emphases added.)

306.     Altria's December 2018 Press Release also quoted JUUL's CEO, defendant

Burns, who stated, in relevant part:

> **Altria's investment sends a very clear message that JUUL's
> technology has given us a truly historic opportunity to improve the
> lives of the world's one billion adult cigarette smokers** . . . . This
> investment and the service agreements will accelerate our mission to
> increase the number of adult smokers who switch from combustible
> cigarettes to JUUL devices.

(Emphasis added.)

307.     Finally, Altria's December 2018 Press Release attempted to assure investors that

Altria's investment in JUUL was made with an ongoing commitment to prevent underage tobacco

consumption, promising that Altria and JUUL would work together to prevent underage use of

JUUL's products.

308.     Also, on December 20, 2018, sixteen minutes after Altria's December 2018 Press

Release was distributed, JUUL issued its own press release, in a coordinated fashion, mirroring

that of Altria's, titled "JUUL Statement About Altria Minority Investment and Service Agreements." Discussing the rise in youth vaping and Altria's investment, JUUL likewise stated that its "*intent was never to have youth use JUUL products*" and the company identified Altria's investment as furthering JUUL's purported mission to prevent underage vaping: "Today, we have been joined by an unlikely – and seemingly counterintuitive – investor in our journey. Altria today announced a minority investment of $12.8 billion into JUUL for a 35% ownership in the company along with services to accelerate our mission." JUUL stated that as part of the agreement, JUUL would gain access to Altria's retail, marketing and distribution apparatus including "access to its premier innovative tobacco products retail shelf space," access to users with "direct communications through cigarette pack inserts and mailing to adult smokers via Altria's companies' databases," and Altria will apply its logistics and distribution experience to help JUUL expand its reach and efficiency, and JUUL will have the option to be supported by Altria's sales organization, which covers more than 230,000 retail locations. JUUL also stated that a condition of the agreement was that Altria must "allow JUUL to remain in control. As part of this investment JUUL remains fully independent and retains full operating control."

309.    During a December 20, 2018 call with analysts and investors discussing the investment, defendant Willard again assured everyone that "Importantly, Altria and JUUL are committed to preventing kids from using any tobacco products. As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve."

310.    During the call, Steve Powers of Deutsche Bank asked defendant Willard point-blank: "*how much of JUUL's business over the last 12 months have you concluded comes from underage consumers*, and how confident are you that progress can be made to eradicate that consumption? And I guess, lastly, what are the risks that you assign to the idea that JUUL's

products ultimately may not receive FDA approval through the PMTA process, given their known association with underage consumption?" Defendant Willard responded: "I think it's hard to nail down exactly how much of the volume could be contributed to -- could be attributed to underage use. *We believe it's quite a small percentage*…."

311.     During a February 20, 2019 earnings call for Altria's fourth fiscal quarter of 2018, defendant Willard claimed that JUUL has taken "significant actions to address…concerns" about "continued underage use." This was false; JUUL and Altria had worked together to attempt to preserve JUUL's ability to market to youth. During the same call, in response to a question of whether JUUL sales may undermine Altria's sales of combustible cigarettes, defendant Willard characterized JUUL as a "harm reduction" opportunity, repeating JUUL's deceptive marketing that JUUL devices serve to reduce harm, when in fact, they were designed to draw in new nicotine addicts.

312.     On February 26, 2019, the Altria Defendants caused Altria to file its Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by defendants Willard, Gifford, Casteen, Devitre, Kelly-Ennis, Kiely, McQuade, Munoz, Newman, Sakkab, and Shanks.[67]  It falsely downplayed the FDA's concern with Altria's investment into JUUL while simultaneously touting Altria's continued commitment to preventing underage vaping and "reaffirm[ed] its ongoing and long- standing investment in underage tobacco prevention efforts." Specifically, the 2018 10-K stated, in relevant part:

> The FDA announced in September 2018 that it is using its regulatory authority to address underage access and use of e-vapor products. As part of this effort, the FDA issued letters to manufacturers of certain e-vapor products, including Nu Mark and JUUL, requiring them to (1) discuss with the FDA the steps each manufacturer intends to take

---

[67]     The 2018 10-K was also signed by non-party Farrell.

to address youth access and use of its e-vapor products and (2) within 60 days provide a detailed written plan to address underage access and use.

In October 2018, Altria responded to the FDA's request for a written plan *setting forth the actions it was taking to address underage access and met with the FDA* . . . . Later in December, Altria purchased, through a wholly owned subsidiary, a 35% economic interest in JUUL. Following the announcement of this investment, Altria requested a meeting with the FDA to discuss the transaction and its ongoing support for underage tobacco prevention. In February 2018 [*sic*], the FDA sent Altria a letter expressing concern about this investment given the rise in underage use of e-vapor products and issued a statement indicating that, if the increased trend in underage use of e-vapor products does not reverse, the FDA may unilaterally take action to address the trend. *Altria responded by reaffirming its ongoing and long-standing investment in underage tobacco prevention efforts*. For example, Altria is advocating raising the minimum legal age to purchase all tobacco products to 21 at the federal and state levels to further address underage tobacco use. Altria will meet with the FDA to continue discussing underage e-vapor use.

