**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

|  |  |
|---|---|
| IN RE ALTRIA GROUP, INC. DERIVATIVE LITIGATION | Lead Case No. 3:20-cv-00772 (DJN) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II.  RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ...................................6

    A.  Summary of the Allegations ..........................................................................6

    B.  The Federal Action .......................................................................................7

    C.  Settlement Negotiations ................................................................................9

    D.  Settlement Consideration .............................................................................12

        1.  Funding Commitment ......................................................................12

        2.  Corporate Governance Commitments...............................................12

        3.  JLI/Altria Meetings .........................................................................14

        4.  Policy Commitments ........................................................................14

III.  ARGUMENT ...................................................................................................15

    A.  The Settlement Should Be Preliminarily Approved ....................................15

        1.  The Settlement Merits a Presumption of Fairness ..........................16

        2.  Federal Plaintiffs' Counsel's Recommendation Is Well-Informed ..........18

        3.  The Settlement Relief Is Outstanding and Provides Substantial Benefits ................................................................................................22

        4.  The Complexity, Expense, and Duration of Litigation Favor Settlement ...........................................................................................25

    B.  The Proposed Notice and Schedule Meet Due Process .........................28

    C.  Proposed Schedule of Events ......................................................................30

IV.  CONCLUSION.................................................................................................30

## TABLE OF AUTHORITIES

**CASES**................................................................................................................**PAGE(S)**

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979)..................................................................................27

*Brooks v. Am. Exp. Indus., Inc.*,
  1977 U.S. Dist. LEXIS 17313 (S.D.N.Y. Feb. 17, 1977)................................................18

*Cohn v. Nelson*,
  375 F. Supp. 2d 844 (E.D. Mo. 2005)...................................................................4, 15, 21

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001)..................................................................................17

*George v. Acad. Mortg. Corp. (UT)*,
  369 F. Supp. 3d 1356 (N.D. Ga. 2019) ...................................................................17, 18

*Granada Invs., Inc. v. DWG Corp.*,
  962 F.2d 1203 (6th Cir. 1992) ..............................................................................25

*Grant v. Bethlehem Steel Corp.*,
  823 F.2d 20 (2d Cir. 1987)..................................................................................27

*In re AOL Time Warner Shareholder Deriv. Litig.*,
  2006 U.S. Dist. LEXIS 63260 (S.D.N.Y. Sept. 6, 2006)..............................................4, 15

*In re Bldg. Materials Corp. of Am. Asphalt Roofing Shingle Prod. Liab. Litig.*,
  2014 WL 12621614 (D.S.C. Oct. 15, 2014) ......................................................................17

*In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*,
  447 F. Supp. 2d 612 (E.D. La. 2006).........................................................................21

*In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prod. Liab. Litig.*,
  55 F. 3d 768 (3d Cir. 1995)..................................................................................16

*In re India Globalization Capital, Inc.*,
  2020 U.S. Dist. LEXIS 77190 (D. Md. May 1, 2020).......................................................28

*In re Jiffy Lube Sec. Litig.*,
  927 F.2d 155 (4th Cir. 1991) ..............................................................................4, 16

*In re MicroStrategy, Inc. Sec. Litig.*,
  148 F. Supp. 2d 654 (E.D. Va. 2001) ............................................................................17

*In re NeuStar, Inc. Sec. Litig.*,
  2015 WL 8484438 (E.D. Va. Dec. 8, 2015) ....................................................................17

*In re Pfizer Inc. S'holder Derivative Litig.*,
    780 F. Supp. 2d 336 (S.D.N.Y. 2011) ................................................................... 24

*In re Pub. Serv. Co. Derivative Litig.*,
    125 F.R.D. 484 (S.D. Ind. 1988) ......................................................................... 28

*In re Schering-Plough Corp. S'holders Derivative Litig.*,
    2008 U.S. Dist. LEXIS 2569 (D.N.J. Jan. 14, 2008) ......................................... 23

*In re UnitedHealth Grp. S'holder Derivative Litig.*,
    631 F.3d 913 (8th Cir. 2011) ............................................................................... 28

*In re Warner Commc'ns Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) .............. 21

*Kyriazi v. W. Elec. Co.*,
    647 F.2d 388 (3d Cir. 1981) ................................................................................ 28

*Maher v. Zapata*,
    714 F.2d 436 (5th Cir. 1983) ............................................................ 4, 15, 23, 24

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950) ............................................................................................ 28

*Nicholes v. Combined Ins. Co.*,
    2019 U.S. Dist. LEXIS 108696 (S.D. W. Va. Feb. 22, 2019) ............................ 17

*Ray v. Mechel Bluestone, Inc.*,
    2018 U.S. Dist. LEXIS 40677 (S.D. W. Va. Mar. 13, 2018) ............................. 16

*Republic Nat'l Life Ins. Co. v. Beasley*,
    73 F.R.D. 658 (S.D.N.Y. 1977) ......................................................................... 15

*Robinson v. Carolina First Bank, N.A.*,
    2019 WL 719031 (D.S.C. Feb. 14, 2019) .......................................................... 16

*Rudi v. Wexner*,
    2022 U.S. Dist. LEXIS 98299 (S.D. Ohio May 16, 2022) ............................. 5, 24

*Schimmel v. Goldman*,
    57 F.R.D. 481 (S.D.N.Y. 1973) ..................................................................... 4, 15

*South Carolina Nat'l Bank v. Stone*,
    749 F. Supp. 1419 (D.S.C. 1990) .................................................................. 25, 27

*Unite Nat'l Ret. Fund v. Watts*,
    2005 U.S. Dist. LEXIS 26246 (D.N.J. Oct. 28, 2005) .................................. 23, 25

*Unitrin, Inc. v. Am. Gen. Corp.*,
    651 A.2d 1361 (Del. 1995) ...........................................................................18

*Willard ex rel. Moneta Bldg. Supply, Inc.* v. *Moneta Bldg. Supply, Inc.*,
    515 S.E.2d 277 (Va. 1999)............................................................................26

*Zimmerman v. Bell*,
    800 F.2d 386 (4th Cir. 1986) ...........................................................4, 15, 23, 27

## STATUTES, RULES & OTHER AUTHORITIES

4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions*
    §11:41 (4th ed. 2002) ..................................................................................4, 15

Federal Rules of Civil Procedure
    Rule 23.1(c).................................................................................................15

*Manual for Complex Litigation (Fourth)*
    §21.632 (2004)..............................................................................................16

Va. Code Ann.
    §13.1-672.4...............................................................................................25, 26

    §13.1-692.1...................................................................................................26

Pursuant to Rule 23.1(c) of the Federal Rules of Civil Procedure ("Rule"), Lead Plaintiffs Eric Gilbert and Thomas Sandys, with plaintiffs David Hamilton and Maria Cecilia Lorca ("Federal Plaintiffs"),[1] respectfully submit this memorandum in support of their Motion for Preliminary Approval of Settlement of the above-captioned shareholder derivative action ("Federal Derivative Action"), brought on behalf of nominal defendant Altria Group, Inc. ("Altria" or the "Company"), on the terms set forth in the Stipulation and Agreement of Settlement ("Stipulation"), filed concurrently herewith.[2]

## I.    INTRODUCTION

This shareholder derivative action arises from Altria's ill-fated $12.8 billion investment in Juul Labs, Inc. ("JLI"), an e-cigarette company, in late 2018.  The proposed Settlement would resolve breach of fiduciary duty and related claims brought by Federal Plaintiffs against certain Altria officers and directors.  These claims are predicated on allegations that the Defendants damaged Altria by causing it to invest billions of dollars in JLI while fully aware of the risks to Altria posed by JLI's products and business practices, including JLI's history of targeting underage consumers.  The risk materialized immediately after the investment closed, exposing Altria to a raft of lawsuits brought by consumers, regulators and government entities arising out of harm caused by underage e-cigarette use.  The proposed Settlement would also resolve claims that JLI

---

[1] Unless otherwise stated, all capitalized terms used herein shall have the same meanings as set forth in the Stipulation and Agreement of Settlement ("Stipulation" or "Stip."), dated August 16, 2022, which is being filed contemporaneously herewith as Exhibit 1.

