IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| IN RE ALTRIA GROUP, INC. DERIVATIVE LITIGATION | Lead Case No. 3:20cv772 (DJN) |

### MEMORANDUM OPINION

This matter comes before the Court on Plaintiffs' Motion for Attorneys' Fees, Expenses and Service Awards (the "Motion for Fees, Expenses and Awards" (ECF No. 147)). Upon consideration of the Motion, the Memorandum in Support (ECF No. 148), the supplemental records offered by Plaintiffs' Counsel and related briefing, and for the reasons stated herein and from the bench at the final approval hearing, the Motion for Fees, Expenses and Awards (ECF No. 147) will be GRANTED IN PART and DENIED IN PART. The Court will award fees, expenses and service awards in the total amount of $15,295,614.44, consisting of $15,000,000 in attorneys' fees, $220,614.44 in litigation expenses and $75,000 in service awards.

### I. BACKGROUND

The background of the instant suit receives ample summary in Plaintiffs' Memorandum in Support of Final Approval ("Mem. Supp. App." (ECF No. 146)) and Memorandum in Support of Fee Request ("Mem. Supp. Fee" (ECF No. 148)). Accordingly, the factual and procedural history of the case need not be repeated in depth in this Memorandum Opinion except as necessary to explain the Court's fee and expense awards.

Briefly summarized, the case is a shareholder derivative action arising out of Altria Group Inc.'s ("Altria" or "the Company") 2018 investment in Juul Labs, Inc. ("JLI"), a $12.8

billion outlay whose value Altria has since written down by over ninety percent (90%).[1] On behalf of Altria shareholders, Plaintiffs allege that certain Altria directors and officers (the "Altria Defendants")[2] breached their fiduciary duties to the Company by consciously disregarding the legal, regulatory, reputational and financial risks associated with the JLI investment. Plaintiffs bring additional claims against the Altria Defendants for breach of fiduciary duty and waste of corporate assets. The Consolidated Complaint (ECF No. 110) also sets forth an aiding and abetting cause of action against JLI and certain of its officers and directors (the "Juul Defendants").[3]

After months of discovery and three formal mediation sessions, the parties reached a settlement agreement in the spring of 2022. The Court found this initial agreement lacking,

---

[1] The case before the Court (the "Federal Action") represents the consolidation of five substantially similar cases: three filed in the Eastern District of Virginia and two filed in the Northern District of California. *See* the Court's April 14, 2021 Order granting the parties joint motion to consolidate (ECF No. 25). Two related derivative actions are pending in Virginia Circuit Court: (i) *In re Altria Group, Inc. Derivative Litigation*, CL20-7051, pending in Henrico County; and (ii) *Merrits v. Casteen, et al.*, CL21-1093, pending in Albermarle County (the "State Actions"). Plaintiffs' Counsel represents that the fees and expenses awarded in the instant suit shall compensate both Plaintiffs' Counsel and counsel for the plaintiffs in the State Actions ("State Counsel"). The Court retains jurisdiction over the instant suit for purposes of resolving any dispute between Plaintiffs' Counsel and State Counsel regarding the allocation of the fee and expense award.

[2] In addition to nominal Defendant Altria Group, Inc., the Altria Defendants include Dinyar S. Devitre ("Devitre"); Debra J. Kelly-Ennis ("Kelly-Ennis"); W. Leo Kiely III ("Kiely"); Kathryn B. McQuade ("McQuade"); George Muñoz ("Muñoz"); John T. Casteen III ("Casteen"); Mark E. Newman ("Newman"); Nabil Y. Sakkab ("Sakkab"); Virginia E. Shanks ("Shanks"); Ellen R. Strahlman ("Strahlman"); the estate of Thomas F. Farrell II ("Farrell"); William F. Gifford, Jr. ("Gifford"); Howard A. Willard III ("Willard"); Kevin C. Crosthwaite, Jr. ("Crosthwaite"); W. Hildebrandt Surgner, Jr. ("Surgner"); Jody L. Begley ("Begley"); and Ivan S. Feldman ("Feldman").

