```
                    UNITED STATES DISTRICT COURT

              FOR THE EASTERN DISTRICT OF VIRGINIA

                        RICHMOND DIVISION


     * * * * * * * * * * * * * *
     IN RE ALTRIA GROUP, INC.    * LEAD CASE NO. 3:20-CV-00772
     DERIVATIVE LITIGATION       * FEBRUARY 16, 2023   11:03 A.M.
                                 * FINAL SETTLEMENT APPROVAL
                                 * HEARING
                                 * VOLUME I OF I
                                 *
                                 *
                                 * Before:
                                 * HONORABLE DAVID J. NOVAK
                                 * UNITED STATES DISTRICT JUDGE
     * * * * * * * * * * * * * * * EASTERN DISTRICT OF VIRGINIA

     APPEARANCES:

     For the Plaintiffs:      KIP B. SHUMAN, ESQUIRE
                              Shuman, Glenn & Stecker
                              100 Pine Street
                              Suite 1250
                              San Francisco, CA 94111

                              PAUL M. FALABELLA, ESQUIRE
                              Butler Curwood PLLC
                              140 Virginia Street
                              Suite 302
                              Richmond, VA 23219

     For the Defendants:      STEPHEN R. DIPRIMA, ESQUIRE
                              JACOB MILLER, ESQUIRE
                              Wachtell, Lipton, Rosen & Katz
                              51 West 52nd Street
                              New York, NY 10019


     Court Reporter:          Melissa H. Custis, RPR
                              701 East Broad Street
                              Richmond, VA 23219
                              (804)916-2278

                 Proceedings recorded by mechanical stenography.
     Transcript produced by computer.
```

```
 1   APPEARANCES (continued):

 2    For the Defendants:        JARED M. GERBER, ESQUIRE
                                 Cleary Gottlieb Steen & Hamilton LLP
 3                               One Liberty Plaza
                                 New York, NY 10006
 4
                                 EDWARD J. FUHR, ESQUIRE
 5                               JOHNATHON E. SCHRONCE, ESQUIRE
                                 Hunton Andrews Kurth LLP
 6                               951 East Byrd Street
                                 Riverfront Plaza - East Tower
 7                               Richmond, VA 23219

 8   For the Petitioners:        DAVID L. AXELROD, ESQUIRE
                                 Ballard Spahr LLP
 9                               1735 Market Street
                                 51st Floor
10                               Philadelphia, PA 19103-7599

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

In re Altria Group, Inc. - 02/16/2023

1           (Court convened at 11:03 a.m.)

2           THE CLERK:  Civil Action 3:20-CV-772, *In Re Altria*

3  *Group, Inc. Derivative Litigation*.

4           Representing the plaintiff is Kip B. Shuman and Paul

5  M. Falabella.

6           Representing the defendants are Stephen R. DiPrima,

7  Jacob Miller, Edward Fuhr, and Jared M. Gerber.

8           Counsel, are we ready to proceed?

9           MR. SHUMAN:  Yes.

10          MR. DiPRIMA:  We are.

11          MR. MILLER:  Yes, we are.

12          THE COURT:  Before we get started, I just want to

13  remind folks that elected to listen on our call-in number,

14  before we get started, they are to put their phone on mute.

15  They may not speak in any manner, and they may not record

16  these proceedings in any fashion.

17          All right.  We're here, hopefully, for the final

18  hearing of the final approval.

19          So it looks like, Mr. Shuman, the issues were

20  resolved and the edits were made that was -- at least complied

21  with what I directed; is that right?

22          MR. SHUMAN:  I can confirm that, Your Honor.

23          THE COURT:  Are you aware of any objectors that

24  remain?

25          MR. SHUMAN:  There are no other objectors that

 1   remain, Your Honor.

 2           THE COURT:  Mr. Axelrod, you're out there somewhere,

 3   right?

 4           MR. AXELROD:  I am here, Your Honor.

 5           THE COURT:  Do you want to come on up here to the

 6   lectern?

 7           MR. AXELROD:  Yes.

 8           THE COURT:  Well, I gave you a starring role the last

 9   time here, and you succeeded on an objection.  But you filed

10   your pleading indicating that's been resolved; is that

11   correct?

12           MR. AXELROD:  That is correct, Your Honor.

13           THE COURT:  So the objections are satisfied?

14           MR. AXELROD:  The objection is satisfied.

15           THE COURT:  Are you aware of any other objectors?

16           MR. AXELROD:  I am not.

17           THE COURT:  Is there any reason why I can't move

18   forward with approval?

19           MR. AXELROD:  Not from the standpoint of the

20   shareholder objectors.

21           THE COURT:  That's fine.  You can have a seat.

22           MR. AXELROD:  Thank you, Your Honor.

23           THE COURT:  I'm just going to ask:  Are there any

24   other objectors present?  Hearing none, we're going to move

25   forward.

1      Mr. DiPrima, did you want to say anything else about

2 the edits?