\* \* \*

[T]he expected benefits of the JUUL transaction, such as any equity earnings and receipt of cash dividends, may not materialize in the expected manner or timeframe or at all, including due to the risks encountered by JUUL in its business, such as operational risks and *regulatory risks* at the international, federal and state levels, *including actions by the FDA*; unanticipated impacts on JUUL's relationships with employees, customers, suppliers and other third parties; potential disruptions to JUUL's management or current or future plans and operations due to the JUUL transaction; or domestic or international litigation developments, investigations, or otherwise . . . . Failure to realize the expected benefits of our JUUL investment could adversely affect the value of the investment. [. . .] [I]f a qualitative assessment of impairment of our JUUL investment were to indicate that its fair value is less than its carrying value, the investment would be written down to its fair value, which could have a material adverse effect on Altria's consolidated financial position or earnings.

313.    The statements referenced above were materially false and misleading because the

Altria Defendants knew or recklessly disregarded but failed to disclose the true risks of its

investment in JUUL, including: (i) that JUUL's overarching marketing scheme was directed at youth; (ii) that JUUL's products were harmful and not a tobacco cessation product; (iii) that JUUL's youth marketing scheme subjected JUUL, Altria, and Altria's investment in JUUL to material risks and expenses, including reputational, litigation and regulatory actions and fines; (iv) that these risks associated with JUUL's products and marketing practices, and the true value of JUUL and its products were known to the Altria Defendants but were not communicated to Altria investors; (v) that all of the foregoing, as well as mounting public scrutiny, negative publicity, and governmental pressure on e-vapor products and JUUL made it reasonably likely that Altria's investment in JUUL would impact Altria's reputation and operations; and (vi) that the materialization of these risks would require Altria to write-down a material portion of its investment in JUUL. The risks of these events would soon materialize.

## O.     The Truth Is Revealed

314.     Altria's JUUL investment came at a historically inopportune time, which the Altria Defendants knew based on the risks described above. Temporally coinciding with Altria's JUUL investment, e-vapor products and JUUL itself increasingly became the subject of scrutiny by government authorities throughout the country. Mounting skepticism, fear, and negative publicity in the media regarding e-cigarettes' safety led to increased scrutiny by government authorities into vaping products, and municipalities throughout the country began tightening sales practices related to those products.

315.     For example, on April 3, 2019, the FDA announced its investigation into nearly three dozen recent cases of people suffering from seizures after vaping. Between 2010 and 2019, the FDA said it received thirty-five reports of people, especially children and young adults, experiencing seizures after using e-cigarettes. On this news, Altria's stock price fell by $2.71 per share, or 4.78%, to close at $53.98 per share on April 3, 2019.

316.     Nevertheless, the Altria Defendants continued to tout the purported benefits of the Company's investment in JUUL. On April 25, 2019, the Altria Defendants caused Altria to issue a press release announcing its financial and operating results for the first quarter of 2019 (the "1Q19 Press Release"). The 1Q19 Press Release quoted defendant Willard, who cited Altria's recent investments, which included JUUL, as factors that would supposedly accelerate Altria's growth and long-term success, stating, in relevant part:

> After taking steps to position Altria for long-term success at the end of 2018, we entered 2019 with an evolved business platform that includes our strong core tobacco businesses and **new strategic investments** with tremendous potential for growth . . . . We believe we've made significant progress in the first quarter on key initiatives to realize the potential of our evolved business platform.

317.     The 1Q19 Press Release also asserted that Altria's investment into JUUL had included, among other factors, an evaluation of the following:

> [T]he possibility that the expected benefits of the transaction may not materialize in the expected manner or timeframe, if at all; the potential inaccuracy of the financial projections (including projections relating to JUUL's domestic growth and international expansion); prevailing economic, market, **regulatory or business conditions**, or changes in such conditions, negatively affecting the parties . . . [and] the fact that Altria's reported earnings, financial position and expected use of equity accounting and any future dividends paid by JUUL on shares owned by Altria may be adversely affected by tax and other factors, including the risks encountered (**including regulatory and litigation risks**) and decisions made by JUUL in its business[.]

318.     That same day, the Altria Defendants caused Altria to file its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by defendant Gifford and briefly discussed ongoing litigation related to the dangers of e-vapor products, without going into detail, and while assuaging investors that Altria was already preparing responses to such lawsuits,

stating in relevant part:

> *E-vapor Litigation*
>
> In April 2019, Altria, PM USA and JUUL were named as defendants in a tobacco and health class action lawsuit filed in the United States District Court for the Middle District of Florida. The lawsuit involves JUUL e-vapor products and proposes various classes of plaintiffs. The theories of recovery include: violation of RICO; fraud; failure to warn; design defect; negligence; unjust enrichment and deceptive and unfair trade practices. Plaintiffs seek various forms of relief including compensatory and punitive damages. Altria and PM USA are preparing their responses to the lawsuit.

319.    On May 16, 2019, Altria held its annual shareholder meeting. As reported by CNBC, defendant Willard was grilled by investors: "Analysts and investors worried Altria paid too much for its 35% stake in JUUL and very little say over its operations, especially with the e-cigarette giant facing regulatory scrutiny." Defendant Willard defended the terms of the deal, saying the e-cigarette market wasn't growing much before JUUL entered. Altria's own MarkTen products had hardly gained traction, prompting Altria to stop selling them in the fall before signing the deal with JUUL. As reported by CNBC, "Willard in response to a shareholder question on how Altria would make itself less vulnerable to JUUL's legal risks said ***Altria was aware of early litigation when he made the investment in JUUL***. He said Altria is committed to reducing youth e- cigarette use…."