[2] The proposed Settlement will also resolve related shareholder derivative litigation captioned *In re Altria Group, Inc. Derivative Litigation*, Case No. CL20-7051, pending in the Virginia Circuit Court of Henrico County and *Merrits v. Casteen, et al.*, Case No. CL21-1093, pending in the Virginia Circuit Court of Albemarle County (collectively, the "State Actions").

and certain of its officers and directors aided and abetted the fiduciary breaches by the Altria Defendants.

In exchange for a release of claims, Federal Plaintiffs have secured an outstanding settlement on Altria's behalf.   The central component of the Settlement is the Funding Commitment by Altria of $117 million over 5 years (the "Funding Amount"), with a minimum spend of $20 million per year, which will be deployed to fund Altria's programs to prevent underage use of tobacco and existing or newly developed nicotine delivery system products, including e-vapor products.   The $117 million Funding Amount represents a new Funding Commitment secured by Federal Plaintiffs in the Settlement, not previously authorized by the Board or disclosed to the public, and will be spent at the direction of the Senior Vice President for Corporate Citizenship of Altria Client Services, the Altria executive primarily responsible for the Company's underage use prevention policies.   This investment will help Altria begin to repair the damage to its reputation inflicted by the Altria Defendants' wrongful conduct in connection with the JLI investment.

Second, Federal Plaintiffs obtained the Corporate Governance Commitments, which are significant corporate governance reforms to be implemented in several key areas.   The Settlement requires Altria to: (a) formalize the structure and duties of the Underage Use Prevention Steering Committee (the "Steering Committee"), a committee composed of senior managers from Altria's four operating companies that meets to discuss emerging issues in underage use prevention and identify additional activity necessary to achieve Altria's corporate goals; (b) maintain the management-level Disclosure Committee; (c) formalize the Board-level Finance Committee's authority and responsibility to review Altria's strategy regarding mergers and investments with

management and the Board; and (d) mandate the careful evaluation of the underage use impacts of any investment or acquisition involving Altria.

Third, to further develop and support evidence-based interventions to address underage use of tobacco products, the Settlement provides for the JLI/Altria Meetings, which require representatives of JLI and Altria to meet semi-annually to: (a) discuss their respective company's ongoing youth tobacco prevention initiatives, including as they relate to e-vapor use; and (b) explore new opportunities to help prevent underage tobacco use.

Fourth, the Settlement requires Altria to maintain for 5 years: (a) its corporate goals to lead the tobacco industry in preventing underage use of tobacco products and contributing to the healthy development of youth ages 12-18; and (b) its Standards for Underage Use Prevention ("Standards"), which require Altria's operating and service companies to address underage use prevention proactively in their respective businesses.   These commitments (the "Policy Commitments") will ensure that Altria focuses on underage use prevention for years to come.

In sum, by ensuring that Altria's underage use prevention programs are adequately funded, strengthening the Steering Committee and related Board and executive-level committees, and requiring Altria and JLI to meet to discuss underage use prevention initiatives and opportunities, the relief obtained will help significantly reduce the probability of future liabilities arising out of underage use of tobacco products, while advancing the societal goal of protecting youth from the harmful consequences of nicotine.  In the wake of the Altria's disastrous investment in JLI, the Settlement will also lay the foundation for restoring confidence in Altria's acquisition and disclosure practices, thereby protecting and enhancing shareholder value.

As discussed below, the Parties reached the Settlement through a fair and non-collusive process.  It is the product of many months of hard-fought, arm's-length negotiations among

- 3 -

sophisticated parties represented by experienced counsel overseen by highly experienced, nationally recognized mediators—Hon. Layn Phillips and Ms. Niki Mendoza, Esq. of Phillips ADR Enterprises (the "Mediators")—with a long track record of mediating complex shareholder disputes. *See In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991) (proposed settlement of a representative action is "fair" if it "was reached as a result of good-faith bargaining at arm's length, without collusion").

There is an overriding public interest in settling and quieting litigation, and this is particularly true in shareholder derivative litigation. *See Zimmerman v. Bell*, 800 F.2d 386, 392 (4th Cir. 1986) ("'Settlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable'" (quoting *Maher v. Zapata*, 714 F.2d 436, 455 (5th Cir. 1983) (quoting *Schimmel v. Goldman*, 57 F.R.D. 481, 487 (S.D.N.Y. 1973))).[3] Derivative settlements are particularly favored because they minimize the litigation expenses of the parties, reduce the strain such litigation imposes upon already scarce judicial resources, and halt a major distraction for company management. *See Zimmerman*, 800 F.2d at 392 ("Settlement here is favored for the reasons that settlements generally are favored: disputes are resolved; the resources of litigants and courts are saved; and, in the case of a derivative action, management can return its attention and energy from the courtroom to the corporation itself.").

Here, the Settlement constitutes a recovery that falls well within the range that is fair, reasonable, and adequate, particularly when weighed against the substantial complexity, costs,

---

[3] *See also In re AOL Time Warner Shareholder Deriv. Litig.*, 2006 U.S. Dist. LEXIS 63260, at *7-8 (S.D.N.Y. Sept. 6, 2006) (recognizing the public policy favoring settlement of shareholder derivative litigation); *Cohn v. Nelson,* 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005) (settlement of shareholder derivative suits are particularly favored); *see also* 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* §11:41 at 87 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy.").

duration, and risks that would attend any attempt to improve the result through further litigation. Indeed, courts routinely find that funding commitments like that provided for in the Settlement here confer a substantial corporate benefit and warrant judicial approval. *See*, *e.g.*, *Rudi v. Wexner*, 2022 U.S. Dist. LEXIS 98299 (S.D. Ohio May 16, 2022), at *3-4 (approving derivative settlement that provided for a $90 million funding commitment by the corporation to finance corporate governance reforms designed to enhance workplace protections and protocols). Under well-established precedent, preliminary approval is warranted.

After the Parties had agreed on all other material terms of the Settlement, and with the assistance of the Mediators, the Parties entered good faith, arm's-length negotiations as to the amount of the Fee and Expense Award to be paid to Plaintiffs' Counsel. However, despite these efforts, the Parties were unable to reach an agreement on the Fee and Expense Award. The Parties are now in the process of arbitrating the amount of the Fee and Expense Award before the Mediators for a final, non-appealable arbitral determination, subject to Court approval. The Parties will advise the Court of the Fee and Expense Award arbitration decision before the August 25, 2022 preliminary approval hearing, and submit an updated proposed notice to shareholders. As will also be set forth in the proposed notice to shareholders, Plaintiffs will also seek Court approval of Service Awards to Plaintiffs of $15,000.00 each, payable from the Fee and Expense Award.