[3] In addition to Defendant JLI, the Juul Defendants include Adam Bowen ("Bowen"); James Monsees ("Monsees"); Kevin Burns ("Burns"); Riaz Valani ("Valani"); Nicholas J. Pritzker ("Pritzker"); and Hoyoung Huh ("Huh").

however, and it withheld preliminary approval in late August of last year. (*See* ECF No. 130 (denying preliminary approval).) Armed with the Court's suggestions as to how to improve the settlement, and with the assistance of United States Magistrate Judge Mark. R. Colombell, the parties reached a revised settlement in mid-October. The Court preliminarily approved the revised settlement on October 26, 2022. (ECF No. 143.)

After receiving notice of the proposed settlement, four Altria shareholders (the "Objectors")[4] filed a joint objection to the proposed settlement. (ECF No. 150.) The Objectors outlined three discrete complaints with the proposed settlement, one of which the Court sustained during the first final approval hearing in mid-January. (ECF No. 170.) The Court again instructed the parties as to how they could rectify flaws in the proposed settlement. (*Id.*)

The parties once again amended the proposed settlement, and, upon reviewing the now-twice revised Settlement Agreement, the Objectors informed the Court that the proposed settlement "adequately addresse[d]" their concerns, thus resolving the sustained objection. (ECF No. 174.) The Court therefore granted final approval of the settlement. (ECF No. 180.)

Now, finally, the parties perform their swan song. Plaintiffs move for a fee and expense award of $17.5 million. Plaintiffs' Counsel[5] also seeks the Court's approval to disburse a $15,000 service award to each named plaintiff. The parties reached the $17.5 million figure, which constitutes a 1.5x multiple on Plaintiffs' Counsel's approximately $11.6 million lodestar, via arbitration. Neither Altria nor the Objectors oppose Plaintiffs' fee request.

---

[4] The Objectors include Action on Smoking and Health ("ASH"), Trinity Health, Ruth E. Malone and Edward L. Sweda.

[5] Plaintiffs' Counsel includes attorneys from six firms: (i) Shuman, Glenn & Stecker; (ii) Scott + Scott LLP; (iii) Butler & Curwood PLC; (iv) Shapiro, Haber & Urmy LLP; (v) Schubert Jonckheer & Kolbe; and (vi) Robbins LLP. Shuman, Gleen & Stecker and Scott + Scott LLP served as Co-Lead Counsel.

3

## II. STANDARD OF REVIEW

In shareholder derivative actions, as in aggregate litigation more broadly, "[i]t is for the district court in the first instance to calculate an appropriate award of attorney's fees." *Fire & Police Retiree Health Care Fund, San Antonio v. Smith*, 2020 WL 6826549, at *4 (D. Md. Nov. 20, 2020) (quoting *Carroll v. Wolpoff & Abramson*, 53 F.3d 626, 628 (4th Cir. 1995)). The district court enjoys "broad discretion" in making this calculation. *Carroll*, 53 F.3d at 628.

District courts in the Fourth Circuit largely apply one of two methods in determining a suitable award for attorneys' fees. *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 681 (D. Md. 2013). In cases in which the relief obtained includes the creation of a "common fund" — i.e., a monetary recovery for the benefit of the class members themselves — "courts in [the Fourth Circuit] generally use [the] percentage of the recovery method . . . ." *Fire & Police Retiree Health Care Fund*, 2020 WL 6826549, at *4; *see also Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756, 757 (S.D.W. Va. 2009) ("The percentage method has overwhelmingly become the preferred method for calculating attorneys' fees in common fund cases."). The percentage of the recovery method constitutes a "results-driven" approach, tying the attorneys' fee award "to the overall result achieved rather than the hours expended by the attorneys." *Singleton*, 976 F. Supp. 2d at 681. Attorneys' fee awards under the percentage of the recovery method often land between twenty and thirty percent of the common fund, though figures above and below this range are not uncommon. *Jones*, 601 F. Supp. 2d at 763. Courts in the Fourth Circuit analyze eight factors to determine the reasonableness of a fee award under the percentage of the recovery method: (1) the results obtained for the class; (2) the quality, skill and efficiency of the attorneys involved; (3) the risk of nonpayment; (4) objections by members of the class to the settlement terms and/or fees requested by counsel; (5) awards in similar cases; (6) the