3      MR. DiPRIMA:  Nothing further, Your Honor.

4      THE COURT:  I intend to move forward, then, and

5 approve this, thankfully, for all of our well-beings, I think.

6      All right.  So I'm going to grant the final approval

7 of the settlement, finding it to be fair, reasonable, and

8 adequate, as amended, based upon what the parties recently

9 filed.  I think it was Exhibit A made the changes.

10      Number one factor:  Settlements of shareholder

11 derivative actions are favored in the Fourth Circuit.  The

12 Fourth Circuit has made it clear in the *Zimmerman* case that

13 settlements in such cases are particularly favored because

14 shareholder derivative actions are notoriously difficult to

15 litigate.  On this point, the Court acknowledges a few of the

16 key benefits of settlement in this case.

17      One, the dispute is resolved; two, both the parties

18 and the Court conserve resources that otherwise would be used

19 on further litigation; and perhaps, most importantly, three,

20 Altria management can get back to running their company,

21 including implementing the changes that the settlement

22 requires.

23      (2) Fairness.  This agreement was reached at arm's

24 length negotiation with a process by competent representation.

25 But I'm also going to add, of course, we're here for the third

1  time, so I have rejected the first and the second efforts to

2  have this resolved.  I added, myself, different parameters to

3  ensure that it was fair and adequate, including the

4  requirement of an independent monitor, who I appointed, who

5  has also filed a pleading saying he joins in recommending the

6  approval of this settlement.  So, clearly, there has been an

7  arm length's negotiation.

8          I find there's no evidence of collusion, specifically

9  because I implemented the independent monitor here.  And I

10  actually went the additional step that I normally do not do,

11  which is I selected the independent monitor myself to avoid

12  any concerns about collusion, because, frankly, in the

13  beginning, I had concerns about that.

14          The advanced posture of this case also suggests that

15  settlement was reached through a fair process, much of which

16  I've already discussed.  But it also included multiple

17  settlement conferences in front of Judge Colombell, as well as

18  other mediators, former judge Layn Phillips and Ms. Niki

19  Mendoza, who I'm told are nationally-recognized mediators with

20  specific experience in shareholder derivative actions.

21          There was extensive discovery conducted in this

22  settlement -- in this case as well.  Mr. Shuman and his

23  colleagues have described that process in their papers.

24  Again, the circumstances surrounding the settlement

25  negotiations and experience of counsel on both sides suggest

1   that the settlement process was procedurally fair.  Lawyers on

2   both sides also have ample experience in shareholder

3   derivative litigation as well.

4        I also find the fact that the -- we had experienced

5   counsel on behalf of the objectors weigh in, and they

6   objected.  We resolved it in a way that's satisfactory to the

7   objectors, and I think also supports the fairness of the

8   settlement agreement as amended.

9        (3)  As to adequacy, this was the issue that I was

10  concerned about the last time.  I wanted to make sure that it

11  was real money that was on the table, in addition to the

12  measurables that we spoke of before.  I find that the

13  substantive benefits that the settlement confers in the

14  company here are significant.  Their payment of $100 million

15  of what I'm going to refer to as new money and not funneled to

16  legacy programs I think benefits the corporation, particularly

17  their reputation.

18       Also, the independent monitor, along with the

19  measurables that he is going to enforce, I believe are going

20  to have significant benefits to the company, thereby providing

21  benefits to the shareholders.

22       Of course, there was significant risk at trial here

23  that that needs to be weighed against.  Again, Virginia law,

24  like many states, is quite deferential to the decisions that

25  corporate officers and directors.  And the parties have

1    accurately pointed out that Virginia, in fact, is one of the

2    most deferential to the decisions of corporate officers and

3    directors.  So when you look at the settlement return versus

4    the risk, I think it was significant.

5         That amount of money, $100 million, shows, I believe,

6    that Altria is putting their money where their mouth is,

7    restoring some of their credibility that they lost through the

8    bungling of the JUUL investment.  And, again, I believe quite

9    strongly in the value of the oversight that is presented by

10   the independent monitor, Mr. Dry, who the Court knows to be an

11   individual of high character, integrity, and ability.

12        It will provide him with the authority to meet the

13   measurables.  We're also saving $7 million in reserve on top

14   of what his budget of up to $2 million per year to undertake

15   his compliance efforts.  But there's also $7 million that will

16   be held in reserve, that will be deployed, but only if

17   necessary, if it finds that the company is not properly

18   implementing the terms of the settlement in meeting their

19   measurables.

20        In other words, I have built in this an incentive,

21   $7 million incentive for Altria to meet the demands of the

22   agreement, which I think are considerable.  And I'm hopeful

23   that they'll meet it, and I hope that they keep the

24   $7 million.  That's a pretty good incentive here.

25        And, lastly, as I required the last time in terms of

1  the wording, Mr. Dry has final veto power over the selection

2  of these independent, third-party programs who are going to

3  receive the funding.