320.    On July 30, 2019, the Altria Defendants caused Altria to issue a press release announcing the Company's financial and operating results for the second quarter of 2019 (the "2Q19 Press Release"). The 2Q19 Press Release quoted defendant Willard, who continued to describe the JUUL transaction as a factor that would contribute to Altria's future growth and success, stating, in relevant part:

> Altria delivered excellent second quarter adjusted diluted earnings per share growth of nearly 9%, driven by our core tobacco

businesses. We've maintained our focus on the adult tobacco consumer and believe that with our leading premium tobacco brands, U.S. commercialization rights to IQOS, *investment in JUUL* and pending transactions, we are best positioned among tobacco peers to lead through a dynamic time in the U.S.

321.    The 2Q19 Press Release contained generic, boilerplate representations concerning risk factors related to Altria's investment in JUUL, including, in relevant part:

[T]he risks generally related to our investments in JUUL and Cronos, including our inability to realize the expected benefits of our investments in the expected time frames, or at all, due to the risks encountered by our investees in their businesses, such as operational, compliance and regulatory risks at the international, federal and state levels, including actions by the FDA; [and] . . . domestic or international litigation developments, government investigations, tax disputes or otherwise; and potential impairment of our investments[.]

322.    On July 13, 2019, in an interview with CNBC, that was later posted on the internet, defendant Burns stated: "First of all, I'd tell them that I'm sorry that their child's using the product. *It's not intended for them. I hope there was nothing that we did that made it appealing to them.* As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through."

323.    On July 25, 2019, defendant Monsees stated to Congress through written testimony: "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JUUL products. . . .That is a serious problem. Our company has no higher priority than combatting underage use."

324.    On August 29, 2019, *The Wall Street Journal* reported that the FTC was investigating whether JUUL used influencers and other marketing practices to appeal e-cigarettes to minors. On this news, Altria's stock price fell $1.60 per share, or 3.49%, to close at $44.25 per share on August 29, 2019.

325.    On August 30, 2019, both the FDA and the CDC announced that they were collaborating to investigate e-cigarette related cases of illnesses and "working tirelessly to investigate the distressing incidents of severe respiratory disease associated with use of e-cigarette products." On this news, Altria's stock price fell an additional $0.51 per share, or 1.15%, to close at $43.74 per share on August 30, 2019—a total loss of $2.11 per share, or 4.6%, since closing at $45.85 per share two trading days earlier on August 28, 2019.

326.    On September 9, 2019, the FDA issued a warning letter to JUUL asserting that its statements regarding the risk of harm presented by JUUL constituted unauthorized modified risk claims under federal law and regulation, directing JUUL to cease making or publishing such statements and to take immediate corrective action. These statements included those made to students during JUUL's youth outreach and education program indicating that JUUL was about to be approved by the FDA and that it was at least 99% safer than cigarettes, as well as JUUL's former CEO, defendant Burns, making statements regarding the supposedly reduced levels of harmful compounds produced by JUUL's temperature control system.

327.    On September 11, 2019, news sources reported that the Trump administration was preparing a ban on flavored e-cigarettes as federal agencies probe an outbreak of a lung problem that killed at least six people and reportedly led to the sickness of hundreds of others. President Trump and U.S. Health Secretary Azar reportedly both confirmed that a ban was possible after the vaping issues were investigated.

328.    On September 12, 2019, during after-market hours, *Reuters* reported that, "[w]ithin weeks, New Jersey could become the latest state to restrict e-cigarette use, with the governor on Thursday launching a task force to find ways to curb vaping, linked by U.S. health officials to hundreds of respiratory illnesses and a half-dozen deaths." Additionally, that same day,

the CDC reported that as of September 11, 2019, 380 confirmed cases, and probably cases of lung disease associated with vaping, had been reported by thirty-six states and the U.S. Virgin Islands, with six total deaths confirmed in six states. On this news, Altria's stock price fell $2.45 per share, or 5.51%, to close at $42.01 per share on September 13, 2019.

329.    On September 23, 2019, during after-market hours, news sources began reporting that federal prosecutors in California were conducting a criminal probe into JUUL.

330.    On September 24, 2019, JUUL stated to the *Los Angeles Times* (which was later posted on the internet) that: "We have never marketed to youth and we never will."

331.    On September 25, 2019, the Altria Defendants caused Altria to issue a press release announcing that Philip Morris had called off discussions of a $200 billion merger with Altria due to scrutiny of the vaping industry and the Company's 35% stake in market leader JUUL. JUUL also announced that it was replacing its CEO, defendant Burns, with longtime Altria executive, defendant Crosthwaite, and announced that JUUL would stop advertising in the U.S. According to an SEC filing, Altria made a "special recognition" payment of $2.5 million upon Crosthwaite's departure from Altria to JUUL. Defendant Crosthwaite had served as an observer on JUUL's board of directors after Altria's investment in JUUL. On this news, Altria's stock price fell an additional $0.17 per share, or 0.42%, to close at $40.56 per share on September 25, 2019— a total loss of $0.32 per share, or 0.78%, since closing at $40.88 per share two trading days earlier on September 23, 2019.