Accordingly, Federal Plaintiffs request that the Court approve the proposed notice to shareholders and set a date for the final Settlement Hearing as set forth in the proposed Preliminary Approval Order submitted herewith.

## II.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.   Summary of the Allegations

In late 2018, the Altria Defendants caused Altria to invest $12.8 billion for a 35% stake in JLI, a manufacturer of e-cigarettes.  ¶¶1, 225, 227.[4]  Plaintiffs allege that at the time of this transaction, the Altria Defendants knew about health dangers posed by JLI's products and that JLI targeted underage users, and that it was only a matter of time before JLI would face regulatory scrutiny and massive liabilities.  Federal Plaintiffs allege that, notwithstanding the risks, the Altria Defendants caused Altria to enter into the JLI transaction, becoming an active participant in JLI's unlawful marketing to underage consumers and deceptive marketing of the purported benefits of JLI's products.  ¶¶233-243.

As part of the transaction, JLI demanded that Altria exit the e-cigarette market, contemplating an agreement among the top two competitors in the e-cigarette market not to compete.  Federal Plaintiffs allege that the Altria Defendants and JLI knew this agreement would draw a swift backlash from competition regulators, risking exposure to Altria.  ¶¶15, 18.

Shortly after Altria's investment, JLI's problems intensified.  The U.S. Food and Drug Administration ("FDA") reiterated the inevitability of regulation that would curtail JLI's business model.  State attorneys general launched complaints that further threatened its business.  In addition, health risks from JLI's products materialized in the form of personal injuries suffered by users, making restrictive regulation of the e-cigarette industry even more imminent.  These events severely damaged the value of JLI's business, requiring Altria to write down its investment.

---

[4] Except where otherwise noted, paragraph references (¶_ or ¶¶_) are to the Verified Consolidated Shareholder Derivative Complaint ("Consolidated Complaint"), ECF No. 110.  All citations and footnotes are deemed omitted and all emphasis is deemed added, unless otherwise noted.

In addition to the lost value of its investment in JLI, Altria has come under fire for its participation in JLI's wrongdoing, and has been named as a defendant in the sprawling multidistrict litigation ("MDL") captioned *In re Juul Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation*, No. 19-md-2913-WHO (N.D. Cal.), pending before U.S. District Judge William H. Orrick.  In addition, Altria was named in the securities fraud class action filed by investors in this Court, captioned *Klein, et al. v. Altria Group, Inc., et al.*, Case No. 3:20-cv-00075-DJN.

Federal Plaintiffs allege that the Altria Defendants breached their fiduciary duties by: (a) causing Altria to make the JLI investment notwithstanding JLI's suspect products and business practices; (b) causing Altria to enter into anticompetitive agreements with JLI that would inevitably result in antitrust claims against Altria; (c) causing Altria to participate in unlawful marketing of nicotine products to underage consumers and deceptive marketing of its products as harm reduction devices; (d) causing Altria to issue false and misleading statements to investors about the benefits of Altria's investment in JLI, exposing Altria to substantial liability for securities fraud; and (e) wasting Altria's corporate assets by making an improvident investment.  Federal Plaintiffs further allege claims against the JLI Defendants for aiding and abetting the Altria Defendants' breaches.

### B.    The Federal Action

Between November 2019 and July 2020, the Federal Plaintiffs made pre-suit demands on Altria's Board as mandated by Virginia law.  Altria's Board responded, among other things, that it was familiar with the history and current status of Altria's investment in JLI, that it was actively engaged in monitoring and overseeing that investment, and that it believed that it was in the best interests of Altria to defend itself in these proceedings, which were at a very preliminary stage.

Plaintiffs each waited the statutory ninety days from the date of their respective demands, and subsequently filed plenary shareholder derivative actions asserting claims for relief on behalf of Altria under Virginia law.  On April 14, 2021, the Court consolidated the derivative actions and set a briefing schedule for the appointment of Lead Plaintiff and Lead Counsel.  ECF No. 25.

On April 21, 2021, the Court conducted a telephone conference with all counsel regarding case management.  On that date, the Court ordered the consolidated action to private mediation to occur no later than September 30, 2021.  ECF No. 54.  Also on that date, competing motions were filed for the appointment of Lead Plaintiff and Lead Counsel, and briefing was concluded on May 11, 2021.  ECF Nos. 60-61, 62-63.  On May 13, 2021, the Court appointed Gilbert and Sandys as Co-Lead Plaintiffs and Shuman, Glenn & Stecker and Scott+Scott Attorneys at Law LLP as Co-Lead Counsel for Federal Plaintiffs.  ECF No. 94.

On June 28, 2021, the Court issued a Scheduling Order ordering: (1) Plaintiffs to file a Consolidated Complaint by July 16, 2021; (2) the parties to submit a jointly agreed upon protective order and electronically stored information (ESI) protocol by July 16, 2021; (3) Defendants to produce the discovery provided in the Securities Action on or before July 23, 2021, and on a rolling basis going forward; and (4) the parties to participate in mediation on or about September 14, 2021. ECF No. 104.  The jointly agreed upon protective order and ESI protocol were filed with the Court on July 15, 2021.  ECF Nos. 108 & 109.  Plaintiffs filed their Consolidated Complaint on July 16, 2021.  ECF No. 110.

On September 23, 2021, the parties filed a Joint Status Report on Mediation, advising the Court that a mediation had occurred before the Mediators on September 13, 2021.  The parties reported that they had a productive mediation, and, although the case did not settle, they believed that further mediation sessions would advance resolution, and that a second mediation session had

been scheduled for December 3, 2021, with interim discussions to occur before that date.  ECF No. 117.

### C.    Settlement Negotiations

Plaintiffs' Counsel and counsel for Defendants participated in their first of three formal mediations on September 13, 2021.  *See* Stip., §II.C.  Mediators Judge Phillips (Ret.) and Ms. Mendoza, each nationally recognized neutrals with extensive experience mediating complex derivative actions, supervised the mediation process.  *Id.*  Before the first mediation session, the Parties submitted detailed mediation statements.  Plaintiffs also provided a proposed framework to guide further settlement discussions based on their assessment of damages and their assessment of Altria's inadequate corporate governance and oversight practices they contended contributed to Altria's damages.  *Id.*

The September 13, 2021 mediation ended without a settlement.  Thereafter, Plaintiffs continued to review and evaluate the substantial volume of documents and deposition discovery provided by Defendants.   Plaintiffs reviewed tens of thousands of internal documents, encompassing millions of pages.  These documents included, among other things: (a) minutes, agendas, board packages, communications, and other materials relating to regularly conducted and special meetings of the Board and committees; (b) internal officer- and employee-level communications, reports, and other materials regarding, among many other things, due diligence between Altria and JLI, youth prevention, communications with regulators, and write-downs of Altria's investment in JLI; and (c) deposition transcripts of Altria and JLI directors, officers, employees, and investors taken in related litigation and inquiries.  *Id.*

While no final resolution was reached at the September 13, 2021 mediation, significant progress was made, and the Parties continued their dialogue with the ongoing assistance of the