4

complexity and duration of the case; (7) public policy; and (8) the amount of time devoted to the case by Plaintiffs' Counsel. *Singleton*, 976 F. Supp. 2d at 682; *In re Genworth Sec. Litig.*, 210 F. Supp. 3d 837, 843 (E.D. Va. 2016).[6]

In cases where the relief obtained does not include the creation of a common fund, district courts in the Fourth Circuit largely turn to the second approach to calculating attorney fee awards: the lodestar method. *See, e.g., In re Star Sci., Inc.*, 2016 WL 4820637 (E.D. Va. Aug. 3, 2016) (applying the lodestar method where "the settlement . . . did not establish a common fund or otherwise involve any monetary recovery.") Under the lodestar method, "a district court identifies a lodestar figure by multiplying the number of hours expended by class counsel by a reasonable hourly rate." *Singleton*, 976 F. Supp. 2d at 688. From there, the district court "ascertain[s] what is reasonable in terms of hours expended and the rate charged." *Star Sci.*, 2016 WL 4820637, at *2. To make that determination, the court leans on the factors set forth in *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714 (5th Cir. 1974).[7] *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013). The court next "subtract[s] fees for hours spent on unsuccessful claims unrelated to successful ones." *Id.* Then, finally, the court "award[s] 'some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff.'" *Id.* (quoting *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009)).

---

[6] Courts typically present these factors as sevenfold, using one of either the seventh or eighth factors, but not both. For purposes of completeness, the Court includes all eight.

[7] The *Johnson* factors include: "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases." *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978).

Notwithstanding the above two methods, "there is no strict formula [that] the Court is required to follow" in determining an appropriate fee award. *Star Sci.*, 2016 WL 4820637, at *3; *see also In re MicroStrategy, Inc.*, 172 F. Supp. 2d 778, 787 (E.D. Va. 2001) (noting that "arithmetic calculations aid the fee-setting process, but ultimately a trial court's judgment is centrally important and may trump the calculations"). Courts often employ both the percentage of the recovery method and the lodestar method in tandem, using the lodestar method to "cross-check" the figure derived from the percentage of the recovery method. *See, e.g., Singleton*, 976 F. Supp. 2d at 688. Ultimately, "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Doe v. Chao*, 435 F.3d 492, 506 (4th Cir. 2006).

### III. ANALYSIS

#### A. Plaintiffs' Fee Request

Plaintiffs and their counsel seek an attorneys' fee and expense award of $17.5 million. Such an award would represent a 1.5x multiple on Plaintiffs' Counsel's lodestar, which Plaintiffs calculate at approximately $11,664,544.50. Plaintiffs' Counsel reached their lodestar figure by multiplying 19,398.65 total hours worked by a blended hourly rate of $601.31, which represents the weighted average of the hourly rates for each of the six firms comprising Plaintiffs' Counsel. (Master Declaration ("Master Decl.") (ECF No. 149) at 38.) Those rates, Plaintiffs represent, are "based on periodic assessments of rates used by firms performing comparable work." (Mem. Supp. Fee at 27.) Plaintiffs' Counsel also incurred $220,614.44 in expenses in litigating the instant suit, though Plaintiffs do not seek a separate expense award. Finally, Plaintiffs' Counsel requests the Court's approval of a $15,000 service award to each of the five named Plaintiffs.

#### B. Discussion

Plaintiffs' Counsel argues in support of its fee request by reference to the factors

identified in *Singleton* and *Genworth*. (Mem. Supp. Fee at 17–25.) Plaintiffs' Counsel then undertakes a lodestar cross-check. (Mem. Supp. Fee at 25–28.) This approach proves apropos, and the Court analyzes Plaintiffs' fee request on those same terms.[8] Notably, the *Singleton* and *Genworth* factors largely overlap with the *Johnson* factors discussed at the final approval hearing and referenced *supra* herein.