4        I want to note here too that I expect Altria, in

5  consultation with Mr. Dry, to continue to develop more

6  measurables.  I find that the measurables now are sufficient

7  and off to a good start.  But I think it's in the company's

8  interest and, therefore, in the shareholders' interest that it

9  be an ongoing relationship, which is why I've given him broad

10  authority, and also with the ability, as I believe both sides

11  have agreed, that I will retain jurisdiction, if necessary,

12  also for either party to come back as well as the monitor.

13        I think, Mr. DiPrima, you wrote in that Altria can

14  come back as well, and I think that's good for all of you.

15  But I have no intention of being the monitor myself.  I don't

16  think you want me running Altria.  I know the company doesn't.

17  And I have other things to do around here.  But that's why I

18  picked Mr. Dry.  It's somebody who I have complete faith in.

19  I know he's going to handle this properly.  He has the

20  judgment, integrity, and the character in order to carry this

21  out in an appropriate way.

22        So with all that being said, I reiterate that I find

23  the settlement to be fair, reasonable, and adequate, and it,

24  therefore, warrants final approval, which I will do.  I will

25  dismiss the case with prejudice; however, I'm going to retain

1    jurisdiction over this case for purposes of enforcement for

2    the settlement, as the parties have agreed, consistent with

3    *Kokkonen versus Guardian Life*, the Supreme Court opinion on

4    this.

5              And, as noted, I empower not just Altria but also

6    counsel, but also the independent monitor to return to me if

7    there's any issues with implementation.  So I'm going to

8    approve that.

9              We're now going to turn to the request for attorneys'

10   fees and service awards for the named plaintiffs.

11             I have no problems -- I will tell you, Mr. Shuman, if

12   you want to come on up here, I'm going to handle this a little

13   bit differently than what you approached me on.  I'm going to

14   approve the service awards for the named plaintiffs in the

15   amount of -- you asked for 15,000 each, as I recall, so I'm

16   going to approve that.  I'm going to segregate the expenses

17   and approve that.  That amount was $220,614.44.

18             As I understand, then, your fee that you're asking

19   for off the lodestar, which goes unchallenged here, is

20   $11,664,544.50; is that right?

21             MR. SHUMAN:  That's right.

22             THE COURT:  And you're looking for a multiplier of

23   1.5.

24             MR. SHUMAN:  That's right, Your Honor.

25             THE COURT:  That would result in a total of

1   17.5 million.  And I believe that you're indicating this would

2   also encompass fees for cases that are pending in the Virginia

3   Circuit Courts in Albemarle and Henrico Counties, and there

4   would be no fee petitions submitted with those cases; is that

5   right?

6           MR. SHUMAN:  That's right, Your Honor.

7           THE COURT:  I'm certainly fine with that.

8           Now, you say any dispute over fees goes to Judge

9   Phillips.  I'm going to change that.  I'm going to preserve

10  the ability to address any fee issues.  So if there's a

11  problem, you're going to come back to me.

12          The issue that I have is this:  Look, I don't want to

13  beat a dead horse because I know I've given you a hard time,

14  and you're obviously a respected force in the plaintiffs'

15  community, so I don't mean to be disrespectful.  But,

16  obviously, I haven't been happy with this.  I'm happy with one

17  sense, in the amount of money, but that first one I thought to

18  be completely illusory.  Look, you're clearly a really good

19  lawyer.  If I can see that -- you're an expert in this area --

20  you should have seen that.  And then we had to come back

21  again.  And I'm not looking to give you a multiplier of 1.5.

22          I will tell you, I initially was just going to give

23  you the lodestar, but I think that there's some inherent risk

24  in taking on these cases.  I mean, look, if they didn't agree,

25  I was ready to set it for trial.  I said that in my order, I'm

1  ready to try this case, right?

2         But I wanted to give you a chance to be heard on

3  this.  I'm thinking of a number in between the lodestar and

4  1.5, but I want to give you, out of fairness, a chance to be

5  heard.

6         MR. SHUMAN:  Your Honor, I would ask for the 1.5

7  multiplier and the $17.5 million fee.

8         This case was about as hard a case as we have had.

9  Going against big tobacco is very difficult.  They have a

10  reputation of not settling, of litigating hard, and of having

11  very fine lawyers.

12         I just learned just this last week that in 2022 this

13  case was deemed the fifth largest securities settlement in the

14  country.  We did that with all the defenses that defendants

15  possessed.  We did that without surviving even at the pleading

16  standard.  And their defenses, which I can tick off but

17  they're in our papers, were substantial.  So for us to do

18  that --

19         THE COURT:  I accept all this.  I accept everything

20  you just said so far.

21         MR. SHUMAN:  So this case, in the fifth largest, is

22  the second largest derivative settlement of 2022.  It's a

23  superb recovery.  It's better now because of the Court's

24  intervention; we don't deny that.  But I want to address that.