332.    On October 14, 2019, defendant Willard stated to Congress through a letter to Senator Richard Durbin the following:

> "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and had quickly become a very compelling product among adult vapers. We decided to pursue an

economic interest in JUUL, believing that an investment would significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products."

333.     On October 31, 2019, the Altria Defendants caused Altria to announce that the Company was taking a $4.5 billion write-down on its investment in JUUL. Altria also announced that the FTC was scrutinizing Altria's role in the departure of JUUL's CEO.  Altria disclosed that on October 1, 2019, Altria received a civil investigative demand "seeking information regarding, among other things, Altria's role in the resignation of JUUL's former chief executive officer and the hiring by JUUL of any current or former Altria director, executive or employee." On this news, Altria's stock price fell an additional $1.15 per share, or 2.5%, to close at $44.06 per share on October 31, 2019.

334.     On January 30, 2020, the Altria Defendants caused Altria to announce that the Company was taking an additional $4.1 billion charge related to its JUUL investment. It cited "the increased number of legal cases pending against JUUL and the expectation that the number of legal cases against JUUL will continue to increase." On this news, Altria's stock price fell an additional $2.11 per share, or 4.2%, to close at $48.00 per share on January 30, 2020.

335.     On February 21, 2020, at 3:37 pm (just before the close of trading), the *Wall Street Journal* reported that the SEC had launched an investigation into whether Altria fully disclosed to its shareholders the risks associated with its investment in JUUL. On this news, Altria's stock price fell $0.29 from $46.18 at 3:30 pm to $45.89 at the close of trading on February 21, 2020. Altria's stock price fell an additional $2.09 per share, or 4.8%, to close at $43.80 per share on the next trading day February 24, 2020, and continued to decline to $40.30 on February 27, 2020, for a total decline of $5.88, or 12.7%.

336.     On April 17, 2020, Altria announced that defendant Willard would resign as CEO of Altria. Analysts and the press attributed Willard's resignation to Altria's disastrous investment in JUUL.

P.     **Altria Has Been Damaged**

337.     After the unrelenting stream of bad news throughout 2019, including regulatory enforcement, litigation, and widespread reporting of disease and death, Altria had no choice but to correct on its own books the lofty, irrational valuation of JUUL that its investment had implied.

338.     On October 31, 2019, Altria recorded a pre-tax impairment charge of $4.5 billion, pointing to the likelihood of FDA action to remove flavored e-vapor products from the market. Such a removal of flavored e-cigarettes would not only cause an immediate negative impact on JUUL's revenues but would also thwart JUUL's long-term strategy of ensnaring young, new consumers into nicotine addiction and into the JUUL brand.

339.     Just a couple of months later, on January 3, 2020, Altria recorded yet another non-cash impartment, this time for $4.1 billion, which it attributed to its JUUL investment. Altria pointed to the increased number of legal cases against JUUL and Altria and the expectation of further legal cases to come.

340.     Ten months later, on October 30, 2020, Altria announced a further $2.6 billion write-down.  On April 29, 2021, Altria recorded a non-cash pre-tax unrealized loss of $200 million for the three months ended March 31, 2021 as a result of a decrease in the fair value of its investment in JUUL.

341.     These accounting charges total $11.3 billion, ***reflecting a loss of 88% of Altria's investment in JUUL less than two years after it was made***. Altria's carrying value of the JUUL investment is now just $1.2 billion. This has severely damaged Altria's value.

342.     JUUL's troubles following Altria's investment were no surprise. The Altria

Defendants knew how this story would end because they wrote the book the first time around, having themselves originally pioneered the business model of illegal marketing of nicotine products to underage consumers.

343.    JUUL's downfall tracked the history of Big Tobacco's earlier downfall, simply at a much quicker pace, but this too was entirely anticipated. The regulatory framework for severe restrictions upon harmful nicotine products, particularly those targeted to teenagers, had fully matured the first time around, and was prepared to respond much more swiftly to the threat e-cigarettes posed than it had to combustible cigarettes. Having themselves been subject to that regulatory regime, it could have been no surprise to the Altria Defendants how quickly JUUL would falter.

344.    In addition to the billions of dollars squandered by the Altria Defendants in the JUUL acquisition, Altria has suffered other direct financial damages as a result of their misconduct. Altria has already expended significant resources defending itself in the Securities Action, the FTC Action, the private antitrust actions, the several regulatory actions and investigations, and the MDL actions. These expenses will only increase as the litigation proceeds. Altria faces potential damages in the hundreds of millions of dollars for the Securities Action alone (should it lose or settle that lawsuit).  Altria's presently ascertainable exposure in the related litigation runs into the billions of dollars.

345.    The Company also faces the probability that its relationship with JUUL will be "unwound" on less than favorable terms in the FTC Action, eliminating the remaining $1.5 billion value Altria continues to claim for the asset.

## VI.    DERIVATIVE AND DEMAND IGNORED ALLEGATIONS

346.    On November 27, 2019, Plaintiff Lorca sent Altria's Board a pre-suit litigation demand detailing the wrongdoing explained herein and demanding that the Board investigate and

initiate litigation against the culpable fiduciaries.  A copy of Plaintiff Lorca's demand is attached hereto as Exhibit A-1.