Mediators.  On December 3, 2021, another formal mediation took place.  In advance of that mediation, Federal Plaintiffs submitted updated and revised proposed settlement terms.  Those terms were based on Federal Plaintiffs' continued review of the voluminous documents that Defendants produced, as well as numerous communications directly between Federal Plaintiffs and Defendants prior to the December 3, 2021 mediation, often with the participation of the Mediators.  *Id.*

At the December 3, 2021 mediation, the Parties continued to work through the strengths and weaknesses of the claims.  The Parties discussed at length Federal Plaintiffs' proposed remedial framework, as well as specific elements of Federal Plaintiffs' formal settlement demand.  The second formal mediation ended without an agreement.  Still, the Parties made substantial progress toward clarifying the range of risks and rewards of litigation and the contours of a corporate governance framework that might yield a settlement agreement.  *Id.*

Following the second mediation session, the Parties engaged in months of verbal and written exchanges of information, discussions, proposals, and counterproposals under the aegis of the Mediators.  At the same time, Federal Plaintiffs continued their review of the documents Defendants had produced, began further analysis of "hot" documents, and organized the documents in preparation for the potential commencement of formal discovery and to litigate the case.  *Id.*

On March 2, 2022, the Parties participated in an informal video conference with the Mediators.  The purpose of this call was to discuss further the prospects of settlement and better understand where the Parties stood, what additional information the Federal Plaintiffs required, and whether continued negotiations were worthwhile given that the Parties remained far apart on a number of issues.  That call was productive, and the Parties continued to engage.  *Id.*

The Parties, with the aid of the Mediators, continued to work in good faith toward a possible resolution throughout this period of time.  Eventually, material progress towards a settlement was made.  This included the additional exchange of proposals and counter proposals, numerous direct communications with Defendants, and participation of the Mediators.  A third mediation session, held on May 6, 2022, resulted in a settlement.  The Parties proceeded to negotiate a comprehensive Memorandum of Understanding ("MOU") setting forth the material terms of the Settlement.  *Id.*

The MOU negotiations proved to be as difficult and contentious as the settlement negotiations.  The number of Parties involved and related litigation in which Altria is a defendant added to the complexity and challenges.  Despite these hurdles, the Parties were able to finalize the MOU on June 10, 2022.  The MOU contemplates a comprehensive and global resolution of the Actions.  *Id.*

Throughout the settlement negotiations, Defendants' counsel and Federal Plaintiffs' Counsel participated in dozens of communications.  These communications were difficult, with each side advocating their views, seeking clarification, and narrowing the issues.  Similarly, Defendants' counsel and Plaintiffs' Counsel exchanged numerous drafts of proposed settlement terms.  At no time during these negotiations or during the three formal mediations did the Parties discuss an award of Plaintiffs' Counsel's attorneys' fees and expenses.  *Id.*

Following the execution of the MOU, Plaintiffs and Defendants commenced for the first time discussions and negotiations regarding the Fee and Expense Award, or an appropriate award of attorneys' fees and expenses that would reflect the value of the Settlement's benefits to Altria and Plaintiffs' Counsel's contributions in securing it.  As set forth above, the Parties are now in the process of arbitrating the amount of the Fee and Expense Award before the Mediators for a final, non-appealable arbitral determination, subject to Court approval, and will advise the Court

of the Fee and Expense Award arbitration decision before the August 25, 2022 preliminary approval hearing, and submit an updated proposed notice to shareholders.

### D. Settlement Consideration

#### 1. Funding Commitment

As previewed above, Altria will commit to funding of $117 million over 5 years to be deployed for specified programs to prevent underage use of tobacco and existing or newly developed nicotine delivery system products, including e-vapor products, under the direction of the Senior Vice President for Corporate Citizenship of Altria Client Services. The $117 million Funding Amount represents a new funding commitment not previously authorized by the Altria Board or disclosed to the public. The programs and commitments for the spend may include: (a) research about underage use; (b) enhanced training and support to prevent underage access to tobacco and nicotine delivery system products in retail; (c) third-party programs that provide resources for adolescents; (d) smoking cessation resources for underage tobacco users; and (e) initiatives that the Senior Vice President for Corporate Citizenship reasonably believes would facilitate the accomplishment of Altria's corporate goals and the work of the Steering Committee. The Funding Amount will be deployed to fund the Funding Commitment and will not be used for any other purposes. *See* Stip., §VI at ¶1.2 & Exhibit A.

#### 2. Corporate Governance Commitments

Steering Committee: Altria will adopt procedures formalizing the structure and activities of the Steering Committee, which has primary responsibility for Altria's underage use prevention programs. In particular, Altria will develop a written charter for the Steering Committee, establish committee membership criteria, require that the committee meet at least four times per year, establish agenda and record-keeping protocols, empower the committee to retain advisors, and

require the committee to evaluate the Standards annually for necessary modifications or enhancements. In addition, the Chairperson of the Steering Committee shall be required to make semi-annual presentations to the Nominating, Corporate Governance, and Social Responsibility Committee on the committee's work, annual presentations to the full Board, and annual assessments of each operating company's underage use prevention programs. *See id.*, Exhibit A.

Disclosure Committee: Altria will maintain its management-level Disclosure Committee, which shall work to ensure that all public disclosures made by the Company to its security holders or the investment community, including those in its U.S. Securities and Exchange Commission ("SEC") filings, should: (a) be materially accurate, complete, and timely; (b) fairly present the Company's financial condition, results of operations and cash flows in all material respects; and (c) meet any other applicable laws and stock exchange requirements. *Id.*

Finance Committee: Altria will amend the Finance Committee Charter to provide that the Finance Committee shall have the authority and responsibility to review Altria's strategy regarding mergers and investments with management, and shall require that the Finance Committee's findings regarding any proposed corporate transaction be reported to the full Board. *Id.*

Transaction Diligence: Altria shall require that for each potential transaction involving a tobacco products-related business: (a) the transaction shall be evaluated for all risks relating to underage use; (b) a target-specific due diligence plan shall be developed which shall elicit information regarding the target company's products and their compatibility with Altria's corporate goals and the Standards; (c) appropriately scoped and targeted information requests are propounded to permit fully informed evaluations regarding underage use matters and their potential impact; (d) all target company responses regarding underage use shall be shared with

management working on the transaction; and (e) for transactions in excess of $100 million, reports shall be made to the Finance Committee on due diligence regarding underage use. *Id.*

### 3.    JLI/Altria Meetings

Altria and JLI shall meet semi-annually to: (a) discuss their respective companies' ongoing youth tobacco prevention initiatives, including as they relate to e-vapor use; and (b) explore new opportunities to help prevent underage tobacco use. A report of these meetings shall be delivered to Altria's and JLI's respective senior management and (with respect to Altria only) to the Nominating, Corporate Governance, and Social Responsibility Committee of the Board and to the Steering Committee. *Id.*

The topics for consideration at the Altria/JLI Meetings may include: evaluation of new survey, market, law enforcement, or other relevant data relating to mitigation strategies to address underage use of tobacco products, including electronic nicotine delivery systems (ENDS); evaluation of third-party, community-based programs to address underage use of tobacco products, including ENDS; assessment of in-house and third-party, independent studies and surveys to support the development of mitigation strategies to address underage use of tobacco products, including ENDS; campaigns and programs to coordinate with retailers and local law enforcement to reduce "social source access" to tobacco products, including ENDS; and new controls and technologies for the sale of tobacco products to support compliance with age-verification requirements (e.g., electronic ID scanning) and to reduce social-sourcing of tobacco products (e.g., product-quantity limits). *Id.*