### 1. The Result Obtained

Though the Settlement Agreement constitutes a victory for Altria shareholders, the Court cannot find that the result obtained fully supports Plaintiffs' Counsel's $17.5 million fee request. Rather, Plaintiffs' Counsel's performance, though capable, necessitated substantial involvement by the Court to ensure that the Settlement Agreement (ECF No. 140-1), as amended by ECF No. 173-1) amounted to something more than a paper tiger. While the Settlement Agreement advances the interests of Altria shareholders and furthers the cause of youth tobacco use prevention and cessation, these worthy achievements came with a healthy dose of assistance from the Court.

As initially presented to the Court, the proposed settlement agreement largely rang hollow. The $117 million funding commitment for programs designed to prevent underage tobacco and nicotine use lacked any guarantee that the funded programs would be independent of Altria itself. Put differently, the settlement agreement, as originally conceived, allowed Altria to devote the entire $117 million funding commitment to in-house or legacy programs. This feature of the parties' initial proposal drew the Court's ire in three respects.

First, because Altria could deploy the entire $117 million funding commitment to in-

---

[8] Because the eighth factor — the amount of time devoted to the case by Plaintiffs' Counsel — proves duplicative of other factors, the Court excludes a separate discussion of this factor.

7

house or legacy programs, the initial settlement agreement guaranteed nothing more than an accounting maneuver. Altria could satisfy the terms of the initial settlement agreement by simply designating funds that it already intended to spend as funds deriving from the $117 million funding commitment.

Second, because the initial settlement agreement allowed Altria to fund in-house initiatives, it failed to provide for independent oversight of the efficacy of the selected programs. Thus, nothing in the initial settlement agreement prevented Altria from funding programs with a proven track record of *failing to prevent or decrease youth tobacco use*. Altria officials, and Altria officials only, were poised to oversee the distribution of settlement funds. The fox was guarding the henhouse.

Third, the initial settlement agreement lacked fixed, objective benchmarks by which Altria could measure its progress.

These flaws in the initial settlement agreement rendered it toothless, forcing the Court to step in. After denying preliminary approval, the Court provided the parties with three potential modifications to the settlement's structure: (1) first, a funding commitment devoted entirely to independent, third-party programs, the selection of which would be overseen by an Independent Monitor; (2) second, fixed measurables, developed in consultation with the Independent Monitor, that would ensure that Altria measured its progress towards the Settlement Agreement's stated goals using objective yardsticks; and (3) third, a new allocation of Altria's $117 million funding commitment whereby $100 million of the settlement would go towards youth tobacco use prevention and cessation programs, $10 million of the settlement would support the Independent Monitor's annual compliance efforts, and $7 million of the settlement would be held in reserve, to be deployed as the Independent Monitor deems necessary to remedy shortcomings in Altria's

progress towards the Settlement Agreement's stated goals. The parties adopted the Court's proposed structure in the revised settlement agreement, to which the Court granted preliminary approval on October 26, 2022.

A similar issue arose in advance of the first final approval hearing. In their objections, the Objectors identified a provision of the Settlement Agreement that the Court had missed at the preliminary approval stage. The Settlement Agreement provided that Altria could satisfy the Settlement Agreement's first year funding commitment — $20 million — by funding third-party, legacy programs already on the Company's ledgers. In essence, the Settlement Agreement allowed Altria to avoid 20% of its funding commitment by designating funds that it had already budgeted to spend as counting towards the $100 million figure. The Court was again forced to propose a modification to a key settlement term where Plaintiffs' Counsel should have already done so. The Court denied final approval and instructed the parties to remove the objected-to provision from the Settlement Agreement.