25         In terms of us -- I just want to address it head-on,

 1   because I think that's what the Court appreciates.

 2           THE COURT:  Yeah.  I'm a pretty direct guy.  You've

 3   figured that out by now.

 4           MR. SHUMAN:  In terms of us not getting the

 5   independent monitor right away, that was never going to

 6   happen.  The independent monitor in this case, that the Court

 7   instructed, is akin to a consent decree, a governmental

 8   consent decree, that requires a company to do or not do

 9   certain things over a period of time, with independent

10   oversight over a five-year period.

11           At the stage of this litigation, and even if this

12   case had been litigated longer, plaintiffs are negotiating a

13   compromise.  That's what we do.  That's what litigators do.

14   We do the best job we could do.  There was no rollover.  If

15   there was a rollover, we would have been before you a year and

16   a half ago.  There wouldn't be $117 million.  It would be a

17   corporate governance only settlement, which is very common in

18   derivative cases.

19           But we pushed and we pushed.  And the fact of the

20   matter is, and this is the reality, when a court tells the

21   parties that something needs to be done, that introduces a

22   completely new dynamic.  That's the reality.  We don't have

23   that ability to bring that kind of pressure.  I wish we did,

24   but we don't.  That's how it happened here.

25           So with due respect, to the extent the Court wasn't

1  happy with all aspects of the settlement, we understand that.

2  The settlement is better today.  As a representative for the

3  plaintiffs, who is representing Altria and its shareholders,

4  we're happy about that.

5          But no criticism, in my mind, could be leveled

6  against us or our fee reduced because we could not get an

7  independent monitor.  It was not on the plate.

8          And I want to add just one more thing to that.  I've

9  been doing derivative litigation solely since 2006, since the

10  backdating stock options scandals.  I have never seen an

11  independent monitor in any private litigation.  It's never

12  happened.  We looked at defendants' papers; they said the same

13  thing.  It's a unicorn.

14          Now, my view is it could serve as a model for future

15  derivative settlements.  It would be an excellent model.  It's

16  another tool that we would have that we could potentially

17  push.  But in the first instance, it wasn't available to us

18  without this Court's intervention.

19          Even with that, after the independent monitor was --

20  you know, the guidance from the Court that we would need one,

21  we pushed and we pushed to have the independent monitor with

22  the strongest possible role that Mr. Dry could have.  We

23  wanted to empower him.  We got him veto power.  Although it's

24  written in the agreement now, it was in the agreement already.

25          THE COURT:  The language is made clear.

1          MR. SHUMAN:  The language is now explicit, correct.

2          And even then, we pushed defendants and we pushed

3    them, and we pushed them until we couldn't push them any

4    further.  And then at that point, we went to Magistrate

5    Colombell, twice.  We briefed issues.  We visited him.  We had

6    a Zoom.  So even then we were pushing to get the best and

7    strongest role for the independent monitor at the same time

8    when the objectors came.  We solved that problem.  That was a

9    multifaceted problem because of the group's involved:

10   plaintiffs, defendants, Mr. Dry, the objectors, the Court.

11         At every point in time, we have navigated every issue

12   here.  At the same time, Your Honor, we prepared for trial.

13   This Court held true to itself.  It said, "Settle or you're

14   going to get a rocket docket date," and we knew that.  We got

15   a dump of 37 million pages of documents.  I'm not going to go

16   through, it's in our papers, what we did to go through those

17   documents, organize them by team, subject matter, weekly phone

18   calls.  We were two-tracking this case for a couple years.  We

19   were preparing for trial and formal discovery and at the same

20   time using that knowledge obtained in those documents for

21   mediation.  We had our feet to the fire here for two years.

22         We're proud of the settlement.  We ended up with the

23   second largest derivative settlement in 2022.  Fees are often

24   in the 20 to 30 percent.  When you look at this case, we're

25   asking for 15 percent.  We're not seeking a windfall.  There's

1  risk to these cases.  We're all relatively smaller firms.  We

2  take them on a contingency basis.  We don't get paid any

3  money.

4          THE COURT:  Well, that's the reason why there should

5  be a multiplier.  I originally, frankly, thought about just

6  giving you your lodestar amount, but I do believe there should

7  be a multiplier.

8          MR. SHUMAN:  The multiplier is modest; that's the

9  fact of the matter.  I wish it was higher.

10         THE COURT:  Well, it might go lower here.

11         MR. SHUMAN:  I understand that.  I understand by

12  speaking I run some risk.

13         THE COURT:  No, you don't.  Look, your points are

14  well taken, but here's what I would say in response, right?  I

15  do think at the end of the day this is a good outcome.  It is

16  true that when I, you know, direct a party to look at

17  somebody, there's a little bit more heft than when it's on

18  from the other side.  I understand that.