347.    Altria's counsel responded to Plaintiff Lorca's letter on December 10, 2019, confirming the Board's receipt of the demand and requesting proof that Plaintiff Lorca was an Altria shareholder at all relevant times.  Counsel claimed that "[o]nce we receive the required proof of ownership, we will provide a further response to your letter within a reasonable time."  A copy of the December 10, 2019 letter is attached hereto as Exhibit A-2.

348.    Although there is no requirement that Plaintiff Lorca provide the requested proof, she did so by letter dated December 18, 2019.  Lorca's letter inquired as to what steps the Board "has taken thus far and plans to take in response to [Plaintiff Lorca's] Demand, including whether the Board has formed a special committee to consider the demand, the membership of that committee, and when we can expect to receive a decision on the demand."  A copy of the December 18, 2019 letter is attached hereto as Exhibit A-3.

349.    Counsel for the Board responded by letter dated January 10, 2020, stating that the Board would not consider the merits of the demand until some unspecified time in the future.  The Board took the position that "it is in the best interests of Altria to defend itself in the securities litigation and other proceedings, which are at a very preliminary stage.  After there have been further developments in these proceedings, the board will make a timely and appropriate determination on the matters raised by your letter, and that determination will be promptly communicated to you."  The Board did not explain (i) how or why an independent investigation would interfere with its defense of the Securities Action or any other related litigation; (ii) why it singled out developments in the Securities Action as necessary precursors to any Board investigation for purposes of responding to Lorca's demand; or (iii) what further developments in

the Securities Action might spur it to commence the required investigation, apart from the vague reference to the then "preliminary stage" of proceedings in the Securities Action.   A copy of the January 10, 2020 letter is attached hereto as Exhibit A-4.

350.    Plaintiff Lorca responded by letter that same day, explaining that the Board's position made little sense, since any decision in response to the demand would require the Board to be adequately informed as to the underlying facts.  In particular, Plaintiff Lorca's letter stated,

> While it may be the case that it's in the best interests of the Company to mount a defense to all allegations, we question how the Board could make such a determination without a complete and thorough investigation into the underlying facts.  Further, we fail to see why a defense of litigation would prevent the Board from conducting its own internal investigation.  Accordingly, we ask the Board to reconsider and conduct the demanded investigation.

A copy of Plaintiff Lorca's January 10, 2020 letter is attached hereto as Exhibit A-5.

351.    On January 24, 2020, the Board reiterated its refusal to investigate Plaintiff Lorca's demand.  Apart from vaguely representing that it would "update" Ms. Lorca in some fashion following a decision on the pending motion to dismiss in the Securities Action, the Board once again provided no concrete explanation for its refusal to commence an investigation until some unspecified set of developments in the various related litigation.   Citing a number of inapposite cases that did not construe the governing Virginia statute, the Board claimed its refusal to investigate was a valid exercise of business judgment, stating:

>  Given the pendency of these various related matters, and the board's belief that it is in Altria's best interests to defend itself in the securities litigation and other proceedings, which remain at a very preliminary stage, the board has informed you that it will make a determination on the matters raised in your demand after there have been further developments.  The board has also committed to update you once there has been a decision on the motion to dismiss the securities litigation.
>                                        ***
> The issues raised in your demand are closely related to the issues actively being litigated in the securities litigation and other proceedings.  In such circumstances, the Altria board's decision to make a determination on your demand after there have been further developments in these related proceedings is well within its business judgment.

A copy of the Board's January 24, 2020 letter is attached hereto as Exhibit A-6.

352.    On January 27, 2020, Plaintiff Lorca responded by letter attached hereto as Exhibit A-7, explaining that the Board's refusal to investigate and evaluate her demand within the ninety-day statutory period, citing Va. Code §13.1-672.1, permitted her to file suit, and that the Board's repeated refusal to commit to taking any appropriate action on her demand constituted wrongful demand refusal:

> We disagree with your assertion that the refusal to investigate our client's stockholder litigation demand, and instead defer the investigation into some time in the future, is a valid exercise of the Board of Directors ("Board") of Altria Group, Inc.'s ("Altria Group" or the "Company") business judgment. Altria Group is incorporated in Virginia, and therefore Virginia law applies to the Company's internal affairs. Virginia law provides the Board with ninety days to consider and substantively respond to a stockholder demand or the stockholder is free to file a derivative action. Va. Code §13.1-672.1. Each of the decisions you cite in your letter in which an action was dismissed as premature concerned companies that were incorporated in states that did not contain a set deadline for a Board's response. The distinction is vital. In *Piven v. Ryan*, No. 05 CV 4619, 2006 WL 756043, at *3 (N.D. Ill. Mar. 23, 2006), one of the decisions you cite, the Court explained that "[c]ourts determine what constitutes an adequate amount of time to respond on a case-by-case basis." Virginia, by adopting a mandatory response date, has removed that subjective determination from the courts.

> The one universal demand decision you did cite, *LR Trust v. Rogers*, 270 F. Supp. 3d 1364 (N.D. Ga. 2017), did not address the ninety day rule at all. In fact, while the demand review committee did defer some part of the investigation that was dependent on the result of related litigation, it also "conducted a thorough, detailed, and lengthy investigation" into the underlying wrongdoing. Id. at 1373. Here, the Board has refused to even do the partial investigation that took place in LR Trust. Accordingly, the Board's refusal to consider the demand is wrongful.