### 4.    Policy Commitments

Altria will keep in place for a period of 5 years (a) its corporate goals to prevent underage use of tobacco products and promote healthy development of youth aged 12-18, and (b) its

Standards for underage use prevention, which require each Altria operating and service company to develop and adhere to programs to help reduce underage use.  *Id.*

## III.    ARGUMENT

### A.    The Settlement Should Be Preliminarily Approved

There is an overriding public interest in settling and quieting litigation, and this is particularly true in shareholder derivative litigation.  *See Zimmerman*, 800 F.2d at 392 ("'Settlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable'" (quoting *Maher*, 714 F.2d at 455 (quoting *Schimmel*, 57 F.R.D. at 487 (S.D.N.Y. 1973))); *see also AOL Time Warner*, 2006 U.S. Dist. LEXIS 63260, at *7-8 (recognizing the public policy favoring settlement of shareholder derivative litigation); *Cohn*, 375 F. Supp. 2d at 852 (settlement of shareholder derivative suits are particularly favored); *see also Newberg on Class Actions* §11:41 at 87   ("The compromise of complex litigation is encouraged by the courts and favored by public policy.").

Derivative settlements are particularly favored because they minimize the litigation expenses of the parties, reduce the strain such litigation imposes upon already scarce judicial resources, and halt a major distraction for company management.  *See Zimmerman*, 800 F.2d at 392 ("Settlement here is favored for the reasons that settlements generally are favored: disputes are resolved; the resources of litigants and courts are saved; and, in the case of a derivative action, management can return its attention and energy from the courtroom to the corporation itself.")

Under Rule 23.1, a derivative action "may be settled, voluntarily dismissed, or compromised only with the court's approval.  Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders." Fed. R. Civ. P. 23.1(c).  "Approval of a derivative settlement is appropriate 'if it fairly and

adequately serves the interests of the corporation' on whose behalf it was brought." *Zimmerman,* 800 F.2d at 391 (quoting *Republic Nat'l Life Ins. Co. v. Beasley*, 73 F.R.D. 658, 667 (S.D.N.Y. 1977)).  The primary issue before the Court at the preliminary approval stage is whether the proposed settlement is within the range of what might be found fair, reasonable, and adequate at final approval. *Robinson v. Carolina First Bank, N.A.*, 2019 WL 719031, at *7 (D.S.C. Feb. 14, 2019); *accord Manual for Complex Litigation (Fourth)* §21.632, at 320-21 (2004) (at preliminary approval stage, "[t]he judge must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of the certification, proposed settlement, and date of the final fairness hearing.").

In the Fourth Circuit, a proposed settlement of a representative action is "fair" if it "was reached as a result of good-faith bargaining at arm's length, without collusion." *Jiffy Lube*, 927 F.2d at 159.  Whether a proposed settlement is "adequate" depends upon an analysis of "(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement." *Id.*  As discussed below, the relevant factors at this stage of the approval process indicate that the Settlement bears all the hallmarks of being fair, reasonable, and adequate, and therefore warrants preliminary approval.

### 1.    The Settlement Merits a Presumption of Fairness

There is an initial presumption of fairness when a settlement of a representative action negotiated at arm's-length is presented to the Court for approval. *Ray v. Mechel Bluestone, Inc.*, 2018 U.S. Dist. LEXIS 40677, at *10 (S.D. W. Va. Mar. 13, 2018) (citing *In re Gen. Motors Corp.*

*Pick-up Truck Fuel Tank Prod. Liab. Litig.*, 55 F. 3d 768, 785 (3d Cir. 1995)).  As set forth in the Stipulation, the Settlement is the product of hard-fought, mediator-supervised negotiations conducted over almost a year among sophisticated parties represented by experienced and well-informed counsel.  The presumption in favor of approval is particularly strong here.

First, Federal Plaintiffs' Counsel are specialists in shareholder litigation.  *In re NeuStar, Inc. Sec. Litig.*, 2015 WL 8484438, at *4 (E.D. Va. Dec. 8, 2015) (where plaintiffs' counsel are "'nationally recognized members of the securities litigation bar'" a court "may pay heed to [their] judgment" in settling claims).  Courts in this circuit give substantial weight to the experience of the attorneys who prosecuted and negotiated a settlement.  *In re Bldg. Materials Corp. of Am. Asphalt Roofing Shingle Prod. Liab. Litig.*, 2014 WL 12621614, at *4 (D.S.C. Oct. 15, 2014) ("The evidence demonstrates that the Settlement, which is recommended by experienced counsel, falls well within a range warranting notice to absent class members."); *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 665 (E.D. Va. 2001) (it is "appropriate for the court to give significant weight to the judgment of class counsel that the proposed settlement is in the interest of their clients and the class as a whole, and to find that the proposed partial settlement is fair").

Second, the Mediators' significant role throughout the negotiations confirms that the Settlement was reached fairly in the context of rigorous negotiation.  *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("mediator's involvement ... helps to ensure that the proceedings were free of collusion and undue pressure"); *Nicholes v. Combined Ins. Co.*, 2019 U.S. Dist. LEXIS 108696, at *5 n.1 (S.D. W. Va. Feb. 22, 2019) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."); *George v. Acad. Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1370 (N.D. Ga. 2019) ("mediation with an experienced mediator ... further confirms that the process was procedurally sound and not collusive.").

Third, Altria's current Board, including each of its independent, non-defendant directors, has unanimously approved the Settlement in the good faith exercise of its fiduciary duties. *See* Stip., §V. The Board has found that (a) Federal Plaintiffs' litigation and settlement efforts substantially and materially contributed to the Board's decision to agree to, formalize, and/or maintain the Altria Commitments; (b) the Altria Commitments confer substantial benefits on Altria and its shareholders; and (c) the Settlement is fair, reasonable, and adequate, and is in Altria and its shareholders' best interests. *Id.* The Board's reasonable exercise of business judgment regarding the resolution of litigation warrants substantial deference. *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1386 (Del. 1995) ("courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness"); *Brooks v. Am. Exp. Indus., Inc.*, 1977 U.S. Dist. LEXIS 17313, at *10 (S.D.N.Y. Feb. 17, 1977) (board approval of a settlement "is a business judgment with presumptive validity").

### 2.    Federal Plaintiffs' Counsel's Recommendation Is Well-Informed

Federal Plaintiffs' Counsel conducted substantial factual investigation of the underlying claims in the course of the litigation. In April 2021, Federal Plaintiffs negotiated with Defendants for the production of documents produced by Defendants in the factually related Securities Action. By order dated June 28, 2021, the Court ordered Altria to produce to Federal Plaintiffs all such discovery. ECF No. 104. These materials consisted of documents previously produced in the MDL proceedings (which, in addition to original discovery produced for the MDL proceedings, also included documents previously produced by Altria and JLI to the U.S. Federal Trade Commission as part of its antitrust investigation), and documents previously produced by Altria

and JLI to the SEC.  Federal Plaintiffs executed confidentiality agreements and ESI protocols with Altria and JLI, and received the respective initial productions via hard drive in July 2021.