Given the foregoing, the Court assigns diminished weight to Plaintiffs' Counsel's discussion of the result obtained on behalf of Altria shareholders. Plaintiffs' Counsel negotiated an agreement lacking any enforcement mechanism or independent oversight, necessitating the Court's subsequent efforts to provide these missing elements. Absent the Court's twice-enforced requirement that the parties revise their agreement, the settlement would have conferred far less benefit on Altria's shareholders. Accordingly, a fee award of $15 million — below Plaintiffs' Counsel's requested amount — proves appropriate.

### 2. The Quality, Skill and Efficiency of the Attorneys Involved

For the reasons discussed immediately prior, the Court also assigns lessened weight to the quality, skill and efficiency of the attorneys that comprise Plaintiffs' Counsel. *Genworth*, 210 F.

Supp. 3d at 844. Plaintiffs' Counsel undoubtedly possesses a great deal of experience in litigating complex derivative actions. (Master Decl. ¶ 116; Master Decl. Exs. 2–7.) Moreover, Plaintiffs' Counsel undertook a cumbersome and lengthy discovery process in litigating this case. (Mem. Supp. Fee at 7–11.) However, an attorney's value in settlement negotiations is principally tied to the result that he achieves for his client. As noted above, deficiencies in the original Settlement Agreement necessitated the Court's intervention in the negotiation process. The initial deal that Plaintiffs' Counsel struck with Altria amounted to a façade, and the Court will not credit Plaintiffs' Counsel for their skill and experience where Plaintiffs' Counsel failed to bring those qualities to bear in the negotiation process. This second factor again counsels a fee award below the requested amount.

### 3. The Risk of Nonpayment

"In determining the reasonableness of an attorneys' fee award, courts consider the relative risk involved in litigating the specific matter compared to the general risks incurred by attorneys taking on class actions on a contingency basis." *Jones*, 601 F. Supp. 2d at 762. Here, Plaintiffs' Counsel took on substantial risk in light of the substance of Plaintiffs' claims. Virginia law, akin to many other states, permits corporations to exculpate fiduciaries from liability absent "willful misconduct or a knowing violation of the criminal law or of any federal or state securities law." Va. Code § 13.1-692.1. Because Altria's Articles of Incorporation exculpate officers and directors to the fullest extent allowed under Virginia law, winning Plaintiffs' claims on the merits presented a daunting challenge.

On the other hand, Plaintiffs' Counsel faced risks that largely prove ordinary for those who make their living by contingent litigation. *Lyle v. Food Lion, Inc.*, 954 F.2d 984, 989 (4th Cir. 1992) (finding that the risk of counsel not being compensated in a case taken on a contingent

fee basis, standing alone, was not a sufficient ground for enhancing the lodestar fee). True, Plaintiffs' Counsel prosecuted the suit "without any assurance of meaningful recovery." (Mem. Supp. Fee at 23.) However, "the risk of nonpayment was no more serious here than in most other derivative actions, where counsel inevitably must contend with the same demand requirements and business judgment presumptions." *Fire & Police Retiree Health Care Fund*, 2020 WL 6826549, at *5.

Plaintiffs' Counsel also benefitted from the substantial discovery taken in the related Securities Action,[9] all of which was re-produced in the instant suit. (*See* ECF No. 104 (ordering the production of the discovery provided in the related Securities Action).) Similarly, Plaintiffs' Counsel enjoyed the benefit of "government action preceding the suit," *Singleton*, 976 F. Supp. 2d at 683, as Altria's document production encompassed materials produced to the U.S. Federal Trade Commission in connection with its antitrust investigation and materials produced to the U.S. Securities and Exchange Commission. (Mem. Supp. Fee at 7.) In sum, the risk of nonpayment associated with litigating the instant action proved no more or less significant than the same risk in litigating derivative actions more broadly.

### 4. Objections to the Fee Request

A "lack of objections tends to show that . . . the requested fee is reasonable for the services provided and the benefits achieved[.]" *Singleton*, 976 F. Supp. 2d at 684. Here, as Plaintiffs' Counsel points out, there have been no objections to the proposed fee and expense award. (Mem. Supp. Fee at 21.) The absence of objections from Altria, JLI and Altria shareholders weighs in favor of Plaintiffs' Counsel's fee request.