19         But you really do have leverage too, and that's this:

20  Your leverage is trial, right?  And, to me, you either believe

21  in your case or you don't.  If you don't believe in your case,

22  you ought not to be filing the complaint, right?  You're

23  obviously an expert in this area and you're a seasoned trial

24  lawyer, right?  So before you file that complaint, you had to

25  say to yourselves, along with your colleagues, that if they

1   don't settle, we're going to try this case, right?  And that's

2   how successful plaintiffs lawyers operate.

3         That's certainly true with Mr. Falabella's firm,

4   who's in this courthouse all the time.  They know -- and

5   that's how you get leverage over people, right?  You say,

6   "Listen, you don't want to meet us in the middle, we're going

7   to try the case," right?  So you do have leverage is what I'm

8   telling you.

9         I greatly appreciate the risk.  In fact, I just went

10  over the issues, the deference, particularly under Virginia

11  law, to corporate officers, and I'm in complete agreement on

12  the risk.

13        What I'm concerned about is what I've said before --

14  and, again, I want to stress, I mean no disrespect to you

15  personally.  That's not what this is about.  In fact, it's the

16  opposite.  I have complete respect for you and your

17  colleagues.  When I saw that first settlement, I immediately

18  knew that it was illusory.  Now, if I'm smart enough to figure

19  that out, you're double smarter than me, you're able to figure

20  that out too.

21        And your local counsel's job -- and, Mr. Falabella,

22  I'm going to criticize you here a little bit on this.  You

23  know our courthouse.  You know not just me but every judge in

24  this building.  We don't just rubber stamp stuff.  We do our

25  job.  And you should have been telling your folks that this is

1  going to get real scrutiny.  And no judge in this building is

2  sign it to get rid of it because we have too much work to do.

3  We do have too much work to do, but we all do our duty.  And

4  any scrutiny -- so this is never going to happen again is what

5  I want to tell you, because the next time it will be a zero

6  fee.  Am I clear about that?

7          MR. FALABELLA:  Yes, Your Honor.

8          THE COURT:  So what I'm saying is, any scrutiny on

9  that original proposal that you had to me, while the number is

10 sexy in the beginning, the 117 million, in many ways, to me,

11 it was zero.  It was illusory because there was no mechanism

12 to ensure that the contents of that agreement were carried

13 out.

14          And so I came up with the independent monitor just

15 because I was concerned about what was going on.  And I

16 understand that I have -- I have some different oomph to the

17 equation.  I get that, right?  But I think you should have

18 known that, to be honest with you, number one.

19          And then number two, when we came back the second

20 time and this legacy program thing, it was readily apparent to

21 me what they were trying to do.  Again, if it's apparent to

22 me, it should have been apparent to you.

23          So that is what my concerns are.  And I'm saying that

24 to you because I'm thinking not just about this case, but I'm

25 thinking about the next case.  I'm thinking the next time

In re Altria Group, Inc. - 02/16/2023

1  Mr. Falabella and his firm comes in front of me and when

2  people seek multipliers, I give great scrutiny to this.

3          I do think you should get a multiplier.  I'm not sure

4  it's the number that you want.  But that's what my concerns

5  are.  I'll give you one last chance to be heard on that.

6          MR. SHUMAN:  Well, Your Honor, we were preparing for

7  trial, but, you know, I would say that this case, like all

8  cases, are not black-and-white, right?  So there's either, you

9  know, you settle, or you go to trial.

10         We looked at their defenses, whether it be appointing

11 a special litigation committee, the business judgment rule,

12 the exculpatory clause.  And here's a big one:  We didn't have

13 a smoking gun.  We didn't have a whistleblower in our case.

14 And as trial lawyers, that makes it very difficult.  We're

15 proving our case through their documents and our experts.

16 Whereas, in contrast, you know, they have a line of witnesses,

17 friendly witnesses that were going to be very difficult.

18         So I agree with what the Court says, that you have to

19 be ready for trial.  We were in the process of that.  That's

20 where our lodestar lies, was doing that.

21         THE COURT:  I have no challenge to your -- I'm

22 accepting your lodestar.  That's not the issue.

23         MR. SHUMAN:  Yeah, but we have to be realistic, and

24 we were realistic.  And in some ways, we exceeded our

25 expectations by getting a hundred-plus million dollar

1  settlement.

2      THE COURT:  I'll add one factor that weighs, I think,

3  in your favor, is that the fee award does not come from your

4  clients.  It doesn't come from the plaintiffs.  It comes from

5  the corporation itself.  So it doesn't -- it's not like every

6  dollar I give to you detracts from a plaintiff who was

7  injured, right?

8      MR. SHUMAN:  Right.

9      THE COURT:  I think that's a factor.

10      MR. SHUMAN:  That was actually in my notes.

11      I would also say that the -- one way to look at the

12  15 percent request and the multiplier 1.5 -- I'm still going

13  to try to do what I can on that today, if you don't mind.