353.    The Board did not deign to respond to Plaintiff Lorca's January 27, 2020 letter.

354.    Plaintiff Lorca waited patiently for a response for seven months before filing her initial derivative action in the United States District Court for the Northern District of California, where the vast majority of related litigation was concentrated, on August 27, 2020. Plaintiff Lorca's suit was virtually compelled by the Board's conscious inaction; significant developments

in the related litigation, such as consolidation and organization of lead cases, dispositive motion practice, and significant discovery, including of several Altria Defendants; and Altria's fast mounting damages.

355.    As of the date of Plaintiff Lorca's filing, Altria had recorded $8.6 billion of impairments on its JUUL stockholdings, based expressly upon the increased likelihood of the FDA banning flavored e-vapor products, the e-vapor bans already in place and under consideration in jurisdictions throughout the U.S. and in international markets, and the likely range of costs and to defend and resolve the mounting related litigation.  By mid-2020, while the Board continued to disregard its duty to investigate Plaintiff Lorca's allegations and proposed claims, Altria had become subject to twenty-five class actions, 561 individual actions, twenty-four state or local government lawsuits, and eleven lawsuits filed by public school districts to recover the costs of managing and mitigating the youth nicotine addiction crisis precipitated by JUUL's products. Nearly all of the well-researched lawsuits cited evidence that the Altria Defendants knew all about JUUL's youth-targeting advertising and marketing practices, failure to disclose the nicotine potency of its products, dearth of clinical studies supporting JUUL's (and later, Altria's) statements about the health and safety of JUUL's products, when they structured, negotiated and approved the JUUL investment.

356.    The hollowness of the Board's supposed commitment to "update" Plaintiff Lorca once a decision was rendered on the motion to dismiss the Securities Action was laid bare in Board counsel's April 28, 2021, letter.  The Board acknowledged that the motion had been denied more than a month earlier, on March 12, 2021.  But rather than commence a formal investigation for purposes of evaluating and responding to Plaintiff Lorca's demand, the Board continued to take the position that it would continue merely to "monitor[] and oversee[]" the JUUL investment, and

defend Altria in the related actions.  The Board expressly stated that it would continue to defer indefinitely any formal investigation into Lorca's demand and any decision regarding the merits of the proposed claims or the Company's best interests with respect to them, pending unspecified "further developments" in the securities litigation.  The Board's only commitment was to provide some further "update"  "after the close of discovery in the securities litigation."  A true and correct copy of Board counsel's April 28, 2021 letter is attached hereto as Exhibit A-8.

357.    On April 7, 2020, Plaintiff Gilbert issued a formal written pre-suit Demand under Virginia law on the Board. *See* Exhibit B-1. Therein, Plaintiff Gilbert demanded that Altria, acting by and through its Board, take critical steps to investigate, preserve and protect the Company's valuable claims against certain of the Individual Defendants named herein. Specifically, Plaintiff Gilbert demanded: "(i) undertake an independent, good faith investigation into which directors and/or officers negotiated, arranged or consented to the arrangement with JUUL described herein and as alleged by the FTC; and (ii) take action against each officer and/or director to recover the damages described herein for the benefit of the Company; (iii) institute appropriate remedies, including changes to corporate governance and operational policies to ensure compliance with all applicable federal and state laws and regulations, including but not limited to marketing regulations, FTC regulations, and the federal antitrust laws."

358.    The Board's initial response, dated June 26, 2020, demanded documentation confirming Plaintiff Gilbert's ownership of Altria common stock prior to making a further response to Plaintiff Gilbert's demand. *See* Exhibit B-2. Plaintiff Gilbert responded by letter dated July 3, 2020, by noting that Virginia law does not require proof of stock ownership in connection with a shareholder demand, but nevertheless Plaintiff Gilbert provided the evidence of ownership the Board demanded. *See* Exhibit B-3. Four days later, on July 7, 2020, counsel for the Board

responded to Plaintiff Gilbert. The Board's response confirmed that it would not take the actions demanded by Plaintiff Gilbert, but that it would defer acting until "after there have been further developments" in related litigation, including the FTC action and "other ongoing litigation and government inquiries concerning JUUL and e-vapor products generally". *See* Exhibit B-4. In other words, the Board decided that for an indefinite period of time, it would do absolutely nothing.

359.    Plaintiff Sandys made two demands on Altria's board, on February 14, 2020 and April 21, 2020. *See* Exhibits C-1 and C-3. Plaintiff Sandys demanded that the Board investigate claims that Altria officers caused Altria to violate the law by colluding with JUUL in violating antitrust laws and in marketing to underage users, as well as exposing Altria to known reputational and regulatory risks by pursuing the transaction in the first place.  In a response dated February 25, 2020, the Board's counsel demanded the same type of ownership documentation, and offered the same types of *pro forma* responses, calling for indefinite deferral of the investigation, that it offered to other stockholders, such as Lorca, Hamilton and Gilbert. *See* Exhibit C-2.  Under the Virginia Stock Corporation Act, Plaintiff Sandys waited for more than the 90-day waiting period, counting from the date of the second demand, to file the first plenary derivative action regarding this misconduct.

360.    On July 30, 2020, Plaintiff Hamilton sent to the Altria board of directors a formal pre-suit demand under Virginia law. *See* Exhibit D-1**.** In that letter, Plaintiff demanded that the Altria board take action to enforce Altria's claims against individuals who breached their fiduciary duties to Altria or otherwise violated the law in connection with Altria's investment in JUUL.