Federal Plaintiffs' litigation support managers selected a discovery platform for storing, reviewing and analyzing the Altria and JLI documents.  Following substantial technical work, they were able to produce a universe of documents for a targeted review with no duplicative content.  As contemplated by the scheduling order, Federal Plaintiffs requested and received further productions of documents produced in the Securities Action after the initial delivery of documents.  In total, Federal Plaintiffs received a combined 6.8 million documents totaling 35.9 million pages from Defendants.

Federal Plaintiffs prioritized the Altria review by selecting the most critical custodial files to image and code on a first-level review.  These files included Board-level documents from Altria's Corporate Secretary as well as those of each of the individual Altria Defendants.  Further tiers of priority review were created based in part on what the attorneys learned from the initial tiers, including additional individuals known to have worked on due diligence, regulatory matters, and Altria's youth prevention efforts.  A similar effort was applied to the JLI production, first prioritizing the custodial files of the individual JLI Defendants, and then proceeding to other custodians involved in the Altria investment and JLI's regulatory and youth prevention efforts.

Once the top priority custodial files were identified and imaged, dedicated attorneys began the first-level review, coding documents by relevance as well as by key issues.  Attorneys also made detailed notes on certain important documents for use in a second-level review.  Once the review was underway, reviewers shared their findings via memos and emails circulated among the team.  Supervising attorneys also held regular, biweekly conference calls for the review team to

discuss pertinent findings, share case information, elicit technical and substantive questions and concerns, and generally maintain a coordinated review effort.

The first-level review took place over the course of seven months, from August 2021 until March 2022. Federal Plaintiffs employed a team of approximately 4-8 full-time equivalent reviewers for the first-level review and strategically reviewed over 185,234 documents totaling 1,961,731 pages of the top-priority custodial files. Following completion of the first-level review, Federal Plaintiffs narrowed the review team to a smaller group of highly-skilled attorneys to (a) build a chronology of the most important documents identified during the first-level review; (b) review deposition transcripts from earlier proceedings involving the same factual matter; and (c) conduct targeted searches for documents relevant to specific questions. This second-level review took place between March and June 2022, ceasing upon execution of the MOU.

The task of building a chronology was intended to provide a single source of truth for the factual matter relevant to Federal Plaintiffs' claims. Attorneys re-reviewed the most important documents identified during the first-level review, adding additional coding for issues and potential witnesses as well as supplementing notes with further elaboration and/or page citations, as needed.

With respect to review of deposition transcripts, the team prioritized the most important witnesses, including those named as defendants in the Federal Action and other key personnel, and assigned them for review on a witness-by-witness basis. Attorneys then reviewed all the transcripts and exhibits pertaining to each witness and drafted memoranda summarizing their most impactful testimony. These summaries were then shared with and discussed among the team as needed. In total, Plaintiffs reviewed or were in the process of reviewing the transcripts and exhibits of eighteen potential Altria and JLI witnesses in the Federal Action.

Finally, attorneys skilled in searching structured data sets conducted several targeted research efforts to address specific questions and issues necessary to conducting an effective prosecution of the Federal Action. These searches included such things as: (a) compiling a full set of Altria's and JLI's relevant correspondence with the FDA; (b) compiling the negotiation letters and term sheets exchanged between Altria and JLI prior to the investment; (c) compiling documents showing the extent of due diligence conducted by the Altria Defendants; (d) compiling the internal accounting memoranda (and any pertinent drafts and discussions) explaining Altria's impairment charges of October 2019, January 2020, and October 2020; (e) compiling key Altria board materials relevant to the Federal Action; and (f) compiling documents relevant to Altria's and JLI's corporate governance and youth prevention programs.

Federal Plaintiffs' Counsel also reviewed and analyzed data from many other sources specific to this matter, including, but not limited to: (a) Altria and JLI's publicly available websites; (b) Altria's public filings with the SEC, press releases, announcements, transcripts of investor conference calls, and news articles; (c) analyst, business, and financial media reports, scholarly literature, and publications about Altria and JLI; and (d) dockets and reports of related litigation and regulatory inquiries. Federal Plaintiffs' Counsel further engaged the services of leading researchers in the area of youth tobacco prevention as consulting experts. Federal Plaintiffs' Counsel have also: (a) researched the applicable law with respect to the claims asserted (or which could be asserted) in the shareholder derivative actions and the potential defenses thereto; and (b) researched, drafted, and filed comprehensive and fulsome complaints. In addition, Federal Plaintiffs' Counsel: (a) prepared detailed mediation statements; (b) reviewed documents and information provided in advance of the mediation sessions and during settlement negotiations; (c)

participated in multiple mediation sessions and several additional calls and meetings; and (d) engaged in months-long settlement discussions with counsel for Defendants.

Thus, Federal Plaintiffs reached the stage where they had "a clear view of the strengths and weaknesses of their cases." *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986); *see also Cohn*, 375 F. Supp. 2d at 855 ("In assessing the merits of the Settlement, plaintiffs' counsel considered the factual and legal questions that were disputed in the derivative actions. The Court is convinced that the proposed Settlement was reached after counsel had conducted an extensive investigation ...."); *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 620-21 (E.D. La. 2006) ("'[T]he question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it."). Throughout the negotiations, Federal Plaintiffs demonstrated their grasp of the facts and the law relevant to their claims. The comprehensive Settlement reflects their substantial efforts.

### 3.     The Settlement Relief Is Outstanding and Provides Substantial Benefits

The central calculus in evaluating any settlement involves weighing the benefits the settlement guarantees against the range of recovery that might be achieved through further litigation, discounted by the probability of success on the merits and the complexity, expense, and likely duration of the litigation. Federal Plaintiffs submit that the proposed settlement, consisting of the Funding Commitment, the Corporate Governance Commitments, the JLI/Altria Meetings, and the Policy Commitments, is well within the range of reasonableness because the relief obtained is extraordinary and substantial. The Company will commit $117 million in new funding to its

underage use prevention programs, ensuring that Altria will dedicate substantial resources to preventing underage use.  This new investment advances corporate and shareholder interests by mitigating the risk of further liability in civil and/or regulatory litigation concerning underage use of tobacco products.  Along with this significant new allocation of resources, Altria has agreed to commit for a period of five years to (a) its corporate goals to lead the tobacco industry in underage use prevention and to contribute to the healthy development of youth aged 12-18, and (b) the Standards, which put Altria's corporate goals into effect.

In addition, Federal Plaintiffs obtained extensive corporate governance and internal control enhancements that address the core of the wrongdoing alleged—the failure by Altria's fiduciaries to sufficiently prioritize underage use prevention in Altria's business practices.  In this regard, the reforms materially strengthen the operations of the all-important Steering Committee, which charts the course for all of Altria's underage use prevention programming.  Importantly, given that the core allegations in this case arise out of Altria's disastrous acquisition of JLI, the reforms specifically target Altria's transaction protocols to ensure that any exposure to liabilities involving underage use presented by a particular investment or acquisition are properly elevated, fully understood and carefully analyzed *prior to* a transaction being finalized.  Finally, the Settlement establishes a detailed framework for regular meetings between Altria and JLI to discuss underage use prevention concerning the respective companies' products.