---

[9] *Klein, et al. v. Altria Group, Inc., et al.*, Case No. 3:20cv75.

11

### 5. Awards in Similar Cases

"Comparing the size of fund and fee awards in other cases, while overly simplistic, 'nonetheless provides a valuable point of reference.'" *In re Neustar, Inc. Sec. Litig.*, 2015 WL 8484438, at *9 (E.D. Va. Dec. 8, 2015) (quoting *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 264 (E.D. Va. 2009)). Though "[i]t would be nearly impossible for this Court . . . to evaluate hundreds of class action settlements and come up with a median or average fee amount in similar cases[,]" such an exercise proves unnecessary, as both legal scholars and our sister courts in the Fourth Circuit "have already gathered this kind of empirical data." *Loudermilk Servs., Inc. v. Marathon Petroleum Co.*, 623 F. Supp. 2d 713, 723 (S.D.W. Va. 2009). The Court's survey of recent cases and the scholarship they cite suggests that fee awards between fifteen and thirty-three percent of the settlement's value prove typical in complex actions of similar size. *Fire & Police Retiree Health Care Fund*, 2020 WL 6826549, at *6 (collecting cases and scholarship); *Mills*, 265 F.R.D at 264 (same).

Here, the requested fee and expense award, $17.5 million, constitutes approximately fifteen percent of the $117 total funding commitment. That percentage increases to sixteen percent when excluding the $7 million held in reserve, to be deployed only if the Independent Monitor deems necessary. While this rough calculation makes no attempt at estimating the value that the $117 million funding commitment will confer on Altria's shareholders (an impossible exercise), it suggests that Plaintiffs' Counsel's fee request falls within the range generally considered reasonable by courts in the Fourth Circuit.

### 6. The Complexity and Duration of the Case

The complexity and duration of the litigation provide limited support for Plaintiffs' Counsel's requested fee. "In evaluating the complexity and duration of the litigation, courts

consider not only the time between filing the complaint and reaching settlement, but also the amount of motions practice prior to settlement, and the amount and nature of discovery." *Singleton*, 976 F. Supp. 2d at 686 (quoting *Jones*, 601 F. Supp. 2d at 761). Here, though the amount of discovery proved substantial, document production largely replicated materials produced (1) in the related multi-district litigation ("MDL"), *In re Juul Labs, Inc. Marketing Sales Practices, and Products Liability Litig.*, No. 19-md-2913-WHO (N.D. Cal.), (2) to the U.S. Federal Trade Commission in connection with the Commission's antitrust investigation, and (3) by Altria and JLI in the related Securities Action. This replication of prior document production significantly lessened the discovery burden on Plaintiffs' Counsel. The absence of dispositive motions practice prior to settlement negotiations similarly suggests a relatively light burden on Plaintiffs' Counsel. These considerations weigh against Plaintiffs' Counsel's requested fee award.

       7.    **Public Policy**

Two countervailing public policy considerations factor into the Court's determination of the proper attorneys' fee award. First, the Court must remain mindful of "the need to diminish the perception among a significant part of the non-lawyer population and even among lawyers and judges that the risk premium is too high in [complex litigation] and that . . . plaintiffs' lawyers are overcompensated for the work that they do." *In re Wachovia Corp. ERISA Litig.*, 2011 WL 5037183, at *5 (W.D.N.C. Oct. 24, 2011) (cleaned up). Meanwhile, however, the Court's fee award should be sufficiently high to "ensure that competent, experienced counsel will be encouraged to undertake the often risky and arduous task" of prosecuting derivative shareholder actions. *MicroStrategy*, 172 F. Supp. 2d at 788.

After considering the foregoing policy considerations, the Court believes that attorneys'

fees of $15 million will prove sufficient to incentivize qualified counsel to expend the significant resources necessary to litigate meritorious actions. At the same time, however, this fee rests at the lower end of awards in similar cases and therefore counteracts any public perception that plaintiffs' lawyers are overcompensated.