14      THE COURT:  You should.  I'm giving you your chance

15  to be heard.

16      MR. SHUMAN:  -- is that one way to look at it, the

17  15 percent is just based on the $117 million.  It's 15 percent

18  of 117, which is under --

19      THE COURT:  Well, I think the real number is 100

20  million, because that's what they're paying.  And I allocated

21  10 million -- up to 10 million for Mr. Dry.  The 7 million --

22  I'm hopeful that they behave.  So I think the better number to

23  work off in terms of percentages is 100 million.

24      MR. SHUMAN:  Fine.  So if you call it 100 million,

25  which is still a rare settlement, derivative settlement over

1   100 million, you're talking now 17.5.

2           THE COURT:  And you lump, though -- I will say this:

3   You lumped your expenses into your number, right?

4           MR. SHUMAN:  Well, we do that out of just, you

5   know --

6           THE COURT:  I know that.

7           MR. SHUMAN:  Yeah.  Right.

8           THE COURT:  What I'm saying to you is:  I

9   intentionally said before I get to the --

10          MR. SHUMAN:  Yeah.

11          THE COURT:  This is beneficial to you.  I'm

12  intentionally saying the named plaintiffs get their award,

13  expenses come first, and then the fees.  So, to me, it's three

14  separate categories, which I think is beneficial to you at the

15  end of the day.

16          MR. SHUMAN:  Yeah.

17          THE COURT:  Does that make sense to you?

18          MR. SHUMAN:  Yes, it does.

19          So just to continue my thought.  Call the settlement

20  100, then, not 117; that's fine.  I understand the reasoning

21  there.  So maybe the multiplier is not 1.5, maybe it's 1.6.  I

22  don't know, right?  But the fact of the matter is that values

23  the settlement at only the $100 million.

24          But there is more here.  Now, the Court maybe

25  overwhelmed, underwhelmed, or in the middle about the other

1  aspects of the settlement.

2      Now, there's the internal strength controls at the

3  steering committee.  Those clearly have been strengthened.

4  There's board reporting for the first time to those -- from

5  that steering committee about underage issues, particularly

6  transactions of future proposed merges and acquisitions.  Most

7  importantly, when there's a proposed merger and acquisition of

8  a nicotine/tobacco-related company, there are new due

9  diligence requirements here.

10      Again, are they the greatest that have ever been, you

11  know, created?  This is a negotiation.  They weren't there

12  before; they are there today.

13      THE COURT:  What made them meaningful was the

14  measurables and the monitor.

15      MR. SHUMAN:  No doubt.

16      THE COURT:  I agree with everything you're saying.

17  The problem is, is the initial agreement you negotiated, there

18  was no substance to it without the measurables and the

19  monitor.

20      MR. SHUMAN:  This is substance that was behind that,

21  and this is our thinking:  Once Altria, the defendants,

22  entered a settlement agreement like this, they have a

23  fiduciary duty to follow the settlement agreement, to do the

24  things that are required.  Now, I can't tell you in two years

25  whether they would have done it or not.  I don't know.  Give

1  rise to another lawsuit?  I don't know.

2          But the underlying police -- policing of this

3  agreement is the board's fiduciary duties and Altria's duties

4  to its shareholders that are encompassed in their agreement.

5  That's the policing agent that we had.  So it wasn't as if

6  it -- I mean, I can't tell you whether they would have

7  co-opted the process.  I can't tell the future.  But I can

8  tell you that there was a policing agent here, and that's what

9  it was.

10         So I just -- back to my point.  I only want to just

11  emphasize that given the $100 million dollars settlement, that

12  gives no value to the -- if we're asking for a percentage of

13  that, this percentage of $17.5 million, which I guess is

14  17.5 percent instead of 15 percent --

15         THE COURT:  So if you're at 15 percent, it would be

16  15 million.

17         MR. SHUMAN:  Yeah, but I still want --

18         THE COURT:  You still want 17.5.

19         MR. SHUMAN:  -- 17.5.

20         THE COURT:  I would do the same thing that you're

21  doing.  I don't blame you.

22         MR. SHUMAN:  I still want 17.5.

23         THE COURT:  You have to make your pitch.

24         MR. SHUMAN:  I've gotten some gray hairs from this

25  case, so why not, right?

1       THE COURT:  So have I, I can assure you, and I'm not

2   asking for 17 million.

3       MR. SHUMAN:  Right.  So my point just is that even

4   looking at the 100 million, right, that gives us no value or

5   credit for any of the reforms I've just talked about.  And

6   those reforms may not be the cat's meow, but they're real

7   reforms.  They took months to negotiate, and they're good

8   reforms that will be implemented, whether they're new mergers

9   and acquisitions or whether they're strengthening the usage

10  steering committee, more board reporting.  I believe, Your

11  Honor, that as a result of this settlement and this governance

12  package that the likelihood of a second Juul-type debacle has

13  been materially reduced.  So if you give zero value --

14      THE COURT:  I agree with that, by the way.

15      MR. SHUMAN:  Thank you.

16      THE COURT:  And I think particularly because of the

17  independent monitor.