361.    Plaintiff Hamilton set forth in the demand many of the same facts presented in this complaint, focusing in particular on the reckless nature of Altria's decision to invest in JUUL, given that Altria knew prior to the investment that JUUL faced substantial liability for unlawful

marketing to underage consumers and for deceptive marketing of e-cigarettes as a smoking cessation device.

362.    On or about October 28, 2020, Plaintiff Hamilton's counsel received a letter from an attorney for Altria's Board in response to Plaintiff's demand. *See* Exhibit D-2.  As reflected therein, the Altria Board has taken no action in response to the demand. It has made no investigation of any underlying claim. Instead, similar to the other Plaintiffs, the Board took the 90-day statutory time to advise Plaintiff that it would do nothing, indefinitely, in deference to developments in other litigation.

363.    Upon receipt of a pre-suit demand from a shareholder, directors are duty-bound to promptly, independently, and in good faith investigate and evaluate the facts and circumstances surrounding the demand allegations, the merits of the proposed claims, and the corporation's best interests with respect to each proposed claim.  Rather than fulfill its fiduciary duty to act in good faith and on an informed basis, the Board has taken no action for the better part of two years since receiving the first shareholder demand, and, despite significant and material developments in the facts, the related litigation, and Altria's mounting damages, the Board has continued to put off any such action indefinitely.

364.    Despite its decision to put off an investigation of and decision on the demands indefinitely (through at least the close of discovery in the Securities Action, which promises to be a years-long undertaking), upon information and belief, the Board has failed to take the rudimentary step of securing tolling agreements with the potentially culpable parties, as requested by a number of the demands, to ensure that the Company's claims are preserved.

365.    In sum, the foregoing allegations fully support the legal inference that Altria's Board has tacitly and wrongfully ignored Plaintiffs' demands. The Board's decision to do nothing

indefinitely in response to the demands amounts, at a minimum, to gross negligence; does not comport with Altria's Code of Business Conduct and Ethics for Directors, which obligates Altria's directors to take action to protect the Company's assets; is not protected by Virginia's demand statute; and is entitled to no deference under the business judgment rule.

366.     By this derivative action, Plaintiffs seek to vindicate the Company's rights against certain Altria directors and officers, as well as JUUL and certain of its directors and officers as active and knowing participants in the Altria Defendants' wrongdoing, since Altria's current directors have failed to discharge their fiduciary duties as alleged herein.

**COUNT I**

**For Breach of Fiduciary Duties**

**Against the Altria Defendants**

367.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

368.     As Altria's directors and top officers, the Altria Defendants owed Altria and its shareholders fiduciary duties of loyalty, candor, and good faith – the highest duties known to the law. Rather than speak the entire truth when they said, or caused anything to be said, about the Company, the Altria Defendants breached their fiduciary duties by disseminating false and misleading statements about the Company's investment in JUUL and the risks associated with that investment, including JUUL's marketing of its products to underage consumers.

369.     As a result of the Altria Defendants' fiduciary failures, Altria has been damaged.

370.     Plaintiffs, on behalf of Altria, have no adequate remedy at law.

111

## COUNT II

### For Unjust Enrichment

### Against the Altria Defendants

371.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

372.    By their wrongful acts and omissions, the Altria Defendants were unjustly enriched at the expense of and to the detriment of Altria.

373.    All the payments and benefits provided to the Altria Defendants were at the expense of Altria. The Company received no benefit from these payments.

374.    Plaintiffs, on behalf of Altria, seek restitution from the Altria Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

375.    Plaintiffs, on behalf of Altria, have no adequate remedy at law.

## COUNT III

### For Aiding and Abetting Breaches of Fiduciary Duties

### Against the JUUL Defendants

376.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

377.    By knowingly inducing the Altria Defendants to take the aforementioned wrongful actions, the JUUL Defendants knowingly participated in the Altria Defendants' breaches of fiduciary duty.

378.    The Company suffered, and is suffering, damages as a proximate result of the Altria Defendants' breaches of fiduciary duty.

379.    As a result, the JUUL Defendants aided and abetted the Altria Defendants in their breach of their fiduciary duties.

380.    The JUUL Defendants are therefore liable to Altria for the damages Altria has sustained.

## COUNT IV

### For Waste of Corporate Assets

### Against the Altria Defendants

381.    Plaintiffs incorporate by reference and reallege each allegation contained above as through fully set forth herein.

382.    As a result of the wrongdoing alleged in this complaint, the Altria Defendants have caused Altria to waste its assets by overpaying for the JUUL investment, as well as by improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duties and forced Altria to overpay for the investment in JUUL and to engage in other breaches of fiduciary duties alleged in this complaint.

383.    As a direct and proximate result of Altria Defendants' waste of Altria's corporate assets, Altria has sustained, and will continue to sustain, significant damages, both financially and to its corporate image and goodwill.