Courts have long recognized that in derivative actions, non-monetary benefits, such as material changes in corporate management or policies like those achieved here, provide real and substantial benefits that warrant final approval. As the Fourth Circuit stated:

> While monetary recovery may, of course, be an element of a derivative settlement, it is not the only element and "parties to the settlement of a shareholders' derivative action are ... permitted great freedom in shaping the form of the settlement consideration." *Maher v. Zapata Corporation*, 714 F.2d

> 436, 466 (5th Cir. 1983). Influencing the future conduct of management may serve the interests of the corporation as fully as a recovery for past misconduct, and a settlement may be accepted "even though no direct monetary benefits are paid by the defendants to the corporation." *Id*. Here the Statement of Policy provides guidelines for future management responses to tender offers and takeover bids, the very situation that prompted these various complaints.

*Zimmerman*, 800 F.2d at 392 (ellipsis in original); *see also In re Schering-Plough Corp. S'holders Derivative Litig.*, 2008 U.S. Dist. LEXIS 2569, at *15 (D.N.J. Jan. 14, 2008) ("This litigation provides an example of how derivative actions that result in the adoption of rigorous compliance standards confer tangible benefits to the corporation and its shareholders."); *Unite Nat'l Ret. Fund v. Watts*, 2005 U.S. Dist. LEXIS 26246, at *8, *18 (D.N.J. Oct. 28, 2005) ("the most important factor in evaluating the fairness of the settlement agreement is the benefit to the corporation" and approving settlement where "the great benefit conferred upon Shell as a result of the new corporate governance principles provided for in the settlement agreement ... will serve to prevent and protect Shell from the reoccurrence of certain alleged wrongdoings"); *In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) (approving derivative settlement predicated on "a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have, in recent years, caused extensive harm to the company"); *Maher*, 714 F.2d at 461 ("effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment").

Courts routinely find that funding commitments like that provided for in the Settlement here confer a substantial corporate benefit and warrant judicial approval. For example, a derivative settlement very similar to the one achieved here was recently granted preliminary and then final approval by the U.S. District Judge Mark H. Watson of the U.S. District Court for the Southern District of Ohio. *See Rudi*, 2022 U.S. Dist. LEXIS 98299. In that derivative action, plaintiffs asserted breach of fiduciary duty claims against certain officers and directors of L Brands, Inc.

based on allegations that they tolerated pervasive sexual harassment at the corporation, leading to financial and reputational losses. *Id.* at *2. In settlement, the derivative plaintiffs negotiated a series of remedial corporate governance provisions to enhance workplace protections and protocols, including a $90 million funding commitment by the corporation to finance the corporate governance reforms. *Id.* at *3-4. As significant as the funding and reforms were in L Brands, Plaintiffs submit that the instant settlement will have broader significance and remedial impact, improving and protecting Altria from further exposure and liabilities and advancing the broader societal goal of underage nicotine use prevention.

### 4.   The Complexity, Expense, and Duration of Litigation Favor Settlement

The excellent benefits obtained in settlement must be weighed against the risks of further litigation. As courts have recognized, derivative litigation is "notoriously difficult and unpredictable." *See, e.g.*, *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992); *see also Unite*, 2005 U.S. Dist. LEXIS 26246, at *13 ("Here, Plaintiffs face the 'difficulties inherent in derivative litigation as well as significant procedural and substantive obstacles.'"). Courts recognize the value of settlement in complex shareholder litigation. "Although Plaintiffs in any case may firmly believe that their claims have merit, the complexities and uncertainties characteristic of complex securities litigation, and the concomitant costs that necessarily are entailed, make it appropriate for such Plaintiffs to compromise their claims pursuant to a reasonable settlement." *South Carolina Nat'l Bank v. Stone*, 749 F. Supp. 1419, 1426 (D.S.C. 1990).

Federal Plaintiffs faced particular risks related to whether they adequately pleaded their allegations under Rule 23.1 and applicable Virginia law that Altria wrongfully refused their litigation demands. Under applicable Virginia law, when a derivative action is filed, the

corporation may seek to reassert control over the claims and terminate the derivative proceeding or pursue the claims in its own right. *See* Va. Code Ann. § 13.1-672.4. Here, the Board advised Plaintiffs that it would consider their litigation demands and determine its course of action at a later date, pending the results of other factually-related litigation. While Federal Plaintiffs argued that such open-ended delay was unwarranted and amounted to a constructive refusal of their litigation demands, there is no assurance that Federal Plaintiffs would be able to establish that the Board's conduct amounted to a wrongful refusal, risking possible dismissal or stay of the case.

In addition, assuming that the Board eventually did determine to seek to terminate the claims after conducting an investigation, the Court's evaluation of a petition for dismissal under the Virginia statute is deferential to the Board's decision. It pertains solely to whether the statute's elements have been satisfied and not whether the underlying judgment to dismiss the suit is reasonable. The Virginia statute provides that a court "shall" dismiss a derivative action if a majority of the corporation's disinterested directors has: (1) conducted a review and evaluation, adequately informed in the circumstances, of the allegations made in the demand or complaint; (2) determined in good faith based on that review and evaluation that the maintenance of the derivative proceeding is not in the best interests of the corporation; and (3) submitted in support of the motion a short and concise statement of the reasons for its determination." *Id.* § 13.1-672.4(A). A shareholder plaintiff seeking to challenge a corporation's determination to terminate a derivative action has the burden of pleading and proving that either the directors deciding to discontinue the proceeding were not disinterested or that these individuals failed to come to a good faith determination after conducting an adequate review. *Id.* § 13.1- 672.4(C), (D).

Even if Federal Plaintiffs were to overcome this hurdle, each defendant would, of course, strongly deny liability and dispute the factual and legal predicates underlying the derivative claims.

"[I]n Virginia, a director's discharge of duties is not measured by what a reasonable person would do in similar circumstances or by the rationality of the ultimate decision. Instead, a director must act in accordance with his/her good faith business judgment of what is in the best interests of the corporation." *Willard ex rel. Moneta Bldg. Supply, Inc.* v. *Moneta Bldg. Supply, Inc.*, 515 S.E.2d 277, 283-84 (Va. 1999).   Establishing liability and recovering damages would have been exceptionally difficult in light of Section 13.1-692.1 of the Virginia Stock Corporation Act, which strictly limits the amount of monetary liability for officers and directors unless they "engaged in willful misconduct or a knowing violation of the criminal law or of any federal or state securities law."[5]  In addition, litigating the claims would entail substantial costs and impose material burden on all parties.  Should Federal Plaintiffs' claims have proceeded to trial, there would be evidentiary disputes regarding the knowledge and conduct of the directors and senior officers in connection with the misconduct alleged.  It is in this context that Plaintiffs would have to establish the breaches of fiduciary duty alleged in the action.

Even victory at trial would be no guarantee that the judgment would ultimately be sustained on appeal or by the trial court.  *See, e.g.*, *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268 (2d Cir. 1979) (reversing $87 million judgment after trial).   Add to these post-trial and appellate risks, and the benefits of the Settlement become all the more apparent.   *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 24 (2d Cir. 1987) (affirming settlement where potential defenses presented the "possibility of 'a lesser or no recovery after trial'").   The Settlement

---

[5] Altria's Articles of Incorporation provided that "[t]he full extent that the Virginia Stock Corporation Act[] … permits the limitation or elimination of the liability of directors, officers or other eligible persons, no director or officer of the Corporation or other eligible person made a party to any proceeding shall be liable to the Corporation or its stockholders for monetary damages arising out of any transaction, occurrence or course of conduct, whether occurring prior or subsequent to the effective date of this Article."

eliminates these and other risks of continued litigation, while guaranteeing Altria and its stockholders the substantial benefits secured in the Settlement. *See Zimmerman*, 800 F.2d at 392.