### 9. Lodestar Cross-Check

Finally, the lodestar cross-check confirms the reasonableness of the Court's $15 million fee award. Because the lodestar analysis serves as a double-check on the reasonableness of the fee award, the Court need not discuss the twelve *Johnson* factors separately.[10] *See Neustar*, 2015 WL 8484438, at *9 ("Because the lodestar is employed as a 'cross-check' . . . each of the twelve [*Johnson*] factors will not be laid out and analyzed separately.") (citing *Mills*, 265 F.R.D. at 261 n.6). The Court therefore limits its analysis to a brief discussion of Plaintiffs' Counsel's lodestar calculation and the multiplier implied by a $15 million fee award.

Plaintiffs' Counsel reports a lodestar figure of $11,663,544.50. On its face, this amount appears reasonable for a shareholder derivative action exceeding two years in duration. And indeed, an examination of the component parts of Plaintiffs' Counsel's lodestar calculation reveals that the figure reasonably reflects the time and effort devoted to the case. Across the six firms comprising Plaintiffs' Counsel, the firms' partners, associates, staff attorneys, paralegals, and other support staff recorded 19,398.65 hours of billable work. The Court accepts this unchallenged figure as a reasonable reflection of the time necessary to prosecute a complex aggregate action for multiple years. *See Mills*, 265 F.R.D. at 264 ("When using lodestar as a 'cross-check,' the Court need [] not apply the 'exhaustive scrutiny' typically mandate, and the

---

[10] For the Court's discussion of the twelve *Johnson* factors, see the transcript of the February 16, 2023 final approval hearing.

Court may accept the hours estimates provided by Lead Counsel."). The Court similarly accepts the hourly rates charged which, although high for this locality, fall within a reasonable range for complex shareholder derivative actions, "where the market for . . . attorneys is nationwide and populated by very experienced attorneys with excellent credentials."[11] *MicroStrategy*, 172 F. Supp. 2d at 788.

Concerning the lodestar multiple, Plaintiffs' Counsel reached its $17.5 million fee request figure by applying a 1.5x multiple on its lodestar figure. This multiple falls within the range of what district courts in the Fourth Circuit have found to be reasonable. *See, e.g., Mills*, 265 F.R.D. at 265 (approving 1.3x lodestar multiple); *Jones*, 601 F. Supp. 2d at 766 (noting that "[c]ourts have generally held that lodestar multipliers falling between 2[x] and 4.5[x] demonstrate a reasonable attorneys' fee").

Notwithstanding the above, it is the judgment of the Court that a reasonable fee award in this case is $15 million, which constitutes a 1.28x multiple on Plaintiffs' Counsel's lodestar and fifteen percent of the funding amount dedicated to independent, third-party programs ($100 million) under the revised Settlement Agreement. A $15 million fee award, while below Plaintiffs' Counsel's request, adequately compensates Plaintiffs' Counsel for the time and effort exerted, sufficiently rewards Plaintiffs' Counsel for the risk they took in litigating a contingent fee case, and adequately incentivizes competent counsel to take up future shareholder derivative actions where meritorious. In light of the eight factors set forth in *Singleton, Genworth, Mills* and elsewhere, as well as the lodestar cross-check, the Court finds a $15 million fee award proper.

---

[11] The reported hourly rates among the six firms comprising Plaintiffs' Counsel fall within the following ranges: (i) Paralegals: $135/h to $305/h; (ii) Staff Attorneys: $350/h to $675/h; (iii) Associates: $350/h to $750/h; Partners: $500/h to $1,295/h.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Fees, Expenses and Awards (ECF No. 147) will be GRANTED IN PART and DENIED IN PART. The Court awards Plaintiffs' Counsel $15,000,000 in attorneys' fees and $220,614.44 in expenses. Furthermore, each named plaintiff shall receive a $15,000 service award.

An appropriate Final Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

/s/
David J. Novak
United States District Judge

Richmond, Virginia
Dated: February 17, 2023