18      MR. SHUMAN:  Thank you.

19      And if you give zero value to that, zero, our

20  request, just based on the 115 or the $100 million, is still

21  reasonable and still below both as a percentage and below as a

22  multiplier than that often given, much less in the second

23  largest case in 2022.

24      So I would ask this Court, given the work performed,

25  given the lodestar, given the two-tracking of the case that we

In re Altria Group, Inc. - 02/16/2023

1  did, solving and helping solve all the problems that have

2  occurred, that the modest multiplier, the modest percentage

3  should be awarded.

4          Now, I understand the Court is going to reserve the

5  distribution, potential allocation between the state and

6  federal plaintiffs, if I understood that right.

7          THE COURT:  No.  No.  No.

8          MR. SHUMAN:  Okay.

9          THE COURT:  What I'm saying is this:  You have agreed

10  that whatever fee I approve it encompasses the state.

11          MR. SHUMAN:  That's right.  So there's another -- the

12  federal fee is going to get reduced more.

13          THE COURT:  Okay.  I think what I'm saying to you,

14  what I was saying to you, what I'm reserving is if there's a

15  dispute, it's going to come to me, not to Judge Phillips.

16          MR. SHUMAN:  Got it.

17          THE COURT:  Because, look, I'm not also happy with

18  what that they did too, because I think -- look, I mean no

19  disrespect to Judge Phillips.  I've never met him before,

20  right?  I've had a lot of his cases where he's been the

21  mediator in, it's not just this case, and I've heard that he's

22  one of the best in the country.  So, again, I haven't met the

23  guy.  But I'm kind of a hands-on guy -- you've probably

24  figured that out by now --

25          MR. SHUMAN:  Yes.

1          THE COURT:  -- and I want to achieve what I want to

2   achieve here, and so if there's a problem on the fees, you

3   come back to me.

4          But what you proposed, putting aside the multiplier,

5   the aggregate encompasses the state.  So I'm not going to give

6   you the 1.5.  I think I'm going to give you a little bit more

7   than what I intended when I came out here.  But whatever that

8   number is, you divide that up with your colleagues as you

9   originally were going to do, right?  And if there's a dispute,

10  you return to me instead of Judge Phillips.

11         MR. SHUMAN:  You got it, Your Honor.

12         THE COURT:  Does that make sense?

13         MR. SHUMAN:  Yep.  It's the procedure that is going

14  to be different.

15         THE COURT:  So I'm just going to modify it.

16         MR. SHUMAN:  Right.

17         THE COURT:  A dispute on fees comes to me.  That's

18  it.

19         MR. SHUMAN:  Well, I've made my arguments about the

20  17.5.  You know, if we were seeking a windfall or a high

21  multiplier, if we hadn't navigated, you know, through not only

22  Altria's defenses but the minefields over the last -- since

23  August -- you know, we've done a great job.  I'm proud of the

24  job we did.  Altria's in a better place because of it, and its

25  shareholders are in a better place for it.

1        THE COURT:  Well, it's clear -- look, these cases are

2   hard.  I've already said that.  You've got great lawyers on

3   the other side, an endless pool of money to defend over there.

4   You were transferred away from San Francisco here to our

5   beloved city of Richmond.  I probably didn't make you feel too

6   good.  So I know you've had an uphill climb, but I still hope

7   that you walk out of here feeling that you did a good job.

8        MR. SHUMAN:  Thank you.

9        THE COURT:  Is there anything else you want to say?

10       MR. SHUMAN:  No, Your Honor.

11       THE COURT:  Mr. DiPrima, did you have a need to say

12   anything?

13       MR. DiPRIMA:  No, Your Honor, we don't.

14       THE COURT:  Mr. Axelrod, do the objectors have any

15   comment on fees?

16       MR. AXELROD:  No, Your Honor.

17       THE COURT:  Does anybody present object on the fee

18   request?  None being heard.

19       All right.  In cases where the relief obtained does

20   not include the creation of a common fund, district courts in

21   this circuit largely turn to the lodestar method in relying on

22   the *Johnson* factors.

23       One:  The time and labor expended.  Here there's no

24   question there was a substantial amount of time and labor.  I

25   should make it clear, I'm not challenging the lodestar

1  calculation.  That amount seems completely reasonable to me

2  with the complexity of this case.

3          Two:  The novelty and the difficulty of the questions

4  raised.  Again, I just said this is a complex case.

5          Three:  The skill required to properly perform the

6  legal services rendered.  I've already spoken about the fact

7  that plaintiffs' counsel here is quite experienced and experts

8  in this area.