384.    As a result of the misconduct alleged in this count, the Altria Defendants are liable to Altria.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Against the Altria Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Altria Defendants' breaches of fiduciary duty, corporate waste and unjust enrichment;

113

B. Against the JUUL Defendants for aiding and abetting the Altria Defendants' breaches of fiduciary duties, and awarding damages to Altria for such breaches;

C. Against the Altria Defendants and in favor of the Company for damages sustained by Altria by the waste of Altria corporate assets;

D. Against the Altria Defendants and in favor of the Company for damages sustained by Altria via the unjust enrichment received by the Altria Defendants;

E. Directing Altria to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Altria and its shareholders from a repetition of the damaging events described herein;

F. Extraordinary equitable and/or injunctive relief as permitted by law, equity and the state statutory provisions sued hereunder, including attaching, impounding and imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiffs on behalf of Altria have an effective remedy;

G. Awarding to Altria restitution from the Individual Defendants, and each of them, including ordering disgorgement of all profits, benefits and other compensation obtained by the Altria Defendants;

H. Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

I. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: July 16, 2021     Respectfully submitted,

             **BUTLER CURWOOD, PLC**

             */s/Paul Falabella*

Paul M. Falabella (VSB No. 81199)
Craig J. Curwood (VSB No. 43975)
140 Virginia Street, Suite 302
Richmond, Virginia 23219
Tel.: (804) 648-4848
Fax: (804) 237-0413
craig@butlercurwood.com
paul@butlercurwood.com

*Liaison Counsel for Co-Lead Plaintiffs Eric Gilbert
and Thomas Sandys and counsel for additional
plaintiffs David Hamilton and Maria Cecilia Lorca,*

**SHUMAN, GLENN & STECKER**
Kip B. Shuman (*pro hac vice*)
100 Pine Street, Ste. 1250
San Francisco, CA 94111
Tel.: (303) 861-3003
Fax: (303) 536-7849
kip@shumanlawfirm.com

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn (*pro hac vice*)
600 17th Street, Suite 2800 South
Denver, CO 80202
Tel.: (303) 861-3003
Fax: (303) 536-7849
rusty@shumanlawfirm.com

**SHUMAN, GLENN & STECKER**
Brett D. Stecker (*pro hac vice*)
326 W. Lancaster Avenue
Ardmore, PA 19003
Tel.: (303) 861-3003
Fax: (303) 536-7849
brett@shumanlawfirm.com

*Plaintiffs' Co-Lead Counsel and Counsel for Co-
Lead Plaintiff Eric Gilbert*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Geoffrey M. Johnson (*pro hac vice*)
12434 Cedar Road
Cleveland, OH 44106
Tel.: (216) 229-6088

Fax: (216) 229-6092
gjohnson@scott-scott.com

Joseph A. Pettigrew (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
Fax: (619) 233-0508
jpettigrew@scott-scott.com

Jing-Li Yu (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 223-6444
Fax: (212) 223-6334
jyu@scott-scott.com

*Plaintiffs' Co-Lead Counsel and Counsel for Co-Lead Plaintiff Thomas Sandys*

Edward F. Haber
Patrick J. Vallely
**SHAPIRO HABER & URMY LLP**
Seaport East, 2 Seaport Lane
Boston, MA 02210
Tel.: (617) 439-3939
Fax: (617) 439-0134
ehaber@shulaw.com
pvallely@shulaw.com

Robert C. Schubert
Willem F. Jonckheer
**SCHUBERT JONCKHEER & KOLBE LLP**
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Tel.: (415) 788-4220
Fax: (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law

*Additional Plaintiffs' Counsel and Counsel for Consolidated Plaintiff David Hamilton*

Brain J. Robbins
Craig W. Smith
Shane P. Sanders
**ROBBINS LLP**
5040 Shoreham Place
San Diego, CA 92122
Tel.: (619) 525-3990
Fax: (619) 525-3991
brobbins@robbinsllp.com
csmith@robbinsllp.com
ssanders@robbinsllp.com

*Additional Plaintiffs' Counsel and Counsel for
Consolidated Plaintiff Maria Cecilia Lorca*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 16th of July, 2021, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to all counsel of record.

<u>*/s/ Paul M. Falabella*</u>
Paul M. Falabella (VSB No. 81199)
BUTLER CURWOOD, PLC
140 Virginia Street, Suite 302
Richmond, Virginia 23219
Tel.: 804-648-4848
Fax: 804-237-0413
paul@butlercurwood.com

## **VERIFICATION**

I, Maria Cecilia Lorca, hereby declare as follows:

I am one of the plaintiffs in this consolidated shareholder derivative action.  I have read the Consolidated Shareholder Derivative Complaint.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:_____7/14/2021_____

_____

MARIA CECILIA LORCA

## Altria, Inc. Verification

I, Eric Gilbert, hereby verify that I am familiar with the allegations in the Verified Consolidated Shareholder Derivative Complaint and that I have authorized the filing of the Verified Consolidated Shareholder Derivative Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: __7/15/2021_____        _____
                                              Eric Gilbert

**VERIFICATION OF THOMAS SANDYS**

I, Thomas Sandys, being duly sworn, depose and say:

I am a derivative plaintiff in this action.  I verify that I have reviewed the Verified Consolidated Shareholder Derivative Complaint (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern myself, are true to my personal knowledge. I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 15 , 2021

_thomas sandys_
_____
THOMAS SANDYS

## <u>VERIFICATION</u>

I, David Hamilton, hereby declare as follows:

I am one of the plaintiffs in this consolidated shareholder derivative action. I have read the Consolidated Shareholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: July 16, 2021
_____

*David Hamilton*
_____
David Hamilton