In sum, the likely duration and associated expense of continued litigation favor settlement. *See South Carolina Nat'l Bank*, 749 F. Supp. at 1426 (finding that duration, complexity, and expenditures of continued litigation supports approval of a proposed settlement). Federal Plaintiffs respectfully contend that consideration of each of the above factors as applied to the proposed Settlement fully supports the Court's granting of preliminary approval at this time.

### B.    The Proposed Notice and Schedule Meet Due Process

Rule 23.1(c) requires that notice of a proposed stockholder derivative settlement be given to stockholders "in the manner that the court orders." The Court's discretion under Rule 23.1(c) is "[i]n contrast to the more extensive requirements governing notice in certified class actions." *In re UnitedHealth Grp. S'holder Derivative Litig.*, 631 F.3d 913, 917 (8th Cir. 2011). In the context of settlements of shareholder derivative litigation, the notice program district courts commonly approve includes: (a) filing the notice with the SEC on Form 8-K; (b) publishing the notice in a press release and/or national publication; and (c) posting of the notice, together with the settlement agreement, on the Company's website through the hearing date. *In re India Globalization Capital, Inc.*, 2020 U.S. Dist. LEXIS 77190, at *13 (D. Md. May 1, 2020) (notice of derivative settlement to be filed on Form 8-K, published by press release and distributed in *Investor's Business Daily*, and posted with the settlement agreement on the company's website).

The forms of notice provided for in the Stipulation satisfy due process under the relevant state and federal rules and legal precedent. They are "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the [settlement] and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S.

306, 314 (1950).  For notice to be adequate in a derivative context, the notice "must be sufficiently informative and give sufficient opportunity for response."  *Kyriazi v. W. Elec. Co.*, 647 F.2d 388, 395 (3d Cir. 1981); *see also In re Pub. Serv. Co. Derivative Litig.*, 125 F.R.D. 484, 486 (S.D. Ind. 1988) (notice that provided complete and accurate information of all material elements of the litigation and proposed settlement found to constitute valid and adequate notice under Rule 23(e)).

Subject to the Court's approval, within twenty-one (21) days following preliminary approval of the Settlement by the Court, Altria shall cause: (a) the filing of the Stipulation and Notice with the SEC on Form 8-K; (b) publication of the Summary Notice once in the Wall Street Journal; and (c) publication of the Stipulation and the Notice on the "Investor Relations" page of Altria's corporate website, to be maintained until the date the Court enters the Final Judgment and Order.  Altria shall be responsible for providing notice of the Settlement in such form and manner as directed by the Court.

Here, the proposed forms of notice describe in plain English all material terms and conditions of the proposed Settlement; the facts and considerations that caused Federal Plaintiff's Counsel to conclude that the proposed Settlement is fair and adequate; the proposed amount of attorneys' fees, inclusive of expenses, payable to Plaintiffs' Counsel for their efforts[6] and the service awards payable to Plaintiffs; the procedure for objecting to the proposed Settlement; and the date, place, and time of the Settlement Hearing.  These proposed forms of notice will fairly and reasonably apprise Altria shareholders of the proposed Settlement, and of their options with respect thereto, and thus, fully satisfy due process requirements.

---

[6] As previously noted, the Parties will advise the Court of the Fee and Expense Award arbitration decision before the August 25, 2022 preliminary approval hearing, and submit an updated proposed notice to shareholders.

### C.  Proposed Schedule of Events

Federal Plaintiffs propose the following schedule for dissemination of notice, the filing of submissions in support of final approval and attorneys' fees and expenses and any objections thereto, and the Settlement Hearing.  This schedule, similar to those used in numerous derivative settlements, affords due process to the Company's stockholders concerning their rights with respect to the Settlement.

| | |
|---|---|
| Settlement Hearing | November 14, 2022 |
| The Company shall file a Form 8-K with the SEC attaching the Notice; the Company shall post the Notice and Stipulation on the Company's website; the Company shall cause publication of the Summary Notice in the Wall Street Journal | September 15, 2022 |
| All filings due in support of the Settlement and the Fee and Expense Award | October 10, 2022 |
| Counsel for the Company shall file proof of dissemination of Notice by declaration or affidavit | November 7, 2022 |
| All filings due in opposition to the Settlement and/or the Fee and Expense Award | October 24, 2022 |
| Any reply filings due in support of the Settlement and/or Fee and Expense Award | November 7, 2022 |

## IV.  CONCLUSION

For the foregoing reasons, Federal Plaintiffs respectfully submit that the Settlement should be preliminarily approved and notice published in accordance with the order on preliminary approval.

Dated: August 16, 2022                Respectfully submitted,

**ERIC GILBERT and THOMAS SANDYS**
Lead Plaintiffs

*/s/  Paul M. Falabella*
Craig J. Curwood (VSB No. 43975)
Paul M. Falabella (VSB No. 81199)
Butler Curwood, PLC
140 Virginia Street, Suite 302
Richmond, Virginia 23219
Tel: 804-648-4848
Fax: 804-237-0413
craig@butlercurwood.com
paul@butlercurwood.com

*Liaison Counsel for Lead Plaintiffs Eric Gilbert and*
*Thomas Sandys and counsel for additional*
*Plaintiffs David Hamilton and Maria Cecilia Lorca*

Kip B. Shuman (*pro hac vice*)
SHUMAN, GLENN & STECKER
100 Pine Street, Ste. 1250
San Francisco, CA 94111
Tel. (303) 861-3003
kip@shumanlawfirm.com

Geoffrey M. Johnson (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
12434 Cedar Road
Cleveland, OH 44106
Tel: 216-229-6088
Fax: 216-229-6092
gjohnson@scott-scott.com

*Co-Lead Counsel*

Edward F. Haber (*pro hac vice*)
Patrick J. Vallely (*pro hac vice*)
SHAPIRO HABER & URMY LLP
Seaport East, 2 Seaport Lane
Boston, Massachusetts 02210
Tel: (617) 439-3939
ehaber@shulaw.com
pvallely@shulaw.com

Robert C. Schubert (*pro hac vice*)
Willem F. Jonckheer (*pro hac vice*)
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, California 94111
Telephone: (415) 788-4220
rschubert@sjk.law
wjonckheer@sjk.law

*Attorneys for Plaintiff David Hamilton*

Brain J. Robbins
Craig W. Smith (*pro hac vice*)
Shane P. Sanders (*pro hac vice*)
ROBBINS LLP
5040 Shoreham Place
San Diego, California 92122
Tel: (619) 525-3990
brobbins@robbinsllp.com
csmith@robbinsllp.com
ssanders@robbinsllp.com

*Attorneys for Plaintiff Maria Cecilia Lorca*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 16th day of August, 2022, I will electronically file the

foregoing with the Clerk of the Court using the CM/ECF system, which will then send a

notification of such filing (NEF) to all counsel of record.

<div style="margin-left:40%">

<u>/s/    Paul M. Falabella</u>
Paul M. Falabella (VSB No. 81199)
Butler Curwood, PLC
140 Virginia Street, Suite 302
Richmond, Virginia 23219
Tel: 804-648-4848
Fax: 804-237-0413
Email: paul@butlercurwood.com

</div>