9          Four:  The attorneys' opportunity costs in presenting

10 the instant litigation.  I am approving over $200,000 in

11 expenses, which also goes to the risk that is involved to

12 plaintiffs' counsel here.  They put over $11 million of work

13 into it, plus they had over $200,000 in expenses, so there was

14 significant risk involved.

15         Five:  The customary fee for like work.  The 1.5

16 multiplier is within the realm of numbers.  In fact, I think

17 it was cited back to me that one of my cases I approved

18 something higher.  It always makes me nervous when lawyers

19 cite work I've done in other cases.  So the 1.5 is not out of

20 the range.  It's certainly within the range.

21         Six:  The attorneys' expectations at the outset of

22 the litigation.  Mr. Shuman has talked about that a little

23 bit.

24         Seven:  The time limitations imposed by the client or

25 circumstances.  I don't really think that's a factor.

1          Eight is the one that I'm hung up on, the amount in

2    controversy and the results obtained.  I don't want to beat a

3    dead horse because the original amount of money here is

4    significant, and the final result I think is extremely

5    favorable.  I can't say that strongly enough.  But it required

6    me to do a lot of work here, and that should not have

7    happened.  I think the first settlement that was submitted

8    here was completely illusory, and that should have been known,

9    and plaintiffs' counsel should have taken other measures on

10   that.  And then I had to adjust it the last time at the

11   hearing, so I'm factoring that in.

12          Nine:  The experience, reputation, and ability of the

13   attorneys.  It's really on both sides, because you also have

14   to measure the amount of defense that was here, and certainly

15   Mr. DiPrima and his crew are very able lawyers with deep

16   pockets, so they could have litigated this to the hilt.

17          Ten:  The undesirability of the case within the legal

18   community in which the case arose.  I would say the risk is

19   what speaks to the undesirability.  We've talked about that.

20          Eleven:  The nature and the length of the

21   professional relationship between attorney and the client.

22   That's not really much of a factor here.

23          And twelve:  The attorneys' fee awards in similar

24   cases.

25          We've already talked about the result obtained.  I

1  think, at the end of the day, the final settlement here is

2  quite significant.  And I hope this is used as a monitor going

3  forward.  You can call that Novak model, if you want, when you

4  advance that going forward.  And I'm sure Mr. Dry wants to be

5  part of the Novak model in other cases.  I think he'll be

6  readily available.

7           I look at awards in similar cases here.  Derivative

8  actions are quite difficult and there are other cases where

9  the multiplier has actually been quite high.

10          Three:  The objections.  There was some; we resolved

11 it.  I had my own objections and we had to deal with it.  But,

12 really, if you look at the complexity of the case, the risk

13 involved, the time and expense dedicated to this case and

14 public policy concerns, certainly a multiplier is appropriate.

15 I'm not going to agree with the 1.5 multiplier.  But what I

16 think I've decided to do -- again, let's step back.

17          I'm awarding $15,000 for each named plaintiff; that's

18 separate.

19          I'm awarding the expenses of $220,614.44; that's

20 separate.

21          I think what I've decided to do is use Mr. Shuman's

22 words against him earlier when he talked about 15 percent.

23 I'm going to use the 100,000 as the marker for that.  I'm

24 going to award $15 million in attorneys' fee, which, by my

25 calculation, is close to about 1.3 as the multiplier.  And the

In re Altria Group, Inc. - 02/16/2023

1   reason is the problems that we've had before.  I think that's

2   a fair and reasonable number.

3          I know you're in disagreement with that, Mr. Shuman,

4   but $15 million is a pretty big number here at the end of the

5   day.

6          Is there anything else that needs to be done?

7          MR. SHUMAN:  Thank you, Your Honor.

8          THE COURT:  We're going to enter to that effect here

9   going forward.

10          MR. SHUMAN:  Appreciate that.

11          THE COURT:  Mr. DiPrima, anything else from you?

12          MR. DiPRIMA:  Nothing further, Your Honor.

13          THE COURT:  So I'm not going to have to deal with

14   this case again, I hope, right?

15          Look, if Altria is smart, they'll use the independent

16   monitor in the way that it should be used, which in many ways

17   is almost like an insurance policy going forward, because he's

18   so able.  I have found on the record his character, integrity,

19   and qualifications, so use the tool.  Don't fight the tool is

20   really what I'm saying, and then we'll kind of go from there.

21          Mr. Axelrod, thanks for coming down here.

22          Mr. Dry, thank you for agreeing to serve as the

23   compliance monitor in this case.

24          MR. DRY:  Thank you.

25          THE COURT:  All right.  We're all done.

In re Altria Group, Inc. - 02/16/2023

1    (Court recessed at 11:45 a.m.)

2                    CERTIFICATE

3  I, Melissa H. Custis, certify that the foregoing is

4  a correct transcript from the record of proceedings

5  in the above-entitled matter.

6

7  /s/  Melissa H. Custis, RPR          Date:  02/23/2023

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25